ORIGINAL

FILED
OCT 15 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY, LLC, a Delaware limited liability company,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

CASE NO. 04-1569C

**COMPLAINT**

Plaintiff, MNS Wind Company LLC ("MNS"), through its undersigned counsel, files this Complaint against defendant The United States of America and states as follows:

**INTRODUCTION**

1. The Nevada Test Site ("NTS") encompasses 1,375 square miles of partially undeveloped land approximately 60 miles northwest of Las Vegas, Nevada. Historically, the primary mission of the NTS was to conduct nuclear weapons tests. Since the moratorium on testing began in 1992, this mission changed to maintaining a readiness to conduct tests if so directed by the President and to continue to host a number of national defense-related programs. In 1996, the United States Department of Energy (the "DOE") issued a decision regarding the future use of the NTS. Under the DOE's decision, the NTS was to maintain its readiness to resume underground nuclear testing; continue the defense-related and other programs of the NTS; and pursue further diversification of private industry uses of the NTS.

2. Due to electrical power shortages in the Western United States, the federal government focused its attention on the need for developing additional generation facilities in the West. Additionally, the State of Nevada passed legislation that required Nevada electric utilities to

obtain 5 percent of their power from renewable resources by 2003, increasing to 15 percent by 2013.

3. In or about March 2000, the Nevada Test Site Development Corporation ("NTSDC"), on behalf of the DOE, National Nuclear Security Administration Nevada Operations Office ("NNSA/NV") approached M&N Wind Power ("M&N") with a proposal to develop a commercially viable alternative energy production facility on the NTS using wind turbines.

4. The NTSDC, a Nevada not-for-profit corporation, is the designated community-reuse organization established and funded by the DOE for the NTS, whose purpose was to develop additional compatible uses for NTS land.

5. The proposed wind farm project would not only further the DOE's stated objectives of diversifying the use of the NTS, including initiating private sector economic development at the NTS, it would also support the growing need and Nevada mandate for alternative sources of renewable energy. The proposed wind farm project would also further the DOE's and the NTSDC's stated objectives of reinvigorating regional employment by the construction and continuing operation and maintenance of as many as 545 wind turbine electricity generators on the NTS to help restore some of the 9000 jobs lost in the area after the moratorium on nuclear testing.

6. After several months of intense negotiations, and with the assistance of local and federal agencies and local and national political leaders, the DOE, the NTSDC and MNS (the energy development company formed by M&N responsible for developing the project) executed agreements that were intended to result in the development of one of the largest wind-energy farms in America at the NTS. After signing the agreements, the DOE touted the proposed NTS

project as a model partnership between the private sector and the federal government in the quest to build additional generating facilities at other federal facilities across the nation.

7. MNS spent two years and millions of dollars in performing under the agreements by developing the site only to have the DOE repudiate or breach all of its agreements. As noted below, the repudiations and breaches are so fundamental to the agreements, it appears as if the DOE never intended to perform the terms of the agreements.

8. On information and belief, the DOE was aware of the national security concerns of other branches of the federal government, but failed to disclose the magnitude of those concerns to MNS. If the DOE had disclosed to MNS the magnitude of those national security concerns, MNS would not have entered into the agreements.

9. As described in further detail below, the DOE, among other things, materially breached the agreements by: 1) wrongfully interfering with the environmental condition to the agreements by terminating the environmental review process; 2) failing to perform under the agreements; and 3) repudiating the agreements by claiming that they never came into effect.

## PARTIES

10. MNS, a Delaware limited liability company, is an energy development company that was formed by its investors to develop major wind energy projects and to promote the sale of their goods and services.

11. The DOE, acting by and through the NNSA/NV, is the federal agency responsible for administering the NTS.

## JURISDICTION

12. This complaint is founded upon written contracts with the DOE. This Court has jurisdiction over this action under 28 U.S.C. section 1491(a).

## FACTUAL BACKGROUND

### I. MNS and the DOE Negotiate an Agreement to Develop the NTS.

13. In or about March 2000, the NTSDC, on behalf of the DOE approached MNS with a proposal to develop a wind farm at the NTS. After the DOE provided MNS wind data from the NTS, MNS concluded that the data supported the potential development of a wind farm at the NTS and decided to move forward with the NTS project.

14. The DOE agreed to grant an easement to the NTSDC, for the express benefit of MNS, and to grant to MNS the right to construct a wind farm on the NTS with up to 545 wind turbines. MNS became the express third party beneficiary under the easement, with the right to enjoy and enforce all of the terms of the agreement directly against the DOE.

15. To implement the easement, the NTSDC entered into a subeasement with MNS. The subeasement expressly incorporated the terms of the easement and the terms of a compensation agreement that provided for compensation among the parties. The DOE executed a written consent expressly approving the terms of the subeasement and the compensation agreement.

16. During the negotiations, the DOE stated that it wanted the right to terminate the agreements at any time for national security reasons. In addition, the DOE expressed concerns about the availability for development of portions of the NTS for national security reasons. MNS refused to agree to invest time and resources in a project only to have the project terminated for national security reasons without compensation.

17. The parties ultimately negotiated three major issues that required allocating risks or solving potential disputes: (1) responsibility for the environmental review process; (2) the government's ability to terminate the project for national security concerns; and (3) an expedited alternative dispute resolution process.

18. MNS agreed to incur the risk of compliance with any environmental conditions and it retained the absolute right to discontinue the project if, in its sole and absolute discretion, it concluded that the cost of environmental compliance was unacceptable.

19. On the other hand, the parties agreed to share the risk of national security concerns. MNS agreed to commit time and resources to develop the project, and the DOE retained the contractual right to revoke the easement for national security reasons, but to implement a revocation through eminent domain, which required the DOE to pay MNS the fair market value of the project at the time of the revocation.

20. Lastly, the parties also agreed to submit any disputes arising from or related to these agreements to binding arbitration and the Government warranted to NTSDC and MNS "that it has the power and authority to enter into this Easement." Easement, Part II - page 11, ¶ X(2). With these understandings, the parties entered into the final agreements discussed below.

## II. MNS, the DOE and the NTSDC enter three interdependent agreements whereby the parties allocated the risks associated in developing the NTS project, and agreed to an expedited alternative dispute resolution process.

21. In order to implement the agreements reached, the parties entered into a series of interdependent agreements that were negotiated and expressly approved by the DOE.

22. On or about December 22, 2000, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the NTSDC for the express

benefit of MNS. A true and correct copy of the Easement is attached and incorporated herein as Exhibit A.

23. The Easement expressly provides for the construction, installation, maintenance, repair, replacement, use and operation of wind powered electricity-generating facilities on the NTS. The term of the Easement was for thirty-five (35) years from the date of execution of the Easement.

24. On or about January 17, 2001, the NTSDC and MNS entered into the subeasement referred to in the Easement, whereby the NTSDC granted to MNS a subeasement to use and occupy the NTS upon the terms and subject to the conditions set forth in the Easement (hereinafter "Subeasement"). A true and correct copy of the Subeasement is attached and incorporated herein as Exhibit B.

25. On or about January 17, 2001, MNS and the NTSDC also entered into a compensation agreement, whereby MNS agreed to pay the NTSDC a specific amount per year as compensation for the rights, services and benefits granted to MNS under the Subeasement (hereinafter "Compensation Agreement"). A true and correct copy of the Compensation Agreement is attached and incorporated herein as Exhibit C.

26. On or about January 17, 2001, the DOE executed a written consent expressly approving the Subeasement between the NTSDC and MNS (hereinafter "DOE Written Consent"). A true and correct copy of the DOE Written Consent is attached and incorporated herein as Exhibit D.

27. In this series of agreements, the parties agreed to the following basic framework: (1) MNS is made an express third-party beneficiary under the Easement; (2) the DOE expressly and specifically approved and consented to NTSDC entering into the Subeasement with MNS; (3) the DOE expressly approved the terms and conditions of the Subeasment between NTSDC and MNS, including the incorporation into the Subeasement of the terms and conditions of both the

Easement and the Compensation Agreement; and (4) the DOE and the NTSDC agreed that MNS had the right to enforce directly against the DOE all rights and remedies of the NTSDC under the Easement, and the NTSDC agreed to enforce the Easement for the benefit of MNS.

28. The parties also specifically addressed the environmental and national security issues. Because the development of this project could have environmental impacts, the grant of the Easement was subject to compliance with the requirements of the National Environmental Policy Act ("NEPA"). Easement, Part I – page 1, ¶1.

29. Under the Easement, the DOE covenanted to, among other things: not unreasonably interfere with the construction, maintenance or operation of MNS's project; not act in a manner that is arbitrary or capricious; and act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. Thus, the DOE specifically agreed not to unreasonably interfere with or unilaterally terminate the NEPA process.

30. Concomitantly, MNS was given the sole and absolute right to determine what costs, if any, it was prepared to spend in order to satisfy the NEPA process. Subeasement at 10, ¶18.7(iii).

31. The parties agreed that the DOE was permitted to revoke the Easement in the interest of national security, provided that the revocation of the Easement must be accomplished by eminent domain. Easement, Part II – page 3, ¶E(1). Thus, both the DOE and MNS were protected if some unforeseen national security issue arose – the DOE could unilaterally revoke the Easement, and MNS would be paid just compensation.

## III. Nature of Dispute with the DOE.

### A. In the two years following the execution of the Easement, MNS spent valuable resources developing the site.

32. Under the Easement, the DOE provided MNS with land sufficient to develop 545 wind turbine sites on the NTS. Because the DOE authorized wind turbines with capacity between 900 KW and 2000 KW, a total maximum MNS facility ranging between 490.5 MWs and 1090 MWs was possible.

33. Initially, the DOE granted MNS 175 sites on the NTS in the Easement. MNS was also given the exclusive right for two years to identify an additional 370 developable sites within the NTS. MNS planned to construct commercially operating wind farm facilities with a total capital cost in excess of $600 million.

34. During the two years after the parties executed the Easement, the Subeasement and the Compensation Agreement, MNS and its affiliates created an organization for this specific project requiring concentration of its efforts to the exclusion of developing other projects, and spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies; complying with the NEPA process; obtaining various permits from Nevada; and executing a power purchase agreement with Nevada Power for the first 85 MWs of power production.

35. The 175 sites were in the final stages of development and ready for construction to begin when the DOE terminated the Easement allegedly for national security reasons. In addition, another 73.5 MWs on adjacent sites were near final development, and would have been ready to begin construction within a short period of time but for the DOE's unilateral termination of the

Easement. Indeed, the successful development work done on these sites improved the value of the entire 545 sites on which MNS intended to install wind turbines and related infrastructure.

36. During the summer of 2001, MNS, in accordance with its rights under the Easement and pursuant to the ongoing studies of the entire site, requested permission from the DOE to develop additional and alternative sites within the NTS that were not part of the 175 sites identified in the original Easement. In breach of the Easement, the DOE inappropriately and summarily turned down these requests.

**B. The DOE breaches the Easement by Unilaterally Terminating the NEPA process.**

37. The grant of the Easement was subject to compliance with an environmental review process. When a federal agency, such as the DOE, is required to comply with an environmental review process, it is permitted by statute and regulations to pass off any associated mitigation costs to the project developers. MNS, therefore, bore the financial risks associated with compliance with the NEPA process. However, under the Subeasement, MNS retained the sole and absolute right to approve any costs required to comply with the environmental assessment and the property condition report.

38. With this understanding, MNS proceeded with the NEPA process covering use of all potential sites under the Easement. The environmental consultants responsible for the NEPA process had prepared and issued an advanced Draft Environmental Impact Statement ("EIS") that failed to identify any significant impacts that would provide a barrier to the implementation of the project. The EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. An

initial estimate of the cost of mitigation if the project had gone to construction was less than $2 million.

39. Nevertheless, on July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible "major impacts to National Security," the DOE had decided to terminate "the NEPA process" and that the Easement would not go into effect "according to the terms of the agreement." (DOE's July 12, 2002 Revocation Letter attached hereto as Exhibit E).

40. The DOE claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward."

41. Instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS eminent domain just compensation, the DOE attempted to avoid that promise by interfering with the environmental condition. The DOE's action materially breached and repudiated the agreements.

42. As discussed above, the Easement specifically provides that the Easement may be revoked for national security reasons. The parties negotiated and contracted for this specific possibility. The parties agreed, that in the event of a national security necessity, the DOE could exercise its rights under the terms of the agreement to revoke the Easement, in which event the revocation would be accomplished by eminent domain. Under these circumstances, unilaterally terminating the NEPA process on grounds of national security was in bad faith.

43. Not only did the DOE repudiate the revocation procedures provided in the Easement, the DOE also refused to comply with its contractual obligation to submit any and all disputes to arbitration, even going so far as to allege, under oath, that representatives of the DOE never saw, reviewed or negotiated the agreement containing the arbitration procedures.

## COUNT I

### (Breach of Contract)

44. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 43 of the Complaint.

45. MNS has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the agreements.

46. In contrast, the DOE has failed to perform all conditions, covenants, and promises required on its part to be performed under the agreements.

47. MNS has made several demands that the DOE perform its obligations under the agreements.

48. The DOE has materially breached and/or repudiated the agreements by failing to perform the conditions and promises of the agreements on its part. The DOE has materially breached and/or repudiated the agreements by, among other things: failing to act in good faith in taking any action, exercising any discretion or making any determination under the agreements; unreasonably interfering with the construction, maintenance or operation of MNS's project; refusing to revoke the contract for national security reasons, and pay MNS eminent domain just compensation, but rather attempting to avoid that promise by wrongfully interfering with the environmental condition to the agreements by terminating the environmental review; and repudiating the agreements by claiming that they never came into effect.

49. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

## COUNT II

**(Breach of Covenant of Good Faith and Fair Dealing)**

50. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 49 of the Complaint.

51. Under the express terms of the agreements, the DOE promised to, among other things: 1) not act in a manner that is arbitrary or capricious; and 2) act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. In addition, an implied covenant of good faith and fair dealing exists in every contract with the federal government.

52. In order to facilitate MNS's immediate development of the NTS, the DOE assigned a full-time employee to the NTS project, Kevin Thornton ("Thornton"). Thornton was responsible for, among other things, monitoring and facilitating all DOE-related activity on the NTS, including compliance with the environmental review process. In addition, Thornton ran the DOE's Site Utilization Board ("SUD") meetings. The SUD, which consisted of all federal agencies involved with the NTS, including the DOE and the Department of Defense ("DOD"), held regular meetings to discuss all development on the NTS, including the wind-farm project.

53. The NTSDC also held monthly executive committee meetings to discuss the status of the various NTSDC projects, including the NTS wind project. The DOE was represented on the executive committee and the Board of Directors of the NTSDC. In addition, since the NTS bordered the Nellis Air Force Base, a representative of the United States Air Force was also a member of the executive committee. The Commander of Nellis Air Force base also served as an ex-officio member of the NTSDC's Board of Directors.

54. During negotiations of the agreements, there were also discussions with the DOE regarding the DOE's desire to benefit from a power cost reduction at the NTS as a result of this project. As a result, the parties inserted into the Easement a section on power delivery and the benefits that would be afforded to the DOE. The parties agreed to provide a benefit to the DOE equivalent to a ten percent reduction in energy usage based upon total NTS consumption for fiscal year 2000, the expected MNS installed generation capacity at the NTS, and the expected capacity to deliver all of the generated energy.

55. After executing the agreements, MNS proceeded with the development of the NTS, including compliance with the NEPA process covering use of all potential sites under the Easement. The environmental consultants responsible for the NEPA process had undertaken a comprehensive investigation and prepared and issued an advanced Draft EIS that failed to identify any significant impacts that would provide a barrier to the implementation of the project.

56. In November 2001, MNS proposed a power purchase agreement to Nevada Power. Nevada Power accepted the unsolicited proposal to purchase the power. The Nevada Public Utilities Commission later approved the power purchase agreement. This not only demonstrated Nevada Power's support for the project, but the State's as well. The acceptance of this renewable energy power purchase agreement for a wind project was one of the driving factors in the establishment, by the Nevada Legislature, of one of the most aggressive renewable energy portfolio standards in the Nation (requiring that 15% of the State's power be produced by renewable sources by the year 2013). Every State agency from the Governor of Nevada on down were involved in the development of this project and showed their support. The NTSDC also received letters of support from the Congressional delegation.

57. Nevertheless, on July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible national security concerns raised by the Air Force, the DOE had decided to terminate the NEPA process and that the Easement would not go into effect according to the terms of the agreement. Instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS the fair market value for the project, the DOE attempted to avoid that promise by interfering with the environmental condition and improperly terminating the NEPA process.

58. The national security issue was allegedly based upon the potential adverse impact of the turning of the wind turbine rotor blades on operations of the United States Air Force, including specifically their potential effects on radar. Although the Air Force had a liaison officer in the local DOE office who participated in SUD meetings, was represented on the NTSDC's executive committee and Board of Directors, and was knowledgeable about all proposed uses and equipment specifications for the NTS wind farm, neither the Air Force nor the DOE representative disclosed that this issue was a reason to terminate the project.

59. This rotor blade issue was so basic to the development of the NTS wind farm project that it was surprising that the termination based on the alleged rotor blade problem came after MNS had spent so much time, effort and expenditures in developing the project and after the Air Force had been involved in key meetings regarding the development process.

60. The DOE had been dragging its feet in compliance with the NEPA process, based in part upon these rotor blade concerns raised by the Air Force. Even though the Air Force's concerns did not involve environmental issues and therefore were not within the scope of the NEPA review, MNS wanted to resolve these issues as quickly as possible since MNS was under time constraints to begin construction of the turbines.

61. To this end, MNS, in good faith, submitted studies from wind farms located all over Europe and other parts of the United States showing that the operation of wind turbines did not adversely impact radar operations. In addition, the NTSDC and MNS attempted to schedule meetings with the Air Force to discuss these issues, but the Air Force never agreed to a meeting. The only thing these attempts to address the rotor blade issue accomplished was to delay the project completion date into 2003.

62. Finally, in July 2002, MNS informed the DOE that it had to immediately place the order for the wind turbines, and that the NEPA report had to be formally filed as soon as possible if MNS was to complete the project on time. MNS also told the DOE and the NTSDC that the project was ready to proceed to the construction phase and MNS could not afford any more delays if it wanted to meet a much delayed December 2003 completion date for the first phase of the project. Immediately following MNS's request for expediency, the DOE issued the formal termination of the NEPA process for national security reasons.

63. Upon information and belief, the DOE knew of the Air Force's alleged national security concerns prior to entering into the agreements with MNS. The DOE, however, either intentionally withheld this information from MNS or misrepresented the scope and impact of the national security issues on the NTS project.

64. Upon information and belief, the DOE entered into the agreements in order to reap the political benefits associated with the agreements to produce wind power, but did not intend to perform under the agreements.

65. The DOE also took affirmative actions to protect its own interests at the expense of MNS, by among other things, wrongfully interfering with the environmental condition to the

agreements by terminating the environmental review in order to attempt to avoid paying eminent domain just compensation as agreed to under the contract.

66. In contrast, MNS performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the agreements.

67. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

**COUNT III**

**(Estoppel)**

68. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 67 of the Complaint.

69. As discussed above, MNS consistently informed the DOE that it would not agree to invest time and resources in the NTS project only to have its rights terminated without compensation for national security reasons.

70. As a result, the Easement expressly provides that the DOE could revoke the Easement in the interest of national security, provided that the revocation of the Easement was accomplished by eminent domain. Thus, both the DOE and MNS were protected if some unforeseen national security issue arose – the DOE could unilaterally revoke the Easement, and MNS would be paid just compensation.

71. Nevertheless, the DOE decided to terminate the NEPA process because of possible national security concerns raised by the Air Force, and now contends, among other things, that the Easement never went into effect. So instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS the fair market value for the project, the DOE

has attempted to avoid that promise by interfering with the environmental condition and improperly terminating the NEPA process.

