# Exhibit 1

# In The United States Court of Federal Claims

## Cover Sheet

Plaintiff(s) or Petitioner(s)

MNS Wind Company, LLC, a Delaware limited liability company

**If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attach an alphabetized, numbered list of all plaintiffs.**

Name of the attorney of record: [See RCFC 83.1(c)] Steven. S. Rosenthal

Firm Name: Kaye Scholer LLP

Post Office Box:

Street Address: 901 15th Street, NW

City-State-Zip: Washington, DC 20005

Telephone & Facsimile Numbers: (T) 202.682.3500 (F) 202.682.3580

E-mail address: srosenthal@kayescholer.com

Is the attorney of record admitted to the Court of Federal Claims Bar? yes

If **NO**, please call (202) 219-9630 for admission papers and instructions.

Nature of suit code: 1 3 4

**Select only one [three digit] nature of suit code from attached sheet and if numbers 118, 134, 226, 312, 356, or 528 are used, please explain.**

Agreement to develop alternative energy production facility on the Nevada test site.

RECEIVED
OVER THE COUNTER
OCT 15 2004
THE OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

Government Agency Involved: D O E

**See attached Sheet for three digit code.**

Amount Claimed: $ 270,000,000

**If to be determined, put the phrase "to be determined" in Amount Claimed Space.**

Vaccination Date: **(Vaccine Cases Only)**

If this is case related to any pending or previous case you are **required** to file a separate notice of related case(s). See RCFC 40.2

April 25, 2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. ____________ |

**COMPLAINT**

Plaintiff, MNS Wind Company LLC ("MNS"), through its undersigned counsel, files this Complaint against defendant The United States of America and states as follows:

**INTRODUCTION**

1. The Nevada Test Site ("NTS") encompasses 1,375 square miles of partially undeveloped land approximately 60 miles northwest of Las Vegas, Nevada. Historically, the primary mission of the NTS was to conduct nuclear weapons tests. Since the moratorium on testing began in 1992, this mission changed to maintaining a readiness to conduct tests if so directed by the President and to continue to host a number of national defense-related programs. In 1996, the United States Department of Energy (the "DOE") issued a decision regarding the future use of the NTS. Under the DOE's decision, the NTS was to maintain its readiness to resume underground nuclear testing; continue the defense-related and other programs of the NTS; and pursue further diversification of private industry uses of the NTS.

2. Due to electrical power shortages in the Western United States, the federal government focused its attention on the need for developing additional generation facilities in the West. Additionally, the State of Nevada passed legislation that required Nevada electric utilities to

obtain 5 percent of their power from renewable resources by 2003, increasing to 15 percent by 2013.

3. In or about March 2000, the Nevada Test Site Development Corporation ("NTSDC"), on behalf of the DOE, National Nuclear Security Administration Nevada Operations Office ("NNSA/NV") approached M&N Wind Power ("M&N") with a proposal to develop a commercially viable alternative energy production facility on the NTS using wind turbines.

4. The NTSDC, a Nevada not-for-profit corporation, is the designated community-reuse organization established and funded by the DOE for the NTS, whose purpose was to develop additional compatible uses for NTS land.

5. The proposed wind farm project would not only further the DOE's stated objectives of diversifying the use of the NTS, including initiating private sector economic development at the NTS, it would also support the growing need and Nevada mandate for alternative sources of renewable energy. The proposed wind farm project would also further the DOE's and the NTSDC's stated objectives of reinvigorating regional employment by the construction and continuing operation and maintenance of as many as 545 wind turbine electricity generators on the NTS to help restore some of the 9000 jobs lost in the area after the moratorium on nuclear testing.

6. After several months of intense negotiations, and with the assistance of local and federal agencies and local and national political leaders, the DOE, the NTSDC and MNS (the energy development company formed by M&N responsible for developing the project) executed agreements that were intended to result in the development of one of the largest wind-energy farms in America at the NTS. After signing the agreements, the DOE touted the proposed NTS

project as a model partnership between the private sector and the federal government in the quest to build additional generating facilities at other federal facilities across the nation.

