d. If development of installed generation capacity or energy production by Subgrantee or its affiliates is greater or less than expected, the percentage assessment for transmission losses shall remain fixed at 1.28%.

e. Energy delivery shall be scheduled by Subgrantee at its expense through the appropriate area load controller and shall equal the amount of energy metered at the high side of the step up transformer at the Project's substation located on the Property minus 1.28% attributed to transmission losses as provided in subparagraph (c) above.

f. The DOE shall have the right to validate and audit all meter readings and production schedules of the Subgrantee.

g. DOE, Grantee and Subgrantee shall work with local interconnected utilities to develop mutually agreed upon metering protocols and administration procedures to verify energy deliveries to the NTS and actual power schedules and deliveries off the NTS.

h. DOE does not guarantee the operable condition of the NTS transmission and distribution system and shall not be subject to fines, penalties or other charges either indirect or direct regarding the failure of the NTS transmission and distribution system. The DOE shall coordinate with the Subgrantee any scheduled maintenance and repairs of the system that affect the Subgrantee's ability to deliver power through the NTS system.

i. The Grantee and Subgrantee shall have the right to make any improvements to the existing NTS transmission and distribution system as deemed necessary to either improve system reliability and/or current carrying capability to allow for the efficient transmission of generated energy on and off the NTS. The design and location of such improvements shall be mutually agreed upon by DOE, Grantee and Subgrantee. Construction, operation and maintenance of such improvements to the existing NTS transmission and distribution system will be accomplished through the DOE Management and Operating Contractor at the Grantee's or Subgrantee's expense. Operation and maintenance of the transmission and distribution system from the high side of the generator transformers to the point of interconnection with the existing DOE transmission and distribution system will be accomplished through the DOE Management and Operating Contractor, for the full cost recovery of actual time and materials in accordance with DOE accounting practices, at the Grantee's or Subgrantee's expense.

12. **Environmental Assessment**

DOE is preparing an Environmental Assessment (EA) for this Grant of Easement pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq. DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process. After DOE has completed the EA and considered the environmental impacts of this action, DOE will either issue a Finding of No Significant Impact or prepare an Environmental Impact Statement.

13. **Real Estate Operations Permit**

DOE and Grantee agree that the Real Estate Operations Permit is made a part hereof as Attachment A-5.

14. **Administration**

For purposes of this Easement, the DOE and the Grantee's Representative will be:

For DOE: Manager, U.S. Department of Energy, Nevada Operations Office

For Grantee: President, NTS Development Corporation

The following Attachments are referenced in this Exhibit A and made a part of this Exhibit A:

Attachment A-1 Map of Permitted Area

Attachment A-2 Real Property Condition Report

Attachment A-3 Environmental Condition Report

Attachment A-4 Environmental Assessment (in process)

Attachment A-5 Real Estate Operations Permit



G-MNS08494

Attachment A-2

**Real Property Condition Report**

The Real Property Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Real Property Condition Report.

Attachment A-3

## Environmental Condition Report

The Environmental Condition Report is being developed. Except for preparatory activities approved by the DOE, no operations or activities shall be conducted on the Property prior to completion of the Environmental Condition Report.

Attachment A-4

Environmental Assessment

In process.

EXHIBIT "3"

Consent of Master Grantor

EXHIBIT "3"

CONSENT OF MASTER PERMITTOR

As provided under Paragraph 5.(a) of Part I of the Easement granted to NTS Development Corporation as Grantee as of December 22, 2000, the United States of America, acting by and through the U.S. Department of Energy, hereby approves and consents to the foregoing Subeasement between Grantee and MNS Wind Power, LLC, as the Subgrantee referred to therein.

THE UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY,
NEVADA OPERATIONS OFFICE

By: ______________________________
Kathleen Carlson, Manager

January 17, 2001

WITNESSED BY;

January 17, 2001

Secretary of Energy Bill Richardson

U.S. Senator Harry Reid

Administrator of National Nuclear Security Administration General John Gordon

Assistant Secretary for Energy Efficiency and Renewable Energy Dan Reicher

A:\Subeasement final clean MS 011201

# SUBEASEMENT

This Subeasement ("*Subeasement*") is entered into as of January 17, 2001, by and between NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation ("**Subgrantor**"), and MNS Wind Company, LLC, a Delaware limited liability company ("**Subgrantee**").

