No. 04-1569
Judge Wolski

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

MNS WIND COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# MOTION FOR PARTIAL SUMMARY JUDGMENT

---

George T. Caplan, Counsel of Record
Bryant S. Delgadillo
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

Dated: October 5, 2005

23180598.WPD

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . 5

I. INTRODUCTION . . . . . 5

II. STATEMENT OF QUESTION INVOLVED . . . . . 7

III. STATEMENT OF THE CASE AND SUMMARY OF MATERIAL FACTS . . . . . 7

A. The Parties Agree to A Framework for Developing the NTS. . . . . . 7

B. The Parties Enter Into Three Binding and Enforceable Agreements – An Easement, Subeasement, and Compensation Agreement . . . . . 10

C. The DOE Breached the Easement by Unilaterally Terminating the Environmental Review Process . . . . . 12

IV. ARGUMENT . . . . . 14

A. Legal Standard . . . . . 14

B. The Easement is Valid and Enforceable. . . . . . 16

C. The DOE Prevented the Completion of the Environmental Condition to the Easement When It Interfered With and Terminated the NEPA Process . 17

D. NEPA Does Not Require Analysis of Non-Environmental Issues, Including National Security Issues . . . . . 19

V. CONCLUSION . . . . . 22

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . 14, 15

*Andrus v. Sierra Club*,
442 U.S. 347 (1979) . . . . . 19

*Anthuis v. Colt Indus. Operating Corp.*,
971 F.2d 999 (3d Cir. 1992) . . . . . 17

*California v. United States*,
271 F.3d 1377 (Fed. Cir. 2001) . . . . . 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) . . . . . 15

*Glass v. United States*,
258 F.3d 1349 (Fed. Cir. 2001),
*amended on reh'g* 273 F.3d 1072 (Fed. Cir. 2001) . . . . . 16

*Idaho Conservation League v. Mumma*,
956 F.2d 1508 (9th Cir. 1992) . . . . . 21

*Kleppe v. Sierra Club*,
427 U.S. 390, n. 21 (1976) . . . . . 21

*Lobensein v. United States*,
91 U.S. 324 (1875) . . . . . 18

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) . . . . . 21

*Moden v. United States,*
404 F.3d 1335 (Fed. Cir. 2005) . . . . . 14

*Novartis Corp. v. Ben Venue Laboratories*,
271 F.3d 1043 (Fed. Cir. 2001) . . . . . 15

*Prineville Sawmill Co., Inc. v. United States,*
859 F.2d 905 (Fed. Cir. 1988) . . . . . 15

*Public Util. Com'n of State of California v. FERC*,
900 F.2d 269 (D.C. Cir. 1990) . . . . . . . . . . 21

*Riley & Ephriam Constr. Co., Inc.*,
408 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 15

*Southern California Edison v. United States*,
58 Fed. Cl. 313 (Ct. Cl. 2003) . . . . . . . . . . 18

*Stratos Mobile Networks USA, LLC v. United States*,
213 F.3d 1375 (Fed. Cir. 2000) . . . . . . . . . . 15

*Vanadium Corp. v. Fidelity & Deposit Co.*,
159 F.2d 105 (2d Cir. 1947) . . . . . . . . . . 17

*Winstar Corp. v. United States*,
518 U.S. 839 (1996) . . . . . . . . . . 14

**STATE CASES**

*A.C. Shaw Construction, Inc. v. Washoe County*,
784 P. 2d 9 (Nev. 1989) . . . . . . . . . . 18

*Elizabeth E. v. ADT Security Sys. West, Inc.*,
839 P.2d 1308 (Nev. 1992) . . . . . . . . . . 16

