IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company, | ) | CASE NO. 04-1569C |
| Plaintiff, | ) | (Judge Wolski) |
| v. | ) | Declaration of Tim Carlson in Support of Plaintiff MNS Wind Company LLC's Motion for Partial Summary Judgment on Contract Liability |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DECLARATION OF TIM CARLSON**

I, Tim Carlson declare as follows:

1. I was the President of the Nevada Test Site Development Corporation ("NTSDC"). I have personal knowledge of the matters stated herein, and if called as a witness would testify competently thereto. I submit this Declaration in Support of MNS Wind Company LLC's ("MNS") Motion to For Partial Summary Judgment on Contract Liability.

2. Under Section 3161 of the National Defense Authorization Act for Fiscal Year 1993, the United States Congress encouraged the DOE to pursue means to minimize the social and economic impacts on workers and communities resulting from the downsizing of defense-related facilities. One of the methods the DOE used to implement this Congressional directive was to establish local Community Reuse Organizations ("CRO") to assist economic development efforts. The CRO for the Nevada Test Site ("NTS") is the NTSDC.

3. The NTSDC is a Nevada not-for-profit corporation, with its principal place of business in Las Vegas.

4. As the CRO for the NTS, the NTSDC was responsible for bringing commercialization opportunities to the NTS. In this capacity, the NTSDC, acting as the agent for the DOE,

approached the private business sector with various business proposals for the NTS. If the private sector showed interest in the project, the NTSDC would act as the intermediary between the private sector and the DOE in order to bring the project to fruition. One such project was the development of a wind farm on the NTS by MNS Wind Company, Inc. ("MNS").

5. The NTSDC and the DOE both agreed that the development of a wind-farm on the NTS would provide numerous benefits to the DOE and the surrounding community. The proposed wind farm project would not only further the DOE's stated objectives of diversifying the use of the NTS, including initiating private sector economic development at the NTS, it would also support the growing need and the Nevada mandate for alternative sources of renewable energy. The proposed wind farm project would also further the DOE's and the NTSDC's stated objectives of reinvigorating regional employment by the construction and continuing operation and maintenance of as many as 545 wind turbine electricity generators on the NTS to help restore some of the thousands of jobs lost in the area after the moratorium on nuclear testing.

6. The NTSDC, however, did not have any expertise regarding wind-farming. Rather, given the DOE's prior experience supporting wind-farm projects on other federally-owned sites, the NTSDC relied exclusively on the DOE's (and the DOE's Office of Energy Efficiency and Renewable Energy) ("EERE") experience in all aspects of wind-farming, including the equipment involved and the impacts, if any, of the equipment on the environment. The DOE itself determined that the NTS could be used as a wind-farm. The NTSDC acted merely as a facilitator between the DOE and MNS in their drafting and negotiating of the documents governing the NTS wind-farm project.

7. The NTSDC held monthly executive committee meetings to discuss the status of the various NTSDC projects, including the NTS wind project. Kathy Carlson ("Carlson"), Manager

of the DOE's NNSA/NV, represented the DOE on the executive committee and the Board of Directors, as an ex-officio member. In addition, since the NTS bordered the Nellis Air Force Base, a representative of the United States Air Force was also a member of the executive committee. The Commander of Nellis Air Force base, Major General L.D. Johnston, served as an ex-officio member of the NTSDC's executive committee and Board of Directors.

8. In my capacity as the President and as a member of the Executive Committee and Board of Directors of NTSDC, I was personally involved with the implementation of the NTS wind-farm project. I personally attended virtually every meeting between the DOE and MNS and participated in conference calls between the parties. However, the precise terms of the agreements concerning the NTS wind-farm project were negotiated directly between representatives of the DOE, including Ken Powers ("Powers") and Bud Bornhoff ("Bornhoff"), the Chief Counsel for the DOE's NNSA/NV, and representatives of MNS, including John Johansen ("Johansen"), the President of MNS, and its counsel and others.

9. In June 2000, the NTSDC, on behalf of the DOE approached Johansen with a proposal to develop a commercially viable renewable energy production facility on the NTS. After the DOE provided MNS wind data from the NTS, Johansen told me that MNS believed that the data supported the development of a wind farm at the NTS and that MNS decided to move forward with the NTS project.

10. During the negotiations from September 2000 through January 2001, I was present at several meetings where representatives of the DOE, including Powers and Bornhoff, indicated that the DOE wanted the right to terminate the agreements at any time for national security reasons. In addition, representatives of the DOE, including Powers and Bornhoff, expressed concerns about the availability for development of portions of the NTS for national security

reasons. Johansen informed the DOE's representatives that MNS would not agree to invest time and resources in a project only to have its rights terminated for national security reasons, without compensation. In addition, MNS insisted on an inexpensive and streamlined procedure to resolve any disputes with the DOE, including a determination of the fair market value of the project after a termination for national security reasons.

11. I was also present at several meetings where the parties discussed their respective responsibilities under the easement regarding the timing of the project. Johansen informed representatives of the DOE, including Powers and Bornhoff, that MNS intended to complete the first phase of the wind farm by the end of 2002 and needed to commence development as soon as possible. Representatives of the DOE, in particular the Director of the EERE, Dan Reicher ("Reicher"), stated that it wanted to complete the easement before the changing of the administrations – from President Clinton to President Bush.

12. Indeed, in order to facilitate MNS's immediate development of the NTS, the DOE assigned a full-time employee to the NTS project, Kevin Thornton ("Thornton"). Thornton was responsible for, among other things, monitoring and facilitating all DOE-related activity on the NTS, including compliance with the environmental review process. In addition, Thornton ran the DOE's Site Utilization Board ("SUD") meetings. The SUD, which consisted of all federal agencies involved with the NTS, including the DOE and the Department of Defense, held regular meetings to discuss all development on the NTS, including the wind-farm project.

