IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF ENERGY, NATIONAL NUCLEAR SECURITY ADMINISTRATION, NEVADA OPERATIONS OFFICE, an agency of the United States government<br><br>Defendant. | CASE NO. 04-1569C<br><br>(JUDGE WOLSKI)<br><br>DECLARATION OF THOMAS WILLIAMS IN SUPPORT OF MNS WIND COMPANY LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT LIABILITY |

**DECLARATION OF THOMAS WILLIAMS**

I, Thomas Williams declare as follows:

1. I am currently the Executive Director of the Research Foundation at the University of Nevada, Las Vegas. I formerly was the Program Manager at the Nevada Operations Office, National Nuclear Security Administration ("NNSA"), Department of Energy ("DOE"). In this capacity I reported directly to the Manager of the Nevada Operations Office. I have personal knowledge of the matters stated herein, and if called as a witness would testify competently thereto. I submit this Declaration in Support of MNS Wind Company LLC's ("MNS") Motion to For Partial Summary Judgment on Contract Liability.

2. As the Program Manager, I was responsible, for among other things, providing guidance and oversight to the local NNSA staff in the local implementation of DOE's community reuse program activities, including the consideration of the wind farm proposal at the Nevada Test Site

("NTS"). The DOE was encouraged to pursue means to minimize the social and economic impacts on workers and local communities of downsizing defense-related facilities. One of the methods the DOE used to implement this directive was to establish local Community Reuse Organizations ("CRO") to assist economic development efforts. The CRO for the NTS was the Nevada Test Site Development Corporation ("NTSDC").

3. The NTSDC and the DOE both agreed that the development of a wind-farm on the NTS would provide numerous benefits to the DOE and the surrounding community. The proposed wind farm project could further the DOE's stated objectives of diversifying the use of the NTS, including initiating private sector economic development at the NTS, as well as the DOE's and the NTSDC's stated objectives of reinvigorating regional employment by the construction and continuing operation and maintenance of as many as 545 wind turbine electricity generators on the NTS to help restore some of the thousands of jobs lost in the area after the moratorium on nuclear testing.

4. As the Program Manager, I was personally involved with the implementation of the NTS wind-farm project, including, among other things, the drafting, reviewing and negotiating of the documents governing the NTS wind-farm project. The DOE began negotiations with MNS regarding the proposed wind-farm project on or around September 2000.

5. From the beginning of the negotiations, the DOE was aware of concerns raised by the United States Air Force ("USAF") that the proposed wind farm project on the NTS could have potential adverse impacts on national security.

6. For example, on or about October 31, 2000, I was copied on an email from Colonel (Ret.) Jack Schofield, the liaison between the USAF and the DOE concerning the wind farm project,

and Kathleen Carlson, the Manager of the NTS Office, in which Col. Schofield informed us that the Air Force had some concerns about the location of the proposed wind farm. A true and correct copy of the October 31, 2000 email is attached hereto as Exhibit A.

7. During the negotiations in late 2000 and early 2001, I was also present at several meetings between the DOE and MNS where representatives of the DOE, including but not limited to Ken Powers, Deputy Nevada Operations Office Manager and Bud Bornhoff, Chief Counsel of the Nevada Operations Office said that the DOE wanted the right to terminate the agreements at any time for national security reasons. In addition, representatives of the DOE, including Powers and Bornhoff, expressed concerns about the availability for development of portions of the NTS for national security reasons.

8. In the past, the DOE ordinarily issued revocable use permits to private commercial entities for any commercial activities at the NTS. The use of revocable permits would allow the DOE to completely control all commercial activities at the NTS, in that the DOE had final authority over the administrative approvals required in the permits. Because the DOE retained the ultimate authority over whether to revoke the permit at any time, any private commercial organization operating or wishing to operate on the NTS would be required to assume the entire financial risk of termination in the event of a conflict between the needs of the Government and the conduct of the commercial activities.

9. With regard to the proposed wind farm at the NTS, John Johansen, the President of MNS, told us that MNS would not agree to invest time and resources in a project only to have its rights terminated for national security reasons without compensation for its involvement. In addition,

Johansen informed us that a revocable use permit was unacceptable, and that a non-revocable use permit for an extended term was essential to secure commercial funding for the wind-farm project. As a result of this assertion by Mr. Johansen and in order to push the negotiations to a successful conclusion, Mr. Bornhoft explored and determined that the Department of Energy, as authorized by the Atomic Energy Act was allowed to grant easements for the kind of commercial activities MNS was planning to engage in at the NTS.

10. As a result of the negotiations, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") for the development of the wind farm on the NTS.

11. Unlike a revocable use permit in which the Government could revoke the permit at any time and without financial consequences, under the Easement, the DOE agreed to assume financial risk if the Easement was revoked for national security reasons. The DOE expressly agreed that it would have the right to revoke the Easement at any time for national security reasons, but that the DOE would have to implement the revocation through eminent domain, pursuant to which the DOE would have to pay MNS the fair market value of the project as of the time of the revocation. I spoke with other members of DOE management negotiating the Easement and we all understood that this provision could involve significant financial consequences to the Government, and differed from the revocable use permits that the DOE usually granted. We also understood that this added risk was necessary given the nature of the project and the financial commitment that would be required by MNS to develop the wind farm.

12. After the Easement was executed, MNS proceeded with the development of the NTS, including compliance with the NEPA process covering use of all potential sites under the

Easement. As Program Manager, I was also involved with the DOE's oversight of and compliance with the NEPA process.

