IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | CASE NO. 04-1569C<br><br>(Judge Wolski)<br><br>Declaration of Michelle Conway in Support of Plaintiff MNS Wind Company LLC's Motion for Partial Summary Judgment on Contract Liability |

**DECLARATION OF MICHELLE K. CONWAY**

I, Michelle K. Conway declare as follows:

1. I am a former employee of Global Renewable Energy Partners, Inc. ("GREP"), a renewable energy development company. GREP owns and holds one hundred percent of the membership of MNS Wind Company, LLC ("MNS"). I submit this Declaration in support of MNS's Motion For Partial Summary Judgment on Contract Liability.

2. Beginning in or about October 2001, I was assigned to the MNS team responsible for the implementation and development of a wind farm on the Nevada Test Site ("NTS"). I was personally responsible for, among other things, overseeing and guiding MNS's compliance with the environmental review process for the entire NTS project, including compliance with the National Environmental Policy Act ("NEPA") process. NEPA requires public review of and involvement in analysis of potential environmental impacts resulting from a federal action and the preparation of an environmental impact statement ("EIS"). An EIS must contain all of the required contents specified in NEPA, and must disclose and discuss all major points of view on the environmental impacts.

3. I was responsible, on behalf of MNS, with assisting the DOE and its environmental consultants, in drafting the EIS. In this regard, I participated in weekly conference calls to discuss the EIS process. Representatives from the DOE, including Kevin Thornton ("Thornton") and Sharon Hejazi, an in-house attorney at the DOE, participated in these calls. Thornton, in particular, was the DOE representative overseeing the EIS process on behalf of the DOE.

4. Over the next several months, both the DOE and MNS assisted the environmental consultants with the drafting of the Draft Environmental Impact Statement ("Draft EIS"). Indeed, the Draft EIS incorporates extensive comments from both MNS and the DOE. In or about March 2002, the environmental consultants prepared and circulated a Draft EIS. True and correct copies of relevant portions of the Draft EIS are attached hereto as Exhibit A.

5. While the EIS is labeled as a "Draft," the document actually was a finished product as required by NEPA. It was labeled as "Draft" due to the fact that it was still subject to public review and comment. In fact, representatives of the DOE, including Thornton, told me that both the local Nevada office and the Washington D.C. office of the DOE had approved the Draft EIS as written, and that he had specifically requested that the Draft EIS be published in the Federal Register and released for public comment. MNS also approved the Draft EIS for publication.

6. The Draft EIS failed to identify any significant impacts that would have provided a barrier to the implementation of the NTS project. The Draft EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. Based on our estimation, the cost of mitigation would have been approximately $2 million, a cost that was modest for a project of this size.

7. On or about April 29, 2002, Thornton informed me via email that the DOE had decided to hold the Draft EIS for release to the public until certain issues raised by the United States Air

Force were resolved. A true and correct copy of the April 29, 2002 email is attached hereto as Exhibit B. Thornton further informed me that the DOE would not take any action on the Draft EIS until those issues were addressed. I did not hear from the DOE about the Draft EIS for several months until the DOE circulated its letter in which it purported to terminate the NEPA process.

8. In the course of my duties with MNS, I became familiar with the agreements between the DOE, MNS and the Nevada Test Site Development Corporation ("NTSDC") regarding the proposed wind farm on the NTS. I have reviewed the Easement, Subeasement and Compensation Agreement attached to the declaration of Tim Carlson as Exhibits A, B and C respectively, and those documents are true and correct copies of the agreements between the parties.

9. During the two years after the parties executed the agreements, MNS spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies, complying with the NEPA process; obtaining various permits from Nevada; and executing a power purchase agreement with Nevada Power for the first 85 MW's of power production.

10. As a result of the DOE's termination of the NTS project, the core leadership of the MNS team responsible for the project was laid off, including the team leader and President, John Johansen.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 3rd day of October 2005, at La Jolla, California.

Michelle K. Conway

EXHIBIT A



DOE/EIS--0335

# Wind Farm at the Nevada Test Site Draft Environmental Impact Statement

National Nuclear Security Administration



Prepared by
SWCA Environmental Consultants





March 2002

SWCA
ENVIRONMENTAL CONSULTANTS

DOE/EIS-0335

# WIND FARM AT THE NEVADA TEST SITE
# DRAFT ENVIRONMENTAL IMPACT STATEMENT

National Nuclear Security Administration

March 2002

# SUMMARY

The Nevada Test Site Development Corporation (NTSDC), together with the MNS Wind Company LLC (MNS) have applied to the U.S. Department of Energy (DOE), National Nuclear Security Administration Nevada Operations Office (NNSA/NV) to develop a commercially viable, alternative energy production facility on the Nevada Test Site (NTS) using wind turbines. If fully implemented, the proposal would result in the construction and operation of as many as 545 wind turbines generating up to 510 megawatts (MW) of electricity within the Shoshone Mountain and Pahute Mesa areas of the NTS.

The Proposed Action would permit NNSA/NV to grant NTSDC authority to implement an easement allowing for the construction, operation, and maintenance of a wind farm at the NTS pursuant to an easement granted to the NTSDC (and a sub-easement granted by NTSDC to MNS) and to provide oversight for project activities to ensure compliance with the easement.

This Draft Environmental Impact Statement (DEIS) has been prepared in compliance with procedures established under National Environmental Policy Act (NEPA[1]), Council on Environmental Quality (CEQ) regulations (40 CFR 1500-1508) and DOE guidelines contained within the DOE NEPA Handbook (DOE, 1993). NNSA/NV is the lead federal agency, as defined by 40 CFR 1501.5. NNSA/NV will use the information provided in this DEIS to support federal decisions regarding the proposed project.