72. Upon information and belief, the DOE knew of the Air Force's alleged national security concerns prior to entering into the agreements with MNS. The DOE, however, either intentionally withheld this information from MNS or misrepresented the scope and impact of the national security issues on the NTS project.

73. MNS was not aware of the true nature, scope and impact of the Air Force's alleged national security issues regarding the wind-project prior to entering into the agreements. However, MNS also believed that it was adequately protected from any national security issues based upon the express language of the agreements

74. Upon information and belief, the DOE entered into the agreements in order to reap the political benefits associated with the agreements to produce wind power, but never intended to perform under the agreements.

75. The conduct of the DOE, including its misrepresentations and omissions, were made by government officers acting within their scope of authority.

76. MNS has relied on the DOE's conduct to its detriment by, among other things, creating an organization for this specific project, which required an investment of its efforts and capital to the exclusion of other projects and opportunities. MNS also spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies; complying with the NEPA process; obtaining various permits from Nevada; and negotiating and executing a power purchase agreement with Nevada Power for the first 85 MWs of power production.

77. As a direct and proximate result of the foregoing facts, DOE is estopped from (1) denying that the Easement ever came into existence based on the DOE's improper interference with the environmental condition to the Easement; and (2) revoking the Easement for national security reasons by any means other than by paying MSN eminent domain just compensation as provided in the Easement.

78. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

## PRAYER FOR RELIEF

WHEREFORE, MNS prays for the following relief:

**On Counts I, II and III:**

A) Damages in excess of $270 million dollars;

B) Just Compensation as hereafter determined, including interest;

C) The costs of this action, together with reasonable attorneys fees; and

D) Any such further relief as this Court may deem just and proper.

Dated: October 15, 2004

Respectfully submitted,

Steven S. Rosenthal, Counsel of Record
KAYE SCHOLER LLP
901 Fifteenth Street, NW, Suite 1100
Washington, D.C. 20005
Telephone: (202) 682-3500
Facsimile: (202) 682-3580

*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

**Department of Energy**
Nevada Operations Office
P. O. Box 98518
Las Vegas, NV 89193-8518

DEC 22 2000

Tim Carlson, President
NTS Development Corporation
2330 Paseo Del Prado, Suite C-101
Las Vegas, NV 89102

John Johansen, President
MNS Wind Company, LLC
4225 Executive Square, Suite 1650
La Jolla, CA 92037

GRANT OF EASEMENT FOR WIND POWERED ELECTRIC GENERATING FACILITY

Pursuant to our telephone conference calls of December 22, 2000, there is transmitted herewith the executed "U.S. Department of Energy, Nevada Operations Office, Grant of Easement for Wind Powered Electric Generating Facility."

As we advised during our telephone conferences, the Department of the Interior has questioned the sufficiency of this Department's authority under section 161q of the Atomic Energy Act, 42 U.S.C. 2201(q), to enter into this easement. The Department of the Interior's legal doubt is based on the limitations on this Department's authority contained in the terms of the 1961 public land order by which the portion of the Nevada Test Site over which this easement is to be granted was permanently withdrawn. As we indicated during our telephone conferences, we have agreed with senior officials of the Department of the Interior promptly to submit the evident differences in legal view on the question of this Department's authority to grant this easement to the Office of Legal Counsel of the Department of Justice.

Should the Department of Justice's Office of Legal Counsel conclude that this Department's legal authority was inadequate to serve as the basis for granting this easement, the terms now contained in the easement will have to be reformulated in order for the document to conform to a revocable permit of the sort as to which no question exists between this Department and the Department of the Interior as to this Department's authority to enter into. Moreover the grantee and subgrantee may choose to seek additional actions by the Department of the Interior to arrive at the basis for the project's continued presence at the Nevada Test Site.

Please indicate your receipt of the executed easement and this letter by acknowledging this letter at the places indicated.

Kathleen A. Carlson
Manager

**ACKNOWLEDGED AND AGREED:**

NTS Development Corporation
By:________________________

MNS Wind Company, LLC,
a Delaware limited liability company
By: ________________________

**U. S. DEPARTMENT OF ENERGY
NEVADA OPERATIONS OFFICE
GRANT OF EASEMENT FOR
WIND POWERED ELECTRIC GENERATING FACILITY**

*PART I*
*SPECIFIC PROVISIONS*

This Grant of Easement for Wind Powered Electric Generating Facility ("*Easement*") is made as of December 22, 2000 by the UNITED STATES OF AMERICA, as the Grantor, hereinafter referred to as the "GOVERNMENT", acting by and through the Nevada Operations Office, U.S. Department of Energy, hereinafter referred to as the "DOE," and NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation, hereinafter referred to as the "GRANTEE."

**WITNESSETH:**

A. The Secretary of Energy, under the authority of Section 161 of the Atomic Energy Act of 1954, as amended (Public Law 83-703), Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), and other applicable law, has determined that the Property (as hereinafter defined), which is located at the Government's Nevada Test Site (hereinafter referred to as the "NTS"), is not excess property as defined by Section 3(e) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 472), and that this Easement is advantageous to the Government.

B. The Secretary of Energy, under the aforesaid authority, has further determined that (i) the Property is public land withdrawn or reserved for use by the Department of Energy, (ii) this Easement is compatible with the DOE's interests, (iii) this Easement does not include more property than is reasonably necessary for the purpose for which the Easement is granted, and (iv) this Easement otherwise fully complies with all requirements of the aforesaid authority and other applicable law.

NOW THEREFORE, in consideration of the mutual covenants and agreement hereinafter set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Government, subject to compliance with the National Environmental Policy Act, 42 U.S.C. 4321 et seq., hereby grants and conveys to Grantee, for the use and benefit of Subgrantee (as hereinafter defined) an easement on, over, under, across and through the property described in Exhibit A, Attachment A-1 (the "*Property*") for the purpose of the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of wind

powered electric generating facilities (the "*Project*"), which Project shall include, wind turbine generators, support structures, transformers, substations, electric power and other utility lines and towers, communication lines and equipment, water and gas lines, and other improvements and systems necessary or advisable for the construction and operation of a wind powered electric generating facility. Any relocation of a wind turbine generator outside of the Project Site will require the consent of the DOE in accordance with Exhibit A.

(a) The Government agrees not to intentionally interfere with the flow, direction, generation or speed of wind over and across the Property, or unreasonably interfere with the construction, maintenance and operation of the Project. The Government and Subgrantee shall coordinate their use of the Property in accordance with Exhibit A.

(b) The Government further agrees to promptly grant such additional easements and rights of way requested by Grantee or Subgrantee over other areas of the NTS approved by the DOE, which are necessary or advisable for the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of utility towers, electric power and other lines, communication lines and equipment, water and gas lines, access roads, substations, transformers and such other systems as may be necessary or advisable for the construction and operation of the Project, and ingress and egress therefrom. If the DOE does not approve a proposed easement or right of way, the DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible.

2. Included within Exhibit A is a description of the land and improvements, including a map of the area; a map of the installation depicting common areas to include means for ingress and egress and restricted areas; a description of the Economic Development Activity (as hereinafter defined); an inventory of personal property; limits of operations within the Property and common areas not addressed in *Part II-General Provisions*; description and charges for utility, maintenance, and other services not covered under *Part II-General* provisions; a real property conditions report; and an environmental conditions report.

3. This Easement shall remain effective for a term as set forth in Exhibit A of thirty-five (35) years), plus an additional (10) ten year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

4. Grantee shall pay the Government an annual fee as set forth in Exhibit A in advance at the start of each easement year. Any charges for services specified in Exhibit A will not begin until the Property is subject to the Subeasement (as hereinafter defined) unless services are used sooner by the Grantee. The Grantee is permitted to charge fees for its subeasement property, but any fees that are collected which exceed Grantee's cost must be reinvested into economic development endeavors.

5. (a) The sole purpose for which the Grantee shall use the Property is to support Economic Development as part of the mission of the U.S. Department of Energy. For the purpose of

this Easement for wind powered electrical generating projects, Economic Development Activity includes, but shall not be limited to, the following: activities relating to furthering the employment of displaced and current contractor employees; creating or enhancing new business opportunities at the facility or in the surrounding community; providing funding for such activities; and educating the employees or the community regarding such activities. The Grantee must obtain the written approval of DOE prior to using the Property for any purpose other than that specified above. The Government hereby approves and consents to Grantee entering into one or more subeasements of the Property (hereinafter individually and collectively referred to as a "*Subeasement*") with MNS Wind Company, LLC, a Delaware limited liability company or affiliated companies (hereinafter individually and collectively referred to as a "*Subgrantee*"), and to the construction and operation of portions of the Project on the Property by each Subgrantee. The Government has reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property, and acknowledges that the proposed use of the Property constitutes an approved Economic Development Activity as required under this Easement. The Government and Grantee further acknowledge and agree that a default under any Subeasement shall not, solely by reason of such default, constitute a default under any other Subeasement. In the event of default under a Subeasement, the Government and Grantee shall exercise their respective rights and remedies only against the Subeasement in default, and the remaining Subeasements shall remain in full force and effect and shall not be disturbed.

(b) The Government acknowledges and agrees that in the event of any dissolution of Grantee, or in the event the Easement or Subeasement are rejected in any bankruptcy or are terminated for any reason (except as a result of a default by Subgrantee thereunder), the Easement and Subeasement shall continue in full force and effect as if such easements were entered into directly between the Government and Subgrantee (provided that the DOE's obligations to Subgrantee under the Subeasement shall be no greater than DOE's obligations to Grantee under this Easement), and Subgrantee's use of the Property and Project will not be disturbed. Upon request, the Government shall enter into a new easement directly with Subgrantee or the Project lender upon the same terms and conditions of the Subeasement (provided that the DOE's obligations under the new easement shall be no greater than DOE's obligations to Grantee under this Easement). The Government and Grantee acknowledge and agree for the benefit of Subgrantee, that Subgrantee shall have the right to enjoy and directly enforce against the Government any and all rights and remedies of Grantee under this Easement.

6. In the event DOE or its prime contractors at the NTS and other NTS contractors, in their good faith, prudent judgment, observe an unsafe practice or unsafe condition that poses a material threat of imminent danger to persons or property under Grantee's or Subgrantee's control, Grantee and Subgrantee shall, upon oral or written notification (provided that if such notice is oral, the Government shall promptly also provide Grantee written confirmation notice of such matter) by DOE or a regulatory authority having jurisdiction over the activity, cease such unsafe activity to the extent required by applicable law and promptly correct such unsafe practice or condition in accordance with applicable law.

7. Grantee shall require Subgrantee to comply with all Federal Government and State of Nevada laws and regulations and NTS rules applicable to the transportation, storage, use and disposal of hazardous materials or substances. Grantee or Subgrantee shall immediately file with the NTS fire department copies of all material safety data sheets applicable to hazardous materials or substances stored or used by Subgrantee at the NTS.

8. Grantee shall cause the Subgrantee to certify to DOE that it currently has and/or is in the process of obtaining all required regulatory permits and licenses. It is agreed that the Subgrantee must obtain and comply in all material respects with the terms and conditions of regulatory agency permits affecting the Project during the term of this Easement, especially if the specific activity impacts DOE's ability to comply with a regulatory agency permit condition. Any excursion of regulatory agency permit requirements that are the fault of the Grantee or Subgrantee and that result in fines or penalties will be the responsibility of the Grantee and Subgrantee to the extent caused by the Grantee or Subgrantee. If the agency of competent jurisdiction determines that Grantee or Subgrantee is out of compliance with a regulatory permit or license and Grantee or Subgrantee thereafter fails to take appropriate measures as determined by the regulatory authority to achieve compliance, and if such noncompliance poses a material threat of danger to the health and safety of personnel on the NTS, DOE shall have the right to direct Grantee or Subgrantee to stop operations if such noncompliance is not corrected within thirty (30) days following written notice to Grantee and Subgrantee; provided, however, that if the nature of the noncompliance is such that more than thirty (30) days are reasonably required for its cure, then Grantee and Subgrantee shall not be required to stop operations if Subgrantee commences to cure the noncompliance within such thirty (30) day period and thereafter diligently prosecutes such cure to completion (and during the period of such cure, takes all steps reasonably necessary to protect the public health and safety). Operations will resume only after review and approval by the agency of competent jurisdiction.

9. Grantee acknowledges that construction, maintenance and operational activities performed on the NTS for DOE programs are subject to project specific labor agreements with the Nevada Building and Construction Trades. Grantee acknowledges that it has consulted with the Nevada Building and Construction Trades concerning Subgrantee's activities to be conducted at the NTS and has resolved any concerns in a manner that does not impact DOE relations with the Nevada Building and Construction Trades.

10. Security measures will be determined on a building-by-building or area-by-area basis according to the nature of the activities undertaken by the DOE within the particular security zone. Detailed in Exhibit A are generic requirements for security and badging.

11. This Easement consists of this *Part I--Specific Provisions*, *Part II--General Provisions*, and Exhibit A. In the event of inconsistencies between this *Part I--Specific Provisions*, and *Part II--General Provisions*, *Part I* shall control; in the event of inconsistencies between Exhibit A to this Easement and *Parts I or II*, Exhibit A shall control. The terms and conditions of Part II -

General Conditions and Exhibit A (and each part thereof) are incorporated herein by this reference and made a part hereof.

12. For the purpose of this Easement, the DOE representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at U.S. Department of Energy, Nevada Operations Office, P.O. Box 98518, Las Vegas, NV 89193-8518.

For the purpose of this Easement, the Grantee Representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at NTS Development Corporation, 2330 Paseo Del Prado, Suite C-101, Las Vegas, NV 89102.

IN WITNESS WHEREOF, the parties hereto have caused this Easement to be executed on their behalf by their duly authorized representative as of the date first above written.

**GRANTEE:**

NTS Development Corporation

By: [signature]
Tim Carlson, President

**GRANTOR:**

The United States of America, acting by and through the Nevada Operations Office of the U.S. Department of Energy

By: [signature]
Kathleen A. Carlson, Manager for

**ACKNOWLEDGED and AGREED:**

MNS Wind Company, LLC,
a Delaware limited liability company

By: John A. Johansen
Name: John A. Johansen
Its: 

**U. S. DEPARTMENT OF ENERGY**
**NEVADA OPERATIONS OFFICE**
**GRANT OF EASEMENT FOR**
**WIND POWERED ELECTRIC GENERATING FACILITY**

*PART II*
*GENERAL PROVISIONS*

A. Availability of Site Facilities and Support Services

1. Grantee may arrange with DOE and its prime contractors at the NTS for use of site facilities and support services, which may include the use of general infrastructure facilities such as roads, utility systems, water wells, etc. and services such as maintenance, repairs, emergency response and other such support services. Exhibit A sets forth a schedule of available site facilities and support services, and the basis for assessing charges and conditions of use therefor, which may be provided under this Easement.

2. The site facilities set forth in Exhibit A will be maintained by DOE to a maintenance level necessary to conduct its authorized programs and activities at the NTS and, during maintenance, in a manner that minimizes impact on the Project. The Government and Grantee acknowledge that roads do not and will not be maintained to meet U.S. Department of Transportation load bearing standards. DOE makes no representation that the facilities are suitable for the use intended.

3. Nothing in this Easement is intended to restrict or impair the right of Grantee or Subgrantee, as the case may be, from securing site facilities and services, including those available from DOE or its contractors, from any other vendor at any time during this Easement; however, it is the desire of DOE and Grantee that Subgrantee will consider, without obligation, using current DOE contractors, to the extent reasonably feasible, consistent with sound commercially reasonable practices, to provide those support services commonly provided to NTS users. Such vendors shall be treated by the DOE in a manner equal to that of vendors providing services for DOE or the prime contractors at the NTS.

4. Grantee may agree in any subeasement to fees, charges, terms and conditions for site facilities and support services, or any other services secured by Grantee and provided to Subgrantee, that are greater than or less than the charges, terms and conditions for site facilities and support services as provided in this Article A. No such agreement, however, shall alter Grantee's rights and obligations under this Easement.

B. Insurance

1. Grantee shall procure and maintain and shall require Subgrantee to procure and maintain, each at its own expense, the following insurance coverage in the respective, minimum amounts specified in Exhibit A: (i) Property structures loss and damage (Subgrantee only), (ii) Comprehensive General Liability (including contractual liability), (iii) Automobile Liability, and (iv) Statutory Workers' Compensation coverage. The Government and the prime contractors at the NTS shall be named as additional insureds under the Comprehensive General Liability and Automobile Liability policies of insurance (Grantee shall be an additional insured on the Subgrantee's policies).

2. All insurance which this Easement requires to be carried for general liability and on the Property shall be with such insurers as the Government may from time to time reasonably approve and shall otherwise be in form and in amounts, and issued by an insurer, acceptable to any lender for the Project. Each policy of insurance shall contain a provision for thirty (30) days written notice to the DOE prior to the making of any material change in or the cancellation of the policy. Grantee shall deliver promptly to the DOE a certificate of insurance or a certified copy of each insurance policy required by this Easement and shall also deliver, no later than thirty (30) days prior to the expiration of any such policy, a certificate of insurance or a certified copy of each renewal policy covering the same risks.

C. <u>Condition of Property</u>

1. Grantee has examined, knows, and accepts the condition and state of repair of the Property and the NTS of which it forms a part, and acknowledges that except as set forth in Exhibit A, the Government has made no representation concerning such condition and state of repair, nor any agreement or promise to alter, improve, adapt, repair, or keep in repair the same, or any item thereof, which has not been fully set forth in this Easement which contains all agreements made and entered into between Grantee and the Government. The Government shall reasonably provide Grantee and Subgrantee with current, known information concerning anticipated impacts, including seismic loads, airborne release potentials, and the like, potentially arising from DOE activities that could potentially affect the Grantee's or Subgrantee's activities.

2. The Government has provided Grantee with current, known information concerning environmental conditions on the Property. The Government makes no representation concerning the environmental condition of the Property outside the information provided in the environmental condition report as shown in Exhibit A as appropriate for the particular property.

3. The Grantee at its own expense shall maintain and repair the Property and all means of ingress and egress dedicated specifically (i.e., access not available for other uses) to the Property, and that the same will at all times be kept in at least as good condition as when received hereunder, subject, however, to ordinary wear and tear and loss or damage for which Grantee is not liable

hereunder. Grantee shall insure any structure(s) owned by the DOE in accordance with Article B above.

4. The Government has entered into a Federal Facilities Agreement (FFA) with the State of Nevada which describes the activities the Government intends to undertake in regard to environmental conditions at the NTS. No representations are made concerning further activity on behalf of the Government, either in regard to environmental conditions or otherwise. Financial responsibility for compliance with the FFA shall remain with the Government

D. Existing and Future Easements and Rights of way

This Easement is subject to all outstanding easements and rights of way over, across, in, and upon the Property. To the extent that services cannot be adequately and economically provided by DOE's service systems to the satisfaction of Grantee, the Government acknowledges that Grantee or Subgrantee, or service providers, may seek easements or rights of way over, across, in, and upon the NTS in order to provide utilities and other services to the Property. If the DOE does not approve of a proposed easement or right of way, DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible, on the NTS. DOE shall support Grantee's or Subgrantee's applications to appropriate jurisdictional authorities for such easements or rights of way (including any easement or right of way requested by Subgrantee pursuant to Paragraph 1(b) of Part I) which do not unreasonably interfere with DOE's use of the NTS.