7. MNS spent two years and millions of dollars in performing under the agreements by developing the site only to have the DOE repudiate or breach all of its agreements. As noted below, the repudiations and breaches are so fundamental to the agreements, it appears as if the DOE never intended to perform the terms of the agreements.

8. On information and belief, the DOE was aware of the national security concerns of other branches of the federal government, but failed to disclose the magnitude of those concerns to MNS. If the DOE had disclosed to MNS the magnitude of those national security concerns, MNS would not have entered into the agreements.

9. As described in further detail below, the DOE, among other things, materially breached the agreements by: 1) wrongfully interfering with the environmental condition to the agreements by terminating the environmental review process; 2) failing to perform under the agreements; and 3) repudiating the agreements by claiming that they never came into effect.

## PARTIES

10. MNS, a Delaware limited liability company, is an energy development company that was formed by its investors to develop major wind energy projects and to promote the sale of their goods and services.

11. The DOE, acting by and through the NNSA/NV, is the federal agency responsible for administering the NTS.

## JURISDICTION

12. This complaint is founded upon written contracts with the DOE. This Court has jurisdiction over this action under 28 U.S.C. section 1491(a).

## FACTUAL BACKGROUND

### I. MNS and the DOE Negotiate an Agreement to Develop the NTS.

13. In or about March 2000, the NTSDC, on behalf of the DOE approached MNS with a proposal to develop a wind farm at the NTS. After the DOE provided MNS wind data from the NTS, MNS concluded that the data supported the potential development of a wind farm at the NTS and decided to move forward with the NTS project.

14. The DOE agreed to grant an easement to the NTSDC, for the express benefit of MNS, and to grant to MNS the right to construct a wind farm on the NTS with up to 545 wind turbines. MNS became the express third party beneficiary under the easement, with the right to enjoy and enforce all of the terms of the agreement directly against the DOE.

15. To implement the easement, the NTSDC entered into a subeasement with MNS. The subeasement expressly incorporated the terms of the easement and the terms of a compensation agreement that provided for compensation among the parties. The DOE executed a written consent expressly approving the terms of the subeasement and the compensation agreement.

16. During the negotiations, the DOE stated that it wanted the right to terminate the agreements at any time for national security reasons. In addition, the DOE expressed concerns about the availability for development of portions of the NTS for national security reasons. MNS refused to agree to invest time and resources in a project only to have the project terminated for national security reasons without compensation.

17. The parties ultimately negotiated three major issues that required allocating risks or solving potential disputes: (1) responsibility for the environmental review process; (2) the government's ability to terminate the project for national security concerns; and (3) an expedited alternative dispute resolution process.

18. MNS agreed to incur the risk of compliance with any environmental conditions and it retained the absolute right to discontinue the project if, in its sole and absolute discretion, it concluded that the cost of environmental compliance was unacceptable.

19. On the other hand, the parties agreed to share the risk of national security concerns. MNS agreed to commit time and resources to develop the project, and the DOE retained the contractual right to revoke the easement for national security reasons, but to implement a revocation through eminent domain, which required the DOE to pay MNS the fair market value of the project at the time of the revocation.

20. Lastly, the parties also agreed to submit any disputes arising from or related to these agreements to binding arbitration and the Government warranted to NTSDC and MNS "that it has the power and authority to enter into this Easement." Easement, Part II - page 11, ¶ X(2). With these understandings, the parties entered into the final agreements discussed below.

**II. MNS, the DOE and the NTSDC enter three interdependent agreements whereby the parties allocated the risks associated in developing the NTS project, and agreed to an expedited alternative dispute resolution process.**

21. In order to implement the agreements reached, the parties entered into a series of interdependent agreements that were negotiated and expressly approved by the DOE.

22. On or about December 22, 2000, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the NTSDC for the express

benefit of MNS. A true and correct copy of the Easement is attached and incorporated herein as Exhibit A.

23. The Easement expressly provides for the construction, installation, maintenance, repair, replacement, use and operation of wind powered electricity-generating facilities on the NTS. The term of the Easement was for thirty-five (35) years from the date of execution of the Easement.