## RECITALS

A. Subgrantor has the right to use and occupy certain premises known as a portion of the Nevada Test Site, as specifically described in Exhibit "1" attached hereto and incorporated herein by this reference, (the "**Premises**") pursuant to and as more specifically described as the "Property" in the Easement for Wind Powered Electric Generating Facility granted as of December 22, 2000 (the "**Easement**") between Subgrantor, as Grantee, and the United States of America, acting by and through the Nevada Operations Office of the Department of Energy (the "**Master Grantor**", "**Government**" or "**DOE**"). A true and correct copy of the Easement with parts I and II and all exhibits thereto is attached hereto as Exhibit "2", and incorporated herein by this reference.

B. Subgrantee desires to obtain from Subgrantor a subeasement granting to Subgrantee the right to use and occupy the Premises and to obtain the benefit of the appurtenant rights and commitments of the Master Grantor which are set forth in the Easement, and Subgrantor is willing to grant to Subgrantee this subeasement conveying to Subgrantee the right to use and occupy the Premises, as well as the right to use and benefit from such appurtenant rights and commitments, upon the terms and subject to conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing premises and the mutual promises of the parties which are set forth below, Subgrantor and Subgrantee agree as follows:

1. **Grant of Easement and Term**. Pursuant to the authority granted by the Easement, and with the consent and approval of the Master Grantor, as required by the Easement, Subgrantor hereby grants and conveys to Subgrantee an easement to use and occupy the Premises upon the terms and subject to the conditions set forth herein and in the Easement. Subgrantor further grants and conveys to Subgrantee all of its right and interest to use and enjoy the appurtenant benefits, commitments and agreements of Master Grantor set forth in the Easement. Subgrantor agrees to use its reasonable good faith efforts to enforce the Easement, at Subgrantee's cost, for the benefit of Subgrantee, and agrees that Subgrantee may enforce directly against Master Grantor all rights and remedies of Subgrantor under the Easement.

The Premises shall be used for the purpose of a wind powered electric generating facility (the "*Project*"), as more fully described in the Easement (the "**Economic Development Activity**"), and for no other purpose without the prior written consent of Master Grantor and Subgrantor, which consent shall not be unreasonably withheld, conditioned or delayed.

The term of this Subeasement (the "**Subeasement Term**") shall commence upon the later of (i) the date upon which this Subeasement is executed by both parties hereto; or (ii) the date upon which this Subeasement is approved by Master Grantor (the "**Term Commencement Date**") and shall end on the earlier of (a) the thirty-fifth (35th) annual anniversary of the Term Commencement Date; or (b) the expiration or earlier termination of the Easement, unless sooner terminated pursuant to the terms of this Subeasement. If the Master Grantor approves the extension of the term of the Easement as provided therein, Subgrantee shall have the right to extend the initial term of this Subeasement for an additional period of ten (10) years (the "Option Period") upon the same terms and conditions as stated herein except for the terms of the Compensation Agreement described in Section 3, below. Provided there exists no continuing Event of Default hereunder, Subgrantee may exercise its right to extend the term by written notification to Subgrantor not less than (180) days prior to the expiration of the Subeasement Term.

In the event it is determined that the Master Grantor did not have the power or authority to enter into the Easement, Subgrantor agrees to use its best efforts to (i) obtain an amendment to the public land order under which the NTS was permanently withdrawn, authorizing or permitting the granting of the Easement and the subeasements contemplated thereunder, or (ii) obtain from the Department of Interior a lease, easement or other grant on terms substantially similar to the Easement. In any case, Subgrantor agrees to enter into subeasements or similar other agreements with Subgrantee or its designated affiliate company on terms and conditions substantially similar to those of this Subeasement. Any increased rental or fee payable under any such new or substitute master agreement shall be deducted from the Annual Fee payable under the Subeasement (or substitute agreement).