*Lear v. Bishop*,
476 P.2d 18 (Nev. 1970) . . . . . . . . . . 16

*Lipshie v. Tracy Inv. Co.*,
566 P.2d 819 (Nev. 1977) . . . . . . . . . . 16

*NGA #3 LLC v. Rains, Jr.*,
946 P.2d 163 (Nev. 1997) . . . . . . . . . . 17

**STATUTES AND REGULATIONS**

42 U.S.C. § 4332 . . . . . . . . . . 19, 21

40 Code Fed. Reg 1508.14 . . . . . . . . . . 20, 21

40 Code Fed. Reg. 1508.8 . . . . . . . . . . 20

**OTHER AUTHORITIES**

12 American Jurist § 885 . . . . . . . . . . 17

2 Farnsworth on Contracts § 8.6 (2d ed. 1998) . . . . . . . . . . 18

8 Corbin on Contracts (Conditions) § 40.17 (rev. ed. 1999) . . . . . . . . . . 17, 18

*Restatement (Second) of Contracts*, § 224 (1981) . . . . . . . . . . 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | CASE NO. 04-1569C<br><br>(Judge Wolski)<br><br>**MNS WIND COMPANY, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT LIABILITY**<br><br>**Filed Concurrently with MNS Wind Company LLC's Proposed Findings of Uncontroverted Facts, and the Declarations of Tim Carlson, Michelle K. Conway, Thomas Williams and Bryant S. Delgadillo** |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, MNS Wind Company LLC ("MNS"), through its undersigned attorneys, hereby moves, pursuant to Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), for partial summary judgment in favor of MNS on the issue of contract liability. More specifically, MNS seeks a judgment that the United States, through the Department of Energy ("DOE"), materially breached the agreement between MNS and the DOE when, among other things, the DOE failed to terminate the wind farm project in accordance with the express provision in the contract that permitted the DOE to revoke the agreement "in the interest of national security, in which event the revocation" of the agreement "*shall* be accomplished by eminent domain." *See* Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") at Part II, §E, p. 3, attached as Exhibit A to the Declaration of Tim Carlson filed herewith. The following material facts are undisputed:

- The DOE entered into the Easement with the Nevada Test Site Development Corporation ("NTSDC") -- the local Community Reuse Organization for the Nevada Test Site

("NTS") -- for the development of a wind farm on the NTS, *see* Proposed Findings of Uncontroverted Fact ("Undisputed Fact"), No. 1;

- In the Easement, both the DOE and the NTSDC acknowledged and agreed for the benefit of MNS, that MNS shall have the right to enjoy and directly enforce against the DOE any and all rights and remedies of the NTSDC under the Easement, *see* Undisputed Fact, No. 2;
- In the Easement, the parties expressly agreed that the DOE was permitted to revoke the Easement in the interest of national security, in which event the revocation of the Easement *must* be accomplished by eminent domain, *see* Undisputed Fact, No. 3;
- Prior to executing the Easement, the DOE was aware of both: (a) the United States Air Force's ("USAF") concerns about the wind farm project's potential impact on national security; and (b) MNS's refusal to agree to develop the wind farm project only to have its rights terminated for national security reasons without compensation for its involvement, *see* Undisputed Fact, Nos. 5-7; and
- Because of possible national security concerns raised by the USAF, the DOE cancelled the wind farm project by purporting to terminate the National Environmental Policy Act ("NEPA") process, *see* Undisputed Fact, No.12.

Thus, it is undisputed that the parties negotiated and agreed that if the DOE determined that issues of national security prevented the continued development of the proposed wind farm, the DOE could cancel the project at any time and revoke the Easement. In such an instance, however, the parties expressly agreed that the DOE would implement any such revocation through eminent domain. Despite agreeing to this provision, and being fully aware of the additional risks it imposed, when the USAF informed the DOE that national security concerns

would prevent the continued development of the wind farm on the NTS, the DOE failed to revoke the agreement through eminent domain. Instead, the DOE unilaterally terminated the NEPA process based on the USAF's national security concerns, and asserted, in bad faith, that the Easement never came into effect because MNS did not satisfy the freestanding environmental review condition to the Easement.

While it is undisputed that the Easement was ultimately subject to compliance with the NEPA process, the parties never agreed that the DOE could unilaterally terminate the environmental condition based on national security issues. Indeed, there is no dispute that the parties agreed that MNS, not the DOE, retained the sole and absolute right to approve any costs required to comply with the environmental condition. Furthermore, it is undisputed that, prior to terminating the NEPA process, the DOE's manager of the NTS had approved the Draft Environmental Impact Statement ("EIS") for release for public review and comment. However, even though the cost of mitigation under the Draft EIS would have been modest under the circumstances, MNS was unable to exercise its discretion to comply with the environmental condition because the DOE unilaterally terminated the NEPA process.