13. As a result of the negotiations, MNS agreed to incur certain risks associated with the development of the project, including compliance with any environmental conditions, but it retained the absolute right to discontinue the project if, in its sole and absolute discretion, it

concluded that the developmental costs, including environmental mitigation costs, were unacceptable.

14. On the other hand, the parties agreed to share the risk of national security concerns. MNS agreed to immediately commence the development of the project for a timely completion and that the DOE would have the right to revoke the easement for national security reasons, but that the DOE would have to implement the revocation through eminent domain, pursuant to which the DOE would have to pay MNS the fair market value of the project as of the time of the revocation. Lastly, the parties also agreed to submit any disputes arising from or related to these agreements to binding arbitration.

15. In order to implement the agreements reached, the parties entered into three interdependent agreements -- an easement, subeasement and compensation agreement -- all of which were reviewed, negotiated and expressly approved by representatives of the DOE.

16. On or about December 22, 2000, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the NTSDC for the express use and benefit of MNS. True and correct copies of relevant portions of the Easement are attached hereto as Exhibit A. The term of the Easement was for thirty-five (35) years from the date of execution of the Easement.

17. In the Easement, both the DOE and the NTSDC "acknowledge and agree for the benefit of [MNS], that [MNS] shall have the right to enjoy and directly enforce against the [DOE] any and all rights and remedies of [the NTSDC] under the Easement." Easement, Part I, ¶5(b), p. 3. In addition, the DOE expressly "approves and consents to [the NTSDC] entering into one or more subeasements . . . with MNS" and further stated it had "reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property . . . ."

Easement, Part I, ¶5(a), p. 3. Lastly, the DOE "warrants to [the NTSDC] and [MNS] that it has the power and authority to enter into this Easement." Easement, Part II, ¶X(2), p. 11.

18. In the Easement, the parties agreed that the DOE was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain." Easement, Part II, ¶E(1), p. 3. In addition, the DOE covenanted to, among other things: "not unreasonably interfere with the construction, maintenance or operation of the Project", Easement, Part I, ¶1(a), p. 2; "act in a manner that is not arbitrary or capricious" in revoking the Easement, Easement, Part II, ¶E(1), p. 3; and "act prudently and in good faith" in taking any action, exercising any discretion or making any determination under the Easement and other related documents, Easement, Part II, ¶X(1), p. 11.

19. The NTSDC, the DOE and MNS also simultaneously negotiated the terms of two documents, both expressly referred to in the Easement -- a Subeasement and Compensation Agreement between MNS and the NTSDC. The parties executed these documents on or about January 17, 2001. True and correct copies of relevant portions of the Subeasement and Compensation Agreement are attached hereto as Exhibits B and C respectively.

20. Both the Subeasement and the Compensation Agreement were reviewed and revised by representatives of the DOE, including Powers and Bornhoff, and as discussed above the DOE represented in the Easement that it had reviewed and consented to the terms of the Subeasement. Indeed, the NTSDC could not enter into any agreement relating to the NTS without the DOE's express consent. Therefore, the DOE participated in the negotiations of both of these agreements.

21. Under the Subeasement, the NTSDC granted to MNS a subeasement to use and occupy the NTS upon the terms and subject to the conditions set forth in the Easement. Subeasement,

¶1, p. 1. The Compensation Agreement provides that MNS pay the NTSDC a specific amount per year as compensation for the rights, services and benefits granted to MNS under the Subeasement and outlines the procedures and agreements regarding the arbitration referred to in the Easement. The Subeasement also contained an integration clause that expressly incorporates the terms and conditions of both the Easement and the Compensation Agreement. Subeasement, ¶18.8, p. 11.

22. On or about January 17, 2001, the DOE also executed a written consent expressly approving the Subeasement between the NTSDC and MNS (hereinafter "DOE Written Consent"). A true and correct copy of the DOE Written Consent is attached hereto as Exhibit D.

23. In summary, the parties agreed to the following basic framework: (1) the Easement was made for the express benefit of MNS (Easement, Part I, ¶5(b), p. 3); (2) the DOE expressly and specifically approved and consented to the NTSDC entering into the Subeasement with MNS (Easement, Part I, ¶5(a), p. 3); (3) the DOE expressly approved the terms and conditions of the Subeasment between NTSDC and MNS, including the incorporation into the Subeasement of the terms of both the Easement and the Compensation Agreement (Easement, Part I, ¶5(a), p. 3 and DOE Written Consent); and (4) the DOE and the NTSDC agreed that MNS had the right to enforce directly against the DOE all rights and remedies of the NTSDC under the Easement (Easement, Part I, ¶5(b), p. 3) and the NTSDC agreed to enforce the Easement for the benefit of MNS (Subeasement, ¶1, p. 1).

24. During negotiations of the Easement and Subeasement, there were also discussions with the DOE regarding the DOE's desire to benefit from a power cost reduction at the NTS as a result of this project. As a result, the parties inserted into the Easement a section on power delivery and the benefits that would be afforded to the DOE. Easement, Exhibit A, ¶11, p. 6.

The parties agreed to provide a benefit to the DOE equivalent to a ten percent reduction in energy usage based upon total NTS consumption for fiscal year 2000, the expected MNS installed generation capacity at the NTS, and the expected capacity to deliver all of the generated energy.

25. After executing the agreements, MNS proceeded with the development of the NTS, including compliance with the NEPA process covering use of all potential sites under the Easement. The environmental consultants responsible for the NEPA process had undertaken a comprehensive investigation and prepared and issued an advanced Draft Environmental Impact Statement ("EIS") that failed to identify any significant impacts that would provide a barrier to the implementation of the project. The EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. Representatives of MNS, including Johansen, informed the NTSDC that its initial estimate of the cost of mitigation was in the range of $2 million.