13. During the NEPA process, the USAF continued to express its concerns about the wind farm's potential to adversely impact national security. In an attempt to address these concerns, I personally arranged meetings between representatives of the USAF and United States Senator Harry Reid's office to determine whether there was any way to overcome these concerns.

14. For example, on July 10, 2002, at the request of Senator Reid, I met with representatives of the USAF including a Deputy Assistant Secretary of the Air Force and Senator Reid's staff to discuss the wind farm project. During this meeting, the USAF told Senator Reid's staff that the USAF felt that the entire wind farm project would provide too much impact to ongoing and future operations at the Nellis Air Force Base. After some discussion on this issue, the USAF agreed to do further evaluation of the project to determine if it could continue. I reported these developments to Ms. Carlson in an email that same day. A true and correct copy of my July 10, 2002 email is attached hereto as Exhibit B.

15. After further high level discussions between the USAF and Senator Reid's Office, the USAF concluded that national security concerns would not allow the project to continue.

16. Thereafter, I met with Ms. Carlson to discuss how the DOE would terminate the wind farm project. During this meeting, I informed Ms. Carlson that Senator Reid's office had expressed the strong desire that the DOE compensate MNS for the termination of the wind farm project.

17. During the meeting, Ms. Carlson related to me that the Administrator of the National Nuclear Security Administration ("NNSA") General John Gordon ("General Gordon") also supported compensation to MNS for it's investment in the wind farm. There was never

any discussion that the DOE would claim that the Easement did not come into effect because MNS did not satisfy the NEPA process. Indeed, it was my understanding that the termination for national security reasons would specifically require what the parties had negotiated -- a revocation of the Easement by the DOE through eminent domain.

18. Subsequently, I learned that Ms. Carlson sent a letter to the NTSDC, that asserted that because of possible national security concerns, the DOE had decided to terminate the NEPA process and that the Easement would not go into effect according to the terms of the agreement, thus in effect, disavowing the national security revocation clause negotiated by the parties. I was quite surprised by this action which seemed to be contrary to the good faith agreement that my DOE collegues and MNS negotiated to mitigate the financial effect of a National Security taking which was always possible, but provided for in the agreement as a contingency.

19. It is my understanding that the DOE has not compensated MNS for its revocation of the Easement. I am embarrassed by the DOE's refusal to compensate MNS for the revocation of the Easement, and believe that the DOE has disavowed its specific agreement.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 4 day of October 2005, at Washington D.C.

Thomas Williams

EXHIBIT A

**Robertson George Civ AF/TEZ**

**From:** Schofield, Jack C. Col.
**Sent:** Wednesday, November 01, 2000 10:44 AM
**To:** Norman, Jay H.
**Subject:** RE: WREN

Got it.

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

-----Original Message-----
**From:** Norman, Jay H.
**Sent:** Tuesday, October 31, 2000 3:58 PM
**To:** Schofield, Jack C. Col.
**Subject:** RE: WREN

Jack, Thanks for the prompt response. Ken Powers is heading the negotiations for us on this project. Jay

-----Original Message-----
**From:** Schofield, Jack C. Col.
**Sent:** Tuesday, October 31, 2000 7:54 AM
**To:** Carlson, Kathy; Norman, Jay H.
**Cc:** Williams, Tom; Johnson, Glen Lt. Col
**Subject:** WREN

Kathy-I passed the WREN Briefing to all my AF brethren several weeks ago and as expected, there is a little concern about the Pahute/Rainer Mesa location. No problems with Shoshone or Skull.

Main concern is not flyover considerations, but interference. Doppler effect of those big blades might be a big impact. They're also trying to find out what the blades and towers are composed of. They're still working the details.

Knowing that you want to give them a preliminary recommendation on the 1st, thought I would arm you with what I have. Will forward any other information as soon as I get it.

Is there a better POC for me?

Thanks

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Norman, Jay H. | Read: 11/1/2000 2:42 PM |



G-MNS09069

EXHIBIT B

**Hutchins, Virginia A.**

**From:** Williams, Tom
**Sent:** Wednesday, July 10, 2002 1:30 PM
**To:** Carlson, Kathy
**Cc:** Ginyard, Irma B.; 'thomas.williams@ccmail.nevada.edu'; Powers, Ken W.; Thornton, Kevin D.

Kathy,

I attended a meeting this afternoon at the request of Senator Reid and on behalf of the UNLV Research Foundation with the Air Force and Senator Reid's staff in regard to the Wind farm.

Though the AF conveyed that they had provided the "DOE" with the results of it's classified report recently, they told Reid's staff that they felt the project (even phase one) would provide too much impact to ongoing and future operations at the Nellis Range.

Based on a very lively discussion, it was resolved that the AF would do further evaluation of Phase one of the project including blades on the turbines which would be smaller than the proposal and that would have no eastern exposure over the ridge line at Shoshone Ridge.

Additionally, the AF and the Wind power company will begin discussions on the possibility of the AF purchasing a significant amount of Wind generated power over a long term as an alternative to completing the NTS wind power project.

I will keep you posted on developments as I here them.

Tom

CERTIFICATE OF FILING

I hereby certify that on October 5, 2005, a copy of the foregoing Declaration of Thomas Williams in Support of MNS' Motion for Partial Summary Judgment on Contract Liability was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant Delgadillo