## Purpose and Need for Action

The proposed project furthers DOE's objectives to diversify use of DOE sites and facilities to include non-defense and private use, and to initiate private sector economic development at these sites and facilities. These objectives stem from Section 3161 of the National Defense Authorization Act for Fiscal Year (FY) 1993, in which the United States Congress encouraged DOE to pursue means to minimize the social and economic impacts on workers and communities of downsizing defense-related facilities. One of the methods DOE uses to implement this Congressional directive is to establish local Community Reuse Organizations (CRO) to assist economic development efforts. The CRO for the NTS is the NTSDC. DOE's development objectives at the NTS were clearly stated in its Record of Decision (ROD) for the *Final Environmental Impact Statement for the Nevada Test Site and Off-Site Locations in the State of Nevada* (1996). The ROD included the statement, "This decision will result in the continuation of the multi-purpose, multi-program use of the Nevada Test Site, under which DOE will pursue a further diversification of interagency, private industry, and public-education uses while meeting its Defense Program, Waste Management, and Environmental Restoration mission requirements" (DOE/NV 2001b).

Recent electrical power shortages have focused national attention on the need for additional generation facilities in the western United States. This need has been addressed by both federal and state agencies.

[1] 42 USC ' 4321, et seq., as amended.

Executive Order 13123 (Greening the Government Through Efficient Energy Management, June 3, 1999) directs federal agencies to improve energy management in order to save taxpayer dollars and reduce emissions that contribute to air pollution and global climate change, and Executive Order 13212 (Actions To Expedite Energy-Related Projects) directs agencies to expedite their review of permits to accelerate the completion of energy related projects. Additionally, the State of Nevada recently passed Senate Bill 372, which requires the electric utilities operating within Nevada to obtain 5 percent of their power from so-called renewable energy resources by 2003, increasing to 15 percent by 2013. The proposed wind farm would both support the need for additional electrical power generation in the west and provide utilities opportunities to meet state requirements to utilize renewable energy sources.

This project will also support the DOE's mission to develop alternative sources of renewable energy by allowing the use of land and existing infrastructure for the proposed facilities. The NNSA/NV believes that the proposed wind farm would also be compatible with and/or directly support other DOE missions and programs. As steward of the NTS, DOE must decide if the proposed action is consistent with current and future planned uses of the NTS and whether the environmental impacts of the proposed action are significant.

## Scoping

The Notice of Intent (NOI) to prepare an EIS for the proposed project was published in the Federal Register on July 25, 2001. Legal notices were published in the Las Vegas Review Journal on August 12, 2001, and the Pahrump Valley Times on August 10, 15, and 17, 2001, to announce public meetings to be held on August 16, 2001, and August 17, 2001, respectively. In addition to the public scoping meetings, an agency scoping meeting was held on September 4, 2001, and tribal governments have been contacted for their review. A separate tribal consultation is being prepared for this report.

A list of 56 issues was compiled from written and verbal comments received during and after formal scoping. Eighteen issues and comments were determined to be beyond the scope of the EIS and/or were eliminated from further consideration. The remaining 38 issues and comments were organized under the major topic headings of Land Use, Transportation, Socioeconomic Resources, Geology, Soils and Mineral Resources, Hydrology, Biological Resources, Air Quality, Noise, Visual Resources, Cultural Resources, Environmental Justice, Places of Traditional Cultural Importance to American Indians, and Health and Safety. These issues are discussed further in Chapter 1.

## Proposed Action Alternative and Additional Alternatives

The proposed project consists of the granting of approval for MNS to develop, operate, and maintain alternative energy generation facilities at the NTS. MNS proposes to construct a wind farm on approximately 2,328 hectares (ha) (5,753 acres (ac.)) within designated areas of the NTS and would produce up to 510 megawatts (MW) of electricity. The project includes a system of underground and

aboveground electric lines to collect the electrical power generated. The project would also include one pad-mounted transformer per turbine, several new collector substations, and approximately 122 kilometers (km) (75.7 miles (mi.)) of new 230 kilovolt (kV) transmission line and maintenance road along the line. The NTS is considered an attractive location for such a project because significant wind resources exist and a majority of the necessary infrastructure is in place to support the Proposed Action.

The alternative actions for the proposed project would consist of the construction of a wind farm within two areas. Alternative 1 (Proposed Action) includes the construction of a wind farm within Shoshone Mountain and Pahute Mesa Project Areas 2,328 ha (5,753 ac.). Alternative 2 (Shoshone Mountain) includes the construction of a wind farm within the Shoshone Mountain Project Area only 1,647 ha (4,070 ac.). Alternative 3 (Pahute Mesa) includes the construction of a wind farm within the Pahute Mesa Project Area only 681 ha (1,683 ac.).

## No Action Alternative

Under the No Action Alternative, the NNSA/NV would not grant approval, under an easement to the NTSDC and a sub-easement to MNS, to construct and operate alternative energy generation facilities at the NTS. Under the No Action Alternative, wind turbines and ancillary facilities would not be constructed. Areas within the NTS not previously disturbed would remain undisturbed. There would be no contribution to the renewable resource requirement under Nevada Senate Bill 372, and DOE Mission statement would not be fulfilled.

## Impacts

Resources evaluated for potential impacts include Land Use, Transportation, Socioeconomic Resources, Geology, Soils, and Mineral Resources, Hydrology, Biological Resources, Air Quality, Noise, Visual Resources, Cultural Resources, Environmental Justice, Places of Traditional Cultural Importance to American Indians, and Health and Safety. Table S-1 summarizes the environmental consequences of each alternative. Detailed descriptions of impacts and proposed mitigations of all resources are discussed in Chapter 4. Unavoidable adverse impacts include the physical loss of cultural resource sites, however this loss would be offset through intensive data collection and analysis, and curation of objects for future study and interpretation. Irreversible commitment of resources would include land and materials used for the establishment of roads and turbine foundations that would remain after project closure.

The Proposed Action would have positive effects on some resource areas including the following:

- The local economy would experience a small boost over the life of the project due to payroll earnings and construction expenditures.

- There would be no adverse impact to air quality, and may improve air quality as the electric source would displace the need for a coal-generated power plant to supply electricity.

- The production of energy from wind turbines would not contribute to the indirect costs (health, environment, and extraction issues) of fossil fuels that are currently used to produce energy.