E. Revocation by Government; Termination by Grantee; Amendment

1. This Easement may be revoked only as provided in this paragraph. In recognition of the consequences that revocation could adversely impact Grantee and Subgrantee and harm the achievement of the Government's economic development initiatives pursuant to Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), the Government shall act in a manner that is not arbitrary or capricious, and shall revoke this Easement only upon the occurrence of the following: (i) failure of the Grantee or Subgrantee to perform or otherwise comply with the terms and conditions of this Easement, which default is not cured within thirty (30) days following written notice of such default to Grantee and Subgrantee; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Grantor and Subgrantee shall not be in default hereunder if Grantor or Subgrantee commences to cure the default within such thirty (30) day period and thereafter diligently prosecutes such cure to completion, (ii) failure by Subgrantee to use the Property for a period of two (2) consecutive years with the intent to permanently abandon its rights under the Subeasement, which failure is not cured with the grace period provided in Paragraph K hereof, or (iii) in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain. The Government shall use

its reasonable efforts to give each Project lender copies of any notices of breach or default given to Grantee or Subgrantee.

2. DOE will provide Grantee with the maximum advance notice that is practicable under the circumstances that revocation of the Easement has been proposed or is under consideration and the opportunity to comment in advance of such revocation. In the event of notices or inquiries from other agencies or offices or in the event of the initiation of litigation which could lead to revocation of the Easement, DOE will provide immediate notice of such information to the Grantee.

3. Grantee may terminate this Easement only in the event of a default by Subgrantee under the Subeasement not cured within any applicable grace period, but such termination shall not relieve Grantee of any continuing obligations under this Easement except as may be specified in Exhibit A.

4. The Government agrees not to modify or amend this Easement without the prior consent of Subgrantee, which consent shall not be unreasonably withheld so long as Subgrantee's rights and obligations are not adversely affected thereby (and in such case, Subgrantee may withhold its consent in its sole and absolute discretion).

F. <u>Damage or Destruction</u>

1. If, during the term of this Easement, the Property, or any part thereof, is damaged by fire or other casualty so as to be rendered untenantable either in whole or in part, and cannot reasonably be restored to substantially its former condition within two (2) years following such fire or other casualty, then DOE or the Grantee or Subgrantee may terminate this Easement and Subeasement as to the portion of the Property so damaged effective the date of such casualty by giving notice to the other within one hundred twenty (120) days following such casualty.

2. In the event of any such damage which does not render all or any portion of the Property untenantable, either in whole or in part or if no party terminates pursuant to the preceding provisions, the damaged area or areas, with all reasonable due diligence will be repaired and restored by the Grantee to substantially the same condition they were in prior to such casualty or as otherwise will be suitable for the Grantee's or Subgrantee's purposes, provided that Subgrantee shall have no obligation to repair the Project if Subgrantee reasonably determines that it is not commercially reasonable to do so. Such restoration shall be commenced and completed as quickly as is reasonably possible. The party making such restoration shall be entitled to receive and use the proceeds of the insurance specified in Exhibit A. Also during the time of such restoration, and to the extent that the Property was not rendered untenantable by the Grantee's or Subgrantee's negligent acts or omissions or willful misconduct, any annual permit fees shall be abated to the extent that all or any portion of the Property is not usable by the Grantee.

G. Surrender

Upon the termination of this Easement or any prior revocation under Article E, Grantee shall quietly and peacefully remove itself and its property from the Property and surrender the possession thereof to the Government; provided, Grantee shall be allowed a reasonable period of time, as reasonably determined by the DOE, in which to remove all of its property from and terminate its operations on the Property. During such period prior to surrender, all obligations assumed by Grantee under this Easement shall remain in full force and effect.

H. Restoration of Property

Upon reasonable notice before any revocation or termination of this Easement, or otherwise within a reasonable period after revocation, at the direction of the DOE, Grantee shall restore the Property and each item thereof to the condition in which it was received, or to such improved condition as may have resulted from any improvement made therein by the Government or by Grantee during the Easement term, subject however, to ordinary wear and tear and loss or damage for which Grantee is not liable hereunder.

I. Installation, Alterations, and Removals

1. The Government and Grantee hereby expressly approve of the construction by Subgrantee of a wind powered electric generating facility on the Property, including the construction and installation of, wind turbine generators, support structures, substations, transformers, electric power and other utility lines and towers, communication lines and equipment, access roads, water and gas lines, and such other systems and appurtenances necessary or advisable for the construction and operation of the Project, all as further described on Exhibit A. The Government and Grantee acknowledge that Subgrantee is relying on the terms and conditions of this Easement in entering into the Subeasement and in constructing the Project.

2. Except as provided in Paragraph 1 above, it is expressly agreed and understood that Grantee will make no other material permanent alterations, additions, or betterments to installations upon the Property without the prior written approval of the DOE, which may include an obligation of removal and restoration upon the revocation or termination of this Easement; provided however, that Grantee and Subgrantee may make repairs and replacements of Project improvements without the consent of the DOE, but subject to coordination with DOE on operational activities. Except insofar as said terms and conditions may expressly provide otherwise, all such alterations, additions, betterments, and installations made by Grantee or Subgrantee shall remain the property of party installing the improvement.

3. During the term of this Easement, or any extension thereof, with the prior written approval of the DOE, Grantee and Subgrantee shall have the right, at its own expense, to install such improvements and additions and to attach such removable fixtures in or upon the Property pursuant to this Easement, and to remove same at any time and upon revocation or termination of this Easement or any extension thereof. All property not so removed shall be deemed abandoned by Grantee and may be used or disposed of by the Government in any manner whatsoever without any liability to account to Grantee therefore, but such abandonment shall in no way reduce any obligation of Grantee to perform restoration under Article H of this Part II. In the event that the Property is not restored to the condition at the time of Easement commencement, ordinary wear and tear excepted, then the Government may cause the Property to be restored at the sole expense of Grantee.

J. Allocation of Liability

1. Grantee covenants that it shall cause the Subgrantee to indemnify and hold harmless the Government, Grantee and DOE's prime contractors at the NTS, with respect to any and all judgments, awards of damages, penalties, or fines by a court of competent jurisdiction or through a regulatory enforcement action, or arbitration awards or settlements reached with the participation and concurrence of the Grantee and Subgrantee (including reasonable attorneys' fees and expenses related to such litigation), to the extent they do not arise from the negligent acts or omissions of the Government, its prime contractors at the NTS, or Grantee, and arise from or are incident to (i) conduct by Subgrantee in its use and occupancy of the Property (including conduct by third parties entering the NTS to conduct business with Subgrantee) giving rise to the judgment, award of damages, penalty, fine, arbitration award or settlement; (ii) damages to the Property or injuries to or death of any person, including without limitation, employees and officers of Grantee or Subgrantee; (iii) any "release" by Subgrantee or its agents as defined in Section 101(22) of CERCLA of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Property at any time while this Easement is in effect; (iv) failure of Subgrantee to comply with applicable environmental laws; and (v) the transportation, deposit, storage, or disposal by Subgrantee of hazardous substances or petroleum off-site of the Property.

2. Grantee shall require Subgrantee to covenant that any property of the Government lost, damaged, or destroyed by the Subgrantee incident to its conduct in the use and occupancy of the Property shall be promptly repaired and replaced by Subgrantee to the satisfaction of the DOE, or in lieu of such repair or replacement, Subgrantee shall, if so required by the DOE, pay to the Government money in an amount sufficient to compensate for the loss sustained by the Government by reason of the destruction of the property.

3. The Government accepts that, without conditions, the Grantee and Subgrantee shall not be responsible for any claims, damages, causes of action, proceedings, judgments, or suits, and

all liabilities, losses, costs or expenses (including without limitation, technical consultant fees and reasonable attorneys' fees) to the extent they do not arise from the negligent acts or omissions of the Subgrantee and may arise from or be incident to (i) conduct of the Government or the prime contractors at the NTS in providing services to the Grantee; (ii) any "release" by the Government or its agents as defined in section 101(22) of CERCLA or any "hazardous substance" as defined in Section 101(14) of CERCLA, or petroleum (including crude oil or any fraction thereof) onto or from the Property at any time prior to the effective date of this Easement; (iii) the failure of the Government to comply with applicable environmental laws; or (iv) the transportation, treatment, deposit, storage, or disposal by the Government of hazardous substances or petroleum off-site of the Property.

K. Abandonment of Property

In the event Subgrantee fails to utilize the Property for the Economic Development Activity for a period of two (2) consecutive years, the DOE shall have the right to terminate this Easement. DOE shall provide sixty (60) days notice prior to such termination.

L. Laws, Ordinances, Rules and Regulations

Grantee shall, and shall require Subgrantee to, comply with all applicable laws, ordinances, rules and regulations of the Federal Government, State, county and municipality wherein the Property is located with regard to health, safety and the environment and shall obtain all applicable licenses or permits to do business or otherwise conduct regulated activities (except that DOE shall arrange for any necessary water rights on the NTS). It is understood that Grantee's activities are considered commercial in nature and, as such, shall be subject to the same requirements as would apply to such activities if not conducted on public property. It is expressly understood that DOE assumes no oversight or enforcement responsibility for safety and health, and DOE specifically defers to the jurisdiction of the appropriate authorities for such matters. However, because the Property is withdrawn public property and will be used concurrently with DOE's own mission, DOE reserves the right to review the Grantee's safety plans which shall be consistent with the Safety and Health Program Management Guidelines of the Occupational Safety and Health Administration as published in the Federal Register (54 F.R. 3908 on January 26, 1989).

M. Cultural Items

Grantee shall, and shall require Subgrantee to, protect and preserve any historical, archaeological, architectural, or other cultural artifacts, relics, vestiges, remains, or objects of antiquity. In the event such items are discovered, the Grantee shall immediately notify the DOE and protect the area and the material from further disturbance until DOE, Grantee, or Subgrantee, as the

case may be, has completed the required coordination with the appropriate authorities and otherwise complied with applicable law.

N. Liens

Grantee shall promptly discharge or cause to be discharged or bonded any valid lien, right in rem, or claim, caused by Grantee and/or any Subgrantee which at any time may arise or exist with respect to the Property or materials or equipment furnished therefor, or any part thereof, on behalf of Grantee.

O. Payments and Interest

All payments to the Government required under this Easement shall be made by check or money order made payable to the U.S. Department of Energy and delivered to the DOE. Notwithstanding any other provision of this Easement, all amounts that become payable by Grantee to the Government under this Easement shall bear interest if not paid within thirty (30) days following written notice of the failure to make such payment when due until paid. The interest rate per annum shall bear the interest rate in effect which has been established by the Secretary of the Treasury pursuant to Public Law 92-42; 85 STAT 97 for the Renegotiation Board, as of the date the amount becomes due as herein provided.

P. Access to Property

The Government or its designated representatives shall have the right of access to the Property for the sole purpose of providing agreed services, maintenance and repair, conducting inspections authorized under this Easement, or responding to a health or safety emergency. In all instances except for emergency response and inspections by regulatory authorities, access to the Property shall be scheduled in advance through the DOE or in accordance with agreements for the provision of services, maintenance and repair. The Grantee shall provide the DOE with a schedule of operations and hours for the Property. The Grantee and Subgrantee shall have the right to accompany the DOE, the Government or its designated representatives in their exercise of this right to access to the Property.

Q. State and Local Taxes

In the event that as a result of any future Act of Congress subjecting Government-owned property to taxation, any taxes, assessment, or similar charges are imposed by state or local authorities upon the Property (other than upon Grantee's possessory interest therein), Grantee shall pay the same when due and payable.

R. Failure of Government to Insist on Compliance

The failure of the Government to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Easement shall not be construed as waiver or relinquishment of the Government's right to the future performance of any such terms, covenants, or conditions, and Grantee's obligations with respect to such future performance shall continue in full force and effect.

S. Assignment or Subletting

Neither Grantee nor Subgrantee shall transfer or assign this Easement, the Subeasement or any interest therein or in any portion of the Property or rights therein without the prior written consent of the Government, which consent shall not be unreasonably withheld, conditioned or delayed, except for reasons of national security. Under any assignment made, the assignee shall be deemed to have assumed all of the obligations of the assignor hereunder, but no assignment shall relieve the assignor of any of Grantee's obligations hereunder except as hereinafter provided. Subgrantee may hypothecate, mortgage or pledge all or any portion of the Subgrantee's right, title or interest under the Easement and Subeasement or in any improvements on the Property as security for any indebtedness or obligation relating to the Project, or any part thereof, to any lender approved by the Government (an "*Approval Lender*"), which approval shall not be unreasonably withheld, conditioned or delayed, except for reasons of national security. In the event of a default under the loan, the Approved Lender (or an approved designee) may succeed to the interests of Subgrantee in the Property by foreclosure or otherwise. Upon any assignment to an assignee approved by the Government, the assignee, shall be deemed to have assumed Subpermittee's obligations under the Subeasement, and the Subpermittee shall be released of all obligations and liability under this Easement and the Subeasement.

T. Conduct Standards

1. Equal Employment Opportunity

In connection with the performance of work under this Easement, Grantee agrees to comply with applicable laws prohibiting discrimination against any employee or applicant for employment because of race, religion, color, age, sex, or national origin or disability.

2. Covenant Against Contingent Fees

Grantee warrants that no person or selling agency has been employed or retained to solicit or secure this Easement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bonafide employees or bonafide established commercial or

selling agencies maintained by Grantee for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Easement without liability or in its discretion to add to the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

3. Officials Not to Benefit

No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Easement, or to any benefit arising from it. However, this clause does not apply to this Easement to the extent that this Easement is made with a corporation for the corporation's general benefit.

4. Gratuities

The right of Grantee to proceed may be revoked if, after notice and hearing, the agency head or a designee determines that Grantee, its agents, or another representative:

(a) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(b) Intended, by the gratuity, to obtain a lease or permit or favorable treatment under a lease or permit.

U. Notices

No notice, order, direction, determination, requirement, consent, or approval under this Easement shall be of any effect unless in writing. All notices required under this Easement shall be addressed to Grantee c/o LEXIS Document Services, 202 S. Minnesota Street, Carson City, NV 89703 and LEXIS Document Services, 1029 J Street, Suite #100, Sacramento, CA 95814.

V. Administration

The DOE representative specified in Exhibit A of this Easement shall have complete charge of the administration of this Easement, and shall exercise full supervision and general direction thereof insofar as the interests of the Government are affected.

W. Severability and Substitution

1. In the event that any provision or portion of this Easement is declared unlawful or unenforceable by a court of law of competent jurisdiction, the remainder of this Easement shall

continue and remain in full force and effect, as if the unlawful or unenforceable provision or portion had been stricken from this Easement. Nothing herein, however, shall preclude revocation as provided above.

2. In the event that the authority or rights of DOE in relation to the Property or the NTS is modified by statute, regulation, court order, or other lawful order, DOE shall, as appropriate, affirm this Easement or enter into a Lease or other binding lawful instrument with Grantee that implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below). Grantee agrees to enter into such other lawful instrument so long as the other lawful instrument implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below).

3. In the event that Grantee or Subgrantee requests a lease, easement, right of way or other lawful instrument from another agency of government having competent jurisdiction over the NTS, DOE agrees to support the request, grant permission to Grantee and Subgrantee to engage in the Economic Development activity authorized by this Easement under such lease, easement, right of way or instrument, and administer such lease, easement, right of way or other instrument under an agreement or understanding with the agency in question; provided, however, that DOE will retain the right to require termination of such lease or instrument under the same terms and conditions of this Easement.

X. <u>General Provisions</u>

1. Whenever any Part of this Easement (or Exhibit A or any other exhibit), or the Subeasement or Compensation Agreement grants the Government or Grantee the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Government and Grantee shall act prudently and in good faith.

2. Provided that the Grantee or Subgrantee observe and perform all of the obligations hereof, Grantee and Subgrantee shall peaceably and quietly hold and enjoy the Property for the term provided herein without interruption by the Government or any person or persons claiming by, through or under the Government. The Government warrants to Grantee and Subgrantee that it has the power and authority to enter into this Easement.

3. The Government and Grantee acknowledge and agree that Subgrantee may in its sole discretion cause this Easement and the Subeasement to be recorded in the official records of the County where the Property is located and such other governmental offices necessary to impart constructive notice of its interest in the Property. Upon request by Subgrantee, the Government and Grantee agree to execute for recordation a short form or memoranda of the Easement and

Subeasement, and such other documents or instruments reasonably requested by Subgrantee, in form and reasonably acceptable to Subgrantee.

4. This Easement and the Subeasement shall constitute covenants running with the Property, and shall inure to the benefit of Subgrantee and its successors and assigns. Part I, Exhibit A and the Recitals of this Easement are incorporated herein by this reference and made a part hereof.

5. This Easement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

6. To the extent not in conflict with applicable federal law, this Easement shall be governed by and construed according to the laws of the State of Nevada. To the extent not in conflict with applicable federal law, any claims or disputes hereunder shall be resolved in accordance with the arbitration procedures set forth in the Subeasement.

**U.S. DEPARTMENT OF ENERGY**
**NEVADA OPERATIONS OFFICE**
**GRANT OF EASEMENT**
**EXHIBIT A FOR WIND GENERATED ELECTRICAL GENERATION AREA**

**1. <u>Map of Property</u>**

A map showing the location and boundary of the Property is attached as Attachment A-1. The Property is located in Areas 29 and 30 of the Nevada Test Site ("NTS") and consists of approximately 664 acres. As mutually agreed upon and approved by the DOE, Grantee, and Subgrantee, additional areas may be developed on the NTS.

**2. <u>Description of Economic Development Activity</u>**

The Economic Development Activity authorized and facilitated at the NTS through this Easement is the use of the Property for ventures related to businesses consistent with the construction, operation and maintenance of a wind powered electric generating facility. The total project will be developed in three phases. The Grantee and the Subgrantee have the exclusive right for the installation of the first 545 wind turbines on the NTS. Each phase will be individually agreed upon and approved by the DOE. To exercise this right, the Grantee and Subgrantee will have 24 months from the date this Easement is executed to obtain DOE approval of additional easements.

The initial phase will be generally located in Areas 29 and 30 of the NTS and will consist of approximately 175 wind turbines. The turbines will be 900 kW to 2000 kW machines up to 400 feet in total height with a foundation approximately 50 feet deep. The initial turbine areas are depicted in Attachment A-1 along with means of ingress and egress to the Property. Additionally, electric transmission and distribution lines necessary to interconnect with the NTS electric utility system will be constructed.

**3. <u>Duration and Use Fee</u>**

a. The duration of this Easement shall be 35 years from the date of execution, unless earlier revoked in the event of a default under the terms of this Easement, plus an additional ten (10) year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

b. In consideration of the rights and privileges granted to Grantee under this Easement, Grantee agrees to pay the Government a fee in the amount of $1.00 per year in the manner and on the terms provided in Part I and Part II of this Easement.

4. **Insurance Requirement**

The following minimum levels of insurance apply pursuant to Article B of Part II of this Easement:

| | | Grantee |
|---|---|---|
| a. | Structures loss and damage: | N/A |
| b. | Comprehensive general liability: | $ 1,000,000 |
| c. | Automobile liability: | $ 1,000,000 |
| d. | Statutory workers compensation: | per statute |

The insurance requirement for the Subgrantee will be based upon the size and nature of the activity, and will be at a minimum those values stated above for the Grantee. The recommended amount of Subeasement insurance for each category will be provided to DOE by Grantee at the time of each Project Location and Screening Process submittal.