24. On or about January 17, 2001, the NTSDC and MNS entered into the subeasement referred to in the Easement, whereby the NTSDC granted to MNS a subeasement to use and occupy the NTS upon the terms and subject to the conditions set forth in the Easement (hereinafter "Subeasement"). A true and correct copy of the Subeasement is attached and incorporated herein as Exhibit B.

25. On or about January 17, 2001, MNS and the NTSDC also entered into a compensation agreement, whereby MNS agreed to pay the NTSDC a specific amount per year as compensation for the rights, services and benefits granted to MNS under the Subeasement (hereinafter "Compensation Agreement"). A true and correct copy of the Compensation Agreement is attached and incorporated herein as Exhibit C.

26. On or about January 17, 2001, the DOE executed a written consent expressly approving the Subeasement between the NTSDC and MNS (hereinafter "DOE Written Consent"). A true and correct copy of the DOE Written Consent is attached and incorporated herein as Exhibit D.

27. In this series of agreements, the parties agreed to the following basic framework: (1) MNS is made an express third-party beneficiary under the Easement; (2) the DOE expressly and specifically approved and consented to NTSDC entering into the Subeasement with MNS; (3) the DOE expressly approved the terms and conditions of the Subeasment between NTSDC and MNS, including the incorporation into the Subeasement of the terms and conditions of both the

Easement and the Compensation Agreement; and (4) the DOE and the NTSDC agreed that MNS had the right to enforce directly against the DOE all rights and remedies of the NTSDC under the Easement, and the NTSDC agreed to enforce the Easement for the benefit of MNS.

28. The parties also specifically addressed the environmental and national security issues. Because the development of this project could have environmental impacts, the grant of the Easement was subject to compliance with the requirements of the National Environmental Policy Act ("NEPA"). Easement, Part I – page 1, ¶1.

29. Under the Easement, the DOE covenanted to, among other things: not unreasonably interfere with the construction, maintenance or operation of MNS's project; not act in a manner that is arbitrary or capricious; and act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. Thus, the DOE specifically agreed not to unreasonably interfere with or unilaterally terminate the NEPA process.

30. Concomitantly, MNS was given the sole and absolute right to determine what costs, if any, it was prepared to spend in order to satisfy the NEPA process. Subeasement at 10, ¶18.7(iii).

31. The parties agreed that the DOE was permitted to revoke the Easement in the interest of national security, provided that the revocation of the Easement must be accomplished by eminent domain. Easement, Part II – page 3, ¶E(1). Thus, both the DOE and MNS were protected if some unforeseen national security issue arose – the DOE could unilaterally revoke the Easement, and MNS would be paid just compensation.

## III. <u>Nature of Dispute with the DOE.</u>

### A. In the two years following the execution of the Easement, MNS spent valuable resources developing the site.

32. Under the Easement, the DOE provided MNS with land sufficient to develop 545 wind turbine sites on the NTS. Because the DOE authorized wind turbines with capacity between 900 KW and 2000 KW, a total maximum MNS facility ranging between 490.5 MWs and 1090 MWs was possible.

33. Initially, the DOE granted MNS 175 sites on the NTS in the Easement. MNS was also given the exclusive right for two years to identify an additional 370 developable sites within the NTS. MNS planned to construct commercially operating wind farm facilities with a total capital cost in excess of $600 million.

34. During the two years after the parties executed the Easement, the Subeasement and the Compensation Agreement, MNS and its affiliates created an organization for this specific project requiring concentration of its efforts to the exclusion of developing other projects, and spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies; complying with the NEPA process; obtaining various permits from Nevada; and executing a power purchase agreement with Nevada Power for the first 85 MWs of power production.

35. The 175 sites were in the final stages of development and ready for construction to begin when the DOE terminated the Easement allegedly for national security reasons. In addition, another 73.5 MWs on adjacent sites were near final development, and would have been ready to begin construction within a short period of time but for the DOE's unilateral termination of the

Easement. Indeed, the successful development work done on these sites improved the value of the entire 545 sites on which MNS intended to install wind turbines and related infrastructure.