2. **Assumption of Obligations**. During the term hereof, Subgrantee shall assume, and faithfully discharge in a timely fashion, all of Subgrantor's obligations under the terms of the Easement with respect to the Premises. Subgrantee shall not do or fail to perform any act which may constitute a breach or violation of any term, covenant or condition under this agreement or Easement. As an additional obligation, Subgrantee shall cause the insurance which is obtained by Subgrantee pursuant to the Easement to name Subgrantor, Master Grantor and prime contractors at the Nevada Test Site as additional insureds. Subgrantee hereby acknowledges that it has read and is familiar with the terms of the Easement and agrees that (i) this Subeasement is subordinate and subject to the Easement and that any termination of the Easement shall likewise terminate this Subeasement except as hereinafter provided or provided in the Master Easement; and (ii) that Subgrantee has not been granted any rights except those set forth herein, in the Master Easement and in the Compensation Agreement. Subgrantee acknowledges and agrees that pursuant to the Easement, certain payments, certificates, notices and other items must be provided to Master Grantor. Subgrantee agrees to provide all such payments, certificates, notices and other items to Master Grantor, with copies of the

appropriate transmittal concurrently delivered to Subgrantor, no later than the date upon which such items must be provided to Master Grantor pursuant to the terms of the Easement.

(a) Provided there exists no continuing Event of Default hereunder, Subgrantor agrees (i) to maintain the Easement during the entire term of this Subeasement and not take any action in contravention thereof, subject, however, to any earlier termination of the Easement in accordance with its terms without the fault of Subgrantor; (ii) to comply with all of the Subgrantor's covenants and obligations under the Easement made by Subgrantor for the benefit of Subgrantee, and to comply with and perform all other obligations of Subgrantor under the Easement that Subgrantee has not expressly assumed under this Subeasement; (iii) not to cancel, terminate, surrender or suspend performance under the Easement or this Subeasement, or consent to any such cancellation, termination, surrender or suspension; (iv) not to modify or amend the Easement without the prior consent of Subgrantee, which consent, shall not be unreasonably withheld so long as Subgrantee's rights and obligations are not adversely affected thereby (and in such case, Subgrantee may withhold its consent in its sole and absolute discretion); and (v) promptly deliver to Subgrantee and its lenders all notices given to or received from the Master Grantor concerning the Premises, the Easement or this Subeasement, including without limitation, all notices of default. Any cancellation, termination, surrender, suspension, amendment or modification made in violation of the foregoing shall be null and void and shall have no effect on the rights of Subgrantee or any lender under this Subeasement or the Easement. Subgrantor shall not have the right to terminate this Subeasement unless Master Grantor terminates the Easement, except as expressly provided herein.

(b) Subgrantee shall have the right to transfer, assign and hypothecate its interest in this Subeasement and the Easement in accordance with Section S of the Easement, which is incorporated herein by this reference. Subgrantee agrees to execute such consents and estoppels as may be reasonably requested by any lender to the Project.

(c) Subgrantor agrees not to interfere with the flow, direction, generation or speed of wind over and across the Premises, or unreasonably interfere with the construction, maintenance and operation of the Project. Subgrantor agrees not to grant any other easement, lease or right to use or occupy any portion of the Premises to any other party during the term of this Subeasement.

3. **<u>Easement Fees and Charges</u>**. Fees and charges which are payable by Subgrantee for the rights, services and benefits conveyed by this Subeasement are set forth in a separate Compensation Agreement, dated of even date herewith, between Subgrantor and Subgrantee (the "**<u>Compensation Agreement</u>**"), the terms and provisions of which are incorporated herein by this reference as though set forth in full herein. Any Event of Default under the terms of the Compensation Agreement shall be a material default of Subgrantee's obligations under this Subeasement.

4. **Alteration and Improvement of the Premises**. Except as otherwise permitted under the Easement, Subgrantee shall not construct improvements upon or otherwise alter the Premises without the prior written approval of Subgrantor and, as set forth in the Easement, the prior written approval of Master Grantor, which consent in each case shall not be unreasonably withheld, conditioned or delayed. Subgrantor hereby consents to and approves of the construction and operation of the Project by Subgrantee as described in the Easement.