Thus, to the extent that compliance with NEPA was a condition to the Easement, the DOE improperly interfered with that condition by unilaterally terminating the NEPA process. It is black letter law that a party that prevents the performance or the happening of a condition to its own performance, excuses or eliminates compliance with that condition for purposes of determining liability under the contract. It was improper for the Government to terminate the NEPA process for "national security" reasons. Nowhere in NEPA is there a requirement to consider the effects of a federal agency action on national security. Indeed, there is not a single

court that has determined that national security concerns are part of NEPA. The NEPA process is specifically focused on environmental resource matters.

This motion is based upon this Motion, the Memorandum of Points and Authorities in Support Thereof, MNS's Proposed Findings of Uncontroverted Fact, the Declarations of Tim Carlson, Thomas Williams, Michelle K. Conway and Bryant S. Delgadillo, all the papers filed concurrently herewith, the pleadings and papers on file in this action, such evidence and argument as may be presented to the Court at the hearing on this Motion, and any other matter of which the Court may take judicial notice.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In approximately June of 2000, the Nevada Test Site Development Corporation ("NTSDC"), on behalf of the Department of Energy ("DOE"), National Nuclear Security Administration Nevada Operations Office ("NNSA/NV") approached Global Renewable Energy Partners, Inc. ("GREP") with a proposal to develop a commercially viable alternative energy production facility on the Nevada Test Site ("NTS"). The NTS, which encompasses 1,375 square miles of partially undeveloped land approximately 60 miles northwest of Las Vegas, Nevada, was formerly used as a testing area for nuclear weapons. By proposing the development of a wind farm on the NTS, the DOE sought to diversify the use of the NTS following the ban on nuclear testing, including initiating private sector economic development at the NTS. The project would also support the growing need and the Nevada mandate for alternative sources of renewable energy.

After several months of intense negotiations, and with the assistance of local and federal agencies and local and national political leaders, the DOE, the NTSDC and MNS Wind Company LLC ("MNS") (the energy development company formed by GREP to develop the project) executed agreements that were intended to result in the development of one of the largest wind-energy farms in America at the NTS. After signing the agreements, the DOE touted the proposed NTS project as a model partnership between the private sector and the federal government in the quest to build additional generating facilities at other federal facilities across the nation.

MNS spent over two years and millions of dollars in performing under the agreements by developing the site only to have the DOE repudiate or breach all of its agreements. It is

undisputed that prior to entering into an agreement with MNS to develop the wind farm project on the NTS, the DOE knew that the United States Air Force ("USAF") was concerned that the proposed wind farm could adversely impact on national security. It is further undisputed that the parties thereafter specifically negotiated a provision giving the DOE the right to terminate the agreements for national security reasons so long as the DOE did so by eminent domain, so that MNS would be fairly compensated for its efforts. The DOE knew that, without this provision, MNS would not have entered into this transaction with the DOE, because MNS would not have agreed to risk millions of dollars in development money, only to be subject to the DOE's sole discretion to terminate for national security reasons without recourse. However, despite agreeing to this expressly negotiated provision, this is precisely what the DOE has done.

The DOE has no legal or factual support for its position. Business ethics, fair play and the law are in perfect harmony. Instead of terminating the agreements for national security reasons and implementing the termination by eminent domain as required by the agreements – points which the parties had specifically and extensively negotiated -- the DOE materially breached the agreements by, among other things: (1) wrongfully interfering with the environmental condition to the agreements and terminating the environmental review process, which was a condition to its own promise; and (2) claiming that the Easement never came into effect. The DOE must not be permitted to relegate fundamental business ethics and fair play to the ash heap of cynicism and outright fraud. In any other setting the plaintiffs would have a legitimate, clear and compelling fraud case, but as the United States can only be sued for fraud in extremely limited circumstances, MNS's Complaint is brought only to enforce the agreements between MNS and the DOE.

MNS therefore respectfully requests that this Court grant its partial Motion for Summary Judgment on Contract Liability and find that the DOE materially breached the Easement by failing to revoke the Easement for national security reasons through eminent domain. Following this determination, MNS will present evidence of the amount of damages to which it is entitled for this breach.