26. In November 2001, MNS proposed a power purchase agreement to Nevada Power. Nevada Power accepted the unsolicited proposal to purchase the power. The Nevada Public Utilities Commission later approved the power purchase agreement. This not only demonstrated Nevada Power's support for the project, but the State's as well. The acceptance of this renewable energy power purchase agreement for a wind project was one of the driving factors in the establishment, by the Nevada Legislature, of one of the most aggressive renewable energy portfolio standards in the Nation (requiring that 15% of the State's power be produced by renewables by the year 2013). Every State agency from the Governor on down was involved in the development of this project and showed their support. The NTSDC also received letters of support from the Congressional delegation.

27. Nevertheless, on July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible national security concerns, the DOE had decided to terminate the NEPA process and that the Easement would not go into effect according to the terms of the agreement. The DOE's July 12, 2002 Revocation Letter is attached hereto as Exhibit E.

28. As discussed above, the Easement provides that the Easement may be revoked for national security reasons. Easement, Part II, ¶E(1), p. 3. The parties negotiated explicit terms to deal with this specific possibility. I believe that instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS the fair market value for the project, the DOE attempted to avoid that promise by interfering with the environmental condition and improperly terminate the NEPA process.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 23 day of September 2005, at Las Vegas, Nevada.

Tim Carlson

EXHIBIT A

**U. S. DEPARTMENT OF ENERGY**
**NEVADA OPERATIONS OFFICE**
**GRANT OF EASEMENT FOR**
**WIND POWERED ELECTRIC GENERATING FACILITY**

*PART I*
*SPECIFIC PROVISIONS*

This Grant of Easement for Wind Powered Electric Generating Facility ("*Easement*") is made as of December 22, 2000 by the UNITED STATES OF AMERICA, as the Grantor, hereinafter referred to as the "GOVERNMENT", acting by and through the Nevada Operations Office, U.S. Department of Energy, hereinafter referred to as the "DOE," and NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation, hereinafter referred to as the "GRANTEE."

**WITNESSETH:**

A. The Secretary of Energy, under the authority of Section 161 of the Atomic Energy Act of 1954, as amended (Public Law 83-703), Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), and other applicable law, has determined that the Property (as hereinafter defined), which is located at the Government's Nevada Test Site (hereinafter referred to as the "NTS"), is not excess property as defined by Section 3(e) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 472), and that this Easement is advantageous to the Government.

B. The Secretary of Energy, under the aforesaid authority, has further determined that (i) the Property is public land withdrawn or reserved for use by the Department of Energy, (ii) this Easement is compatible with the DOE's interests, (iii) this Easement does not include more property than is reasonably necessary for the purpose for which the Easement is granted, and (iv) this Easement otherwise fully complies with all requirements of the aforesaid authority and other applicable law.

NOW THEREFORE, in consideration of the mutual covenants and agreement hereinafter set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Government, subject to compliance with the National Environmental Policy Act, 42 U.S.C. 4321 et seq., hereby grants and conveys to Grantee, for the use and benefit of Subgrantee (as hereinafter defined) an easement on, over, under, across and through the property described in Exhibit A, Attachment A-1 (the "*Property*") for the purpose of the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of wind

powered electric generating facilities (the "*Project*"), which Project shall include, wind turbine generators, support structures, transformers, substations, electric power and other utility lines and towers, communication lines and equipment, water and gas lines, and other improvements and systems necessary or advisable for the construction and operation of a wind powered electric generating facility. Any relocation of a wind turbine generator outside of the Project Site will require the consent of the DOE in accordance with Exhibit A.

(a) The Government agrees not to intentionally interfere with the flow, direction, generation or speed of wind over and across the Property, or unreasonably interfere with the construction, maintenance and operation of the Project. The Government and Subgrantee shall coordinate their use of the Property in accordance with Exhibit A.

(b) The Government further agrees to promptly grant such additional easements and rights of way requested by Grantee or Subgrantee over other areas of the NTS approved by the DOE, which are necessary or advisable for the construction, installation, maintenance, repair, replacement, relocation (within the Property), use and operation of utility towers, electric power and other lines, communication lines and equipment, water and gas lines, access roads, substations, transformers and such other systems as may be necessary or advisable for the construction and operation of the Project, and ingress and egress therefrom. If the DOE does not approve a proposed easement or right of way, the DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible.

2. Included within Exhibit A is a description of the land and improvements, including a map of the area; a map of the installation depicting common areas to include means for ingress and egress and restricted areas; a description of the Economic Development Activity (as hereinafter defined); an inventory of personal property; limits of operations within the Property and common areas not addressed in *Part II-General Provisions*; description and charges for utility, maintenance, and other services not covered under *Part II-General* provisions; a real property conditions report; and an environmental conditions report.

3. This Easement shall remain effective for a term as set forth in Exhibit A of thirty-five (35) years), plus an additional (10) ten year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

4. Grantee shall pay the Government an annual fee as set forth in Exhibit A in advance at the start of each easement year. Any charges for services specified in Exhibit A will not begin until the Property is subject to the Subeasement (as hereinafter defined) unless services are used sooner by the Grantee. The Grantee is permitted to charge fees for its subeasement property, but any fees that are collected which exceed Grantee's cost must be reinvested into economic development endeavors.