**Table S-1. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| Land Use | Land-use impacts resulting from project construction and operation would be compatible with existing land use designations. Total disturbed acreage would be 5,753 acres. | Same as Proposed Action. Total disturbed acreage would be 4,070 acres. | Same as Proposed Action. Total disturbed acreage would be 1,683 acres. | NNSA/NV's mission to develop alternative uses at the NTS would not be fulfilled. No disturbed acreage. |
| | Proposed action may cause interference with U.S. Air Force radio frequency transmissions, interfering with their training operations on NTS. | Same as Proposed Action. | Same as Proposed Action. | No potential for interference with U.S. Air Force radio frequency transmissions or training operations. |
| Transportation | Possible increase of as many as 200 vehicles during construction. Under the Proposed Action, approx. 92 km (57 mi) of new roads would be constructed within the Shoshone Mountain area. Approx. 38 km (24 mi) of roads would be constructed or improved within the Pahute Mesa Project Area. Project would have a negligible impact on the level-of-service of pertinent roads and highways in or near the project area. | Approx. 92 km (57 mi) of new roads would be constructed. | Approx. 38 km (24 mi) of new roads would be constructed. | No increases in vehicle transportation. |
| Socioeconomics | Development of the Shoshone Mountain and Pahute Mesa Project Areas would not require additional county or | Same as those identified for the Shoshone Mountain Project Area under the Proposed Action. | Same as those identified for the Pahute Mesa Project Area under the Proposed Action. | No small positive impact on employment for Nye and Clark counties. |

**Table S-1. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | local infrastructure or services. It would have a small but positive impact on employment for both Nye and Clark counties. | | | |
| Geology and Soils | Approx. 81,773 m$^3$ of (106,956 yd$^3$) of material could be used for installation of 454 (0.9 MW) turbines, or Approx. 50,864 m$^3$ (69,529 yd$^3$) could be used for installation of 430 (1.5 MW) turbines. Approx. 137,600 m$^3$ (180,000 yd$^3$) of gravel will be needed and the opening of one new borrow pit. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | Approx. 43,212 m$^3$ (56,520 yd$^3$) of material could be used for installation of 288 (0.9 MW) turbines or approx. 25,957 m$^3$ (33,951yd$^3$) could be used for installation of 173 (1.5 MW) turbines. Approx. 137,600 m$^3$ (180,000 yd$^3$) of gravel will be needed and the opening of one new borrow pit. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | Approx. 38,561 m$^3$ (50,436 yd$^3$) of material could be used for installation of 166 (0.9 MW) turbines or, approx. 24,907 m$^3$ (32,578 yd$^3$) could be used for installation of 257 (1.5 MW) turbine towers. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | None expected. |
| Hydrology | Impacts to surface waters from alternation of existing runoff patterns, erosion, and sediment loading would be minimal. Water quality of surface water could be impacted by petroleum or hydraulic fluid spills. Preparation of appropriate stormwater pollution and spill prevention plans would prevent these impacts from | Sedimentation impacts would be similar, but roughly 70 percent of the magnitude of the potential impacts of the Proposed Action.<br><br>Well 8 has adequate capacity to provide the estimated groundwater needed for construction in the Shoshone Mountain Project Area, therefore impacts to groundwater would be short-term and | Sedimentation impacts would be similar, but roughly 30 percent of the magnitude of the potential impacts of the Proposed Action.<br><br>Well 8 has adequate capacity to provide the estimated groundwater needed for construction in the Pahute Mesa Project Area, therefore impacts to groundwater would be short-term and negligible. | None expected. |

**Table S-1. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | being significant.<br><br>Well 8 has adequate capacity to provide the estimated 75 mgal of water necessary for construction of both project areas, therefore impacts to groundwater would be short-term and negligible. | negligible. | | |
| **Biological Resources** | Approx. 2,328 ha (5,753 ac.) of plant communities would experience short-term impacts. Approx. 1,397 ha (3,452 acres) of these impacts would also be long-term. | Approx. 1,647 ha (4,070 ac.) of plant communities would experience short-term construction impacts. 988 ha (2,442 ac.) of these impacts would be also be long-term | Approx. 681 ha (1,683 ac.) of plant communities would experience short-term construction impacts. Approximately 409 ha (1,010 ac.) of these impacts would also be long-term. | None expected. |
| | Approx. 1,397 ha (3,452 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.004 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | Approx. 988 ha (2,442 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.0028 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | Approx. 409 ha (1,010 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.0012 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | None expected. |
| | A maximum of 89 ha (220 ac.) of the Mojave population | A maximum of 45 ha (110 ac.) of the Mojave population | A transmission line associated with Pahute Mesa would | None expected. |

Table S-1. Summary of Environmental Consequences of each Alternative.

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | of desert tortoise habitat could be impacted from transmission lines and roads. The acreage impacted is less than 1% of the Mojave desert ecological region and is not expected to have a significant impact on the desert tortoise habitat. | of desert tortoise habitat could be impacted from transmission lines and roads. The acreage impacted is less than 1% of the Mojave desert ecological region and is not expected to have a significant impact on the desert tortoise habitat. | impact approximately 45 ha (110 ac.) of the Mojave population of desert tortoise. The acreage impacted is less than 1% of the Mojave desert ecological region and is not expected to have a significant impact on the desert tortoise habitat. | |
| | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortality. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortality. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortalities. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | None expected. |
| Air Quality | Short-term construction impacts would include fugitive dust ($PM_{10}$), and exhaust emissions ($CO_2$ and $NO_2$) that would be generated during the operation of construction equipment. Implementation of mitigation measures would prevent these impacts from being significant. No NAAQS standards are expected to be exceeded. | Same as those identified under the Proposed Action. No NAAQS standards are expected to be exceeded. | Same as those identified under the Proposed Action. No NAAQS standards are expected to be exceeded. | None expected. |