5. **Personal Property Inventory**

None

6. **Operational Conditions on Use**

a. Grantee shall require each Subgrantee to prepare and maintain an Operations Safety Manual that sets forth health and safety procedures and emergency procedures for the Economic Development Activity as well as operational security procedures related to Subgrantee's activities. DOE intends that Grantee and Subgrantee shall comply with a single set of requirements for health, safety and emergency procedures that conform to the applicable requirements of the Occupational Safety and Health Administration and other agencies having jurisdiction over the commercial activities of the Grantee and Subgrantee. Pursuant to Article L of Part II of the Easement and prior to the commencement of any site activities (exclusive of preparatory activities approved by the DOE), the Grantee and Subgrantee shall submit the Operations Safety Manual to DOE for review. DOE will reasonably determine whether suitable processes have been described in the manual to ensure appropriate oversight by regulatory agencies, whether there are any conflicts with DOE health, safety and emergency requirements

that must be mitigated or eliminated, and whether there are any additional health, safety or emergency requirements that need to be added to the manual to avoid situations that could materially and adversely impact the health and safety of DOE activities; provided, however, that nothing in this provision will authorize DOE to assert jurisdiction to direct conduct of activities by the Grantee or Subgrantee within the primary jurisdiction of another federal agency. The DOE Management and Operating Contractor will accomplish review of the Operations Safety Manual at the Grantee's or Subgrantee's expense.

b. Activities of the Subgrantee must be coordinated with ongoing Government operations at the NTS. The DOE Site Management Division shall be responsible for internal Government communication and implementation of the coordination and scheduling procedures and shall serve as the point of contact for the Government with Grantee and Subgrantee. Direct communication shall be established between DOE and the Subgrantee for day-to-day scheduling and activities coordination. In the event of operational scheduling conflicts that cannot be resolved by the Subgrantee and the DOE, the Manager for DOE Nevada Operations Office shall be the final determining authority.

c. In the course of the Economic Development Activity, Grantee and Subgrantee shall not transit areas or engage in activities in a manner inconsistent with the scheduling and coordination procedures established under Subparagraph b, above, and Section 10 of this Exhibit A.

d. The Grantee shall require each Subgrantee to provide to the fire Department in Mercury a complete set of Material Safety Data Sheets for their facility and a duplicate key to all locks at their facility.

7. <u>**Site Facilities and Support Services**</u>

a. Charges for site facility usage (common site support costs associated with operating and maintaining the Nevada Test Site which benefit all users) and separate support services will be determined on a reimbursable basis at rates that are effective for the period. Provisional rates will be provided upon request.

b. Grantee will require Subgrantee to consider in good faith, but without obligation, utilizing support services available from DOE management and operating contractors in the Economic Development Activity, including, but not limited to:

I. design, procurement, construction and maintenance service for roads, parking areas, access roads, buildings, facilities, and associated infrastructure on or to the Property to the specifications of Grantee and Subgrantee.

II. electric power,

III. water,

IV. telecommunication services,

V. computer network services,

VI. construction equipment,

VII. transportation equipment or services,

VIII. maintenance services, including janitorial, landscaping, repair, and trash service,

IX. hazardous materials transportation and disposal services,

X. machine shop equipment and services, calibration equipment and services, security services for the Property,

XI. such other services as the Government, Grantee, and Subgrantee might agree.

c. Grantee agrees, and will require Subgrantee to utilize emergency medical services and emergency fire and hazardous materials emergency response services available from DOE management and operating contractors. Charges for these services will be reimbursed at rates in effect for the period.

d. Except as provided in subparagraph c above, subparagraph e below, and paragraph 11 (i), the Government and Grantee acknowledge and agree that Subgrantee shall have no obligation to utilize the support services provided by the DOE, Grantee or their respective contractors. DOE shall provide to Grantee the terms and conditions for the provision of such services, including price, quality, and duration of service.

e. The DOE agrees to provide operation and maintenance services for roads, transmission and distribution systems, and other infrastructure as deemed necessary by the Subgrantee. Such operation and maintenance work will be accomplished through the DOE Management and Operating Contractor at the Subgrantee's request

and expense. Charges for these services will be reimbursed at rates in effect for the period.

8. **Real Property Condition Report**

DOE and Grantee agree that the Real Property Condition Report is made a part hereof as Attachment A-2.

9. **Environmental Condition Report**

DOE and Grantee agree that the Environmental Conditions Report is made a part hereof as Attachment A-3. The Property is located within an area known to be desert tortoise habitat, the only Candidate or Listed Species for the area. Ground disturbance in this area will meet the terms and conditions of the Final Programmatic Biological Opinion for tortoise protection at the NTS, received from the United States Fish and Wildlife Service in August 1996. The Grantee acknowledges that complete copies of the documentation described above have been provided to the Grantee and Subgrantee.

10. **Access and Security Procedures**

a. DOE provides general security for the NTS for the Government's operational purposes. Under this security policy, unauthorized persons are not permitted access inside the secure boundaries of the NTS. Grantee or Subgrantee will submit a request for approval by the DOE of those persons who will need access to the secure boundaries of the NTS for purposes associated with the Economic Development Activity. DOE will issue authorization for those persons to enter the secure boundaries of the NTS consistent with DOE security requirements, including necessary badging and security processing for Grantee, Subgrantee, their employees, representatives, contractors, suppliers, customers, and guests, as designated by Subgrantee, as well as permanent access and badging procedures for the employees and customers of Subgrantee. Grantee and Subgrantee acknowledge that visitors, guests, customers, contractors, or employees of Grantee or Subgrantee who are not citizens of the United States must comply with additional security procedures for those circumstances.

b. Ingress and egress to and from the secure boundaries of the NTS shall be by means of ground transportation. Helicopter access is subject to prior approval by the DOE. Grantee and Subgrantee shall restrict their access and movement on the secure boundaries of the NTS to the common facilities of Mercury in Area 23 of the NTS, to the Property (and related easements) and to designated ingress/egress corridors. Grantee and Subgrantee shall have the right to use such areas and the designated

ingress/egress corridors to the Property for the duration of this Easement in accordance with this Exhibit A. All other areas of the NTS are restricted, and Grantee and Subgrantee are prohibited from entering such restricted areas, except as approved by the DOE. Any other access into restricted areas of the NTS will be handled on a case-by-case basis in accordance with DOE policies and practices and, to the extent practicable will be handled in a manner that will have minimal impact on the economic development activity authorized by this permit.

c. Ingress and egress to and from the Property shall be by means of ground transportation, unless other transportation is specifically approved by the DOE.

d. Should the DOE subsequently determine that national security interests will be adversely impacted by Grantee or Subgrantees' continued use of the present access roads to the Property, DOE shall have the unilateral right to change the access corridor. In such event, DOE will arrange for a reasonable alternate corridor to access the Property.

e. Grantee shall require Subgrantee to prepare and maintain Operational Security Procedures as approved by the DOE for access and organizational activities of the Subgrantee.

11. **Power Delivery**

a. The Grantee through its Subgrantee agrees to provide a benefit to the DOE equivalent to a ten percent (10%) reduction in energy usage based upon total NTS consumption for fiscal year 2000. For purposes of this section, the consumption at the NTS in fiscal year 2000 is 102,000 MWh.

b. This benefit shall be based upon the Subgrantee's installed generation capacity on the NTS and delivery of energy as provided herein. Up to 260 MW of installed generation capacity is expected to be developed by the Subgrantee and/or its affiliates at the NTS in three phases with an expected annual energy production of 795,000 MWh plus or minus 15%.

c. In consideration for the use of the NTS, energy losses shall be assessed at a rate fixed at 1.28% of Subgrantee's energy production. Grantee and Subgrantee shall have the right to interconnect with and use the transmission and distribution system on the NTS for the duration of this Easement in accordance with this Exhibit A. The design and location of the interconnection points shall be mutually agreed upon by DOE, Grantee and Subgrantee.

d. If development of installed generation capacity or energy production by Subgrantee or its affiliates is greater or less than expected, the percentage assessment for transmission losses shall remain fixed at 1.28%.

e. Energy delivery shall be scheduled by Subgrantee at its expense through the appropriate area load controller and shall equal the amount of energy metered at the high side of the step up transformer at the Project's substation located on the Property minus 1.28% attributed to transmission losses as provided in subparagraph (c) above.

f. The DOE shall have the right to validate and audit all meter readings and production schedules of the Subgrantee.

g. DOE, Grantee and Subgrantee shall work with local interconnected utilities to develop mutually agreed upon metering protocols and administration procedures to verify energy deliveries to the NTS and actual power schedules and deliveries off the NTS.

h. DOE does not guarantee the operable condition of the NTS transmission and distribution system and shall not be subject to fines, penalties or other charges either indirect or direct regarding the failure of the NTS transmission and distribution system. The DOE shall coordinate with the Subgrantee any scheduled maintenance and repairs of the system that affect the Subgrantee's ability to deliver power through the NTS system.

i. The Grantee and Subgrantee shall have the right to make any improvements to the existing NTS transmission and distribution system as deemed necessary to either improve system reliability and/or current carrying capability to allow for the efficient transmission of generated energy on and off the NTS. The design and location of such improvements shall be mutually agreed upon by DOE, Grantee and Subgrantee. Construction, operation and maintenance of such improvements to the existing NTS transmission and distribution system will be accomplished through the DOE Management and Operating Contractor at the Grantee's or Subgrantee's expense. Operation and maintenance of the transmission and distribution system from the high side of the generator transformers to the point of interconnection with the existing DOE transmission and distribution system will be accomplished through the DOE Management and Operating Contractor, for the full cost recovery of actual time and materials in accordance with DOE accounting practices, at the Grantee's or Subgrantee's expense.

## 12. Environmental Assessment

DOE is preparing an Environmental Assessment (EA) for this Grant of Easement pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq. DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process. After DOE has completed the EA and considered the environmental impacts of this action, DOE will either issue a Finding of No Significant Impact or prepare an Environmental Impact Statement.

## 13. Real Estate Operations Permit

DOE and Grantee agree that the Real Estate Operations Permit is made a part hereof as Attachment A-5.

## 14. Administration

For purposes of this Easement, the DOE and the Grantee's Representative will be:

For DOE: Manager, U.S. Department of Energy, Nevada Operations Office

For Grantee: President, NTS Development Corporation

The following Attachments are referenced in this Exhibit A and made a part of this Exhibit A:

Attachment A-1 Map of Permitted Area

Attachment A-2 Real Property Condition Report

Attachment A-3 Environmental Condition Report

Attachment A-4 Environmental Assessment (in process)

Attachment A-5 Real Estate Operations Permit




**Attachment A-1 Map of Permitted Area**

**Attachment A-2**

**Real Property Condition Report**

The Real Property Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Real Property Condition Report.

**Attachment A-3**

**Environmental Condition Report**

The Environmental Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Environmental Condition Report.

**Attachment A-4**

**Environmental Assessment**

In process.

**Attachment A-5**

**Real Estate Operations Permit**

The Grantee and Subgrantee agree that no operations or activities shall be conducted on the Property prior to the completion and DOE approval of the Real Estate Operations Permit.

# SUBEASEMENT

This Subeasement ("*Subeasement*") is entered into as of January 17, 2001, by and between NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation ("**Subgrantor**"), and MNS Wind Company, LLC, a Delaware limited liability company ("**Subgrantee**").

## RECITALS

A. Subgrantor has the right to use and occupy certain premises known as a portion of the Nevada Test Site, as specifically described in Exhibit "1" attached hereto and incorporated herein by this reference, (the "**Premises**") pursuant to and as more specifically described as the "Property" in the Easement for Wind Powered Electric Generating Facility granted as of December 22, 2000 (the "**Easement**") between Subgrantor, as Grantee, and the United States of America, acting by and through the Nevada Operations Office of the Department of Energy (the "**Master Grantor**", "**Government**" or "**DOE**"). A true and correct copy of the Easement with parts I and II and all exhibits thereto is attached hereto as Exhibit "2", and incorporated herein by this reference.

B. Subgrantee desires to obtain from Subgrantor a subeasement granting to Subgrantee the right to use and occupy the Premises and to obtain the benefit of the appurtenant rights and commitments of the Master Grantor which are set forth in the Easement, and Subgrantor is willing to grant to Subgrantee this subeasement conveying to Subgrantee the right to use and occupy the Premises, as well as the right to use and benefit from such appurtenant rights and commitments, upon the terms and subject to conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing premises and the mutual promises of the parties which are set forth below, Subgrantor and Subgrantee agree as follows:

1. **<u>Grant of Easement and Term</u>**. Pursuant to the authority granted by the Easement, and with the consent and approval of the Master Grantor, as required by the Easement, Subgrantor hereby grants and conveys to Subgrantee an easement to use and occupy the Premises upon the terms and subject to the conditions set forth herein and in the Easement. Subgrantor further grants and conveys to Subgrantee all of its right and interest to use and enjoy the appurtenant benefits, commitments and agreements of Master Grantor set forth in the Easement. Subgrantor agrees to use its reasonable good faith efforts to enforce the Easement, at Subgrantee's cost, for the benefit of Subgrantee, and agrees that Subgrantee may enforce directly against Master Grantor all rights and remedies of Subgrantor under the Easement.

The Premises shall be used for the purpose of a wind powered electric generating facility (the "*Project*"), as more fully described in the Easement (the "**<u>Economic Development Activity</u>**"), and for no other purpose without the prior written consent of Master Grantor and Subgrantor, which consent shall not be unreasonably withheld, conditioned or delayed.

The term of this Subeasement (the "**Subeasement Term**") shall commence upon the later of (i) the date upon which this Subeasement is executed by both parties hereto; or (ii) the date upon which this Subeasement is approved by Master Grantor (the "**Term Commencement Date**") and shall end on the earlier of (a) the thirty-fifth (35th) annual anniversary of the Term Commencement Date; or (b) the expiration or earlier termination of the Easement, unless sooner terminated pursuant to the terms of this Subeasement. If the Master Grantor approves the extension of the term of the Easement as provided therein, Subgrantee shall have the right to extend the initial term of this Subeasement for an additional period of ten (10) years (the "Option Period") upon the same terms and conditions as stated herein except for the terms of the Compensation Agreement described in Section 3, below. Provided there exists no continuing Event of Default hereunder, Subgrantee may exercise its right to extend the term by written notification to Subgrantor not less than (180) days prior to the expiration of the Subeasement Term.

In the event it is determined that the Master Grantor did not have the power or authority to enter into the Easement, Subgrantor agrees to use its best efforts to (i) obtain an amendment to the public land order under which the NTS was permanently withdrawn, authorizing or permitting the granting of the Easement and the subeasements contemplated thereunder, or (ii) obtain from the Department of Interior a lease, easement or other grant on terms substantially similar to the Easement. In any case, Subgrantor agrees to enter into subeasements or similar other agreements with Subgrantee or its designated affiliate company on terms and conditions substantially similar to those of this Subeasement. Any increased rental or fee payable under any such new or substitute master agreement shall be deducted from the Annual Fee payable under the Subeasement (or substitute agreement).

2. __Assumption of Obligations__. During the term hereof, Subgrantee shall assume, and faithfully discharge in a timely fashion, all of Subgrantor's obligations under the terms of the Easement with respect to the Premises. Subgrantee shall not do or fail to perform any act which may constitute a breach or violation of any term, covenant or condition under this agreement or Easement. As an additional obligation, Subgrantee shall cause the insurance which is obtained by Subgrantee pursuant to the Easement to name Subgrantor, Master Grantor and prime contractors at the Nevada Test Site as additional insureds. Subgrantee hereby acknowledges that it has read and is familiar with the terms of the Easement and agrees that (i) this Subeasement is subordinate and subject to the Easement and that any termination of the Easement shall likewise terminate this Subeasement except as hereinafter provided or provided in the Master Easement; and (ii) that Subgrantee has not been granted any rights except those set forth herein, in the Master Easement and in the Compensation Agreement. Subgrantee acknowledges and agrees that pursuant to the Easement, certain payments, certificates, notices and other items must be provided to Master Grantor. Subgrantee agrees to provide all such payments, certificates, notices and other items to Master Grantor, with copies of the

appropriate transmittal concurrently delivered to Subgrantor, no later than the date upon which such items must be provided to Master Grantor pursuant to the terms of the Easement.

(a) Provided there exists no continuing Event of Default hereunder, Subgrantor agrees (i) to maintain the Easement during the entire term of this Subeasement and not take any action in contravention thereof, subject, however, to any earlier termination of the Easement in accordance with its terms without the fault of Subgrantor; (ii) to comply with all of the Subgrantor's covenants and obligations under the Easement made by Subgrantor for the benefit of Subgrantee, and to comply with and perform all other obligations of Subgrantor under the Easement that Subgrantee has not expressly assumed under this Subeasement; (iii) not to cancel, terminate, surrender or suspend performance under the Easement or this Subeasement, or consent to any such cancellation, termination, surrender or suspension; (iv) not to modify or amend the Easement without the prior consent of Subgrantee, which consent, shall not be unreasonably withheld so long as Subgrantee's rights and obligations are not adversely affected thereby (and in such case, Subgrantee may withhold its consent in its sole and absolute discretion); and (v) promptly deliver to Subgrantee and its lenders all notices given to or received from the Master Grantor concerning the Premises, the Easement or this Subeasement, including without limitation, all notices of default. Any cancellation, termination, surrender, suspension, amendment or modification made in violation of the foregoing shall be null and void and shall have no effect on the rights of Subgrantee or any lender under this Subeasement or the Easement. Subgrantor shall not have the right to terminate this Subeasement unless Master Grantor terminates the Easement, except as expressly provided herein.

(b) Subgrantee shall have the right to transfer, assign and hypothecate its interest in this Subeasement and the Easement in accordance with Section S of the Easement, which is incorporated herein by this reference. Subgrantee agrees to execute such consents and estoppels as may be reasonably requested by any lender to the Project.

(c) Subgrantor agrees not to interfere with the flow, direction, generation or speed of wind over and across the Premises, or unreasonably interfere with the construction, maintenance and operation of the Project. Subgrantor agrees not to grant any other easement, lease or right to use or occupy any portion of the Premises to any other party during the term of this Subeasement.

3. **Easement Fees and Charges**. Fees and charges which are payable by Subgrantee for the rights, services and benefits conveyed by this Subeasement are set forth in a separate Compensation Agreement, dated of even date herewith, between Subgrantor and Subgrantee (the "**Compensation Agreement**"), the terms and provisions of which are incorporated herein by this reference as though set forth in full herein. Any Event of Default under the terms of the Compensation Agreement shall be a material default of Subgrantee's obligations under this Subeasement.

4. **Alteration and Improvement of the Premises**. Except as otherwise permitted under the Easement, Subgrantee shall not construct improvements upon or otherwise alter the Premises without the prior written approval of Subgrantor and, as set forth in the Easement, the prior written approval of Master Grantor, which consent in each case shall not be unreasonably withheld, conditioned or delayed. Subgrantor hereby consents to and approves of the construction and operation of the Project by Subgrantee as described in the Easement.

5. **Condition of the Premises**. Subgrantor will deliver to Subgrantee all reports and other information provided to Subgrantor by Master Grantor pertaining to the Premises. Subgrantee acknowledges that Subgrantor has not had possession of or access to the Premises prior to the date of this Subeasement. Accordingly, Subgrantor has not investigated and cannot make any representation or warranty whatsoever concerning any reports or other information furnished by Master Grantor nor any representation or warranty concerning any other aspect of the Premises or the suitability of the Premises for the conduct of Subgrantee's proposed business. The Premises shall be accepted by Subgrantee in its as-is condition and state of repair, and Subgrantor shall have no obligation to improve or alter the Premises in any manner whatsoever except as otherwise provided in the Easement. During the term of this Subeasement, Subgrantee shall maintain the Premises as required by the Easement and shall ensure that the Premises are safe and free from hazards that may cause injury or death to persons or damage to property to the extent required under the Easement. Upon the expiration or earlier termination of this Subeasement, Subgrantee shall, except to the extent that Subgrantee is directed otherwise by Master Grantor or Subgrantor, or otherwise provided by the Easement, remove all of its improvements and alterations from the Premises, and restore the Premises to its original condition and state of repair. However, if Master Grantor or Subgrantor so requests, Subgrantee may in its sole and absolute discretion, leave all of its improvements and alterations (or those improvements and alterations identified by Master Grantor or Subgrantor) in place on the Premises.