36. During the summer of 2001, MNS, in accordance with its rights under the Easement and pursuant to the ongoing studies of the entire site, requested permission from the DOE to develop additional and alternative sites within the NTS that were not part of the 175 sites identified in the original Easement. In breach of the Easement, the DOE inappropriately and summarily turned down these requests.

**B. The DOE breaches the Easement by Unilaterally Terminating the NEPA process.**

37. The grant of the Easement was subject to compliance with an environmental review process. When a federal agency, such as the DOE, is required to comply with an environmental review process, it is permitted by statute and regulations to pass off any associated mitigation costs to the project developers. MNS, therefore, bore the financial risks associated with compliance with the NEPA process. However, under the Subeasement, MNS retained the sole and absolute right to approve any costs required to comply with the environmental assessment and the property condition report.

38. With this understanding, MNS proceeded with the NEPA process covering use of all potential sites under the Easement. The environmental consultants responsible for the NEPA process had prepared and issued an advanced Draft Environmental Impact Statement ("EIS") that failed to identify any significant impacts that would provide a barrier to the implementation of the project. The EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. An

initial estimate of the cost of mitigation if the project had gone to construction was less than $2 million.

39. Nevertheless, on July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible "major impacts to National Security," the DOE had decided to terminate "the NEPA process" and that the Easement would not go into effect "according to the terms of the agreement." (DOE's July 12, 2002 Revocation Letter attached hereto as Exhibit E).

40. The DOE claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward."

41. Instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS eminent domain just compensation, the DOE attempted to avoid that promise by interfering with the environmental condition. The DOE's action materially breached and repudiated the agreements.

42. As discussed above, the Easement specifically provides that the Easement may be revoked for national security reasons. The parties negotiated and contracted for this specific possibility. The parties agreed, that in the event of a national security necessity, the DOE could exercise its rights under the terms of the agreement to revoke the Easement, in which event the revocation would be accomplished by eminent domain. Under these circumstances, unilaterally terminating the NEPA process on grounds of national security was in bad faith.

43. Not only did the DOE repudiate the revocation procedures provided in the Easement, the DOE also refused to comply with its contractual obligation to submit any and all disputes to arbitration, even going so far as to allege, under oath, that representatives of the DOE never saw, reviewed or negotiated the agreement containing the arbitration procedures.

**COUNT I**

**(Breach of Contract)**

44. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 43 of the Complaint.

45. MNS has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the agreements.

46. In contrast, the DOE has failed to perform all conditions, covenants, and promises required on its part to be performed under the agreements.

47. MNS has made several demands that the DOE perform its obligations under the agreements.

48. The DOE has materially breached and/or repudiated the agreements by failing to perform the conditions and promises of the agreements on its part. The DOE has materially breached and/or repudiated the agreements by, among other things: failing to act in good faith in taking any action, exercising any discretion or making any determination under the agreements; unreasonably interfering with the construction, maintenance or operation of MNS's project; refusing to revoke the contract for national security reasons, and pay MNS eminent domain just compensation, but rather attempting to avoid that promise by wrongfully interfering with the environmental condition to the agreements by terminating the environmental review; and repudiating the agreements by claiming that they never came into effect.

49. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

## COUNT II

**(Breach of Covenant of Good Faith and Fair Dealing)**

50. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 49 of the Complaint.

51. Under the express terms of the agreements, the DOE promised to, among other things: 1) not act in a manner that is arbitrary or capricious; and 2) act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. In addition, an implied covenant of good faith and fair dealing exists in every contract with the federal government.

52. In order to facilitate MNS's immediate development of the NTS, the DOE assigned a full-time employee to the NTS project, Kevin Thornton ("Thornton"). Thornton was responsible for, among other things, monitoring and facilitating all DOE-related activity on the NTS, including compliance with the environmental review process. In addition, Thornton ran the DOE's Site Utilization Board ("SUD") meetings. The SUD, which consisted of all federal agencies involved with the NTS, including the DOE and the Department of Defense ("DOD"), held regular meetings to discuss all development on the NTS, including the wind-farm project.