5. **Condition of the Premises**. Subgrantor will deliver to Subgrantee all reports and other information provided to Subgrantor by Master Grantor pertaining to the Premises. Subgrantee acknowledges that Subgrantor has not had possession of or access to the Premises prior to the date of this Subeasement. Accordingly, Subgrantor has not investigated and cannot make any representation or warranty whatsoever concerning any reports or other information furnished by Master Grantor nor any representation or warranty concerning any other aspect of the Premises or the suitability of the Premises for the conduct of Subgrantee's proposed business. The Premises shall be accepted by Subgrantee in its as-is condition and state of repair, and Subgrantor shall have no obligation to improve or alter the Premises in any manner whatsoever except as otherwise provided in the Easement. During the term of this Subeasement, Subgrantee shall maintain the Premises as required by the Easement and shall ensure that the Premises are safe and free from hazards that may cause injury or death to persons or damage to property to the extent required under the Easement. Upon the expiration or earlier termination of this Subeasement, Subgrantee shall, except to the extent that Subgrantee is directed otherwise by Master Grantor or Subgrantor, or otherwise provided by the Easement, remove all of its improvements and alterations from the Premises, and restore the Premises to its original condition and state of repair. However, if Master Grantor or Subgrantor so requests, Subgrantee may in its sole and absolute discretion, leave all of its improvements and alterations (or those improvements and alterations identified by Master Grantor or Subgrantor) in place on the Premises.

6. **Easements and Approvals**. Except for water permits which Subgrantor agrees to obtain on behalf of Subgrantee, Subgrantee acknowledges that it is Subgrantee's sole responsibility to obtain all necessary permits and approvals for its use of the Premises. Subgrantor agrees to reasonably cooperate with Subgrantee in obtaining such permits and approvals at Subgrantee's sole cost and expense. Subgrantee shall be responsible for compliance in all material respects with applicable laws and regulations affecting Subgrantee's use of the Premises including laws and regulations applicable to the transportation, storage, use and disposal of hazardous materials or substances. By execution of this Subeasement, Subgrantee represents, warrants, and certifies to Subgrantor and Master Grantor that Subgrantee currently has or is in the process of obtaining all required regulatory permits and licenses required for Subgrantee to conduct its operations on the Premises.

7. **Safety Data Sheets**. Within thirty (30) days after execution of this Subeasement, and thereafter prior to bringing to the Premises any new or altered hazardous material or substance, Subgrantee shall file with Master Grantor and with the NTS Fire Department, with a copy to Subgrantor, copies of all material safety data sheets applicable to hazardous materials or substances which are or will be stored or used by Subgrantee on the Premises.

8. **Damage to the Property of Master Grantor**. Subgrantee shall be financially responsible for any and all property of Master Grantor or Subgrantor (including any property financed by Subgrantor or any other entity) that is lost, damaged or destroyed as a direct result of Subgrantee's conduct from any cause whatsoever by Subgrantee or its agents, or the operation of the Project (except to the extent that such loss, damage or destruction resulted from the acts or omissions of the Master Grantor, its prime contractors at the NTS, or Subgrantor (including their employees, agents, contractors, vendors and customers)). Any claims arising out of a subsequent contract or agreement for services will be handled in the manner prescribed in that contract or agreement, and shall not be affected by this provision unless specified.

9. **Indemnity**.

(a) Subgrantee shall indemnify, defend (by counsel reasonably acceptable to Subgrantor) and hold harmless Subgrantor from and against all claims, demands, liabilities, costs and expenses, including reasonable attorneys' fees, arising from (i) Subgrantee's breach of its obligations hereunder (including, without limitation, any breach of Subgrantee's obligation under this agreement to perform the obligations of Subgrantor under the Easement; (ii) the use and occupancy by Subgrantee of the Premises; and (iii) any act, omission or negligence on the part of Subgrantee, its employees, agents, contractors or invitees, excluding, however, any such claim, demand, liability, cost or expense arising from the negligence or willful misconduct of Subgrantor, or its employees, agents, contractors or invitees.

(b) Subgrantee shall indemnify and hold harmless Subgrantor, Master Grantor and Master Grantor's prime contractors at the NTS with respect to any and all judgments, awards of damages, penalties, or fines by a court of competent jurisdiction or through a regulatory enforcement action, or arbitration awards or settlements reached with the participation and concurrence of the Subgrantor and Subgrantee (including reasonable attorneys' fees and expenses related to such litigation), to the extent they do not arise from the negligent acts or omissions of the Master Grantor, its prime contractors at the NTS, or Subgrantor, and arise from or are incident to (i) conduct by Subgrantee in its use and occupancy of the Property (including conduct by third parties entering the NTS to conduct business with Subgrantee) giving rise to the judgment, award of damages, penalty, fine, arbitration award or settlement; (ii) damages to the Premises or injuries to or death of any person, including without limitation, employees and officers of Master Grantor or Subgrantee; (iii) any "release" by Subgrantee or its agents as defined in Section 101(22) of the

Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA") of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Premises at any time while this Subeasement is in effect; (iv) failure of Subgrantee to comply with applicable environmental laws; and (v) the transportation, deposit, storage, or disposal by Subgrantee of hazardous substances or petroleum offsite of the Premises.