## II. STATEMENT OF QUESTION INVOLVED

The question before this Court is whether the United States materially breached the Easement when, among other things, it unilaterally interfered with the environmental condition to the Easement by terminating the NEPA process for national security reasons in order to avoid terminating the wind farm project in accordance with the express provision in the Easement that permitted the DOE to revoke the Easement "in the interest of national security, in which event the revocation" of the Easement "*shall* be accomplished by eminent domain."

## III. STATEMENT OF THE CASE AND SUMMARY OF MATERIAL FACTS

### A. The Parties Agree to A Framework for Developing the NTS.

In June of 2000, the NTSDC, on behalf of the DOE approached MNS with a proposal to develop a commercially viable renewable energy production facility on the NTS. *See* Declaration of Tim Carlson ("Carlson Decl.") ¶9. After the DOE provided MNS wind data from the NTS, MNS concluded that the data supported the potential development of a wind farm at the NTS and decided to move forward with the NTS project. Carlson Decl. ¶9.

During the negotiations, the DOE indicated that it wanted the right to terminate the agreements at any time for national security reasons. *See* Carlson Decl. ¶10; Declaration of Thomas Williams ("Williams Decl."), ¶ 7. In addition, the DOE expressed concerns about the availability for development of portions of the NTS for national security reasons. Williams

Decl., ¶ 7. Indeed, the United States Air Force ("USAF") had specifically warned the DOE that the wind farm could have a potential adverse impact on national security. Williams Decl., ¶ 5-6; Declaration of Bryant S. Delgadillo ("Delgadillo Decl."), Exhibits B, C and D (correspondence showing that the USAF informed the DOE, prior to the execution of any agreement, of the USAF's national security concerns); Undisputed Fact, No. 5.

MNS responded by informing the DOE that it would not agree to invest time and resources in a project only to have the project terminated for national security reasons without compensation. Carlson Decl. ¶ 10; Williams Decl., ¶ 9; Undisputed Fact, No. 7. In addition, MNS informed the DOE that a revocable use permit was unacceptable, and that a non-revocable use permit for an extended term, such as an easement, was essential to secure commercial funding for the wind farm project. Williams Decl., ¶ 9.

Representatives of the DOE, including the attorney who negotiated the agreement, clearly understood that a non-revocable permit that required the Government to pay eminent domain damages if it terminated the agreement for national security reasons could involve significant financial consequences to the Government, and differed from the revocable permits that the DOE usually granted. *See* Delgadillo Decl., Ex. C; Williams Decl., ¶¶ 8, 9 & 11; Undisputed Fact, No. 6. In a memorandum the DOE's counsel authored before the signing of easement, he explicitly recognized the risk the Government was taking in agreeing to the national security provision, stating that:

> "should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

Delgadillo Decl. Ex. C; Undisputed Fact, No. 6. Nevertheless, the DOE decided to take this risk because it understood that this was necessary given the nature of the project and the financial commitment that would be required by MNS to develop the wind farm. *See* Williams Decl., ¶ 11; Delgadillo Decl., Ex. C ("Such a non-revocable document for an extended term is essential to secure commercial funding if [the wind farm project] is to proceed."); Undisputed Fact, No. 6.

Ultimately, the parties agreed to share the risk of national security concerns. Carlson Decl. ¶14. The parties agreed that MNS could immediately commence development of the project for a timely completion and the DOE would have the right to revoke the easement for national security reasons, but that the DOE would have to implement the revocation through eminent domain. Carlson Decl. ¶14.

MNS also agreed to incur certain other risks associated with the development of the project, including compliance with any environmental conditions, but it retained the absolute right to discontinue the project if, in its sole and absolute discretion, it concluded that the developmental costs, including environmental mitigation costs, were unacceptable. *Id.* ¶13; Undisputed Fact, No. 9. If MNS concluded that it did not want to go forward with the project because the developmental costs were unacceptable, then MNS would have been responsible for its own costs and expenses incurred in the performance of the agreements. On the other hand, the parties did not agree, that the DOE would have the right to unilaterally terminate the environmental condition based on national security concerns and, thereby, render meaningless the specific national security revocation clause that the parties negotiated to protect the interests of both sides.