5. (a) The sole purpose for which the Grantee shall use the Property is to support Economic Development as part of the mission of the U.S. Department of Energy. For the purpose of

this Easement for wind powered electrical generating projects, Economic Development Activity includes, but shall not be limited to, the following: activities relating to furthering the employment of displaced and current contractor employees; creating or enhancing new business opportunities at the facility or in the surrounding community; providing funding for such activities; and educating the employees or the community regarding such activities. The Grantee must obtain the written approval of DOE prior to using the Property for any purpose other than that specified above. The Government hereby approves and consents to Grantee entering into one or more subeasements of the Property (hereinafter individually and collectively referred to as a "*Subeasement*") with MNS Wind Company, LLC, a Delaware limited liability company or affiliated companies (hereinafter individually and collectively referred to as a "*Subgrantee*"), and to the construction and operation of portions of the Project on the Property by each Subgrantee. The Government has reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property, and acknowledges that the proposed use of the Property constitutes an approved Economic Development Activity as required under this Easement. The Government and Grantee further acknowledge and agree that a default under any Subeasement shall not, solely by reason of such default, constitute a default under any other Subeasement. In the event of default under a Subeasement, the Government and Grantee shall exercise their respective rights and remedies only against the Subeasement in default, and the remaining Subeasements shall remain in full force and effect and shall not be disturbed.

(b) The Government acknowledges and agrees that in the event of any dissolution of Grantee, or in the event the Easement or Subeasement are rejected in any bankruptcy or are terminated for any reason (except as a result of a default by Subgrantee thereunder), the Easement and Subeasement shall continue in full force and effect as if such easements were entered into directly between the Government and Subgrantee (provided that the DOE's obligations to Subgrantee under the Subeasement shall be no greater than DOE's obligations to Grantee under this Easement), and Subgrantee's use of the Property and Project will not be disturbed. Upon request, the Government shall enter into a new easement directly with Subgrantee or the Project lender upon the same terms and conditions of the Subeasement (provided that the DOE's obligations under the new easement shall be no greater than DOE's obligations to Grantee under this Easement). The Government and Grantee acknowledge and agree for the benefit of Subgrantee, that Subgrantee shall have the right to enjoy and directly enforce against the Government any and all rights and remedies of Grantee under this Easement.

6. In the event DOE or its prime contractors at the NTS and other NTS contractors, in their good faith, prudent judgment, observe an unsafe practice or unsafe condition that poses a material threat of imminent danger to persons or property under Grantee's or Subgrantee's control, Grantee and Subgrantee shall, upon oral or written notification (provided that if such notice is oral, the Government shall promptly also provide Grantee written confirmation notice of such matter) by DOE or a regulatory authority having jurisdiction over the activity, cease such unsafe activity to the extent required by applicable law and promptly correct such unsafe practice or condition in accordance with applicable law.

General Conditions and Exhibit A (and each part thereof) are incorporated herein by this reference and made a part hereof.

12. For the purpose of this Easement, the DOE representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at U.S. Department of Energy, Nevada Operations Office, P.O. Box 98518, Las Vegas, NV 89193-8518.

For the purpose of this Easement, the Grantee Representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at NTS Development Corporation, 2330 Paseo Del Prado, Suite C-101, Las Vegas, NV 89102.

IN WITNESS WHEREOF, the parties hereto have caused this Easement to be executed on their behalf by their duly authorized representative as of the date first above written.

**GRANTEE:**

NTS Development Corporation

By: ______________________
Tim Carlson, President

**GRANTOR:**

The United States of America, acting by and through the Nevada Operations Office of the U.S. Department of Energy

By: ______________________
Kathleen A. Carlson, Manager for

**ACKNOWLEDGED and AGREED:**

MNS Wind Company, LLC,
a Delaware limited liability company

By: John A. Johansen
Name: John A. Johansen
Its: ______________________

hereunder. Grantee shall insure any structure(s) owned by the DOE in accordance with Article B above.

4. The Government has entered into a Federal Facilities Agreement (FFA) with the State of Nevada which describes the activities the Government intends to undertake in regard to environmental conditions at the NTS. No representations are made concerning further activity on behalf of the Government, either in regard to environmental conditions or otherwise. Financial responsibility for compliance with the FFA shall remain with the Government

D. Existing and Future Easements and Rights of way

This Easement is subject to all outstanding easements and rights of way over, across, in, and upon the Property. To the extent that services cannot be adequately and economically provided by DOE's service systems to the satisfaction of Grantee, the Government acknowledges that Grantee or Subgrantee, or service providers, may seek easements or rights of way over, across, in, and upon the NTS in order to provide utilities and other services to the Property. If the DOE does not approve of a proposed easement or right of way, DOE shall (i) provide to Grantee and Subgrantee the reasons for such disapproval in writing, and (ii) propose alternate locations, where possible, on the NTS. DOE shall support Grantee's or Subgrantee's applications to appropriate jurisdictional authorities for such easements or rights of way (including any easement or right of way requested by Subgrantee pursuant to Paragraph 1(b) of Part I) which do not unreasonably interfere with DOE's use of the NTS.

E. Revocation by Government; Termination by Grantee; Amendment

1. This Easement may be revoked only as provided in this paragraph. In recognition of the consequences that revocation could adversely impact Grantee and Subgrantee and harm the achievement of the Government's economic development initiatives pursuant to Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), the Government shall act in a manner that is not arbitrary or capricious, and shall revoke this Easement only upon the occurrence of the following: (i) failure of the Grantee or Subgrantee to perform or otherwise comply with the terms and conditions of this Easement, which default is not cured within thirty (30) days following written notice of such default to Grantee and Subgrantee; provided, however, that if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, then Grantor and Subgrantee shall not be in default hereunder if Grantor or Subgrantee commences to cure the default within such thirty (30) day period and thereafter diligently prosecutes such cure to completion, (ii) failure by Subgrantee to use the Property for a period of two (2) consecutive years with the intent to permanently abandon its rights under the Subeasement, which failure is not cured with the grace period provided in Paragraph K hereof, or (iii) in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain. The Government shall use

its reasonable efforts to give each Project lender copies of any notices of breach or default given to Grantee or Subgrantee.

2. DOE will provide Grantee with the maximum advance notice that is practicable under the circumstances that revocation of the Easement has been proposed or is under consideration and the opportunity to comment in advance of such revocation. In the event of notices or inquiries from other agencies or offices or in the event of the initiation of litigation which could lead to revocation of the Easement, DOE will provide immediate notice of such information to the Grantee.