**Table S-1. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| Noise | Temporary impacts during construction. No off-site noise impacts are expected. | Same as those identified under the Proposed Action. No off-site noise impacts are expected. | Same as those identified under the Proposed Action. No off-site noise impacts are expected. | None expected. |
| Visual Resources | Installation of the wind turbines is not expected to impact visual resources. The nearest distance from the wind turbines to a public highway is 20 miles, and thus no adverse visual impacts are expected. | Same as those identified under the Proposed Action. The nearest distance from the wind turbines to a public highway is 20 miles, and thus no adverse visual impacts are expected. | Same as those identified under the Proposed Action. The nearest distance from the wind turbines to a public highway is 20 miles, and thus no adverse visual impacts are expected. | None expected. |
| Cultural Resources | 38 archaeological sites potentially eligible for nomination to the National Register of Historic Places (NRHP) could be impacted by a wind farm at the Shoshone Mountain Project Area. It is assumed that the Section 106 process would prevent significant cultural impacts to the Pahute Mesa Project Area. | Same as those identified under the Proposed Action. | Only Class I inventory data exists; therefore, impacts to Pahute Mesa eligible sites are unknown. | Archaeological sites impacted during pre-feasibility studies (anenometer installation) would be assessed and the Nevada State Historic Preservation Office (SHPO) would be consulted. No other impacts are expected. |
| Environmental Justice | No human health effects are expected to occur as a result of the proposed wind farm at the Shoshone Mountain and/or Pahute Mesa Project Areas. However, the CGTO believes that the proposed action may potentially create both social and economic impacts to | Same as the Proposed Action. | Same as the Proposed Action. | None expected. |

**Table S-1. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | the Indian people living on the reservations, as well as future tribal development plans. | | | |
| **Places of Traditional Cultural Importance to Native Americans** | CGTO believes that adverse impacts to the land will occur causing irreparable damage to potential traditional cultural properties, including ceremonial and traditional use areas. | Same as those identified under the Proposed Action. | Unknown at this time. | None expected. |
| **Health and Safety** | All work would be accomplished within the Occupational Safety and Health Administration's requirements. | Same as those under the Proposed Action. | Same as those identified under the Proposed Action. | None expected. |

**Table S-2. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| Land Use | No mitigation required. |
| Transportation | No mitigation required. |
| Socioeconomics | No mitigation required. |
| Geology, Soils, and Mineral Resources | • Constructing all wind turbines and facilities to seismic standards.<br>• Limiting construction to smaller areas so that more control can be given to an area.<br>• Using smaller construction equipment on steep slopes where feasible to maintain better control of debris.<br>• Using material collected during construction wherever possible for infill, rather than bring additional material from out of the immediate construction area.<br>• Using appropriate erosion control and sedimentation techniques.<br>• Watering down roads during construction to control fugitive dust.<br>• Salvaging topsoil prior to disturbing the ground, protecting it from wind and water erosion, and returning it to disturbed areas during reclamation.<br>• Promptly revegetating with appropriate seed mixture, using soil stabilization methods where necessary.<br>• Preparing stormwater management plans to minimize erosion. |
| Hydrology | • Prepare a Stormwater Pollution Prevention Plan.<br>• Follow Best Management Practices for erosion abatement and sedimentation control.<br>• No construction work would occur during climatic conditions that favor a large rain event.<br>• Roads would be constructed so that natural contours are not altered in and around ephemeral drainages.<br>• Roads would cross ephemeral drainages with a gentle dip in the road.<br>• Transmission line towers would not be placed in or around ephemeral drainages. |
| Biological Resources | • Avoid dense areas of vegetation.<br>• Avoid areas where revegetation through reclamation would be difficult (i.e., steep slopes).<br>• Plant established plants in areas of concern.<br>• Salvage and transplant members of the Cactaceae family (protected by Nevada State Law (NRS 527.060-.120).<br>• Prepare a comprehensive reclamation plan with schedule and monitoring activities.<br>• Rinsing of equipment after completion of construction in areas with noxious weeds. This is done in staging areas within already infected areas.<br>• Application of a chemical treatment (herbicide) operation to prevent spread of noxious weed infestations to disturbed areas.<br>• Seeding of disturbed areas with native plant species that will become established quickly. |

**Table S-2. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| | • Measures shall be taken to minimize take of desert tortoises due to project-related activities and operation of heavy equipment (i.e., flag boundaries, educating construction personnel on desert tortoises, speed limits, construction monitoring and reporting).<br>• Measures shall be taken to minimize entrapment of desert tortoises in open trenches or water impoundments.<br>• Measures shall be taken to minimize predation on desert tortoises by ravens drawn to project areas (adequate food storage and disposal).<br>• Measures shall be taken to minimize destruction of desert tortoise habitat due to project related activities.<br>• Measures shall be taken to ensure compliance with the reasonable and prudent measures, terms and conditions, reporting requirements, and reinitiation requirements contained in the 1996 biological opinion (USFWS 1996).<br>• Surveying for sensitive plant species prior to disturbance and avoiding these species where possible.<br>• Transplanting sensitive plant individuals to unimpacted habitat.<br>• Posting speed limits for areas that contain potential habitat for chuckwalla.<br>• Educating construction personnel regarding wildlife identification, behavior, etc.<br>• Disposing of trash in proper containers and discouraging littering.<br>• Conducting a preconstuction survey during migratory and nesting season for raptors and migratory birds and avoiding all roosting and nesting areas wherever possible.<br>• Site turbines away from known raptor or migratory perches, roosts, and nests.<br>• Schedule construction so that it doesn't conflict with migratory and/or nesting season, should proposed wind turbine sites be near a roost or perch.<br>• Establish sitting guidelines that reduce the potential for avian mortality.<br>• Construct electric distribution lines in accordance with Olendorff et al. 1996.<br>• Reduce the availability of perching areas around turbines (i.e., burying distribution lines, electric lines, and cables).<br>• Signage to alert traffic of the potential occurrence of wild horses.<br>• Restoration of impacted wild horse habitat as soon as possible. |
| Air Quality | • Routine maintenance of vehicles and construction equipment.<br>• Watering the roads to reduce fugitive dust.<br>• Encouraging low speed limits.<br>• Reclaiming disturbed areas as soon as possible. |
| Noise | No mitigation required. |
| Visual Resources | No mitigation required. |
| Cultural Resources | • Rerouting roads, and relocating tower sites and other facilities associated with the project to avoid cultural sites. |