6. **Easements and Approvals**. Except for water permits which Subgrantor agrees to obtain on behalf of Subgrantee, Subgrantee acknowledges that it is Subgrantee's sole responsibility to obtain all necessary permits and approvals for its use of the Premises. Subgrantor agrees to reasonably cooperate with Subgrantee in obtaining such permits and approvals at Subgrantee's sole cost and expense. Subgrantee shall be responsible for compliance in all material respects with applicable laws and regulations affecting Subgrantee's use of the Premises including laws and regulations applicable to the transportation, storage, use and disposal of hazardous materials or substances. By execution of this Subeasement, Subgrantee represents, warrants, and certifies to Subgrantor and Master Grantor that Subgrantee currently has or is in the process of obtaining all required regulatory permits and licenses required for Subgrantee to conduct its operations on the Premises.

7. **Safety Data Sheets**. Within thirty (30) days after execution of this Subeasement, and thereafter prior to bringing to the Premises any new or altered hazardous material or substance, Subgrantee shall file with Master Grantor and with the NTS Fire Department, with a copy to Subgrantor, copies of all material safety data sheets applicable to hazardous materials or substances which are or will be stored or used by Subgrantee on the Premises.

8. **Damage to the Property of Master Grantor**. Subgrantee shall be financially responsible for any and all property of Master Grantor or Subgrantor (including any property financed by Subgrantor or any other entity) that is lost, damaged or destroyed as a direct result of Subgrantee's conduct from any cause whatsoever by Subgrantee or its agents, or the operation of the Project (except to the extent that such loss, damage or destruction resulted from the acts or omissions of the Master Grantor, its prime contractors at the NTS, or Subgrantor (including their employees, agents, contractors, vendors and customers)). Any claims arising out of a subsequent contract or agreement for services will be handled in the manner prescribed in that contract or agreement, and shall not be affected by this provision unless specified.

9. **Indemnity**.

(a) Subgrantee shall indemnify, defend (by counsel reasonably acceptable to Subgrantor) and hold harmless Subgrantor from and against all claims, demands, liabilities, costs and expenses, including reasonable attorneys' fees, arising from (i) Subgrantee's breach of its obligations hereunder (including, without limitation, any breach of Subgrantee's obligation under this agreement to perform the obligations of Subgrantor under the Easement; (ii) the use and occupancy by Subgrantee of the Premises; and (iii) any act, omission or negligence on the part of Subgrantee, its employees, agents, contractors or invitees, excluding, however, any such claim, demand, liability, cost or expense arising from the negligence or willful misconduct of Subgrantor, or its employees, agents, contractors or invitees.

(b) Subgrantee shall indemnify and hold harmless Subgrantor, Master Grantor and Master Grantor's prime contractors at the NTS with respect to any and all judgments, awards of damages, penalties, or fines by a court of competent jurisdiction or through a regulatory enforcement action, or arbitration awards or settlements reached with the participation and concurrence of the Subgrantor and Subgrantee (including reasonable attorneys' fees and expenses related to such litigation), to the extent they do not arise from the negligent acts or omissions of the Master Grantor, its prime contractors at the NTS, or Subgrantor, and arise from or are incident to (i) conduct by Subgrantee in its use and occupancy of the Property (including conduct by third parties entering the NTS to conduct business with Subgrantee) giving rise to the judgment, award of damages, penalty, fine, arbitration award or settlement; (ii) damages to the Premises or injuries to or death of any person, including without limitation, employees and officers of Master Grantor or Subgrantee; (iii) any "release" by Subgrantee or its agents as defined in Section 101(22) of the

Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA") of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Premises at any time while this Subeasement is in effect; (iv) failure of Subgrantee to comply with applicable environmental laws; and (v) the transportation, deposit, storage, or disposal by Subgrantee of hazardous substances or petroleum offsite of the Premises.

(c) Subgrantor acknowledges and agrees that it shall be liable and responsible for any and all claims, demands, liabilities, costs and expenses, including reasonable attorneys' fees, suffered or incurred by Subgrantee or its members, employees, agents or invitees, arising from (i) Subgrantor's breach of its obligations hereunder or under the Easement; (ii) any accidents on, or damages to the Premises or Project or injuries to or death of any person on the Premises, including without limitation, employees and officers of Subgrantee, resulting from Subgrantor's actions; (iii) any "release" directly caused by Subgrantor as defined in Section 101(22) of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA") of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Premises; (iv) failure of Subgrantor to comply with applicable environmental laws applicable to the conduct of its business; (vi) the transportation, deposit, storage, or disposal by Subgrantor or its employees, agents, contractors or invitees of hazardous substances or petroleum offsite of the Premises; and (vii) any act, omission, or negligence on the part of Subgrantor, or its employees, agents, contractors or invitees.

(d) Subgrantee shall not be responsible for any claims, damages, causes of action, proceedings, judgments, or suits, and all liabilities, losses, costs or expenses, (including, without limitation, technical consultant fees and reasonable attorneys' fees) to the extent they do not arise from the negligent acts or omissions of the Subgrantee and may arise from or be incident to (i) conduct of the Master Grantor, Subgrantor, any other subpermittee, or their employees, agents or contractors at the NTS in providing services to the Subgrantee; (ii) any "release" by the Master Grantor, Subgrantor, any other subpermittee, or their agents as defined in section 101(22) of CERCLA or any "hazardous substance" as defined in Section 101(14) of CERCLA, or petroleum (including crude oil or any fraction thereof) onto or from the Premises; (iii) the failure of the Master Grantor, Subgrantor, or any other subpermittee, to comply with applicable environmental laws; or (iv) the transportation, treatment, deposit, storage, or disposal by the Master Grantor, Subgrantor, any other subpermittee, of hazardous substances or petroleum off-site of the Premises.

10. <u>Access</u>. Subgrantor and Master Grantor shall have the right to gain access to the Premises, consistent with Subgrantee's rights of quiet enjoyment, for the sole purpose of providing agreed services, maintenance and repair, conducting inspections authorized under this Subeasement, or responding to a health or safety emergency, provided that Subgrantor shall not unreasonably interfere with Subgrantee's operations. In all instances except for emergency response and

inspections by regulatory authorities, access to the Premises shall be scheduled 48 hours in advance or in accordance with agreements for the provision of services, maintenance and repair. Subgrantee shall provide Subgrantor with a schedule of operations and hours for the Premises. Subgrantee shall have the right to accompany Subgrantor or its designated representatives in their exercise of this right to access to the Premises.

11. **Safety Manual.** Subgrantee shall prepare and maintain an Operations Safety Manual that sets forth health and safety procedures and emergency procedures for the Economic Development Activity as well as operational security procedures related to Subgrantee's activities. For purposes of construction activities, Subgrantee will (i) comply with reasonable commercial construction standards and (ii) submit a construction safety plan, including site specific requirements for emergency response, to Master Grantor, with a copy to Subgrantor, for review prior to commencement of construction activities. Pursuant to Article L of Part II of the Easement and prior to the commencement of any electricity generation activities, the Subgrantee shall submit the Operations Safety Manual to Master Grantor and Subgrantor for review, comment and reasonable approval; provided, however, that nothing in this provision will authorize Master Grantor or Subgrantor to assert jurisdiction to direct conduct of activities by Subgrantee within the primary jurisdiction of another federal agency.

12. **Default.**

12.1 **Events of Default.** The occurrence of any one or more of the following shall constitute an Event of Default:

(a) The occurrence of a default in the performance of the obligations of Subgrantor under the Easement which obligation Subgrantee has agreed to perform under the terms of this Subeasement, which default is not cured after written notice within any applicable grace period in the Easement, except to the extent that such default is caused by Subgrantor.

(b) The failure by Subgrantee to observe or perform any of the other covenants, conditions or provisions of this Subeasement where such failure continues for more than thirty (30) days after written notice from Subgrantor; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Subgrantee shall not be in default if Subgrantee commences such cure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion. Subgrantor agrees to give each lender of the Project copies of any notices of breach or default given to Subgrantee.

(c) Any representation or warranty made by Subgrantee in

in this Subeasement shall have been materially false or misleading as of the date such representation or warranty was made.

12.2 **Remedies of Subgrantor**. Upon the occurrence of an Event of Default, Subgrantor shall have the right to pursue any remedy now or hereafter available to Subgrantor under the laws of the State of Nevada, including, without limitation, the right to terminate this Subeasement and recover damages from Subgrantee (provided, in no event shall Subgrantee be liable for special or consequential damages).

12.3 **Limitation of Liability**. Without limiting any obligation under the Easement, the liability of Subgrantor and Subgrantee (and each Project lender to the extent such lender succeeds to Subgrantee's interests) for failure to perform any obligation under this Subeasement shall be limited to their respective interest in the Project and Premises (and no officer, director, employee, shareholder or member shall have any personal liability with respect thereto).

12.4 **Notices to Lenders**. Subgrantor shall provide each lender to the Project, on a timely basis, copies of any notices of breach or default concerning this Subeasement, the Compensation Agreement, the Easement or the Premises (i) given by the Master Grantor to Subgrantor, promptly upon receipt of such notice (together with a copy of such notice to Subgrantee), and (ii) given to Subgrantee, concurrently with the giving of such notice to Subgrantee. Each lender shall have the right, but not the obligation, to cure any default under such agreements, and Subgrantee agrees to accept such cure. Subgrantee and each lender shall have the right, but not the obligation, to cure directly with the Master Grantor, any default by Subgrantor under the Easement. Subgrantor agrees to maintain during the term of this Subeasement an account with Lexis Document Services or a similar company to facilitate the giving of the notices required hereunder.

13. **Cooperation**. Subgrantor agrees to cooperate with Subgrantee in good faith for the purpose of obtaining consents, approvals, authorizations or additional rights or services, including, without limitation additional rights-of-way and easements, from Master Grantor so that the Premises may be used by Subgrantee for the permitted purposes described herein and in the Easement. Subgrantor reserves the right to obtain reimbursement from Subgrantee for any additional costs or expenses which it reasonably incurs hereunder for additional rights or services to be provided to Subgrantee hereunder.

14. **Utilities and Services**. Subgrantor will cooperate in good faith with Subgrantee to obtain all services which Subgrantee wishes to obtain from Master Grantor. The amounts which Subgrantee is to pay to Subgrantor for such services are set forth in the Compensation Agreement. Subgrantee acknowledges that it is required to consider in good faith utilizing support services provided by Master Grantor, but is under no obligation to do so, except as otherwise provided in Exhibit A of the Easement.

In addition, Subgrantor may elect to provide services to its clients at the Nevada Test Site, including, without limitation, utility services and emergency fire and medical services (collectively, "**Additional Subgrantor Services**"). Subgrantee may but shall have no obligation to contract directly with Subgrantor for available Additional Subgrantor Services, except as otherwise provided in Exhibit A of the Easement.

15. **Successor and Assigns**. This Subeasement shall constitute a covenant running with the Premises, and shall be binding on the successors and assigns of the parties.

16. **Execution**. Each of the undersigned persons represents and warrants that he or she has full power and authority to execute this Agreement on behalf of Subgrantor or Subgrantee, as applicable.

17. **Subgrantor's Liability**. Subgrantee agrees that Subgrantor, its employees, officers, directors, consultants, attorney's shall have no liability to Subgrantee for: a) the termination of the Easement or this agreement for any cause whatsoever except if caused by the act or omission of Subgrantor, b) for the failure or interruption , for any reason whatsoever, of the use of the Premises except if caused by the act or omission of Subgrantor, or c) for the failure or interruption of any utilities, services, and/or facilities in connection with the Premises except if caused by the act or omission of Subgrantor.

18. **Miscellaneous Provisions**.

18.1 **Attorneys' Fees**. In any litigation between the parties regarding this Subeasement, the losing party shall pay to the prevailing party all reasonable expenses and court costs including reasonable attorneys' fees incurred by the prevailing party.

18.2 **Notices**. All notices under this Subeasement shall be in writing and shall be delivered by personal delivery or sent by registered or certified mail, postage prepaid , as follows:

To Subgrantee: MNS Wind Company, LLC
c/o M&N Wind Power, Inc.
4225 Executive Square, Suite 1650
La Jolla, California 92037
Attention: Mr. John Johansen

To Subgrantor: NTS Development Corporation
2330 Pasco del Prado
Suite C-101

Las Vegas, Nevada 89102
Attention: President

Notices which are delivered by personal delivery shall be effective upon receipt. Notices which are given by mail as required above shall be considered given and received two (2) business days after deposit in the mail. Copies of all notices given to Subgrantee under this Easement shall all be delivered to all the Project lenders at the address provided by such lenders.

18.3 **Partial Invalidity**. If any provision of this Subeasement is invalid or unenforceable to any extent, then that provision shall be null and void and the remainder of this Subeasement shall continue in effect and shall be enforceable to the fullest extent permitted by law.

18.4 **Waiver**. The failure of either party to exercise any of its rights is not a waiver of those rights. A party waives only those rights specified in writing and signed by the party waiving its rights.

18.5 **Governing Law**. To the extent not in conflict with applicable federal law, this Subeasement shall be governed by the laws of the State of Nevada.

18.6 **Consent of Master Grantor**. This Subeasement and the rights and obligations of the parties hereunder are subject to the written consent of the Master Grantor, which consent shall be attached hereto as Exhibit "3".

18.7 **Conditions Precedent**. Subgrantee's obligations under this Subeasement are subject to and conditioned upon satisfaction of each of the following conditions precedent:

(i) Subgrantee obtaining financing for the Project on such terms and conditions satisfactory to Subgrantee in its sole and absolute discretion;

(ii) Subgrantee obtaining all consents, permits, licenses, easements, rights of way and other approvals necessary for the construction and operation of the Project;

(iii) Subgrantee's approval in its sole and absolute discretion of the environmental assessment of the Premises and the property condition report;

(iv) Subgrantee shall have determined in its sole and absolute discretion that the construction and operation of the Project is economically feasible; and

(v) Approvals of the Board of Directors of the members of Subgrantee.

In the event of the failure of any of the foregoing conditions precedent, Subgrantee shall have the right to terminate this Subeasement by delivering written notice of such termination to Subgrantor, and upon such termination, Subgrantee shall have no further obligations or liabilities whatsoever hereunder or under the Easement.

18.8 **Integration**. The terms and conditions of the Easement and Compensation Agreement are incorporated herein by this reference and made a part hereof.

18.9 **Quiet Enjoyment**. Provided that the Subgrantee observes and performs all of its obligations hereof, Subgrantee shall peaceably and quietly hold and enjoy the Premises for the term provided herein without interruption by the Government or Subgrantor or any person or persons claiming by, through or under such parties. Subgrantor warrants and represents to Subgrantee that it has the power and authority to enter into this Subeasement and the Compensation Agreement.

18.10 **Good Faith**. Except as otherwise expressly provided, any time the consent of the Master Grantor or Subgrantor is required under any Part of the Easement (or Exhibit A thereto or any other exhibit) or under this Subeasement or the Compensation Agreement, such consent shall not be unreasonably withheld, conditioned or delayed, and, whenever any Part of the Easement (or Exhibit A thereto or any other exhibit), or the Subeasement or the Compensation Agreement grants the Master Grantor or Subgrantor the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Master Grantor and Subgrantor shall act prudently and in good faith.

18.11 **Counterparts**. This Subeasement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, Subgrantor and Subgrantee have executed this Subeasement as of the date written above.

"Subgrantor"

NTS DEVELOPMENT CORPORATION
a Nevada not-for-profit corporation

By: ______________________
Name: TIM CARLSON
Its: PRESIDENT

"Subgrantee"

MNS WIND COMPANY, LLC
a Delaware limited liability company

By: ______________________
John A. Johansen
Authorized Representative

EXHIBIT "1"

PREMISES

EXHIBIT "2"

Easement

# U. S. DEPARTMENT OF ENERGY
# NEVADA OPERATIONS OFFICE
# GRANT OF EASEMENT FOR
# WIND POWERED ELECTRIC GENERATING FACILITY

## *PART I*
## *SPECIFIC PROVISIONS*

This Grant of Easement for Wind Powered Electric Generating Facility ("*Easement*") is made as of December 22, 2000 by the UNITED STATES OF AMERICA, as the Grantor, hereinafter referred to as the "GOVERNMENT", acting by and through the Nevada Operations Office, U.S. Department of Energy, hereinafter referred to as the "DOE," and NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation, hereinafter referred to as the "GRANTEE."

**WITNESSETH:**

A. The Secretary of Energy, under the authority of Section 161 of the Atomic Energy Act of 1954, as amended (Public Law 83-703), Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), and other applicable law, has determined that the Property (as hereinafter defined), which is located at the Government's Nevada Test Site (hereinafter referred to as the "NTS"), is not excess property as defined by Section 3(e) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 472), and that this Easement is advantageous to the Government.

B. The Secretary of Energy, under the aforesaid authority, has further determined that (i) the Property is public land withdrawn or reserved for use by the Department of Energy, (ii) this Easement is compatible with the DOE's interests, (iii) this Easement does not include more property than is reasonably necessary for the purpose for which the Easement is granted, and (iv) this Easement otherwise fully complies with all requirements of the aforesaid authority and other applicable law.

NOW THEREFORE, in consideration of the mutual covenants and agreement hereinafter set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Government, subject to compliance with the National Environmental Policy Act, 42 U.S.C. 4321 et seq., hereby grants and conveys to Grantee, for the use and benefit of Subgrantee (as hereinafter defined) an easement on, over, under, across and through the property described in Exhibit A, Attachment A-1 (the "*Property*") for the purpose of the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of wind

powered electric generating facilities (the "*Project*"), which Project shall include, wind turbine generators, support structures, transformers, substations, electric power and other utility lines and towers, communication lines and equipment, water and gas lines, and other improvements and systems necessary or advisable for the construction and operation of a wind powered electric generating facility. Any relocation of a wind turbine generator outside of the Project Site will require the consent of the DOE in accordance with Exhibit A.

(a) The Government agrees not to intentionally interfere with the flow, direction, generation or speed of wind over and across the Property, or unreasonably interfere with the construction, maintenance and operation of the Project. The Government and Subgrantee shall coordinate their use of the Property in accordance with Exhibit A.

(b) The Government further agrees to promptly grant such additional easements and rights of way requested by Grantee or Subgrantee over other areas of the NTS approved by the DOE, which are necessary or advisable for the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of utility towers, electric power and other lines, communication lines and equipment, water and gas lines, access roads, substations, transformers and such other systems as may be necessary or advisable for the construction and operation of the Project, and ingress and egress therefrom. If the DOE does not approve a proposed easement or right of way, the DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible.

2. Included within Exhibit A is a description of the land and improvements, including a map of the area; a map of the installation depicting common areas to include means for ingress and egress and restricted areas; a description of the Economic Development Activity (as hereinafter defined); an inventory of personal property; limits of operations within the Property and common areas not addressed in *Part II-General Provisions*; description and charges for utility, maintenance, and other services not covered under *Part II-General* provisions; a real property conditions report; and an environmental conditions report.

3. This Easement shall remain effective for a term as set forth in Exhibit A of thirty-five (35) years), plus an additional (10) ten year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

4. Grantee shall pay the Government an annual fee as set forth in Exhibit A in advance at the start of each easement year. Any charges for services specified in Exhibit A will not begin until the Property is subject to the Subeasement (as hereinafter defined) unless services are used sooner by the Grantee. The Grantee is permitted to charge fees for its subeasement property, but any fees that are collected which exceed Grantee's cost must be reinvested into economic development endeavors.