53. The NTSDC also held monthly executive committee meetings to discuss the status of the various NTSDC projects, including the NTS wind project. The DOE was represented on the executive committee and the Board of Directors of the NTSDC. In addition, since the NTS bordered the Nellis Air Force Base, a representative of the United States Air Force was also a member of the executive committee. The Commander of Nellis Air Force base also served as an ex-officio member of the NTSDC's Board of Directors.

54. During negotiations of the agreements, there were also discussions with the DOE regarding the DOE's desire to benefit from a power cost reduction at the NTS as a result of this project. As a result, the parties inserted into the Easement a section on power delivery and the benefits that would be afforded to the DOE. The parties agreed to provide a benefit to the DOE equivalent to a ten percent reduction in energy usage based upon total NTS consumption for fiscal year 2000, the expected MNS installed generation capacity at the NTS, and the expected capacity to deliver all of the generated energy.

55. After executing the agreements, MNS proceeded with the development of the NTS, including compliance with the NEPA process covering use of all potential sites under the Easement. The environmental consultants responsible for the NEPA process had undertaken a comprehensive investigation and prepared and issued an advanced Draft EIS that failed to identify any significant impacts that would provide a barrier to the implementation of the project.

56. In November 2001, MNS proposed a power purchase agreement to Nevada Power. Nevada Power accepted the unsolicited proposal to purchase the power. The Nevada Public Utilities Commission later approved the power purchase agreement. This not only demonstrated Nevada Power's support for the project, but the State's as well. The acceptance of this renewable energy power purchase agreement for a wind project was one of the driving factors in the establishment, by the Nevada Legislature, of one of the most aggressive renewable energy portfolio standards in the Nation (requiring that 15% of the State's power be produced by renewable sources by the year 2013). Every State agency from the Governor of Nevada on down were involved in the development of this project and showed their support. The NTSDC also received letters of support from the Congressional delegation.

57. Nevertheless, on July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible national security concerns raised by the Air Force, the DOE had decided to terminate the NEPA process and that the Easement would not go into effect according to the terms of the agreement. Instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS the fair market value for the project, the DOE attempted to avoid that promise by interfering with the environmental condition and improperly terminating the NEPA process.

58. The national security issue was allegedly based upon the potential adverse impact of the turning of the wind turbine rotor blades on operations of the United States Air Force, including specifically their potential effects on radar. Although the Air Force had a liaison officer in the local DOE office who participated in SUD meetings, was represented on the NTSDC's executive committee and Board of Directors, and was knowledgeable about all proposed uses and equipment specifications for the NTS wind farm, neither the Air Force nor the DOE representative disclosed that this issue was a reason to terminate the project.

59. This rotor blade issue was so basic to the development of the NTS wind farm project that it was surprising that the termination based on the alleged rotor blade problem came after MNS had spent so much time, effort and expenditures in developing the project and after the Air Force had been involved in key meetings regarding the development process.

60. The DOE had been dragging its feet in compliance with the NEPA process, based in part upon these rotor blade concerns raised by the Air Force. Even though the Air Force's concerns did not involve environmental issues and therefore were not within the scope of the NEPA review, MNS wanted to resolve these issues as quickly as possible since MNS was under time constraints to begin construction of the turbines.

61. To this end, MNS, in good faith, submitted studies from wind farms located all over Europe and other parts of the United States showing that the operation of wind turbines did not adversely impact radar operations. In addition, the NTSDC and MNS attempted to schedule meetings with the Air Force to discuss these issues, but the Air Force never agreed to a meeting. The only thing these attempts to address the rotor blade issue accomplished was to delay the project completion date into 2003.