(c) Subgrantor acknowledges and agrees that it shall be liable and responsible for any and all claims, demands, liabilities, costs and expenses, including reasonable attorneys' fees, suffered or incurred by Subgrantee or its members, employees, agents or invitees, arising from (i) Subgrantor's breach of its obligations hereunder or under the Easement; (ii) any accidents on, or damages to the Premises or Project or injuries to or death of any person on the Premises, including without limitation, employees and officers of Subgrantee, resulting from Subgrantor's actions; (iii) any "release" directly caused by Subgrantor as defined in Section 101(22) of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA") of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Premises; (iv) failure of Subgrantor to comply with applicable environmental laws applicable to the conduct of its business; (vi) the transportation, deposit, storage, or disposal by Subgrantor or its employees, agents, contractors or invitees of hazardous substances or petroleum offsite of the Premises; and (vii) any act, omission, or negligence on the part of Subgrantor, or its employees, agents, contractors or invitees.

(d) Subgrantee shall not be responsible for any claims, damages, causes of action, proceedings, judgments, or suits, and all liabilities, losses, costs or expenses, (including, without limitation, technical consultant fees and reasonable attorneys' fees) to the extent they do not arise from the negligent acts or omissions of the Subgrantee and may arise from or be incident to (i) conduct of the Master Grantor, Subgrantor, any other subpermittee, or their employees, agents or contractors at the NTS in providing services to the Subgrantee; (ii) any "release" by the Master Grantor, Subgrantor, any other subpermittee, or their agents as defined in section 101(22) of CERCLA or any "hazardous substance" as defined in Section 101(14) of CERCLA, or petroleum (including crude oil or any fraction thereof) onto or from the Premises; (iii) the failure of the Master Grantor, Subgrantor, or any other subpermittee, to comply with applicable environmental laws; or (iv) the transportation, treatment, deposit, storage, or disposal by the Master Grantor, Subgrantor, any other subpermittee, of hazardous substances or petroleum off-site of the Premises.

10. <u>Access</u>. Subgrantor and Master Grantor shall have the right to gain access to the Premises, consistent with Subgrantee's rights of quiet enjoyment, for the sole purpose of providing agreed services, maintenance and repair, conducting inspections authorized under this Subeasement, or responding to a health or safety emergency, provided that Subgrantor shall not unreasonably interfere with Subgrantee's operations. In all instances except for emergency response and


G-MNS08506

inspections by regulatory authorities, access to the Premises shall be scheduled 48 hours in advance or in accordance with agreements for the provision of services, maintenance and repair. Subgrantee shall provide Subgrantor with a schedule of operations and hours for the Premises. Subgrantee shall have the right to accompany Subgrantor or its designated representatives in their exercise of this right to access to the Premises.

11. **Safety Manual**, Subgrantee shall prepare and maintain an Operations Safety Manual that sets forth health and safety procedures and emergency procedures for the Economic Development Activity as well as operational security procedures related to Subgrantee's activities. For purposes of construction activities, Subgrantee will (i) comply with reasonable commercial construction standards and (ii) submit a construction safety plan, including site specific requirements for emergency response, to Master Grantor, with a copy to Subgrantor, for review prior to commencement of construction activities. Pursuant to Article L of Part II of the Easement and prior to the commencement of any electricity generation activities, the Subgrantee shall submit the Operations Safety Manual to Master Grantor and Subgrantor for review, comment and reasonable approval; provided, however, that nothing in this provision will authorize Master Grantor or Subgrantor to assert jurisdiction to direct conduct of activities by Subgrantee within the primary jurisdiction of another federal agency.

12. **Default**.

12.1 **Events of Default**. The occurrence of any one or more of the following shall constitute an Event of Default:

(a) The occurrence of a default in the performance of the obligations of Subgrantor under the Easement which obligation Subgrantee has agreed to perform under the terms of this Subeasement, which default is not cured after written notice within any applicable grace period in the Easement, except to the extent that such default is caused by Subgrantor.