**B. The Parties Enter Into Three Binding and Enforceable Agreements – An Easement, Subeasement, and Compensation Agreement.**

In order to implement the agreements reached, the parties entered into three interdependent agreements – an easement, subeasement and compensation agreement – all of which were reviewed, negotiated and expressly approved by the DOE. Carlson Decl. ¶ 15. On or about December 22, 2000, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the NTSDC for the express "use and benefit" of MNS. Carlson Decl. ¶16; Undisputed Fact, No. 1. The term of the Easement was for thirty-five (35) years from the date of execution of the Easement. Carlson Decl. ¶ 16.

In the Easement, both the DOE and the NTSDC "acknowledge and agree for the benefit of [MNS], that [MNS] shall have the right to enjoy and directly enforce against the [DOE] any and all rights and remedies of [the NTSDC] under the Easement." Carlson Decl. ¶ 17; Undisputed Fact, No. 2. In addition, the DOE expressly "approves and consents to [the NTSDC] entering into one or more subeasements . . . with MNS" and further stated it had "reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property . . . . " Carlson Decl. ¶ 17. The DOE also "warrants to [the NTSDC] and [MNS] that it has the power and authority to enter into this Easement. Carlson Decl, ¶ 17.

In the Easement, the parties also agreed that the DOE was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement *shall* be accomplished by eminent domain." Carlson Decl. ¶ 18 (emphasis added); Undisputed Fact, No. 3. Lastly, the DOE covenanted to, among other things, not unreasonably interfere with the construction, maintenance or operation of the project, act in a manner that is not arbitrary or capricious in revoking the Easement, and act prudently and in good faith in taking any action,

exercising any discretion or making any determination under the Easement and other related documents. Carlson Decl. ¶ 18; Undisputed Fact, No. 4.

The NTSDC, the DOE and MNS also simultaneously negotiated the terms of two documents, both expressly referred to in the Easement -- a Subeasement and Compensation Agreement between MNS and the NTSDC, which the parties executed on or about January 17, 2001. Carlson Decl. ¶ 19. Both the Subeasement and the Compensation Agreement were reviewed and revised by the DOE, and as discussed above the DOE represented in the Easement that it had reviewed and consented to the terms of the Subeasement. *Id.* ¶ 20.

Under the Subeasement, the NTSDC granted to MNS a subeasement to use and occupy the NTS upon the terms and subject to the conditions set forth in the Easement. Carlson Decl. ¶ 21. The Compensation Agreement provides that MNS pay the NTSDC a specific amount per year as compensation for the rights, services and benefits granted to MNS under the Subeasement and outlines the procedures and agreements regarding the arbitration provisions. The Subeasement also contained an integration clause that expressly incorporates the terms and conditions of both the Easement and Compensation Agreement. Carlson Decl. ¶ 21. On the same day that MNS and the NTSDC executed the Subeasement and Compensation Agreement, the DOE also executed a written consent expressly approving the Subeasement between the NTSDC and MNS. Carlson Decl. ¶ 22.

In summary, the parties ultimately agreed to the following basic framework: (1) MNS is made an express third-party beneficiary under and signatory of the Easement; (2) the DOE expressly and specifically approved and consented to NTSDC entering into the Subeasement with MNS; (3) the DOE *expressly approved* the terms and conditions of the Subeasement between NTSDC and MNS, including the incorporation into the Subeasement of the terms and

conditions of both the Easement and the Compensation Agreement; and (4) the DOE and the NTSDC agreed that MNS had the right to enforce directly against the DOE all rights and remedies of the NTSDC under the Easement, and the NTSDC agreed to enforce the Easement for the benefit of MNS. Carlson Decl. ¶ 23.