3. Grantee may terminate this Easement only in the event of a default by Subgrantee under the Subeasement not cured within any applicable grace period, but such termination shall not relieve Grantee of any continuing obligations under this Easement except as may be specified in Exhibit A.

4. The Government agrees not to modify or amend this Easement without the prior consent of Subgrantee, which consent shall not be unreasonably withheld so long as Subgrantee's rights and obligations are not adversely affected thereby (and in such case, Subgrantee may withhold its consent in its sole and absolute discretion).

F. Damage or Destruction

1. If, during the term of this Easement, the Property, or any part thereof, is damaged by fire or other casualty so as to be rendered untenantable either in whole or in part, and cannot reasonably be restored to substantially its former condition within two (2) years following such fire or other casualty, then DOE or the Grantee or Subgrantee may terminate this Easement and Subeasement as to the portion of the Property so damaged effective the date of such casualty by giving notice to the other within one hundred twenty (120) days following such casualty.

2. In the event of any such damage which does not render all or any portion of the Property untenantable, either in whole or in part or if no party terminates pursuant to the preceding provisions, the damaged area or areas, with all reasonable due diligence will be repaired and restored by the Grantee to substantially the same condition they were in prior to such casualty or as otherwise will be suitable for the Grantee's or Subgrantee's purposes, provided that Subgrantee shall have no obligation to repair the Project if Subgrantee reasonably determines that it is not commercially reasonable to do so. Such restoration shall be commenced and completed as quickly as is reasonably possible. The party making such restoration shall be entitled to receive and use the proceeds of the insurance specified in Exhibit A. Also during the time of such restoration, and to the extent that the Property was not rendered untenantable by the Grantee's or Subgrantee's negligent acts or omissions or willful misconduct, any annual permit fees shall be abated to the extent that all or any portion of the Property is not usable by the Grantee.

continue and remain in full force and effect, as if the unlawful or unenforceable provision or portion had been stricken from this Easement. Nothing herein, however, shall preclude revocation as provided above.

2. In the event that the authority or rights of DOE in relation to the Property or the NTS is modified by statute, regulation, court order, or other lawful order, DOE shall, as appropriate, affirm this Easement or enter into a Lease or other binding lawful instrument with Grantee that implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below). Grantee agrees to enter into such other lawful instrument so long as the other lawful instrument implements and sets forth the spirit, purposes, terms, and conditions of this Easement (except for the circumstances of revocation set forth in Article E of this Part II and not excluded below).

3. In the event that Grantee or Subgrantee requests a lease, easement, right of way or other lawful instrument from another agency of government having competent jurisdiction over the NTS, DOE agrees to support the request, grant permission to Grantee and Subgrantee to engage in the Economic Development activity authorized by this Easement under such lease, easement, right of way or instrument, and administer such lease, easement, right of way or other instrument under an agreement or understanding with the agency in question; provided, however, that DOE will retain the right to require termination of such lease or instrument under the same terms and conditions of this Easement.

X. General Provisions

1. Whenever any Part of this Easement (or Exhibit A or any other exhibit), or the Subeasement or Compensation Agreement grants the Government or Grantee the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Government and Grantee shall act prudently and in good faith.

2. Provided that the Grantee or Subgrantee observe and perform all of the obligations hereof, Grantee and Subgrantee shall peaceably and quietly hold and enjoy the Property for the term provided herein without interruption by the Government or any person or persons claiming by, through or under the Government. The Government warrants to Grantee and Subgrantee that it has the power and authority to enter into this Easement.

3. The Government and Grantee acknowledge and agree that Subgrantee may in its sole discretion cause this Easement and the Subeasement to be recorded in the official records of the County where the Property is located and such other governmental offices necessary to impart constructive notice of its interest in the Property. Upon request by Subgrantee, the Government and Grantee agree to execute for recordation a short form or memoranda of the Easement and

Subeasement, and such other documents or instruments reasonably requested by Subgrantee, in form and reasonably acceptable to Subgrantee.

4. This Easement and the Subeasement shall constitute covenants running with the Property, and shall inure to the benefit of Subgrantee and its successors and assigns. Part I, Exhibit A and the Recitals of this Easement are incorporated herein by this reference and made a part hereof.

5. This Easement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

6. To the extent not in conflict with applicable federal law, this Easement shall be governed by and construed according to the laws of the State of Nevada. To the extent not in conflict with applicable federal law, any claims or disputes hereunder shall be resolved in accordance with the arbitration procedures set forth in the Subeasement.

**U.S. DEPARTMENT OF ENERGY**
**NEVADA OPERATIONS OFFICE**
**GRANT OF EASEMENT**
**EXHIBIT A FOR WIND GENERATED ELECTRICAL GENERATION AREA**

**1. Map of Property**

A map showing the location and boundary of the Property is attached as Attachment A-1. The Property is located in Areas 29 and 30 of the Nevada Test Site ("NTS") and consists of approximately 664 acres. As mutually agreed upon and approved by the DOE, Grantee, and Subgrantee, additional areas may be developed on the NTS.

**2. Description of Economic Development Activity**

The Economic Development Activity authorized and facilitated at the NTS through this Easement is the use of the Property for ventures related to businesses consistent with the construction, operation and maintenance of a wind powered electric generating facility. The total project will be developed in three phases. The Grantee and the Subgrantee have the exclusive right for the installation of the first 545 wind turbines on the NTS. Each phase will be individually agreed upon and approved by the DOE. To exercise this right, the Grantee and Subgrantee will have 24 months from the date this Easement is executed to obtain DOE approval of additional easements.

The initial phase will be generally located in Areas 29 and 30 of the NTS and will consist of approximately 175 wind turbines. The turbines will be 900 kW to 2000 kW machines up to 400 feet in total height with a foundation approximately 50 feet deep. The initial turbine areas are depicted in Attachment A-1 along with means of ingress and egress to the Property. Additionally, electric transmission and distribution lines necessary to interconnect with the NTS electric utility system will be constructed.