**Table S-2. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| | • Unavoidable impacts to sites that are eligible for nomination to the NRHP would be mitigated through the implementation of a treatment plan in accordance with the Programmatic Agreement. |
| **Environmental Justice** | • Impacts to American Indians, the only minority or low-income group that would be impacted, would be mitigated according to agreements established between the tribes and NNSA/NV. |
| **Places of Traditional Cultural Importance to American Indians** | • Before any wind farm construction would be allowed on the project area, tribal consultation would be conducted to address concerns over potential impacts. Avoidance of culturally significant sites would be the most preferable. Mitigation would be drafted that would be acceptable to American Indians, NNSA/NV, and the proponent. |
| **Health and Safety** | • Safety meetings and tailgate safety briefings provided as appropriate.<br>• Adherence to the requirements of federal and state law, DOE orders, and the plans and procedures of each organization performing work on the NTS.<br>• Personal protective equipment worn.<br>• Radiation dosimeters issued along with badges when visiting sensitive areas if necessary.<br>• Use of signs, fences, or barricades for restricted areas.<br>• Strict adherence to safety and health requirements of the Occupational Safety and Health Administration.<br>• Consultation with the Bechtel Nevada radiological field operations section to ensure radiological safety of areas scheduled for construction sites, or any extreme soil disturbing activity. Should contamination be discovered at any time, work would stop, and the appropriate personnel would be contacted so that containment and clean up would occur immediately.<br>• Hazardous materials handled, transported, stored, and disposed of according to safety recommendations (RCRA). Spills would be handled as specified by a Spill Prevention Control Plan.<br>• Refuse would be hauled to a state approved sanitary landfill or other disposal site. It would be stored appropriately prior to transport. |

Mountain, located in Area 25 of the NTS. Several anemometers were placed in service in mid to late 2000 to monitor wind speeds at projected wind turbine hub heights. The results of that monitoring indicate that the Skull Mountain site does not exhibit a sufficient wind regime to warrant the installation of wind turbine generators. As such, MNS does not believe this site should be considered for a commercially viable wind generation facility at this time. Therefore, the Skull Mountain alternative will not be retained for detailed analysis in this EIS.

## 2.5 Comparative Summary of Environmental Consequences

Table 2-7 summarizes and compares the environmental impacts between the Proposed Action, Shoshone Mountain, Pahute Mesa and No Action Alternatives. Direct analysis of impacts is provided in Chapter 4.

**Table 2-7. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| Land Use | Land-use impacts resulting from project construction and operation would be compatible with existing land use designations. Total disturbed acreage would be 5,753 acres. | Same as Proposed Action. Total disturbed acreage would be 4,070 acres. | Same as Proposed Action. Total disturbed acreage would be 1,683 acres. | NNSA/NV's mission to develop alternative uses at the NTS would not be fulfilled. No disturbed acreage. |
| | Proposed action may cause interference with U.S. Air Force radio frequency transmissions, interfering with their training operations on NTS. | Same as Proposed Action | Same as Proposed Action | No potential for interference with U.S. Air Force radio frequency transmissions or training operations. |
| Transportation | Possible increase of as many as 200 vehicles during construction. Under the Proposed Action, approx. 92 km (57 mi) of new roads would be constructed within the Shoshone Mountain area. Approx. 38 km (24 mi) of roads would be constructed or improved within the Pahute Mesa Project Area. Project would have a negligible impact on the level-of-service of pertinent roads and highways in or near the project area. | Approx. 92 km (57 mi) of new roads would be constructed. | Approx. 38 km (24 mi) of new roads would be constructed. | No increases in vehicle transportation. |

**Table 2-7. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| Socioeconomics | Development of the Shoshone Mountain and Pahute Mesa Project Areas would not require additional county or local infrastructure or services. It would have a small but positive impact on employment for both Nye and Clark counties. | Same as those identified for the Shoshone Mountain Project Area under the Proposed Action. | Same as those identified for the Pahute Mesa Project Area under the Proposed Action. | No small positive impact on employment for Nye and Clark counties. |
| Geology and Soils | Approx. 81,773 $m^3$ of (106,956 $yd^3$) of material could be used for installation of 454 (0.9 MW) turbines, or Approx. 50,864 $m^3$ (69,529 $yd^3$) could be used for installation of 430 (1.5 MW) turbines. Approx. 137,600 $m^3$ (180,000 $yd^3$) of gravel will be needed and the opening of one new borrow pit. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | Approx. 43,212 $m^3$ (56,520 $yd^3$) of material could be used for installation of 288 (0.9 MW) turbines or approx. 25,957 $m^3$ (33,951$yd^3$) could be used for installation of 173 (1.5 MW) turbines. Approx. 137,600 $m^3$ (180,000 $yd^3$) of gravel will be needed and the opening of one new borrow pit. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | Approx. 38,561 $m^3$ (50,436 $yd^3$) of material could be used for installation of 166 (0.9 MW) turbines or, approx. 24,907 $m^3$ (32,578 $yd^3$) could be used for installation of 257 (1.5 MW) turbine towers. Potential erosion impacts would be significant unless mitigation measures are effectively implemented. | None expected |
| Hydrology | Impacts to surface waters from alternation of existing runoff patterns, erosion, and sediment loading would be minimal. Water quality of surface water could be impacted by petroleum or hydraulic fluid spills. Preparation of appropriate stormwater pollution and spill prevention plans would prevent these impacts from being significant. | Sedimentation impacts would be similar, but roughly 70 percent of the magnitude of the potential impacts of the Proposed Action.<br><br>Well 8 has adequate capacity to provide the estimated groundwater needed for construction in the Shoshone Mountain Project | Sedimentation impacts would be similar, but roughly 30 percent of the magnitude of the potential impacts of the Proposed Action.<br><br>Well 8 has adequate capacity to provide the estimated groundwater needed for construction in the Pahute Mesa Project Area, | None expected |

Table 2-7. Summary of Environmental Consequences of each Alternative.