5. (a) The sole purpose for which the Grantee shall use the Property is to support Economic Development as part of the mission of the U.S. Department of Energy. For the purpose of

this Easement for wind powered electrical generating projects, Economic Development Activity includes, but shall not be limited to, the following: activities relating to furthering the employment of displaced and current contractor employees; creating or enhancing new business opportunities at the facility or in the surrounding community; providing funding for such activities; and educating the employees or the community regarding such activities. The Grantee must obtain the written approval of DOE prior to using the Property for any purpose other than that specified above. The Government hereby approves and consents to Grantee entering into one or more subeasements of the Property (hereinafter individually and collectively referred to as a "*Subeasement*") with MNS Wind Company, LLC, a Delaware limited liability company or affiliated companies (hereinafter individually and collectively referred to as a "*Subgrantee*"), and to the construction and operation of portions of the Project on the Property by each Subgrantee. The Government has reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property, and acknowledges that the proposed use of the Property constitutes an approved Economic Development Activity as required under this Easement. The Government and Grantee further acknowledge and agree that a default under any Subeasement shall not, solely by reason of such default, constitute a default under any other Subeasement. In the event of default under a Subeasement, the Government and Grantee shall exercise their respective rights and remedies only against the Subeasement in default, and the remaining Subeasements shall remain in full force and effect and shall not be disturbed.

(b) The Government acknowledges and agrees that in the event of any dissolution of Grantee, or in the event the Easement or Subeasement are rejected in any bankruptcy or are terminated for any reason (except as a result of a default by Subgrantee thereunder), the Easement and Subeasement shall continue in full force and effect as if such easements were entered into directly between the Government and Subgrantee (provided that the DOE's obligations to Subgrantee under the Subeasement shall be no greater than DOE's obligations to Grantee under this Easement), and Subgrantee's use of the Property and Project will not be disturbed. Upon request, the Government shall enter into a new easement directly with Subgrantee or the Project lender upon the same terms and conditions of the Subeasement (provided that the DOE's obligations under the new easement shall be no greater than DOE's obligations to Grantee under this Easement). The Government and Grantee acknowledge and agree for the benefit of Subgrantee, that Subgrantee shall have the right to enjoy and directly enforce against the Government any and all rights and remedies of Grantee under this Easement.

6. In the event DOE or its prime contractors at the NTS and other NTS contractors, in their good faith, prudent judgment, observe an unsafe practice or unsafe condition that poses a material threat of imminent danger to persons or property under Grantee's or Subgrantee's control, Grantee and Subgrantee shall, upon oral or written notification (provided that if such notice is oral, the Government shall promptly also provide Grantee written confirmation notice of such matter) by DOE or a regulatory authority having jurisdiction over the activity, cease such unsafe activity to the extent required by applicable law and promptly correct such unsafe practice or condition in accordance with applicable law.

7. Grantee shall require Subgrantee to comply with all Federal Government and State of Nevada laws and regulations and NTS rules applicable to the transportation, storage, use and disposal of hazardous materials or substances. Grantee or Subgrantee shall immediately file with the NTS fire department copies of all material safety data sheets applicable to hazardous materials or substances stored or used by Subgrantee at the NTS.

8. Grantee shall cause the Subgrantee to certify to DOE that it currently has and/or is in the process of obtaining all required regulatory permits and licenses. It is agreed that the Subgrantee must obtain and comply in all material respects with the terms and conditions of regulatory agency permits affecting the Project during the term of this Easement, especially if the specific activity impacts DOE's ability to comply with a regulatory agency permit condition. Any excursion of regulatory agency permit requirements that are the fault of the Grantee or Subgrantee and that result in fines or penalties will be the responsibility of the Grantee and Subgrantee to the extent caused by the Grantee or Subgrantee. If the agency of competent jurisdiction determines that Grantee or Subgrantee is out of compliance with a regulatory permit or license and Grantee or Subgrantee thereafter fails to take appropriate measures as determined by the regulatory authority to achieve compliance, and if such noncompliance poses a material threat of danger to the health and safety of personnel on the NTS, DOE shall have the right to direct Grantee or Subgrantee to stop operations if such noncompliance is not corrected within thirty (30) days following written notice to Grantee and Subgrantee; provided, however, that if the nature of the noncompliance is such that more than thirty (30) days are reasonably required for its cure, then Grantee and Subgrantee shall not be required to stop operations if Subgrantee commences to cure the noncompliance within such thirty (30) day period and thereafter diligently prosecutes such cure to completion (and during the period of such cure, takes all steps reasonably necessary to protect the public health and safety). Operations will resume only after review and approval by the agency of competent jurisdiction.

9. Grantee acknowledges that construction, maintenance and operational activities performed on the NTS for DOE programs are subject to project specific labor agreements with the Nevada Building and Construction Trades. Grantee acknowledges that it has consulted with the Nevada Building and Construction Trades concerning Subgrantee's activities to be conducted at the NTS and has resolved any concerns in a manner that does not impact DOE relations with the Nevada Building and Construction Trades.

10. Security measures will be determined on a building-by-building or area-by-area basis according to the nature of the activities undertaken by the DOE within the particular security zone. Detailed in Exhibit A are generic requirements for security and badging.

11. This Easement consists of this *Part I--Specific Provisions*, *Part II--General Provisions*, and Exhibit A. In the event of inconsistencies between this *Part I--Specific Provisions*, and *Part II--General Provisions*, *Part I* shall control; in the event of inconsistencies between Exhibit A to this Easement and *Parts I or II*, Exhibit A shall control. The terms and conditions of Part II -

General Conditions and Exhibit A (and each part thereof) are incorporated herein by this reference and made a part hereof.

12. For the purpose of this Easement, the DOE representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at U.S. Department of Energy, Nevada Operations Office, P.O. Box 98518, Las Vegas, NV 89193-8518.

For the purpose of this Easement, the Grantee Representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at NTS Development Corporation, 2330 Paseo Del Prado, Suite C-101, Las Vegas, NV 89102.

IN WITNESS WHEREOF, the parties hereto have caused this Easement to be executed on their behalf by their duly authorized representative as of the date first above written.

**GRANTEE:**

NTS Development Corporation

By: [signature]
Tim Carlson, President

**GRANTOR:**

The United States of America, acting by and through the Nevada Operations Office of the U.S. Department of Energy

By: [signature] for
Kathleen A. Carlson, Manager

**ACKNOWLEDGED and AGREED:**

MNS Wind Company, LLC,
a Delaware limited liability company

By: John A. Johansen
Name: John A. Johansen
Its: ____________________

# U. S. DEPARTMENT OF ENERGY
# NEVADA OPERATIONS OFFICE
# GRANT OF EASEMENT FOR
# WIND POWERED ELECTRIC GENERATING FACILITY

## *PART II*
## *GENERAL PROVISIONS*

A. Availability of Site Facilities and Support Services

1. Grantee may arrange with DOE and its prime contractors at the NTS for use of site facilities and support services, which may include the use of general infrastructure facilities such as roads, utility systems, water wells, etc. and services such as maintenance, repairs, emergency response and other such support services. Exhibit A sets forth a schedule of available site facilities and support services, and the basis for assessing charges and conditions of use therefor, which may be provided under this Easement.

2. The site facilities set forth in Exhibit A will be maintained by DOE to a maintenance level necessary to conduct its authorized programs and activities at the NTS and, during maintenance, in a manner that minimizes impact on the Project. The Government and Grantee acknowledge that roads do not and will not be maintained to meet U.S. Department of Transportation load bearing standards. DOE makes no representation that the facilities are suitable for the use intended.

3. Nothing in this Easement is intended to restrict or impair the right of Grantee or Subgrantee, as the case may be, from securing site facilities and services, including those available from DOE or its contractors, from any other vendor at any time during this Easement; however, it is the desire of DOE and Grantee that Subgrantee will consider, without obligation, using current DOE contractors, to the extent reasonably feasible, consistent with sound commercially reasonable practices, to provide those support services commonly provided to NTS users. Such vendors shall be treated by the DOE in a manner equal to that of vendors providing services for DOE or the prime contractors at the NTS.

4. Grantee may agree in any subeasement to fees, charges, terms and conditions for site facilities and support services, or any other services secured by Grantee and provided to Subgrantee, that are greater than or less than the charges, terms and conditions for site facilities and support services as provided in this Article A. No such agreement, however, shall alter Grantee's rights and obligations under this Easement.

B. Insurance

1. Grantee shall procure and maintain and shall require Subgrantee to procure and maintain, each at its own expense, the following insurance coverage in the respective, minimum amounts specified in Exhibit A: (i) Property structures loss and damage (Subgrantee only), (ii) Comprehensive General Liability (including contractual liability), (iii) Automobile Liability, and (iv) Statutory Workers' Compensation coverage. The Government and the prime contractors at the NTS shall be named as additional insureds under the Comprehensive General Liability and Automobile Liability policies of insurance (Grantee shall be an additional insured on the Subgrantee's policies).

2. All insurance which this Easement requires to be carried for general liability and on the Property shall be with such insurers as the Government may from time to time reasonably approve and shall otherwise be in form and in amounts, and issued by an insurer, acceptable to any lender for the Project. Each policy of insurance shall contain a provision for thirty (30) days written notice to the DOE prior to the making of any material change in or the cancellation of the policy. Grantee shall deliver promptly to the DOE a certificate of insurance or a certified copy of each insurance policy required by this Easement and shall also deliver, no later than thirty (30) days prior to the expiration of any such policy, a certificate of insurance or a certified copy of each renewal policy covering the same risks.

C. <u>Condition of Property</u>

1. Grantee has examined, knows, and accepts the condition and state of repair of the Property and the NTS of which it forms a part, and acknowledges that except as set forth in Exhibit A, the Government has made no representation concerning such condition and state of repair, nor any agreement or promise to alter, improve, adapt, repair, or keep in repair the same, or any item thereof, which has not been fully set forth in this Easement which contains all agreements made and entered into between Grantee and the Government. The Government shall reasonably provide Grantee and Subgrantee with current, known information concerning anticipated impacts, including seismic loads, airborne release potentials, and the like, potentially arising from DOE activities that could potentially affect the Grantee's or Subgrantee's activities.

2. The Government has provided Grantee with current, known information concerning environmental conditions on the Property. The Government makes no representation concerning the environmental condition of the Property outside the information provided in the environmental condition report as shown in Exhibit A as appropriate for the particular property.

3. The Grantee at its own expense shall maintain and repair the Property and all means of ingress and egress dedicated specifically (i.e., access not available for other uses) to the Property, and that the same will at all times be kept in at least as good condition as when received hereunder, subject, however, to ordinary wear and tear and loss or damage for which Grantee is not liable

hereunder. Grantee shall insure any structure(s) owned by the DOE in accordance with Article B above.

4. The Government has entered into a Federal Facilities Agreement (FFA) with the State of Nevada which describes the activities the Government intends to undertake in regard to environmental conditions at the NTS. No representations are made concerning further activity on behalf of the Government, either in regard to environmental conditions or otherwise. Financial responsibility for compliance with the FFA shall remain with the Government

D. Existing and Future Easements and Rights of way

This Easement is subject to all outstanding easements and rights of way over, across, in, and upon the Property. To the extent that services cannot be adequately and economically provided by DOE's service systems to the satisfaction of Grantee, the Government acknowledges that Grantee or Subgrantee, or service providers, may seek easements or rights of way over, across, in, and upon the NTS in order to provide utilities and other services to the Property. If the DOE does not approve of a proposed easement or right of way, DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible, on the NTS. DOE shall support Grantee's or Subgrantee's applications to appropriate jurisdictional authorities for such easements or rights of way (including any easement or right of way requested by Subgrantee pursuant to Paragraph 1(b) of Part I) which do not unreasonably interfere with DOE's use of the NTS.

E. Revocation by Government; Termination by Grantee; Amendment

1. This Easement may be revoked only as provided in this paragraph. In recognition of the consequences that revocation could adversely impact Grantee and Subgrantee and harm the achievement of the Government's economic development initiatives pursuant to Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), the Government shall act in a manner that is not arbitrary or capricious, and shall revoke this Easement only upon the occurrence of the following: (i) failure of the Grantee or Subgrantee to perform or otherwise comply with the terms and conditions of this Easement, which default is not cured within thirty (30) days following written notice of such default to Grantee and Subgrantee; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Grantor and Subgrantee shall not be in default hereunder if Grantor or Subgrantee commences to cure the default within such thirty (30) day period and thereafter diligently prosecutes such cure to completion, (ii) failure by Subgrantee to use the Property for a period of two (2) consecutive years with the intent to permanently abandon its rights under the Subeasement, which failure is not cured with the grace period provided in Paragraph K hereof, or (iii) in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain. The Government shall use

its reasonable efforts to give each Project lender copies of any notices of breach or default given to Grantee or Subgrantee.

2. DOE will provide Grantee with the maximum advance notice that is practicable under the circumstances that revocation of the Easement has been proposed or is under consideration and the opportunity to comment in advance of such revocation. In the event of notices or inquiries from other agencies or offices or in the event of the initiation of litigation which could lead to revocation of the Easement, DOE will provide immediate notice of such information to the Grantee.

3. Grantee may terminate this Easement only in the event of a default by Subgrantee under the Subeasement not cured within any applicable grace period, but such termination shall not relieve Grantee of any continuing obligations under this Easement except as may be specified in Exhibit A.

4. The Government agrees not to modify or amend this Easement without the prior consent of Subgrantee, which consent shall not be unreasonably withheld so long as Subgrantee's rights and obligations are not adversely affected thereby (and in such case, Subgrantee may withhold its consent in its sole and absolute discretion).

F. Damage or Destruction

1. If, during the term of this Easement, the Property, or any part thereof, is damaged by fire or other casualty so as to be rendered untenantable either in whole or in part, and cannot reasonably be restored to substantially its former condition within two (2) years following such fire or other casualty, then DOE or the Grantee or Subgrantee may terminate this Easement and Subeasement as to the portion of the Property so damaged effective the date of such casualty by giving notice to the other within one hundred twenty (120) days following such casualty.

2. In the event of any such damage which does not render all or any portion of the Property untenantable, either in whole or in part or if no party terminates pursuant to the preceding provisions, the damaged area or areas, with all reasonable due diligence will be repaired and restored by the Grantee to substantially the same condition they were in prior to such casualty or as otherwise will be suitable for the Grantee's or Subgrantee's purposes, provided that Subgrantee shall have no obligation to repair the Project if Subgrantee reasonably determines that it is not commercially reasonable to do so. Such restoration shall be commenced and completed as quickly as is reasonably possible. The party making such restoration shall be entitled to receive and use the proceeds of the insurance specified in Exhibit A. Also during the time of such restoration, and to the extent that the Property was not rendered untenantable by the Grantee's or Subgrantee's negligent acts or omissions or willful misconduct, any annual permit fees shall be abated to the extent that all or any portion of the Property is not usable by the Grantee.

G. Surrender

Upon the termination of this Easement or any prior revocation under Article E, Grantee shall quietly and peacefully remove itself and its property from the Property and surrender the possession thereof to the Government; provided, Grantee shall be allowed a reasonable period of time, as reasonably determined by the DOE, in which to remove all of its property from and terminate its operations on the Property. During such period prior to surrender, all obligations assumed by Grantee under this Easement shall remain in full force and effect.

H. Restoration of Property

Upon reasonable notice before any revocation or termination of this Easement, or otherwise within a reasonable period after revocation, at the direction of the DOE, Grantee shall restore the Property and each item thereof to the condition in which it was received, or to such improved condition as may have resulted from any improvement made therein by the Government or by Grantee during the Easement term, subject however, to ordinary wear and tear and loss or damage for which Grantee is not liable hereunder.

I. Installation, Alterations, and Removals

1. The Government and Grantee hereby expressly approve of the construction by Subgrantee of a wind powered electric generating facility on the Property, including the construction and installation of, wind turbine generators, support structures, substations, transformers, electric power and other utility lines and towers, communication lines and equipment, access roads, water and gas lines, and such other systems and appurtenances necessary or advisable for the construction and operation of the Project, all as further described on Exhibit A. The Government and Grantee acknowledge that Subgrantee is relying on the terms and conditions of this Easement in entering into the Subeasement and in constructing the Project.

2. Except as provided in Paragraph 1 above, it is expressly agreed and understood that Grantee will make no other material permanent alterations, additions, or betterments to installations upon the Property without the prior written approval of the DOE, which may include an obligation of removal and restoration upon the revocation or termination of this Easement; provided however, that Grantee and Subgrantee may make repairs and replacements of Project improvements without the consent of the DOE, but subject to coordination with DOE on operational activities. Except insofar as said terms and conditions may expressly provide otherwise, all such alterations, additions, betterments, and installations made by Grantee or Subgrantee shall remain the property of party installing the improvement.

3. During the term of this Easement, or any extension thereof, with the prior written approval of the DOE, Grantee and Subgrantee shall have the right, at its own expense, to install such improvements and additions and to attach such removable fixtures in or upon the Property pursuant to this Easement, and to remove same at any time and upon revocation or termination of this Easement or any extension thereof. All property not so removed shall be deemed abandoned by Grantee and may be used or disposed of by the Government in any manner whatsoever without any liability to account to Grantee therefore, but such abandonment shall in no way reduce any obligation of Grantee to perform restoration under Article H of this Part II. In the event that the Property is not restored to the condition at the time of Easement commencement, ordinary wear and tear excepted, then the Government may cause the Property to be restored at the sole expense of Grantee.

J. <u>Allocation of Liability</u>

1. Grantee covenants that it shall cause the Subgrantee to indemnify and hold harmless the Government, Grantee and DOE's prime contractors at the NTS, with respect to any and all judgments, awards of damages, penalties, or fines by a court of competent jurisdiction or through a regulatory enforcement action, or arbitration awards or settlements reached with the participation and concurrence of the Grantee and Subgrantee (including reasonable attorneys' fees and expenses related to such litigation), to the extent they do not arise from the negligent acts or omissions of the Government, its prime contractors at the NTS, or Grantee, and arise from or are incident to (i) conduct by Subgrantee in its use and occupancy of the Property (including conduct by third parties entering the NTS to conduct business with Subgrantee) giving rise to the judgment, award of damages, penalty, fine, arbitration award or settlement; (ii) damages to the Property or injuries to or death of any person, including without limitation, employees and officers of Grantee or Subgrantee; (iii) any "release" by Subgrantee or its agents as defined in Section 101(22) of CERCLA of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Property at any time while this Easement is in effect; (iv) failure of Subgrantee to comply with applicable environmental laws; and (v) the transportation, deposit, storage, or disposal by Subgrantee of hazardous substances or petroleum off-site of the Property.

2. Grantee shall require Subgrantee to covenant that any property of the Government lost, damaged, or destroyed by the Subgrantee incident to its conduct in the use and occupancy of the Property shall be promptly repaired and replaced by Subgrantee to the satisfaction of the DOE, or in lieu of such repair or replacement, Subgrantee shall, if so required by the DOE, pay to the Government money in an amount sufficient to compensate for the loss sustained by the Government by reason of the destruction of the property.

3. The Government accepts that, without conditions, the Grantee and Subgrantee shall not be responsible for any claims, damages, causes of action, proceedings, judgments, or suits, and

all liabilities, losses, costs or expenses (including without limitation, technical consultant fees and reasonable attorneys' fees) to the extent they do not arise from the negligent acts or omissions of the Subgrantee and may arise from or be incident to (i) conduct of the Government or the prime contractors at the NTS in providing services to the Grantee; (ii) any "release" by the Government or its agents as defined in section 101(22) of CERCLA or any "hazardous substance" as defined in Section 101(14) of CERCLA, or petroleum (including crude oil or any fraction thereof) onto or from the Property at any time prior to the effective date of this Easement; (iii) the failure of the Government to comply with applicable environmental laws; or (iv) the transportation, treatment, deposit, storage, or disposal by the Government of hazardous substances or petroleum off-site of the Property.

K. Abandonment of Property

In the event Subgrantee fails to utilize the Property for the Economic Development Activity for a period of two (2) consecutive years, the DOE shall have the right to terminate this Easement. DOE shall provide sixty (60) days notice prior to such termination.