62. Finally, in July 2002, MNS informed the DOE that it had to immediately place the order for the wind turbines, and that the NEPA report had to be formally filed as soon as possible if MNS was to complete the project on time. MNS also told the DOE and the NTSDC that the project was ready to proceed to the construction phase and MNS could not afford any more delays if it wanted to meet a much delayed December 2003 completion date for the first phase of the project. Immediately following MNS's request for expediency, the DOE issued the formal termination of the NEPA process for national security reasons.

63. Upon information and belief, the DOE knew of the Air Force's alleged national security concerns prior to entering into the agreements with MNS. The DOE, however, either intentionally withheld this information from MNS or misrepresented the scope and impact of the national security issues on the NTS project.

64. Upon information and belief, the DOE entered into the agreements in order to reap the political benefits associated with the agreements to produce wind power, but did not intend to perform under the agreements.

65. The DOE also took affirmative actions to protect its own interests at the expense of MNS, by among other things, wrongfully interfering with the environmental condition to the

agreements by terminating the environmental review in order to attempt to avoid paying eminent domain just compensation as agreed to under the contract.

66. In contrast, MNS performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the agreements.

67. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

**COUNT III**

**(Estoppel)**

68. MNS incorporates by reference, as though fully set forth herein, paragraphs 1 through 67 of the Complaint.

69. As discussed above, MNS consistently informed the DOE that it would not agree to invest time and resources in the NTS project only to have its rights terminated without compensation for national security reasons.

70. As a result, the Easement expressly provides that the DOE could revoke the Easement in the interest of national security, provided that the revocation of the Easement was accomplished by eminent domain. Thus, both the DOE and MNS were protected if some unforeseen national security issue arose – the DOE could unilaterally revoke the Easement, and MNS would be paid just compensation.

71. Nevertheless, the DOE decided to terminate the NEPA process because of possible national security concerns raised by the Air Force, and now contends, among other things, that the Easement never went into effect. So instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS the fair market value for the project, the DOE

has attempted to avoid that promise by interfering with the environmental condition and improperly terminating the NEPA process.

72. Upon information and belief, the DOE knew of the Air Force's alleged national security concerns prior to entering into the agreements with MNS. The DOE, however, either intentionally withheld this information from MNS or misrepresented the scope and impact of the national security issues on the NTS project.

73. MNS was not aware of the true nature, scope and impact of the Air Force's alleged national security issues regarding the wind-project prior to entering into the agreements. However, MNS also believed that it was adequately protected from any national security issues based upon the express language of the agreements

74. Upon information and belief, the DOE entered into the agreements in order to reap the political benefits associated with the agreements to produce wind power, but never intended to perform under the agreements.

75. The conduct of the DOE, including its misrepresentations and omissions, were made by government officers acting within their scope of authority.

76. MNS has relied on the DOE's conduct to its detriment by, among other things, creating an organization for this specific project, which required an investment of its efforts and capital to the exclusion of other projects and opportunities. MNS also spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies; complying with the NEPA process; obtaining various permits from Nevada; and negotiating and executing a power purchase agreement with Nevada Power for the first 85 MWs of power production.

77. As a direct and proximate result of the foregoing facts, DOE is estopped from (1) denying that the Easement ever came into existence based on the DOE's improper interference with the environmental condition to the Easement; and (2) revoking the Easement for national security reasons by any means other than by paying MSN eminent domain just compensation as provided in the Easement.

78. As a direct and proximate result of the foregoing facts, MNS has been damaged in an amount in excess of approximately $270 million.

**PRAYER FOR RELIEF**

WHEREFORE, MNS prays for the following relief:

**On Counts I, II and III:**

A) Damages in excess of $270 million dollars;

B) Just Compensation as hereafter determined, including interest;

C) The costs of this action, together with reasonable attorneys fees; and

D) Any such further relief as this Court may deem just and proper.

Dated: October 15, 2004

Respectfully submitted,

Steven S. Rosenthal, Counsel of Record
KAYE SCHOLER LLP
901 Fifteenth Street, NW, Suite 1100
Washington, D.C. 20005
Telephone: (202) 682-3500
Facsimile: (202) 682-3580

*Attorneys for Plaintiff*
*MNS Wind Company, LLC*