(b) The failure by Subgrantee to observe or perform any of the other covenants, conditions or provisions of this Subeasement where such failure continues for more than thirty (30) days after written notice from Subgrantor; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Subgrantee shall not be in default if Subgrantee commences such cure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion. Subgrantor agrees to give each lender of the Project copies of any notices of breach or default given to Subgrantee.

(c) Any representation or warranty made by Subgrantee in

in this Subeasement shall have been materially false or misleading as of the date such representation or warranty was made.

12.2 **Remedies of Subgrantor**. Upon the occurrence of an Event of Default, Subgrantor shall have the right to pursue any remedy now or hereafter available to Subgrantor under the laws of the State of Nevada, including, without limitation, the right to terminate this Subeasement and recover damages from Subgrantee (provided, in no event shall Subgrantee be liable for special or consequential damages).

12.3 **Limitation of Liability**. Without limiting any obligation under the Easement, the liability of Subgrantor and Subgrantee (and each Project lender to the extent such lender succeeds to Subgrantee's interests) for failure to perform any obligation under this Subeasement shall be limited to their respective interest in the Project and Premises (and no officer, director, employee, shareholder or member shall have any personal liability with respect thereto).

12.4 **Notices to Lenders**. Subgrantor shall provide each lender to the Project, on a timely basis, copies of any notices of breach or default concerning this Subeasement, the Compensation Agreement, the Easement or the Premises (i) given by the Master Grantor to Subgrantor, promptly upon receipt of such notice (together with a copy of such notice to Subgrantee), and (ii) given to Subgrantee, concurrently with the giving of such notice to Subgrantee. Each lender shall have the right, but not the obligation, to cure any default under such agreements, and Subgrantee agrees to accept such cure. Subgrantee and each lender shall have the right, but not the obligation, to cure directly with the Master Grantor, any default by Subgrantor under the Easement. Subgrantor agrees to maintain during the term of this Subeasement an account with Lexis Document Services or a similar company to facilitate the giving of the notices required hereunder.

13. **Cooperation**. Subgrantor agrees to cooperate with Subgrantee in good faith for the purpose of obtaining consents, approvals, authorizations or additional rights or services, including, without limitation additional rights-of-way and easements, from Master Grantor so that the Premises may be used by Subgrantee for the permitted purposes described herein and in the Easement. Subgrantor reserves the right to obtain reimbursement from Subgrantee for any additional costs or expenses which it reasonably incurs hereunder for additional rights or services to be provided to Subgrantee hereunder.

14. **Utilities and Services**. Subgrantor will cooperate in good faith with Subgrantee to obtain all services which Subgrantee wishes to obtain from Master Grantor. The amounts which Subgrantee is to pay to Subgrantor for such services are set forth in the Compensation Agreement. Subgrantee acknowledges that it is required to consider in good faith utilizing support services provided by Master Grantor, but is under no obligation to do so, except as otherwise provided in Exhibit A of the Easement.

In addition, Subgrantor may elect to provide services to its clients at the Nevada Test Site, including, without limitation, utility services and emergency fire and medical services (collectively, "**Additional Subgrantor Services**"). Subgrantee may but shall have no obligation to contract directly with Subgrantor for available Additional Subgrantor Services, except as otherwise provided in Exhibit A of the Easement.

15. **Successor and Assigns**. This Subeasement shall constitute a covenant running with the Premises, and shall be binding on the successors and assigns of the parties.

16. **Execution**. Each of the undersigned persons represents and warrants that he or she has full power and authority to execute this Agreement on behalf of Subgrantor or Subgrantee, as applicable.

17. **Subgrantor's Liability**. Subgrantee agrees that Subgrantor, its employees, officers, directors, consultants, attorney's shall have no liability to Subgrantee for: a) the termination of the Easement or this agreement for any cause whatsoever except if caused by the act or omission of Subgrantor, b) for the failure or interruption , for any reason whatsoever, of the use of the Premises except if caused by the act or omission of Subgrantor, or c) for the failure or interruption of any utilities, services, and/or facilities in connection with the Premises except if caused by the act or omission of Subgrantor.

18. **Miscellaneous Provisions**.