**C. The DOE Breached the Easement by Unilaterally Terminating the Environmental Review Process.**

Following the implementation of these agreements, MNS proceeded with the development of the NTS, including compliance with the National Environmental Policy Act ("NEPA") process covering use of all potential sites under the Easement. Carlson Decl. ¶ 25; Williams Decl. ¶ 12. The environmental consultants responsible for the NEPA process had prepared and issued an advanced Draft Environmental Impact Statement ("EIS") that failed to identify any significant impacts that would provide a barrier to the implementation of the project. *See* Declaration of Michelle Conway ("Conway Decl."), ¶ 6. While the EIS was labeled a "draft" as required by NEPA, the document actually was a finished product that incorporated extensive comments from numerous parties, including the DOE and MNS. *See* Conway Decl. ¶ 5. The EIS was labeled as "draft" due to the fact that it was still subject to public review and comment. Conway Decl. ¶ 5. Indeed, at one time both the local and national offices of the DOE had expressly approved the EIS as written, and the DOE had specifically requested that the EIS be released for public comment. Conway Decl. ¶ 5; Delgadillo Decl., Ex. E; Undisputed Fact, No. 10.

The EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. Conway Decl. ¶ 6. An initial estimate of the cost of mitigation if the project had gone to

construction was approximately $2 million. *Id.* ¶ 6. Despite approving the EIS and agreeing that it was ready to be released to the public, the DOE later reversed course and informed MNS that the DOE had decided to hold the EIS for release to the public until certain issues raised by the United States Air Force were resolved. Conway Decl. ¶ 7; Undisputed Fact, No. 11.

MNS did not hear from the DOE about the EIS for several months until the DOE circulated its letter in which it purported to terminate the NEPA process. Conway Decl. ¶ 7. On July 12, 2002, the DOE sent a letter to the NTSDC, that asserted because of possible "major impacts to National Security," the DOE had decided to terminate "the NEPA process" and that the Easement would not go into effect "according to the terms of the agreement." Carlson Decl. ¶ 27; Williams Decl. ¶ 18; Undisputed Fact, No. 12. The DOE claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward." Carlson Decl. ¶ 27; Undisputed Fact, No. 12.

As discussed above, the Easement provides that the Easement may be revoked for national security reasons. The parties negotiated explicit terms to deal with this specific possibility. Instead of exercising its contractual right to revoke the easement for national security reasons and pay MNS the fair market value for the project, the DOE attempted to avoid that promise by interfering with the environmental condition and improperly terminate the NEPA process. Carlson Decl. ¶ 28. Under these circumstances, unilaterally terminating the NEPA condition on grounds of national security was a bad faith attempt to avoid the specific terms of the Easement. As discussed *infra*, the law is clear that one may not interfere with the occurrence of a condition to one's own performance.

## IV. ARGUMENT

### A. Legal Standard

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden v. United States,* 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c). In the United States Court of Federal Claims, summary judgment may be rendered on the issue of liability alone even if a genuine issue of fact exists as to the amount of damages. *See Winstar Corp. v. United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any.); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted . . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely

colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' -- that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp. v. Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) (quoting *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed. Cir. 1988)) ("[The court] determines for itself whether the standards for summary judgment have been met."). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

**B. The Easement is Valid and Enforceable.**

It is undisputed that the DOE entered into an Easement with the NTSDC for the use and benefit of MNS. *See* Undisputed Fact, No.1. It is further undisputed that in the Easement, both the DOE and the NTSDC acknowledged and agreed, for the benefit of MNS, that MNS had the right to enjoy and directly enforce against the DOE any and all rights and remedies of the NTSDC under the Easement. Undisputed Fact, No. 2. Given that the DOE, among other things, negotiated the terms of the three interdependent agreements directly with MNS, expressly mentioned MNS in the Easement, required MNS to sign the Easement as a signatory, expressly acknowledged and agreed that the Easement was for the benefit of MNS, and expressly acknowledged that MNS would rely on the terms of the Easement in entering into the other agreements, *see* Carlson Decl. ¶¶ 17-18, there clearly was an intent to benefit MNS under the Easement. Thus, MNS is an express third party beneficiary under the Easement. *See Elizabeth E. v. ADT Security Sys. West, Inc.*, 108 Nev. 889, 894, 839 P.2d 1308 (Nev. 1992) (in order to enjoy the status of third-party beneficiary, there must be an intent to benefit the third party and it must be shown that the third party's reliance thereon is foreseeable) (*citing Lipshie v. Tracy Inv. Co.*, 566 P.2d 819 (Nev. 1977) and *Lear v. Bishop*, 476 P.2d 18 (Nev. 1970)), *see also Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *amended on reh'g* 273 F.3d 1072 (Fed. Cir. 2001) ("In order to prove third party beneficiary status a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.").[1]

---

1 Here, the parties agreed that, to the extent not in conflict with federal law, the laws of the State of Nevada would apply. *See* Easement, Part II, ¶X(6), p. 12.