**3. Duration and Use Fee**

a. The duration of this Easement shall be 35 years from the date of execution, unless earlier revoked in the event of a default under the terms of this Easement, plus an additional ten (10) year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties.

b. In consideration of the rights and privileges granted to Grantee under this Easement, Grantee agrees to pay the Government a fee in the amount of $1.00 per year in the manner and on the terms provided in Part I and Part II of this Easement.

ingress/egress corridors to the Property for the duration of this Easement in accordance with this Exhibit A. All other areas of the NTS are restricted, and Grantee and Subgrantee are prohibited from entering such restricted areas, except as approved by the DOE. Any other access into restricted areas of the NTS will be handled on a case-by-case basis in accordance with DOE policies and practices and, to the extent practicable will be handled in a manner that will have minimal impact on the economic development activity authorized by this permit.

c. Ingress and egress to and from the Property shall be by means of ground transportation, unless other transportation is specifically approved by the DOE.

d. Should the DOE subsequently determine that national security interests will be adversely impacted by Grantee or Subgrantees' continued use of the present access roads to the Property, DOE shall have the unilateral right to change the access corridor. In such event, DOE will arrange for a reasonable alternate corridor to access the Property.

e. Grantee shall require Subgrantee to prepare and maintain Operational Security Procedures as approved by the DOE for access and organizational activities of the Subgrantee.

11. <u>Power Delivery</u>

a. The Grantee through its Subgrantee agrees to provide a benefit to the DOE equivalent to a ten percent (10%) reduction in energy usage based upon total NTS consumption for fiscal year 2000. For purposes of this section, the consumption at the NTS in fiscal year 2000 is 102,000 MWh.

b. This benefit shall be based upon the Subgrantee's installed generation capacity on the NTS and delivery of energy as provided herein. Up to 260 MW of installed generation capacity is expected to be developed by the Subgrantee and/or its affiliates at the NTS in three phases with an expected annual energy production of 795,000 MWh plus or minus 15%.

c. In consideration for the use of the NTS, energy losses shall be assessed at a rate fixed at 1.28% of Subgrantee's energy production. Grantee and Subgrantee shall have the right to interconnect with and use the transmission and distribution system on the NTS for the duration of this Easement in accordance with this Exhibit A. The design and location of the interconnection points shall be mutually agreed upon by DOE, Grantee and Subgrantee.

**12. Environmental Assessment**

DOE is preparing an Environmental Assessment (EA) for this Grant of Easement pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq. DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process. After DOE has completed the EA and considered the environmental impacts of this action, DOE will either issue a Finding of No Significant Impact or prepare an Environmental Impact Statement.

**13. Real Estate Operations Permit**

DOE and Grantee agree that the Real Estate Operations Permit is made a part hereof as Attachment A-5.

**14. Administration**

For purposes of this Easement, the DOE and the Grantee's Representative will be:

For DOE: Manager, U.S. Department of Energy, Nevada Operations Office

For Grantee: President, NTS Development Corporation

The following Attachments are referenced in this Exhibit A and made a part of this Exhibit A:

Attachment A-1 Map of Permitted Area

Attachment A-2 Real Property Condition Report

Attachment A-3 Environmental Condition Report

Attachment A-4 Environmental Assessment (in process)

Attachment A-5 Real Estate Operations Permit

EXHIBIT B

# SUBEASEMENT

This Subeasement (*"Subeasement"*) is entered into as of January 17, 2001, by and between NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation (**"Subgrantor"**), and MNS Wind Company, LLC, a Delaware limited liability company (**"Subgrantee"**).

## RECITALS

A. Subgrantor has the right to use and occupy certain premises known as a portion of the Nevada Test Site, as specifically described in Exhibit "1" attached hereto and incorporated herein by this reference, (the **"Premises"**) pursuant to and as more specifically described as the "Property" in the Easement for Wind Powered Electric Generating Facility granted as of December 22, 2000 (the **"Easement"**) between Subgrantor, as Grantee, and the United States of America, acting by and through the Nevada Operations Office of the Department of Energy (the **"Master Grantor"**, **"Government"** or **"DOE"**). A true and correct copy of the Easement with parts I and II and all exhibits thereto is attached hereto as Exhibit "2", and incorporated herein by this reference.

B. Subgrantee desires to obtain from Subgrantor a subeasement granting to Subgrantee the right to use and occupy the Premises and to obtain the benefit of the appurtenant rights and commitments of the Master Grantor which are set forth in the Easement, and Subgrantor is willing to grant to Subgrantee this subeasement conveying to Subgrantee the right to use and occupy the Premises, as well as the right to use and benefit from such appurtenant rights and commitments, upon the terms and subject to conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing premises and the mutual promises of the parties which are set forth below, Subgrantor and Subgrantee agree as follows:

1. **Grant of Easement and Term**. Pursuant to the authority granted by the Easement, and with the consent and approval of the Master Grantor, as required by the Easement, Subgrantor hereby grants and conveys to Subgrantee an easement to use and occupy the Premises upon the terms and subject to the conditions set forth herein and in the Easement. Subgrantor further grants and conveys to Subgrantee all of its right and interest to use and enjoy the appurtenant benefits, commitments and agreements of Master Grantor set forth in the Easement. Subgrantor agrees to use its reasonable good faith efforts to enforce the Easement, at Subgrantee's cost, for the benefit of Subgrantee, and agrees that Subgrantee may enforce directly against Master Grantor all rights and remedies of Subgrantor under the Easement.

The Premises shall be used for the purpose of a wind powered electric generating facility (the "*Project*"), as more fully described in the Easement (the "**Economic Development Activity**"), and for no other purpose without the prior written consent of Master Grantor and Subgrantor, which consent shall not be unreasonably withheld, conditioned or delayed.