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | Well 8 has adequate capacity to provide the estimated 75 mgal of water necessary for construction of both project areas, therefore impacts to groundwater would be short-term and negligible. | Area, therefore impacts to groundwater would be short-term and negligible. | therefore impacts to groundwater would be short-term and negligible. | |
| **Biological Resources** | Approx. 2,328 ha (5,753 ac.) of plant communities would experience short-term impacts. Approx. 1,397 ha (3,452 acres) of these impacts would also be long-term. | Approx. 1,647 ha (4,070 ac.) of plant communities would experience short-term construction impacts. 988 ha (2,442 ac.) of these impacts would be also be long-term | Approx. 681 ha (1,683 ac.) of plant communities would experience short-term construction impacts. Approximately 409 ha (1,010 ac.) of these impacts would also be long-term. | None expected |
| | Approx. 1,397 ha (3,452 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.004 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | Approx. 988 ha (2,442 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.0028 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | Approx. 409 ha (1,010 ac.) of wildlife habitat would have long-term adverse impacts. These impacts have the potential to impact several wildlife species. However, the relative small percentage of NTS habitat that would be impacted (0.0012 percent) would prevent these impacts from affecting the population viability of these species within the NTS. | None expected |
| | A maximum of 89 ha (220 ac.) of the Mojave population of desert tortoise habitat could be impacted from transmission lines and roads. The acreage impacted is less than 1% of the Mojave desert ecological region and is | A maximum of 45 ha (110 ac.) of the Mojave population of desert tortoise habitat could be impacted from transmission lines and roads. The acreage impacted is less than 1% of the | A transmission line associated with Pahute Mesa would impact approximately 45 ha (110 ac.) of the Mojave population of desert tortoise. The acreage impacted is less than 1% of the Mojave desert | None expected |

**Table 2-7. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | not expected to have a significant impact on the desert tortoise habitat. | Mojave desert ecological region and is not expected to have a significant impact on the desert tortoise habitat. | ecological region and is not expected to have a significant impact on the desert tortoise habitat. | |
| | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortality. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortality. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | Several sensitive plant and animal species could be impacted, either by habitat disturbance or strike mortalities. Avoidance of sensitive species habitat and use of slower-moving turbine rotors would likely prevent these impacts from being significant. | None expected |
| **Air Quality** | Short-term construction impacts would include fugitive dust ($PM_{10}$), and exhaust emissions ($CO_2$ and $NO_2$) that would be generated during the operation of construction equipment. Implementation of mitigation measures would prevent these impacts from being significant. No NAAQS standards are expected to be exceeded. | Same as those identified under the Proposed Action. No NAAQS standards are expected to be exceeded. | Same as those identified under the Proposed Action. No NAAQS standards are expected to be exceeded. | None expected |
| **Noise** | Temporary impacts during construction. No off-site noise impacts are expected. | Same as those identified under the Proposed Action. No off-site noise impacts are expected. | Same as those identified under the Proposed Action. No off-site noise impacts are expected. | None expected |
| **Visual Resources** | Installation of the wind turbines is not expected to impact visual resources. The nearest distance from the wind turbines to a public highway is 20 miles, and thus no adverse | Same as those identified under the Proposed Action. The nearest distance from the wind turbines to a public highway is 20 miles, | Same as those identified under the Proposed Action. The nearest distance from the wind turbines to a public highway is 20 miles, and thus no | None expected |

**Table 2-7. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| | visual impacts are expected. | and thus no adverse visual impacts are expected. | adverse visual impacts are expected. | |
| **Cultural Resources** | 38 archaeological sites potentially eligible for nomination to the National Register of Historic Places (NRHP) could be impacted by a wind farm at the Shoshone Mountain Project Area. It is assumed that the Section 106 process would prevent significant cultural impacts to the Pahute Mesa Project Area. | Same as those identified under the Proposed Action | It is assumed that the Section 106 process would prevent significant cultural impacts to the Pahute Mesa Project Area. | Archaeological sites impacted during pre-feasibility studies (anenometer installation) would be assessed and the Nevada State Historic Preservation Office (SHPO) would be consulted. No other impacts are expected. |
| **Environmental Justice** | No human health effects are expected to occur as a result of the proposed wind farm at the Shoshone Mountain and/or Pahute Mesa Project Areas. However, the CGTO believes that the proposed action may potentially create both social and economic impacts to the Indian people living on the reservations, as well as future tribal development plans. | Same as the Proposed Action | Same as the Proposed Action | None expected |
| **Places of Traditional Cultural Importance to Native Americans** | CGTO believes that adverse impacts to the land will occur causing irreparable damage to potential traditional cultural properties, including ceremonial and traditional use areas. | Same as those identified under the Proposed Action | Unknown at this time | None expected |

**Table 2-7. Summary of Environmental Consequences of each Alternative.**

| Resource | Alternative 1: Proposed Action | Alternative 2: Shoshone Mountain | Alternative 3: Pahute Mesa | Alternative 4: No Action |
|---|---|---|---|---|
| **Health and Safety** | All work would be accomplished within the Occupational Safety and Health Administration's requirements. | Same as those under the Proposed Action | Same as those identified under the Proposed Action | None expected |

The following mitigation measures (Table 2-8) have been proposed to eliminate or reduce impacts to resources within the project area.

**Table 2-8. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| **Land Use** | No mitigation required |
| **Transportation** | No mitigation required |
| **Socioeconomics** | No mitigation required |
| **Geology, Soils, and Mineral Resources** | • Constructing all wind turbines and facilities to seismic standards.<br>• Limiting construction to smaller areas so that more control can be given to an area.<br>• Using smaller construction equipment on steep slopes where feasible to maintain better control of debris.<br>• Using material collected during construction wherever possible for infill, rather than bring additional material from out of the immediate construction area.<br>• Using appropriate erosion control and sedimentation techniques.<br>• Watering down roads during construction to control fugitive dust.<br>• Salvaging top soil prior to disturbing the ground, protecting it from wind and water erosion, and returning it to disturbed areas during reclamation.<br>• Promptly revegetating with appropriate seed mixture, using soil stabilization methods where necessary.<br>• Preparing stormwater management plans to minimize erosion. |