L. Laws, Ordinances, Rules and Regulations

Grantee shall, and shall require Subgrantee to, comply with all applicable laws, ordinances, rules and regulations of the Federal Government, State, county and municipality wherein the Property is located with regard to health, safety and the environment and shall obtain all applicable licenses or permits to do business or otherwise conduct regulated activities (except that DOE shall arrange for any necessary water rights on the NTS). It is understood that Grantee's activities are considered commercial in nature and, as such, shall be subject to the same requirements as would apply to such activities if not conducted on public property. It is expressly understood that DOE assumes no oversight or enforcement responsibility for safety and health, and DOE specifically defers to the jurisdiction of the appropriate authorities for such matters. However, because the Property is withdrawn public property and will be used concurrently with DOE's own mission, DOE reserves the right to review the Grantee's safety plans which shall be consistent with the Safety and Health Program Management Guidelines of the Occupational Safety and Health Administration as published in the Federal Register (54 F.R. 3908 on January 26, 1989).

M. Cultural Items

Grantee shall, and shall require Subgrantee to, protect and preserve any historical, archaeological, architectural, or other cultural artifacts, relics, vestiges, remains, or objects of antiquity. In the event such items are discovered, the Grantee shall immediately notify the DOE and protect the area and the material from further disturbance until DOE, Grantee, or Subgrantee, as the

case may be, has completed the required coordination with the appropriate authorities and otherwise complied with applicable law.

N. Liens

Grantee shall promptly discharge or cause to be discharged or bonded any valid lien, right in rem, or claim, caused by Grantee and/or any Subgrantee which at any time may arise or exist with respect to the Property or materials or equipment furnished therefor, or any part thereof, on behalf of Grantee.

O. Payments and Interest

All payments to the Government required under this Easement shall be made by check or money order made payable to the U.S. Department of Energy and delivered to the DOE. Notwithstanding any other provision of this Easement, all amounts that become payable by Grantee to the Government under this Easement shall bear interest if not paid within thirty (30) days following written notice of the failure to make such payment when due until paid. The interest rate per annum shall bear the interest rate in effect which has been established by the Secretary of the Treasury pursuant to Public Law 92-42; 85 STAT 97 for the Renegotiation Board, as of the date the amount becomes due as herein provided.

P. Access to Property

The Government or its designated representatives shall have the right of access to the Property for the sole purpose of providing agreed services, maintenance and repair, conducting inspections authorized under this Easement, or responding to a health or safety emergency. In all instances except for emergency response and inspections by regulatory authorities, access to the Property shall be scheduled in advance through the DOE or in accordance with agreements for the provision of services, maintenance and repair. The Grantee shall provide the DOE with a schedule of operations and hours for the Property. The Grantee and Subgrantee shall have the right to accompany the DOE, the Government or its designated representatives in their exercise of this right to access to the Property.

Q. State and Local Taxes

In the event that as a result of any future Act of Congress subjecting Government-owned property to taxation, any taxes, assessment, or similar charges are imposed by state or local authorities upon the Property (other than upon Grantee's possessory interest therein), Grantee shall pay the same when due and payable.

R. Failure of Government to Insist on Compliance

The failure of the Government to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Easement shall not be construed as waiver or relinquishment of the Government's right to the future performance of any such terms, covenants, or conditions, and Grantee's obligations with respect to such future performance shall continue in full force and effect.

S. Assignment or Subletting

Neither Grantee nor Subgrantee shall transfer or assign this Easement, the Subeasement or any interest therein or in any portion of the Property or rights therein without the prior written consent of the Government, which consent shall not be unreasonably withheld, conditioned or delayed, except for reasons of national security. Under any assignment made, the assignee shall be deemed to have assumed all of the obligations of the assignor hereunder, but no assignment shall relieve the assignor of any of Grantee's obligations hereunder except as hereinafter provided. Subgrantee may hypothecate, mortgage or pledge all or any portion of the Subgrantee's right, title or interest under the Easement and Subeasement or in any improvements on the Property as security for any indebtedness or obligation relating to the Project, or any part thereof, to any lender approved by the Government (an "*Approval Lender*"), which approval shall not be unreasonably withheld, conditioned or delayed, except for reasons of national security. In the event of a default under the loan, the Approved Lender (or an approved designee) may succeed to the interests of Subgrantee in the Property by foreclosure or otherwise. Upon any assignment to an assignee approved by the Government, the assignee, shall be deemed to have assumed Subpermittee's obligations under the Subeasement, and the Subpermittee shall be released of all obligations and liability under this Easement and the Subeasement.

T. Conduct Standards

1. Equal Employment Opportunity

In connection with the performance of work under this Easement, Grantee agrees to comply with applicable laws prohibiting discrimination against any employee or applicant for employment because of race, religion, color, age, sex, or national origin or disability.

2. Covenant Against Contingent Fees

Grantee warrants that no person or selling agency has been employed or retained to solicit or secure this Easement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bonafide employees or bonafide established commercial or

selling agencies maintained by Grantee for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Easement without liability or in its discretion to add to the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

3. Officials Not to Benefit

No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Easement, or to any benefit arising from it. However, this clause does not apply to this Easement to the extent that this Easement is made with a corporation for the corporation's general benefit.

4. Gratuities

The right of Grantee to proceed may be revoked if, after notice and hearing, the agency head or a designee determines that Grantee, its agents, or another representative:

(a) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(b) Intended, by the gratuity, to obtain a lease or permit or favorable treatment under a lease or permit.

U. Notices

No notice, order, direction, determination, requirement, consent, or approval under this Easement shall be of any effect unless in writing. All notices required under this Easement shall be addressed to Grantee c/o LEXIS Document Services, 202 S. Minnesota Street, Carson City, NV 89703 and LEXIS Document Services, 1029 J Street, Suite #100, Sacramento, CA 95814.

V. Administration

The DOE representative specified in Exhibit A of this Easement shall have complete charge of the administration of this Easement, and shall exercise full supervision and general direction thereof insofar as the interests of the Government are affected.

W. Severability and Substitution

1. In the event that any provision or portion of this Easement is declared unlawful or unenforceable by a court of law of competent jurisdiction, the remainder of this Easement shall

continue and remain in full force and effect, as if the unlawful or unenforceable provision or portion had been stricken from this Easement. Nothing herein, however, shall preclude revocation as provided above.

2. In the event that the authority or rights of DOE in relation to the Property or the NTS is modified by statute, regulation, court order, or other lawful order, DOE shall, as appropriate, affirm this Easement or enter into a Lease or other binding lawful instrument with Grantee that implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below). Grantee agrees to enter into such other lawful instrument so long as the other lawful instrument implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below).

3. In the event that Grantee or Subgrantee requests a lease, easement, right of way or other lawful instrument from another agency of government having competent jurisdiction over the NTS, DOE agrees to support the request, grant permission to Grantee and Subgrantee to engage in the Economic Development activity authorized by this Easement under such lease, easement, right of way or instrument, and administer such lease, easement, right of way or other instrument under an agreement or understanding with the agency in question; provided, however, that DOE will retain the right to require termination of such lease or instrument under the same terms and conditions of this Easement.

X. General Provisions

1. Whenever any Part of this Easement (or Exhibit A or any other exhibit), or the Subeasement or Compensation Agreement grants the Government or Grantee the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Government and Grantee shall act prudently and in good faith.

2. Provided that the Grantee or Subgrantee observe and perform all of the obligations hereof, Grantee and Subgrantee shall peaceably and quietly hold and enjoy the Property for the term provided herein without interruption by the Government or any person or persons claiming by, through or under the Government. The Government warrants to Grantee and Subgrantee that it has the power and authority to enter into this Easement.

3. The Government and Grantee acknowledge and agree that Subgrantee may in its sole discretion cause this Easement and the Subeasement to be recorded in the official records of the County where the Property is located and such other governmental offices necessary to impart constructive notice of its interest in the Property. Upon request by Subgrantee, the Government and Grantee agree to execute for recordation a short form or memoranda of the Easement and

Subeasement, and such other documents or instruments reasonably requested by Subgrantee, in form and reasonably acceptable to Subgrantee.

4. This Easement and the Subeasement shall constitute covenants running with the Property, and shall inure to the benefit of Subgrantee and its successors and assigns. Part I, Exhibit A and the Recitals of this Easement are incorporated herein by this reference and made a part hereof.

5. This Easement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

6. To the extent not in conflict with applicable federal law, this Easement shall be governed by and construed according to the laws of the State of Nevada. To the extent not in conflict with applicable federal law, any claims or disputes hereunder shall be resolved in accordance with the arbitration procedures set forth in the Subeasement.

# U.S. DEPARTMENT OF ENERGY
# NEVADA OPERATIONS OFFICE
# GRANT OF EASEMENT
# EXHIBIT A FOR WIND GENERATED ELECTRICAL GENERATION AREA

1. Map of Property

A map showing the location and boundary of the Property is attached as Attachment A-1. The Property is located in Areas 29 and 30 of the Nevada Test Site ("NTS") and consists of approximately 664 acres. As mutually agreed upon and approved by the DOE, Grantee, and Subgrantee, additional areas may be developed on the NTS.

2. Description of Economic Development Activity

The Economic Development Activity authorized and facilitated at the NTS through this Easement is the use of the Property for ventures related to businesses consistent with the construction, operation and maintenance of a wind powered electric generating facility. The total project will be developed in three phases. The Grantee and the Subgrantee have the exclusive right for the installation of the first 545 wind turbines on the NTS. Each phase will be individually agreed upon and approved by the DOE. To exercise this right, the Grantee and Subgrantee will have 24 months from the date this Easement is executed to obtain DOE approval of additional easements.

The initial phase will be generally located in Areas 29 and 30 of the NTS and will consist of approximately 175 wind turbines. The turbines will be 900 kW to 2000 kW machines up to 400 feet in total height with a foundation approximately 50 feet deep. The initial turbine areas are depicted in Attachment A-1 along with means of ingress and egress to the Property. Additionally, electric transmission and distribution lines necessary to interconnect with the NTS electric utility system will be constructed.

3. Duration and Use Fee

a. The duration of this Easement shall be 35 years from the date of execution, unless earlier revoked in the event of a default under the terms of this Easement, plus an additional ten (10) year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

b. In consideration of the rights and privileges granted to Grantee under this Easement, Grantee agrees to pay the Government a fee in the amount of $1.00 per year in the manner and on the terms provided in Part I and Part II of this Easement.

4. **Insurance Requirement**

The following minimum levels of insurance apply pursuant to Article B of Part II of this Easement:

| | | Grantee |
|---|---|---|
| a. | Structures loss and damage: | N/A |
| b. | Comprehensive general liability: | $ 1,000,000 |
| c. | Automobile liability: | $ 1,000,000 |
| d. | Statutory workers compensation: | per statute |

The insurance requirement for the Subgrantee will be based upon the size and nature of the activity, and will be at a minimum those values stated above for the Grantee. The recommended amount of Subeasement insurance for each category will be provided to DOE by Grantee at the time of each Project Location and Screening Process submittal.

5. **Personal Property Inventory**

None

6. **Operational Conditions on Use**

a. Grantee shall require each Subgrantee to prepare and maintain an Operations Safety Manual that sets forth health and safety procedures and emergency procedures for the Economic Development Activity as well as operational security procedures related to Subgrantee's activities. DOE intends that Grantee and Subgrantee shall comply with a single set of requirements for health, safety and emergency procedures that conform to the applicable requirements of the Occupational Safety and Health Administration and other agencies having jurisdiction over the commercial activities of the Grantee and Subgrantee. Pursuant to Article L of Part II of the Easement and prior to the commencement of any site activities (exclusive of preparatory activities approved by the DOE), the Grantee and Subgrantee shall submit the Operations Safety Manual to DOE for review. DOE will reasonably determine whether suitable processes have been described in the manual to ensure appropriate oversight by regulatory agencies, whether there are any conflicts with DOE health, safety and emergency requirements

that must be mitigated or eliminated, and whether there are any additional health, safety or emergency requirements that need to be added to the manual to avoid situations that could materially and adversely impact the health and safety of DOE activities; provided, however, that nothing in this provision will authorize DOE to assert jurisdiction to direct conduct of activities by the Grantee or Subgrantee within the primary jurisdiction of another federal agency. The DOE Management and Operating Contractor will accomplish review of the Operations Safety Manual at the Grantee's or Subgrantee's expense.

b. Activities of the Subgrantee must be coordinated with ongoing Government operations at the NTS. The DOE Site Management Division shall be responsible for internal Government communication and implementation of the coordination and scheduling procedures and shall serve as the point of contact for the Government with Grantee and Subgrantee. Direct communication shall be established between DOE and the Subgrantee for day-to-day scheduling and activities coordination. In the event of operational scheduling conflicts that cannot be resolved by the Subgrantee and the DOE, the Manager for DOE Nevada Operations Office shall be the final determining authority.

c. In the course of the Economic Development Activity, Grantee and Subgrantee shall not transit areas or engage in activities in a manner inconsistent with the scheduling and coordination procedures established under Subparagraph b, above, and Section 10 of this Exhibit A.

d. The Grantee shall require each Subgrantee to provide to the fire Department in Mercury a complete set of Material Safety Data Sheets for their facility and a duplicate key to all locks at their facility.

7. <u>Site Facilities and Support Services</u>

a. Charges for site facility usage (common site support costs associated with operating and maintaining the Nevada Test Site which benefit all users) and separate support services will be determined on a reimbursable basis at rates that are effective for the period. Provisional rates will be provided upon request.

b. Grantee will require Subgrantee to consider in good faith, but without obligation, utilizing support services available from DOE management and operating contractors in the Economic Development Activity, including, but not limited to:

I. design, procurement, construction and maintenance service for roads, parking areas, access roads, buildings, facilities, and associated infrastructure on or to the Property to the specifications of Grantee and Subgrantee.

II. electric power,

III. water,

IV. telecommunication services,

V. computer network services,

VI. construction equipment,

VII. transportation equipment or services,

VIII. maintenance services, including janitorial, landscaping, repair, and trash service,

IX. hazardous materials transportation and disposal services,

X. machine shop equipment and services, calibration equipment and services, security services for the Property,

XI. such other services as the Government, Grantee, and Subgrantee might agree.

c. Grantee agrees, and will require Subgrantee to utilize emergency medical services and emergency fire and hazardous materials emergency response services available from DOE management and operating contractors. Charges for these services will be reimbursed at rates in effect for the period.

d. Except as provided in subparagraph c above, subparagraph e below, and paragraph 11 (i), the Government and Grantee acknowledge and agree that Subgrantee shall have no obligation to utilize the support services provided by the DOE, Grantee or their respective contractors. DOE shall provide to Grantee the terms and conditions for the provision of such services, including price, quality, and duration of service.

e. The DOE agrees to provide operation and maintenance services for roads, transmission and distribution systems, and other infrastructure as deemed necessary by the Subgrantee. Such operation and maintenance work will be accomplished through the DOE Management and Operating Contractor at the Subgrantee's request

and expense. Charges for these services will be reimbursed at rates in effect for the period.

8. **Real Property Condition Report**

DOE and Grantee agree that the Real Property Condition Report is made a part hereof as Attachment A-2.

9. **Environmental Condition Report**

DOE and Grantee agree that the Environmental Conditions Report is made a part hereof as Attachment A-3. The Property is located within an area known to be desert tortoise habitat, the only Candidate or Listed Species for the area. Ground disturbance in this area will meet the terms and conditions of the Final Programmatic Biological Opinion for tortoise protection at the NTS, received from the United States Fish and Wildlife Service in August 1996. The Grantee acknowledges that complete copies of the documentation described above have been provided to the Grantee and Subgrantee.

10. **Access and Security Procedures**

a. DOE provides general security for the NTS for the Government's operational purposes. Under this security policy, unauthorized persons are not permitted access inside the secure boundaries of the NTS. Grantee or Subgrantee will submit a request for approval by the DOE of those persons who will need access to the secure boundaries of the NTS for purposes associated with the Economic Development Activity. DOE will issue authorization for those persons to enter the secure boundaries of the NTS consistent with DOE security requirements, including necessary badging and security processing for Grantee, Subgrantee, their employees, representatives, contractors, suppliers, customers, and guests, as designated by Subgrantee, as well as permanent access and badging procedures for the employees and customers of Subgrantee. Grantee and Subgrantee acknowledge that visitors, guests, customers, contractors, or employees of Grantee or Subgrantee who are not citizens of the United States must comply with additional security procedures for those circumstances.

b. Ingress and egress to and from the secure boundaries of the NTS shall be by means of ground transportation. Helicopter access is subject to prior approval by the DOE. Grantee and Subgrantee shall restrict their access and movement on the secure boundaries of the NTS to the common facilities of Mercury in Area 23 of the NTS, to the Property (and related easements) and to designated ingress/egress corridors. Grantee and Subgrantee shall have the right to use such areas and the designated

ingress/egress corridors to the Property for the duration of this Easement in accordance with this Exhibit A. All other areas of the NTS are restricted, and Grantee and Subgrantee are prohibited from entering such restricted areas, except as approved by the DOE. Any other access into restricted areas of the NTS will be handled on a case-by-case basis in accordance with DOE policies and practices and, to the extent practicable will be handled in a manner that will have minimal impact on the economic development activity authorized by this permit.

c. Ingress and egress to and from the Property shall be by means of ground transportation, unless other transportation is specifically approved by the DOE.

d. Should the DOE subsequently determine that national security interests will be adversely impacted by Grantee or Subgrantees' continued use of the present access roads to the Property, DOE shall have the unilateral right to change the access corridor. In such event, DOE will arrange for a reasonable alternate corridor to access the Property.

e. Grantee shall require Subgrantee to prepare and maintain Operational Security Procedures as approved by the DOE for access and organizational activities of the Subgrantee.

11. <u>Power Delivery</u>

a. The Grantee through its Subgrantee agrees to provide a benefit to the DOE equivalent to a ten percent (10%) reduction in energy usage based upon total NTS consumption for fiscal year 2000. For purposes of this section, the consumption at the NTS in fiscal year 2000 is 102,000 MWh.

b. This benefit shall be based upon the Subgrantee's installed generation capacity on the NTS and delivery of energy as provided herein. Up to 260 MW of installed generation capacity is expected to be developed by the Subgrantee and/or its affiliates at the NTS in three phases with an expected annual energy production of 795,000 MWh plus or minus 15%.

c. In consideration for the use of the NTS, energy losses shall be assessed at a rate fixed at 1.28% of Subgrantee's energy production. Grantee and Subgrantee shall have the right to interconnect with and use the transmission and distribution system on the NTS for the duration of this Easement in accordance with this Exhibit A. The design and location of the interconnection points shall be mutually agreed upon by DOE, Grantee and Subgrantee.

d. If development of installed generation capacity or energy production by Subgrantee or its affiliates is greater or less than expected, the percentage assessment for transmission losses shall remain fixed at 1.28%.

e. Energy delivery shall be scheduled by Subgrantee at its expense through the appropriate area load controller and shall equal the amount of energy metered at the high side of the step up transformer at the Project's substation located on the Property minus 1.28% attributed to transmission losses as provided in subparagraph (c) above.

f. The DOE shall have the right to validate and audit all meter readings and production schedules of the Subgrantee.

g. DOE, Grantee and Subgrantee shall work with local interconnected utilities to develop mutually agreed upon metering protocols and administration procedures to verify energy deliveries to the NTS and actual power schedules and deliveries off the NTS.

h. DOE does not guarantee the operable condition of the NTS transmission and distribution system and shall not be subject to fines, penalties or other charges either indirect or direct regarding the failure of the NTS transmission and distribution system. The DOE shall coordinate with the Subgrantee any scheduled maintenance and repairs of the system that affect the Subgrantee's ability to deliver power through the NTS system.

i. The Grantee and Subgrantee shall have the right to make any improvements to the existing NTS transmission and distribution system as deemed necessary to either improve system reliability and/or current carrying capability to allow for the efficient transmission of generated energy on and off the NTS. The design and location of such improvements shall be mutually agreed upon by DOE, Grantee and Subgrantee. Construction, operation and maintenance of such improvements to the existing NTS transmission and distribution system will be accomplished through the DOE Management and Operating Contractor at the Grantee's or Subgrantee's expense. Operation and maintenance of the transmission and distribution system from the high side of the generator transformers to the point of interconnection with the existing DOE transmission and distribution system will be accomplished through the DOE Management and Operating Contractor, for the full cost recovery of actual time and materials in accordance with DOE accounting practices, at the Grantee's or Subgrantee's expense.