18.1 **Attorneys' Fees**. In any litigation between the parties regarding this Subeasement, the losing party shall pay to the prevailing party all reasonable expenses and court costs including reasonable attorneys' fees incurred by the prevailing party.

18.2 **Notices**. All notices under this Subeasement shall be in writing and shall be delivered by personal delivery or sent by registered or certified mail, postage prepaid , as follows:

To Subgrantee: MNS Wind Company, LLC
c/o M&N Wind Power, Inc.
4225 Executive Square, Suite 1650
La Jolla, California 92037
Attention: Mr. John Johansen

To Subgrantor: NTS Development Corporation
2330 Pasco del Prado
Suite C-101

Las Vegas, Nevada 89102
Attention: President

Notices which are delivered by personal delivery shall be effective upon receipt. Notices which are given by mail as required above shall be considered given and received two (2) business days after deposit in the mail. Copies of all notices given to Subgrantee under this Easement shall all be delivered to all the Project lenders at the address provided by such lenders.

18.3 **Partial Invalidity**. If any provision of this Subeasement is invalid or unenforceable to any extent, then that provision shall be null and void and the remainder of this Subeasement shall continue in effect and shall be enforceable to the fullest extent permitted by law.

18.4 **Waiver**. The failure of either party to exercise any of its rights is not a waiver of those rights. A party waives only those rights specified in writing and signed by the party waiving its rights.

18.5 **Governing Law**. To the extent not in conflict with applicable federal law, this Subeasement shall be governed by the laws of the State of Nevada.

18.6 **Consent of Master Grantor**. This Subeasement and the rights and obligations of the parties hereunder are subject to the written consent of the Master Grantor, which consent shall be attached hereto as Exhibit "3".

18.7 **Conditions Precedent**. Subgrantee's obligations under this Subeasement are subject to and conditioned upon satisfaction of each of the following conditions precedent:

(i) Subgrantee obtaining financing for the Project on such terms and conditions satisfactory to Subgrantee in its sole and absolute discretion;

(ii) Subgrantee obtaining all consents, permits, licenses, easements, rights of way and other approvals necessary for the construction and operation of the Project;

(iii) Subgrantee's approval in its sole and absolute discretion of the environmental assessment of the Premises and the property condition report;

(iv) Subgrantee shall have determined in its sole and absolute discretion that the construction and operation of the Project is economically feasible; and

(v) Approvals of the Board of Directors of the members of Subgrantee.

In the event of the failure of any of the foregoing conditions precedent, Subgrantee shall have the right to terminate this Subeasement by delivering written notice of such termination to Subgrantor, and upon such termination, Subgrantee shall have no further obligations or liabilities whatsoever hereunder or under the Easement.

18.8 **Integration**. The terms and conditions of the Easement and Compensation Agreement are incorporated herein by this reference and made a part hereof.

18.9 **Quiet Enjoyment**. Provided that the Subgrantee observes and performs all of its obligations hereof, Subgrantee shall peaceably and quietly hold and enjoy the Premises for the term provided herein without interruption by the Government or Subgrantor or any person or persons claiming by, through or under such parties. Subgrantor warrants and represents to Subgrantee that it has the power and authority to enter into this Subeasement and the Compensation Agreement.

18.10 **Good Faith**. Except as otherwise expressly provided, any time the consent of the Master Grantor or Subgrantor is required under any Part of the Easement (or Exhibit A thereto or any other exhibit) or under this Subeasement or the Compensation Agreement, such consent shall not be unreasonably withheld, conditioned or delayed, and, whenever any Part of the Easement (or Exhibit A thereto or any other exhibit), or the Subeasement or the Compensation Agreement grants the Master Grantor or Subgrantor the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Master Grantor and Subgrantor shall act prudently and in good faith.

18.11 **Counterparts**. This Subeasement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, Subgrantor and Subgrantee have executed this Subeasement as of the date written above.

"Subgrantor"

NTS DEVELOPMENT CORPORATION
a Nevada not-for-profit corporation

By: ______________
Name: TIM CARLSON
Its: PRESIDENT

"Subgrantee"

MNS WIND COMPANY, LLC
a Delaware limited liability company

By: ______________
John A. Johansen
Authorized Representative

EXHIBIT "1"

PREMISES

EXHIBIT "2"

Easement