**C. The DOE Prevented the Completion of the Environmental Condition to the Easement When It Interfered With and Terminated the NEPA Process.**

MNS does not dispute that compliance with the NEPA process was a freestanding condition to the implementation of the Easement. "A condition precedent to an obligation to perform calls for the performance of some act after a contract is entered into, upon which the corresponding obligation to perform immediately is made to depend." *NGA #3 LLC v. Rains, Jr.*, 113 Nev. 1151, 1158-1159, 946 P.2d 163 (Nev. 1997); *see also Restatement (Second) of Contracts*, § 224 (1981) (defining condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). By the terms of the Easement, MNS was required to take on the burden of fulfilling NEPA requirements on behalf of DOE. *See* Carlson Decl. ¶ 13. However, it is undisputed that the DOE unilaterally decided to "terminate" the NEPA process because of possible national security concerns raised by the USAF. Undisputed Fact, No. 12. Thus, the DOE either prevented the occurrence of the condition or waived the condition entirely.

It is well-settled that "one who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition." 8 Corbin on Contracts (Conditions) § 40.17, at 580 (rev. ed. 1999); *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999 (3d Cir. 1992). A party who "voluntarily prevents the occurrence of a condition established for his or her benefit is estopped from seeking relief from the contract on grounds that condition precedent to his obligation failed to occur." *NGA #3*, 113 Nev. at 1161 (internal citations and quotations omitted). "Thus that party cannot escape liability by preventing the happening of the condition on which it was promised." Corbin on Contracts § 40.17, at 580-81; *see also*; 12 Am. Jur. at 885 ("One who makes impossible the performance or happening of the condition

precedent upon which his liability by the terms of the contract is made to depend, cannot avail himself of its non-performance."). "One who induces failure of the other to perform . . . agreed upon condition, cannot take advantage of the failure, either by canceling the contract or by claiming damages for breach. 8 Corbin on Contracts (Conditions) § 40.17, at 583 (rev. ed. 1999).

In addition, the duty of good faith and fair dealing requires at least that a party do nothing to prevent the occurrence of a condition of that party's duty. *See Vanadium Corp. v. Fidelity & Deposit Co.*, 159 F.2d 105 (2d Cir. 1947) (where sale of mining leases was "subject ... to approval by the Secretary of the Interior ... plainly [purchaser] was obligated to refrain from positive actions to prevent approval by the Secretary.").[2] Indeed, the United States Supreme Court has recognized this basic contract principle for decades. "It will always excuse the performance of a condition precedent when it was hindered or prevented by the other party. No party can insist upon a condition precedent when its non-performance has been caused by himself." *Lobensein v. United States*, 91 U.S. 324, 328 (1875).

A party also may be required to do more than refrain from action that will prevent the occurrence of the condition. A party is also expected to take appropriate affirmative steps to see that the condition occurs. *See* 2 Farnsworth on Contracts § 8.6, at 432 (2d ed. 1998). In addition, the breach that excuses a condition may be a repudiation of a duty instead of non-performance of the duty. *See* 2 Farnsworth on Contracts § 8.6, at 435.

---

2 The covenant of good faith and fair dealing is implied into every commercial contract under both Nevada and federal law. *See A.C. Shaw Construction, Inc. v. Washoe County*, 784 P. 2d 9, 10 (Nev. 1989); *Southern California Edison v. United States*, 58 Fed. Cl. 313, 325 (Ct. Cl. 2003).

Here, the DOE agreed to, among other things: not unreasonably interfere with the construction, maintenance or operation of the Project, act in a manner that is not arbitrary or capricious in revoking the Easement, and act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. Carlson Decl. ¶ 18. As discussed above, it is undisputed that instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS eminent domain damages, the DOE attempted to avoid that promise by interfering with the environmental condition and claiming that the Easement never became effective. Undisputed Fact, No. 12.