The term of this Subeasement (the "**Subeasement Term**") shall commence upon the later of (i) the date upon which this Subeasement is executed by both parties hereto; or (ii) the date upon which this Subeasement is approved by Master Grantor (the "**Term Commencement Date**") and shall end on the earlier of (a) the thirty-fifth (35th) annual anniversary of the Term Commencement Date; or (b) the expiration or earlier termination of the Easement, unless sooner terminated pursuant to the terms of this Subeasement. If the Master Grantor approves the extension of the term of the Easement as provided therein, Subgrantee shall have the right to extend the initial term of this Subeasement for an additional period of ten (10) years (the "Option Period") upon the same terms and conditions as stated herein except for the terms of the Compensation Agreement described in Section 3, below. Provided there exists no continuing Event of Default hereunder, Subgrantee may exercise its right to extend the term by written notification to Subgrantor not less than (180) days prior to the expiration of the Subeasement Term.

In the event it is determined that the Master Grantor did not have the power or authority to enter into the Easement, Subgrantor agrees to use its best efforts to (i) obtain an amendment to the public land order under which the NTS was permanently withdrawn, authorizing or permitting the granting of the Easement and the subeasements contemplated thereunder, or (ii) obtain from the Department of Interior a lease, easement or other grant on terms substantially similar to the Easement. In any case, Subgrantor agrees to enter into subeasements or similar other agreements with Subgrantee or its designated affiliate company on terms and conditions substantially similar to those of this Subeasement. Any increased rental or fee payable under any such new or substitute master agreement shall be deducted from the Annual Fee payable under the Subeasement (or substitute agreement).

2. <u>Assumption of Obligations</u>. During the term hereof, Subgrantee shall assume, and faithfully discharge in a timely fashion, all of Subgrantor's obligations under the terms of the Easement with respect to the Premises. Subgrantee shall not do or fail to perform any act which may constitute a breach or violation of any term, covenant or condition under this agreement or Easement. As an additional obligation, Subgrantee shall cause the insurance which is obtained by Subgrantee pursuant to the Easement to name Subgrantor, Master Grantor and prime contractors at the Nevada Test Site as additional insureds. Subgrantee hereby acknowledges that it has read and is familiar with the terms of the Easement and agrees that (i) this Subeasement is subordinate and subject to the Easement and that any termination of the Easement shall likewise terminate this Subeasement except as hereinafter provided or provided in the Master Easement; and (ii) that Subgrantee has not been granted any rights except those set forth herein, in the Master Easement and in the Compensation Agreement. Subgrantee acknowledges and agrees that pursuant to the Easement, certain payments, certificates, notices and other items must be provided to Master Grantor. Subgrantee agrees to provide all such payments, certificates, notices and other items to Master Grantor, with copies of the

Las Vegas, Nevada 89102
Attention: President

Notices which are delivered by personal delivery shall be effective upon receipt. Notices which are given by mail as required above shall be considered given and received two (2) business days after deposit in the mail. Copies of all notices given to Subgrantee under this Easement shall all be delivered to all the Project lenders at the address provided by such lenders.

18.3 **Partial Invalidity**. If any provision of this Subeasement is invalid or unenforceable to any extent, then that provision shall be null and void and the remainder of this Subeasement shall continue in effect and shall be enforceable to the fullest extent permitted by law.

18.4 **Waiver**. The failure of either party to exercise any of its rights is not a waiver of those rights. A party waives only those rights specified in writing and signed by the party waiving its rights.

18.5 **Governing Law**. To the extent not in conflict with applicable federal law, this Subeasement shall be governed by the laws of the State of Nevada.

18.6 **Consent of Master Grantor**. This Subeasement and the rights and obligations of the parties hereunder are subject to the written consent of the Master Grantor, which consent shall be attached hereto as Exhibit "3".

18.7 **Conditions Precedent**. Subgrantee's obligations under this Subeasement are subject to and conditioned upon satisfaction of each of the following conditions precedent:

(i) Subgrantee obtaining financing for the Project on such terms and conditions satisfactory to Subgrantee in its sole and absolute discretion;

(ii) Subgrantee obtaining all consents, permits, licenses, easements, rights of way and other approvals necessary for the construction and operation of the Project;

(iii) Subgrantee's approval in its sole and absolute discretion of the environmental assessment of the Premises and the property condition report;

(iv) Subgrantee shall have determined in its sole and absolute discretion that the construction and operation of the Project is economically feasible; and

(v) Approvals of the Board of Directors of the members of Subgrantee.

In the event of the failure of any of the foregoing conditions precedent, Subgrantee shall have the right to terminate this Subeasement by delivering written notice of such termination to Subgrantor, and upon such termination, Subgrantee shall have no further obligations or liabilities whatsoever hereunder or under the Easement.

18.8 **Integration**. The terms and conditions of the Easement and Compensation Agreement are incorporated herein by this reference and made a part hereof.

18.9 **Quiet Enjoyment**. Provided that the Subgrantee observes and performs all of its obligations hereof, Subgrantee shall peaceably and quietly hold and enjoy the Premises for the term provided herein without interruption by the Government or Subgrantor or any person or persons claiming by, through or under such parties. Subgrantor warrants and represents to Subgrantee that it has the power and authority to enter into this Subeasement and the Compensation Agreement.

18.10 **Good Faith**. Except as otherwise expressly provided, any time the consent of the Master Grantor or Subgrantor is required under any Part of the Easement (or Exhibit A thereto or any other exhibit) or under this Subeasement or the Compensation Agreement, such consent shall not be unreasonably withheld, conditioned or delayed, and, whenever any Part of the Easement (or Exhibit A thereto or any other exhibit), or the Subeasement or the Compensation Agreement grants the Master Grantor or Subgrantor the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, the Master Grantor and Subgrantor shall act prudently and in good faith.

18.11 **Counterparts**. This Subeasement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, Subgrantor and Subgrantee have executed this Subeasement as of the date written above.

"Subgrantor"

NTS DEVELOPMENT CORPORATION
a Nevada not-for-profit corporation

By:____________________
Name: TIM CARLSON
Its: PRESIDENT

"Subgrantee"

MNS WIND COMPANY, LLC
a Delaware limited liability company

By:____________________
John A. Johansen
Authorized Representative

EXHIBIT C

# COMPENSATION AGREEMENT

This Compensation Agreement ("Agreement") is entered into as of this 17 day of January, 2001, by and between NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation ("Subgrantor"), and MNS Wind Company, LLC, a Delaware limited liability company ("Subgrantee").

## RECITALS

A. Subgrantee is entitled to use and occupy the Premises as defined in and pursuant to the terms of a Subeasement between the parties of even date herewith (the "Subeasement"). A true and correct copy of the Subeasement is attached hereto as Exhibit "1", and is incorporated herein by this reference. Capitalized terms not defined herein shall have the meaning provided in the Subeasement.

B. Subgrantor is entitled to compensation from Subgrantee for the rights, services, and benefits granted Subgrantee under the Subeasement.

**NOW THEREFORE,** in consideration of the foregoing premises and the mutual promises of the parties which are set forth below, Subgrantor and Subgrantee agree as follows:

1. **Subeasement Fees.**

A. Annual Fee. In consideration of use of the Premises by Subgrantee for Economic Development Activity, Subgrantee agrees to pay to Subgrantor a fee in the amount of Forty Seven Thousand Dollars ($47,000) per year (the "*Annual Fee*"). The Annual Fee shall be payable in equal monthly installments on the last day of each month commencing in the month following written notice from Subgrantee to Subgrantor of its approval of each of the conditions precedent set forth in Paragraph 18.7 of the Subeasement (the "*Commencement Date*"). The Annual Fee shall be reduced by the amount of the Success Fee (as hereinafter defined) and shall be prorated on the basis of any partial year.

B. Success Fee. Subgrantee shall pay, in addition to all other fees required herein, a "Success Fee" equivalent to (i) one and one-half percent (1.5%) of all gross revenues arising solely from the sale of wind based electrical power generated from the first one hundred twenty (120) wind turbines constructed and operating on the Premises, and (ii) one and three-quarters percent (1.75%) of all gross revenues arising solely from the sale of wind based electrical power generated from any wind turbines constructed and operating on the Premises in excess of one hundred twenty (120)

IN WITNESS WHEREOF, Subgrantor and Subgrantee have executed this Agreement as of the date written above.

"Subgrantor"

NTS DEVELOPMENT CORPORATION
a Nevada not-for-profit corporation

By: ____________________
Name: TIM CARLSON
Its: PRESIDENT & CEO

"Subgrantee"

MNS WIND COMPANY, LLC
a Delaware limited liability company

By: John A. Johansen
John A. Johansen
Authorized Representative

EXHIBIT D

EXHIBIT "3"

Consent of Master Grantor

EXHIBIT "3"

CONSENT OF MASTER PERMITTOR

As provided under Paragraph 5.(a) of Part I of the Easement granted to NTS Development Corporation as Grantee as of December 22, 2000, the United States of America, acting by and through the U.S. Department of Energy, hereby approves and consents to the foregoing Subeasement between Grantee and MNS Wind Power, LLC, as the Subgrantee referred to therein.

THE UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY,
NEVADA OPERATIONS OFFICE

By: ____________________
Kathleen Carlson, Manager

January 17, 2001

WITNESSED BY; January 17, 2001

Secretary of Energy Bill Richardson

U.S. Senator Harry Reid

Administrator of National Nuclear Security Administration General John Gordon

Assistant Secretary for Energy Efficiency and Renewable Energy Dan Reicher

EXHIBIT E

**Department of Energy**
National Nuclear Security Administration
Nevada Operations Office
P.O. Box 98518
Las Vegas, NV 89193-8518

JUL 12 2002

George D. Ormiston, Chief Executive Officer
NTS Development Corporation
4045 S. Spencer, #314
Las Vegas, NV 89119-5248

PROPOSED WIND TURBINE GENERATION PROJECT AT THE NEVADA TEST SITE

In December of 2000, the Nevada Operations Office and the NTS Development Corporation signed a "Grant of Easement for Wind Powered Electric Generating Facility". This agreement provided that the "Grant of Easement will not become effective until DOE has completed the NEPA process".

As part of the ongoing NEPA process, the United States Air Force has stated in a letter dated July 3, 2002, from the 98th Range Wing Commander that wind turbine operations at the NTS are incompatible with the mission of the Nevada Test and Training Range (NTTR) and has recommended that no wind turbines be installed on the NTS. This recommendation came as the result of an SF/AQ Red Team study of a wind farm located on the NTS. Of primary concern to the Air Force are the impacts to the NTTR missions within the ranges surrounding the NTS. Some of these mission capabilities are unique to the NTTR and may cause major impacts to National Security.

John Gordon, Administrator of the National Nuclear Security Administration (NNSA), has decided to terminate the NEPA process at this time in light of the Air Force recommendation. A draft Environmental Impact Statement has been prepared and is ready for release for public review and comment. However, the National Security impacts identified by the Air Force are so significant that further action with respect to the NEPA process is unwarranted. The Nevada Operations Office is hereby notifying you that development of the project will not be allowed to go forward. The easement will not go into effect, according to the terms of the agreement.

KA Carlson

Kathleen A. Carlson
Manager

OCC:KAH

CERTIFICATE OF FILING

I hereby certify that on October 5, 2005, a copy of the foregoing Declaration of Tim Carlson in Support of MNS' Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant Delgadillo