**Table 2-8. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| Hydrology | • Prepare a Stormwater Pollution Prevention Plan.<br>• Follow Best Management Practices for erosion abatement and sedimentation control.<br>• No construction work would occur during climatic conditions that favor a large rain event.<br>• Roads would be constructed so that natural contours are not altered in and around ephemeral drainages.<br>• Roads would cross ephemeral drainages with a gentle dip in the road.<br>• Transmission line towers would not be placed in or around ephemeral drainages. |
| Biological Resources | • Avoid dense areas of vegetation.<br>• Avoid areas where revegetation through reclamation would be difficult (i.e., steep slopes).<br>• Plant established plants in areas of concern.<br>• Salvage and transplant members of the Cactaceae family (protected by Nevada State Law (NRS 527.060-.120).<br>• Prepare a comprehensive reclamation plan with schedule and monitoring activities.<br>• Rinsing of equipment after completion of construction in areas with noxious weeds. This is done in staging areas within already infected areas.<br>• Application of a chemical treatment (herbicide) operation to prevent spread of noxious weed infestations to disturbed areas.<br>• Seeding of disturbed areas with native plant species that will become established quickly.<br>• Measures shall be taken to minimize take of desert tortoises due to project-related activities and operation of heavy equipment (i.e., flag boundaries, educating construction personnel on desert tortoises, speed limits, construction monitoring and reporting).<br>• Measures shall be taken to minimize entrapment of desert tortoises in open trenches or water impoundments.<br>• Measures shall be taken to minimize predation on desert tortoises by ravens drawn to project areas (adequate food storage and disposal).<br>• Measures shall be taken to minimize destruction of desert tortoise habitat due to project related activities.<br>• Measures shall be taken to ensure compliance with the reasonable and prudent measures, terms and conditions, reporting requirements, and reinitiation requirements contained in the 1996 biological opinion (USFWS 1996).<br>• Surveying for sensitive plant species prior to disturbance and avoiding these species where possible.<br>• Transplanting sensitive plant individuals to unimpacted habitat.<br>• Posting speed limits for areas that contain potential habitat for chuckwalla.<br>• Educating construction personnel regarding wildlife identification, behavior, etc.<br>• Disposing of trash in proper containers and discouraging littering. |

**Table 2-8. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| | • Conducting a preconstuction survey during migratory and nesting season for raptors and migratory birds and avoiding all roosting and nesting areas wherever possible.<br>• Site turbines away from known raptor or migratory perches, roosts, and nests.<br>• Schedule construction so that it doesn't conflict with migratory and/or nesting season, should proposed wind turbine sites be near a roost or perch.<br>• Establish siting guidelines that reduce the potential for avian mortality.<br>• Construct electric distribution lines in accordance with Olendorff et al. 1996.<br>• Reduce the availability of perching areas around turbines (i.e., burying distribution lines, electric lines, and cables).<br>• Signage to alert traffic of the potential occurrence of wild horses.<br>• Restoration of impacted wild horse habitat as soon as possible. |
| **Air Quality** | • Routine maintenance of vehicles and construction equipment.<br>• Watering the roads to reduce fugitive dust.<br>• Encouraging low speed limits.<br>• Reclaiming disturbed areas as soon as possible. |
| **Noise** | No mitigation required. |
| **Visual Resources** | No mitigation required. |
| **Cultural Resources** | • Rerouting roads, and relocating tower sites and other facilities associated with the project to avoid cultural sites.<br>• Unavoidable impacts to sites that are eligible for nomination to the NRHP would be mitigated through the implementation of a treatment plan in accordance with the Programmatic Agreement. |
| **Environmental Justice** | • Impacts to American Indians, the only minority or low-income group that would be impacted, would be mitigated according to agreements established between the tribes and NNSA/NV. |
| **Places of Traditional Cultural Importance to American Indians** | • Before any wind farm construction would be allowed on the project area, tribal consultation would be conducted to address concerns over potential impacts. Avoidance of culturally significant sites would be the most preferable. Mitigation would be drafted that would be acceptable to American Indians, NNSA/NV, and the proponent. |
| **Health and Safety** | • Safety meetings and tail-gate safety briefings provided as appropriate.<br>• Adherence to the requirements of federal and state law, DOE orders, and the plans and procedures of each organization performing work on the NTS.<br>• Personal protective equipment worn.<br>• Radiation dosimeters issued along with badges when visiting sensitive areas if necessary.<br>• Use of signs, fences, or barricades for restricted areas.<br>• Strict adherence to safety and health requirements of the Occupational Safety and Health Administration.<br>• Consultation with the Bechtel Nevada radiological field operations section to ensure |

**Table 2-8. Summary of Potential Mitigation Measures.**

| Resource | Potential Mitigation |
|---|---|
| | radiological safety of areas scheduled for construction sites, or any extreme soil disturbing activity. Should contamination be discovered at any time, work would stop, and the appropriate personnel would be contacted so that containment and clean-up would occur immediately.<br>• Hazardous materials handled, transported, stored, and disposed of according to safety recommendations (RCRA). Spills would be handled as specified by a Spill Prevention Control Plan.<br>• Refuse would be hauled to a state approved sanitary landfill or other disposal site. It would be stored appropriately prior to transport. |

- Long-Range Planning (LRP) Areas --- short-term construction impacts would result in the surface disturbance of approximately 1,713 ha (4,236 ac)[1]; long-term operational disturbance would be approximately 1,028 ha (2,542 ac).

5. Short-term construction impacts are limited to the period of construction and time required for reclamation (8 months to 5 years depending on which phases of the project are implemented).
6. Long-term operational impacts are those that are the result of project operations during the life of the project, which is expected to be a minimum of 20 years.
7. Impacts described for wind turbines include estimates for the installation of the 0.9 MW turbine or the 1.5 MW turbine, or some combination thereof.
8. Viewpoints and concerns expressed by American Indians regarding traditional cultural places are *italicized* in the text.
9. All impacts are direct unless stated otherwise

## 4.1 Land Use

### 4.1.1 Alternative 1: Proposed Action

The objectives of the National Security Mission and NTS Land Use Policy (DOE/NV 1998a,b) would be met as this proposed alternate use of the NTS would be compatible with the primary Defense Program's mission, and contribute to the overall vitality of the NTS. NTS land use zones are described in Section 3.1.2 and depicted in Figure 3-1 (digital data to show the land use zones overlain with the proposed project locations were not readily available). As described below, the developments and activities of the proposed action would be compatible with the uses in each land use zone. To ensure compatibility, coordination will be required to ensure non-interference with NNSA/NV and DOD activities.

Land use impacts resulting from the construction of new roads, transmission lines, turbine towers and substations would be compatible with all land use designations within zones that the proposed turbines would be located in, since these designations include compatible defense and non-defense research, development, and testing activities (See Section 3.1.2 for more details on land use designations) (DOE/NV 1998a,b). Land disturbance as a result of project construction is discussed in Section 4.6 under Biological Resources.

[1] Includes 318 ha (786 ac.) at West 40, 64 ha (159 ac.) at Pinnacles Ridge, 681 ha (1,683 ac.) at Pahute Mesa, 318 ha (786 ac.) at Back 40, and 333 ha (822 ac.) of transmission line area (Table 2-4).

The NNSA/NV developed criteria that define the land use zones on the NTS. The goals set for defining land resources are accomplished through the project screening and location process, where new land disturbance is minimized by 1) locating projects in previously disturbed areas, 2) using existing facilities and infrastructure, and 3) locating projects with compatible requirements together (DOE/NV 1998a). Although the development of the Land Use Zones preceded consideration of the wind farm proposal, the initial phase of the proposed project was reviewed and NNSA/NV deemed it compatible with existing missions through the NNSA Project Screening and Location Process. The proposed locations of wind turbines may be in a zone that is designated for nuclear testing; however, exact locations of wind turbines would be on the ridge tops of land features, and not in the valleys where the complex and testing areas are located.

The U.S. Air Force has concerns that the proposed action, or any of the action alternatives may cause disturbance to radio frequency transmissions that would interfere with their training operations on the NTS. Potential impacts and mitigations to training operations will be analyzed by decision makers in a classified appendix to this EIS.

#### 4.1.1.1 Shoshone Mountain

Under the Proposed Action, land use within the Shoshone Mountain Project Area would change from an area not actively used to an area used for activities associated with wind farm development and operations. There would be no impact to land use, since the proposed wind farm sites are compatible with land use designations for all areas.

Impacts are not likely to occur to the use of the tunnel complex in Area 16, as a result of the development and operation of the wind farm at Twisted/Tippipah Ridge. This is due to the location of the proposed facilities on ridges and not in the valley areas near the complex and testing areas. The Twisted/Tippipah Ridge locations could experience ground vibrations from continued use and testing of high explosives in the tunnel complex. These vibrations are not expected to result in adverse impacts to wind farm facilities because they will be constructed to meet seismic standards.

In Areas 18, 29, and 30, impacts to DOD ground training exercises are expected as a result of the construction and operation of the proposed wind farm within the Shoshone Mountain Project Area. Furthermore, restrictions to low-flying training exercises in Areas 29 and 30 would be implemented because of the proposed wind farm. Impacts on these exercises will be analyzed in a classified appendix that will be reviewed by the decision makers.

The proposed wind farm in the project area would neither impact nor be impacted by radiological control areas in Areas 18 and 30.

#### 4.1.1.2 Pahute Mesa

Land use within the Pahute Mesa Project Area would change from an area not actively used to an area used for activities associated with wind farm development and operation. There would be no impact to land use, since the proposed wind farm sites are compatible with land use designations for all areas.

No interference with NNSA/NV missions would be expected at the proposed wind farm project area due to the location of wind farm facilities on ridges and mesas and not in valleys and lower elevation areas where testing occurs. Furthermore, the proposed wind farm in the project area would neither impact nor be impacted by radiological control areas in Area 12 and 19.

### 4.1.2 Alternative 2: Shoshone Mountain

Under Alternative 2, the objectives of the NNSA/NV Strategic Plan and NTS Land Use Policy (DOE/NV 1998a,b) would be met because this proposed alternate use of the NTS would be compatible with the primary Defense Program's mission and would contribute to the overall vitality and reuse of the NTS. Compatibility of the proposed wind farm development with NTS land use zones would be the same as described for Shoshone Mountain in Section 4.1.1.

### 4.1.3 Alternative 3: Pahute Mesa

Under Alternative 3, the objectives of the NNSA/NV Strategic Plan and NTS Land Use Policy (DOE/NV 1998a,b) would be met because this proposed alternate use of the NTS would be compatible with the primary Defense Program's mission and would contribute to the overall vitality and reuse of the NTS. Compatibility of the proposed wind farm development with NTS land use zones would be the same as described for Pahute Mesa in Section 4.1.1.

### 4.1.4 Alternative 4: No Action Alternative

Under the No Action Alternative, the wind farm project would not be utilized to support the need to implement alternate uses and contribute to the overall vitality of the NTS. There would be no changes in land use at the NTS due to wind farm developments.

### 4.1.5 Potential Mitigation

Since impacts associated with all alternatives would be compatible with land use zone designations for the NTS, no mitigation would be required. Potential impacts and mitigations associated with USAF operations to their training operations will be analyzed by decision makers in a classified appendix to this EIS.

EXHIBIT B

**Hutchins, Virginia A.**

**From:** Thornton, Kevin D.
**Sent:** Monday, April 29, 2002 1:37 PM
**To:** 'mconway@globalrenewable.com'
**Cc:** Williams, Tom
**Subject:** Draft EIS for Public Review and Comment

Michele,

Kathy Carlson has decided to hold the Draft EIS here at the Nevada Operations Office until General Gordon, NNSA Administrator, has been briefed on the USAF and Special Operations Command issues. We expect General Gordon to be briefed sometime around May 10. 2002. As of now May 10 is not a firm date.

Kevin Thornton

CERTIFICATE OF FILING

I hereby certify that on October 5, 2005, a copy of the foregoing Declaration of Michelle K. Conway in Support of MNS' Motion for Partial Summary Judgment on Contract Liability was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant Delgadillo