12. **Environmental Assessment**

DOE is preparing an Environmental Assessment (EA) for this Grant of Easement pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq. DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process. After DOE has completed the EA and considered the environmental impacts of this action, DOE will either issue a Finding of No Significant Impact or prepare an Environmental Impact Statement.

13. **Real Estate Operations Permit**

DOE and Grantee agree that the Real Estate Operations Permit is made a part hereof as Attachment A-5.

14. **Administration**

For purposes of this Easement, the DOE and the Grantee's Representative will be:

For DOE: Manager, U.S. Department of Energy, Nevada Operations Office

For Grantee: President, NTS Development Corporation

The following Attachments are referenced in this Exhibit A and made a part of this Exhibit A:

Attachment A-1 Map of Permitted Area

Attachment A-2 Real Property Condition Report

Attachment A-3 Environmental Condition Report

Attachment A-4 Environmental Assessment (in process)

Attachment A-5 Real Estate Operations Permit




**Attachment A-1 Map of Permitted Area**

**Attachment A-2**

**Real Property Condition Report**

The Real Property Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Real Property Condition Report.

**Attachment A-3**

**Environmental Condition Report**

The Environmental Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Environmental Condition Report.

**Attachment A-4**

**Environmental Assessment**

In process.

EXHIBIT "3"

Consent of Master Grantor

EXHIBIT "3"

CONSENT OF MASTER PERMITTOR

As provided under Paragraph 5.(a) of Part I of the Easement granted to NTS Development Corporation as Grantee as of December 22, 2000, the United States of America, acting by and through the U.S. Department of Energy, hereby approves and consents to the foregoing Subeasement between Grantee and MNS Wind Power, LLC, as the Subgrantee referred to therein.

THE UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY,
NEVADA OPERATIONS OFFICE

By: KCarlson
Kathleen Carlson, Manager

January 17, 2001

WITNESSED BY;

January 17, 2001

Secretary of Energy Bill Richardson

U.S. Senator Harry Reid

Administrator of National Nuclear Security Administration General John Gordon

Assistant Secretary for Energy Efficiency and Renewable Energy Dan Reicher

# COMPENSATION AGREEMENT

This Compensation Agreement ("Agreement") is entered into as of this 17 day of January, 2001, by and between NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation ("Subgrantor"), and MNS Wind Company, LLC, a Delaware limited liability company ("Subgrantee").

## RECITALS

A. Subgrantee is entitled to use and occupy the Premises as defined in and pursuant to the terms of a Subeasement between the parties of even date herewith (the "Subeasement"). A true and correct copy of the Subeasement is attached hereto as Exhibit "1", and is incorporated herein by this reference. Capitalized terms not defined herein shall have the meaning provided in the Subeasement.

B. Subgrantor is entitled to compensation from Subgrantee for the rights, services, and benefits granted Subgrantee under the Subeasement.

**NOW THEREFORE**, in consideration of the foregoing premises and the mutual promises of the parties which are set forth below, Subgrantor and Subgrantee agree as follows:

1. **Subeasement Fees.**

A. Annual Fee. In consideration of use of the Premises by Subgrantee for Economic Development Activity, Subgrantee agrees to pay to Subgrantor a fee in the amount of Forty Seven Thousand Dollars ($47,000) per year (the "*Annual Fee*"). The Annual Fee shall be payable in equal monthly installments on the last day of each month commencing in the month following written notice from Subgrantee to Subgrantor of its approval of each of the conditions precedent set forth in Paragraph 18.7 of the Subeasement (the "*Commencement Date*"). The Annual Fee shall be reduced by the amount of the Success Fee (as hereinafter defined) and shall be prorated on the basis of any partial year.

B. Success Fee. Subgrantee shall pay, in addition to all other fees required herein, a "Success Fee" equivalent to (i) one and one-half percent (1.5%) of all gross revenues arising solely from the sale of wind based electrical power generated from the first one hundred twenty (120) wind turbines constructed and operating on the Premises, and (ii) one and three-quarters percent (1.75%) of all gross revenues arising solely from the sale of wind based electrical power generated from any wind turbines constructed and operating on the Premises in excess of one hundred twenty (120)

turbines (the "*Success Fee*"). The Success Fee shall be determined as of the last day of each calendar month, and the fees due for any month shall be payable sixty (60) days following the end of such month.

C. Annual Fee and Success Fee Adjustment. Upon each of the fifth, tenth, fifteenth, twentieth, twenty-fifth and thirtieth anniversary of the Subeasement Term Commencement Date, the Annual Fee shall be adjusted for any increases in the cost of living as reflected in consumer price index described below or any successor index (provided that the adjusted fee shall not be less than the fee payable prior to the adjustment). The adjusted Annual Fee shall be determined as of each adjustment date by multiplying the Annual Fee in effect prior to the adjustment by a fraction, the denominator of which shall be the index figure for the month in which the term of this Subeasement commenced, as published by the US Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average, All Items (1982-84 = 100) or if the Bureau ceases to publish said index figure, then any similar index mutually agreed to by the parties representing an equivalent economic measurement (the "CPI"), and the numerator of which shall be the CPI for the month which is three months prior to the month in which the adjustment occurs.

D. Fees during an Option Period. The Annual Fee and Success fees shall be subject to adjustment at the end of the initial term hereof and the parties shall negotiate said Fees prior to the commencement of any Option Period. The fees payable during the Option Period shall be the fair rental value of the Premises based on its use as a wind powered electric generating facility (the "Project"), provided that the fee payable during the Option Period shall not be less than the fees payable during the initial term. In the event the parties do not agree on the fair rental value of the Premises prior to the commencement of the Option Period, the fees shall be determined by arbitration as hereinafter provided.

E. Expense Reimbursement. Concurrently with the funding of the first advance of the construction loan for the Project to be constructed on the Premises, Subgrantee shall reimburse Subgrantor for actual third party costs and expenses incurred by Subgrantor in connection with this Subeasement, evidenced by receipts and not previously paid or reimbursed by Subgrantee prior to the date hereof, in an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000).

2. **Additional Subgrantor Services Compensation:**

Services are available from the DOE or its contractors as identified in the Easement, Exhibit A, Section 7, *Site Facilities and Support Services*, attached to the Subeasement as Exhibit 1. The Subgrantor will be invoiced from DOE or its contractors for any and all services requested in writing and approved by Subgrantee. Subgrantor will invoice the Subgrantee the actual cost of these services, plus up to a five percent (5%) processing fee (provided that no processing fee shall be charged on any work in connection with the construction of the Project, or on any work contracted directly between Subgrantee and any such contractor (except for routine NTS support services)) as soon as is reasonably possible after receipt of invoice from DOE or its contractors and shall provide Subgrantee copies of all such invoices (which invoices shall be subject to the review and reasonable approval of Subgrantee). Subgrantor agrees to pay such invoices reasonably approved by Subgrantee as soon as practicable, but in no case later than ten (10) business days following written demand.

Some services which are used by the Subgrantee such as electricity, water, sewage, solid waste collection, landfill, etc. may not be specifically requested by the Subgrantee, but will be deemed as requested by their use. Payment for these items will be handled in a manner identical to the above. Subgrantor shall fairly pro-rate bills received from DOE or its contractors which include aggregated amounts used by other users of the NTS based, to the extent possible, on service actually used by each such party. Utilities shall be separately metered to the extent possible.

3. **Events of Default:**

(i) The occurrence of any one or more of the following events shall constitute an Event of Default:

(a) Subgrantee shall fail to pay when due any Fee, or any other payment required pursuant to this Agreement or the Subeasement within ten (10) business days after written notice thereof is sent to Subgrantee; (b) Subgrantee shall do or permit to be done any act which results in a lien being filed against the Premises which is not discharged or bonded within thirty (30) days after written notice from Subgrantor; (c) the liquidation, termination, dissolution of Subgrantee; or (d) Subgrantee shall breach any term, covenant, agreement or provision of this Agreement or the Subeasement, which breach continues for a period of thirty (30) days after written notice from Subgrantor to Subgrantee; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Subgrantee shall not be in default if Subgrantee commences such cure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion. Subgrantor shall provide each lender to the Project, on a timely basis, copies of any notices of breach or default given to Subgrantee under this Agreement or the Subeasement, concurrently with the giving of such notice to Subgrantee. Each

such lender shall have the right to cure any default under this Agreement, the Subeasement or the Easement, and Subgrantor agrees to accept such cure.

If any of the Events of Default described above shall occur, the Subgrantor has the right to pursue any remedy now or hereafter available to Subgrantor under the laws of the State of Nevada. All rights and remedies of Subgrantor at law or equity are cumulative and the exercise of any one or more rights or remedies shall not be taken to exclude or waive the right to exercise any other. In no event shall Subgrantee be liable for special or consequential damages.

(ii) Subgrantor Default. Subgrantor shall be in default under the Subeasement and this Agreement if the DOE or Subgrantor fail to perform any obligation required to be performed by such parties under the Easement or Subeasement within thirty (30) days after the receipt of notice from Subgrantee specifying the failure to perform; provided, however, if the nature of the obligation is such that more than thirty (30) days are required for its performance, then Subgrantor shall not be in default if the DOE or Subgrantor commences such performance within such thirty (30) day period and thereafter diligently pursues the same to completion. Upon any default by the DOE or Subgrantor, Subgrantee may exercise any of the following rights in addition to such other rights and remedies as are available to Subgrantee at law , in equity or under the Subeasement or Easement: (i) terminate the Subeasement, or (ii) perform any obligation of the DOE or Subgrantor specified in the notice of default and set off all of the costs and expenses thereof from the fees or other charges thereafter due under the Subeasement, this Agreement or the Easement.

(iii) Fee Abatement.

(a) Eligibility for Abatement. If Subgrantee is prevented from using and does not use, all or any portion of the Premises or any other easements granted in connection with the Project (the "Affected Area") as a result of any Abatement Event (as hereinafter defined) which continues for either fifteen (15) consecutive business days after Subgrantor's receipt of notice from Subgrantee of the Abatement Event or thirty (30) business days in any twelve- (12-) month period after Subgrantor's receipts of such notice (the "Eligibility Period"), the fees payable under this Agreement shall be abated after the expiration of the Eligibility Period for such time that Subgrantee has been prevented from using, and does not use, the Affected Area in the greater of (a) the proportion that the installed megawatts in the Affected Area bears to the total number of installed megawatts in the Premises, and (b) the proportion that the area in the Affected Area bears to the total area in the Premises (provided that if the Affected Area contains any equipment which affects the operation of any other portion of the Project, the Affected Area shall be deemed to include such other portion of the Project).

(b) Full Abatement. If Subgrantee is prevented from using, and does not use, any portion of the Premises for a period of time in excess of the Eligibility Period and the remaining portion of the Premises is not sufficient to allow Subgrantee to economically conduct its business, no fees shall be due for the time after expiration of the Eligibility Period during which Subgrantee is precluded from using, and does not use, the entire Premises. If, however, Subgrantee begins economic use of any portion of the Premises during this period, the fees allocable to the portion so used shall be payable by Subgrantee from the date on which Subgrantee commences such use.

(c) Abatement Event. An "Abatement Event" is (A) the failure of the DOE or Subgrantor to perform any repair, maintenance, alteration or other obligation that such party is required to perform under the Easement or Subeasement and such failure substantially interferes with Subgrantee's use of the Premises for the generation of wind powered electricity, (B) any failure of or interruption in utilities or services required to be supplied by the DOE or Subgrantor to the Premises which failure or interruption substantially interferes with Subgrantee's use of the Premises for the generation of wind powered electricity, (C) the presence of hazardous materials on the Premises (other than those brought into the Premises by Subgrantee), (D) any failure of the DOE or Subgrantor to provide Subgrantee with access to the Premises, (E) breach of the covenant and agreement set forth in Paragraph 1(a), Part I of the Easement or Paragraph 2(c) of the Subeasement, or (F) any damage or destruction as a result of a force majeure event. Subgrantee's rights and remedies under this paragraph shall be in addition to all of Subgrantee's rights and remedies provided in this Subeasement or the Easement, or at law or in equity.

4. **Miscellaneous Provisions.**

(a) **Attorneys' Fees.**

In the event of any litigation or arbitration between the parties regarding the Subeasement or the Agreement, the losing party shall pay to the prevailing party all reasonable expenses and costs (including reasonable attorneys' fees and expenses) incurred by the prevailing party (including on appeal and in connection with the enforcement of any award or judgment).

(b) **Arbitration**.

(i) General. The parties agree to settle all controversies, claims, disputes or differences between them arising out of or relating to this Agreement, the Subeasement or the Easement by arbitration in accordance with the Rules of the American Arbitration Association ("AAA") in effect at the time of the arbitration ("Rules"), except as such Rules may be modified by this Agreement. Notwithstanding any provisions of such Rules, the parties shall have the right to take depositions and obtain discovery regarding the subject matter of the arbitration in accordance with the Federal Rules of Evidence.

(ii) Procedure. A party desiring to submit a dispute to arbitration hereunder shall file a demand for arbitration ("Demand for Arbitration") with the AAA. A copy of such Demand for Arbitration shall be sent to the other party at the same time. The arbitration proceeding shall be conducted by a panel of three arbitrators. Within ten (10) days after a Demand for Arbitration has been made by either party, each party shall appoint one arbitrator. Within twenty (20) days after the Demand for Arbitration has been made, the two arbitrators shall choose a third arbitrator who shall act as chairperson of the arbitral proceedings. If the two arbitrators chosen by the parties do not agree upon a third arbitrator within twenty (20) days after the filing of the Demand for Arbitration, then upon the application of either party, the third arbitrator shall be appointed by the AAA.

(iii) Venue. The site of the arbitration shall be Las Vegas, Nevada unless otherwise agreed to by the parties. The parties shall diligently and expeditiously proceed with arbitration. Upon the conclusion of the hearing, the parties shall have thirty (30) days to submit written briefs in support of their respective positions. The arbitrators shall be instructed to render a written decision within forty-five (45) days after the filing of such briefs, subject to any reasonable delay due to unforeseen circumstances.

(iv) Remedies. Except to the extent the parties' remedies may be limited by the terms of this Agreement or the Subeasement, the arbitrators shall be empowered to award any remedy available under the laws of the State of Nevada, including monetary damages. The award of the arbitrators shall be in writing with reasons for such award and signed by the arbitrators. The parties agree that any such award rendered shall be final and binding. Judgment rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(v) Expenses. The parties shall share equally (50/50) the compensation and expenses of the arbitrators as well as all fees imposed by the AAA, including, but not limited to, transcripts, hearing room rentals, filing fees and administrative costs. The parties shall be responsible for their own costs and legal fees, if any. Notwithstanding the foregoing, the arbitrators shall make a determination of the prevailing party and shall award such party its costs, expenses and legal fees.

(c) **Late Fee Charge and Interest.** If any payment under this or any other agreement with Subgrantor is not timely made by Subgrantee and remains overdue for a period of ten (10) business days after written notice, Subgrantee agrees to pay Subgrantor interest on all sums due equal to 18 per cent per annum on the unpaid balance of all fees and expenses until paid in full.

(d) Notices. All notices under this Agreement shall be in writing and shall be delivered by personal delivery or sent by registered or certified mail, postage prepaid, or overnight delivery, or facsimile as follows:

To Subgrantee: MNS Wind Company, LLC
c/o M&N Wind Power, Inc.
4225 Executive Square, Suite 1650
La Jolla, California 92037
Attention: Mr. John Johansen

To Subgrantor: NTS Development Corporation
2330 Paseo del Prado, Suite C-101
Las Vegas, Nevada 89102
Attention: President

Notices which are delivered by personal or overnight delivery or facsimile shall be effective upon receipt. Notices, which are given by mail as required above, shall be considered given and received two (2) business days after deposit in the mail.

(e) **Partial Invalidity.** If any provision of this Agreement is invalid or unenforceable to any extent, then that provision shall be null and void and the remainder of this Agreement shall continue in effect and shall be enforceable to the fullest extent permitted by law.

(f) **Waiver.** The failure of either party to exercise any of its rights is not a waiver of those rights. A party waives only those rights specified in writing and signed by the party waiving its rights.

(g) **Binding on Successors.** This Agreement shall bind the parties' heirs, successors, representatives, and assigns.

(h) **Governing Law.** The laws of the State of Nevada shall govern this Agreement.

(i) **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

(j) **Integration**. This Agreement constitutes part of the Subeasement, which is incorporated herein by this reference and made a part hereof. This Agreement terminates concurrently with the expiration or termination of the Subeasement.

IN WITNESS WHEREOF, Subgrantor and Subgrantee have executed this Agreement as of the date written above.

"Subgrantor"

NTS DEVELOPMENT CORPORATION
a Nevada not-for-profit corporation

By: [signature]
Name: TIM CARLSON
Its: PRESIDENT & CEO

"Subgrantee"

MNS WIND COMPANY, LLC
a Delaware limited liability company

By: [signature]
John A. Johansen
Authorized Representative

**EXHIBIT "1"**

**Subeasement**

EXHIBIT "3"

CONSENT OF MASTER PERMITTOR

As provided under Paragraph 5.(a) of Part I of the Easement granted to NTS Development Corporation as Grantee as of December 22, 2000, the United States of America, acting by and through the U.S. Department of Energy, hereby approves and consents to the foregoing Subeasement between Grantee and MNS Wind Power, LLC, as the Subgrantee referred to therein.

THE UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY,
NEVADA OPERATIONS OFFICE

By: ______________________________
Kathleen Carlson, Manager

January 17, 2001

WITNESSED BY;

January 17, 2001

Secretary of Energy Bill Richardson

U.S. Senator Harry Reid

Administrator of National Nuclear Security Administration General John Gordon

Assistant Secretary for Energy Efficiency and Renewable Energy Dan Reicher

**Department of Energy**
National Nuclear Security Administration
Nevada Operations Office
P.O. Box 98518
Las Vegas, NV 89193-8518

JUL 12 2002

George D. Ormiston, Chief Executive Officer
NTS Development Corporation
4045 S. Spencer, #314
Las Vegas, NV 89119-5248

PROPOSED WIND TURBINE GENERATION PROJECT AT THE NEVADA TEST SITE

In December of 2000, the Nevada Operations Office and the NTS Development Corporation signed a "Grant of Easement for Wind Powered Electric Generating Facility". This agreement provided that the "Grant of Easement will not become effective until DOE has completed the NEPA process".

As part of the ongoing NEPA process, the United States Air Force has stated in a letter dated July 3, 2002, from the 98th Range Wing Commander that wind turbine operations at the NTS are incompatible with the mission of the Nevada Test and Training Range (NTTR) and has recommended that no wind turbines be installed on the NTS. This recommendation came as the result of an SF/AQ Red Team study of a wind farm located on the NTS. Of primary concern to the Air Force are the impacts to the NTTR missions within the ranges surrounding the NTS. Some of these mission capabilities are unique to the NTTR and may cause major impacts to National Security.

John Gordon, Administrator of the National Nuclear Security Administration (NNSA), has decided to terminate the NEPA process at this time in light of the Air Force recommendation. A draft Environmental Impact Statement has been prepared and is ready for release for public review and comment. However, the National Security impacts identified by the Air Force are so significant that further action with respect to the NEPA process is unwarranted. The Nevada Operations Office is hereby notifying you that development of the project will not be allowed to go forward. The easement will not go into effect, according to the terms of the agreement.

KA Carlson

Kathleen A. Carlson
Manager

OCC:KAH