**D. NEPA Does Not Require Analysis of Non-Environmental Issues, Including National Security Issues.**

The Government's assertion, in its July 12, 2002 letter terminating the NEPA process, that because of the national security concerns of the USAF that "further action with respect to the NEPA process is unwarranted" is a conclusion that is unsupported by the express language of the NEPA statute. Section 102(2)(C) of NEPA, 42 U. S. C. § 4332(2)(C), provides that, "to the fullest extent possible," all federal agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" discussing, inter alia, the environmental impact of the proposed action and possible alternatives. The thrust of NEPA's analysis requirements is "that environmental concerns be integrated into the very process of agency decision making. The "detailed statement" it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

In short, NEPA requires that federal agencies analyze the "effects" of their actions on the "human environment." The regulations define "effects" solely in terms of the physical or natural environment:

> "Effects" include:
>
> (a) Direct effects, which are caused by the action and occur at the same time and place.
>
> (b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.
>
> Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 Code Fed. Reg. 1508.8.

The regulations define "human environment" as follows:

> "Human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (Sec. 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

40 Code Fed. Reg 1508.14.

Nowhere in NEPA is there a requirement to consider the effects of a federal agency action on national security. Neither the definition of "effects"" nor the definition of "human environment" include national security among the topics to be addressed under NEPA. In

addition, no court has determined that national security concerns should be part of NEPA. Indeed, there are no cases where plaintiffs have even claimed that effects on national security are within NEPA's scope of review.

Where plaintiffs have argued for inclusion of non-environmental impacts (such as economic, social or psychological impacts) in a NEPA review, courts have rejected those claims and held that NEPA simply does not require a particularized assessment of non-environmental impacts. *See* 42 U.S.C. § 4332; *Public Util. Com'n of State of California v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990). An agency's primary duty under the NEPA is to "take[] a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976). Courts have declined to extend NEPA beyond this realm. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1522-23 (9th Cir. 1992) ("NEPA does not require a particularized assessment of non-environmental impact.").

To the extent that an action of a federal agency may have non-environmental consequences, NEPA does not require an analysis of such non-environmental consequences. For instance, although economic and social effects are listed in the definition of "effects" in the regulations, the definition of the "human environment" states that "economic and social effects are not intended by themselves to require preparation of an EIS." 40 Code Fed. Reg 1508.14. Similarly, courts have found that NEPA does not require consideration or analysis of psychological effects, such as fear or stress caused by or in anticipation of a proposed federal agency action, because these are not physical effects on the environment within the scope of NEPA. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983). As stated above, there are no cases where a plaintiff claimed that NEPA required analysis of impacts on national security.

Thus, while MNS does not contest the USAF's position that the wind farm could potentially adversely impact on national security, the national security issue not only should not have had any impact on the NEPA process, it also should not have been used to prevent the Easement from becoming effective. This is particularly true, when as discussed above, the parties specifically negotiated a provision in the Easement that addressed how the parties would handle potential national security issues. Indeed, by torpedoing the NEPA process with the USAF's national security concerns, the DOE has acted in bad faith.

## V. CONCLUSION

For the reasons discussed above, this Court should grant MNS's Motion for Partial Summary Judgment on Contract Liability. Based on the undisputed evidence, the agreement between MNS and the DOE is valid and enforceable. It is undisputed that the parties negotiated and agreed that if the DOE determined that issues of national security prevented the continued development of the proposed wind farm, the DOE could cancel the project at any time and revoke the Easement. In such an instance, however, the parties expressly agreed that the DOE would implement any such revocation through eminent domain. It is further undisputed that despite agreeing to this provision, and being fully aware of the additional risks it imposed, when the USAF informed the DOE that national security concerns would prevent the continued development of the wind farm on the NTS, the DOE failed to revoke the agreement through eminent domain. Instead, the DOE unilaterally terminated the NEPA process based on the USAF's national security concerns, and asserted, in bad faith, that the Easement never came into effect because MNS did not satisfy the freestanding environmental review condition to the Easement. The DOE materially breached the Easement when it failed to revoke the Easement for

national security reasons and failed to accomplish the revocation by eminent domain. No other conclusion can be drawn from the undisputed facts.

Dated: October 5, 2005

s/ George T. Caplan
George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on October 5, 2005, a copy of the foregoing Motion for Partial Summary Judgment on Contract Liability was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo