IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 04-1569C<br><br>(Judge Wolski)<br><br>Declaration of Bryant S. Delgadillo in Support of Plaintiff MNS Wind Company LLC's Motion for Partial Summary Judgment on Contract Liability |

**DECLARATION OF BRYANT S. DELGADILLO**

I, Bryant S. Delgadillo declare as follows:

1. I am an attorney at law licensed to practice law in the State of California, and admitted to practice before this Court. I am an associate at the law firm of Kaye Scholer LLP, attorneys for Plaintiff MNS Wind Company LLC ("MNS"). I make this Declaration based on my personal knowledge and, if called upon, could and would testify to the facts stated herein. I submit this Declaration in Support of MNS's Motion For Partial Summary Judgment on Contract Liability.

2. Attached as Exhibit A is a true and correct copy of the Government's Answer to MNS's Complaint, dated February 7, 2005.

3. Attached as Exhibit B is a true and correct copy of a email from Jack Schofield to Ken Powers, dated November 7, 2000, which was produced by the Government in this matter and bates labeled G-MNS09047.

4. Attached as Exhibit C is a true and correct copy of a memorandum signed by Budd Bornhoft, Chief Counsel, Nevada Site Office, dated December 13, 2000, which was produced by the Government in this matter and bates labeled G-MNS08203-04.

5. Attached as Exhibit D is a true and correct copy of a memorandum from Richard Bradshaw, Special Assistant, Office of Energy Efficiency and Renewable Energy to Madelyn Creedon, Deputy Administrator, National Nuclear Security Agency, dated December 15, 2000, which was produced by the Government in this matter and bates labeled G-MNS01569-71.

6. Attached as Exhibit E is a true and correct copy of a memorandum from Kathleen A. Carlson, Manager, Nevada Operations Office, Department of Energy, National Nuclear Security Administration to John A. Gordon, Administrator, National Nuclear Security Administration, which was produced by the Government in this matter and bates labeled G-MNS09010-12.

7. Attached as Exhibit F is a true and correct copy of a memorandum from Kathleen A. Carlson, Manager, Nevada Operations Office, Department of Energy, National Nuclear Security Administration to John A. Gordon, Administrator, National Nuclear Security Administration, which was produced by the Government in this matter and bates labeled G-MNS08993-09001.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5 day of October 2005, at Los Angeles, California.

Bryant S. Delgadillo

EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 04-1569C<br>(Judge Horn) |

**DEFENDANT'S ANSWER**

For its answer to the complaint, defendant, the United States, admits, denies or alleges as follows:

1. Admits the allegations contained in the first and second sentences of paragraph 1. Denies the allegations contained in the third sentence of paragraph 1, but alleges that the mission of the United States Department of Energy's ("DOE") Nevada Test Site ("NTS") after the 1992 moratorium on testing including testing readiness, "subcrits" testing (testing of nuclear weapons which do not reach criticality – i.e., no uncontrolled, sustained nuclear reaction), and the continuation of national defense related activities. Admits the allegations contained in the fourth and fifth sentences of paragraph 1 to the extent supported by the decision cited, which is the best evidence of its contents.

2. Denies the allegations contained in the first sentence of paragraph 2, but alleges that one of the Federal Government's interests is to increase electrical power generation in areas of the country commonly referred to as the "West". Admits the allegations contained in the second sentence of paragraph 2 to the extent supported by the legislation cited, which is the best

evidence of its contents.

3. Denies.

4. Denies, but alleges that the Nevada Test Site Development Corporation ("NTSDC") is a designated community-reuse organization, in accordance with Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), funded, in part, by the United States Department of Energy ("DOE).

5. Admits the allegations contained in the first sentence of paragraph 5, except denies the allegation that the proposed project would "support the growing need and Nevada mandate of alternative sources of renewable energy," for lack of information sufficient to formulate a response. Denies the allegations contained in the second sentence of paragraph 5, but admits that the project would further DOE's objective of restoring jobs lost after the moratorium on critical nuclear testing went into effect.

6. Admits the allegations contained in the first sentence of paragraph 6 to the extent supported by the agreements cited, which are the best evidence of their contents. Denies the allegations contained in the second sentence of paragraph 6 that "DOE touted" the proposed project as vague, but admits that DOE did issue a press release announcing the agreement.

7. Denies the allegations contained in the first sentence of paragraph 7 for lack of information sufficient to formulate a response. The allegations in second sentence of paragraph 7 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

8. Denies the allegations contained in the first sentence of paragraph 8. Denies the allegations contained in the second sentence of paragraph 8 for lack of information sufficient to formulate a response.

9. The allegations contained in paragraph 9 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

10. Denies for lack of information sufficient to formulate a response.

11. Admits.

12. ,Denies the allegations contained in the first sentence of paragraph 12. The allegations contained in the second sentence of paragraph 12 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

13. Denies the allegations contained in the first sentence of paragraph 13. Admits the allegations in the second sentence of paragraph 13, that DOE provided wind data from the NTS, but otherwise denies the allegations in the second sentence of paragraph 13 for lack of information sufficient to formulate a response.

14. Admits the allegations contained in the first sentence of paragraph 14 to the extent supported by the easement ("Easement") cited, which is the best evidence of its contents. The allegations contained in the second sentence of paragraph 14 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

15. Admits the allegations contained in the first and second sentences of paragraph 15 to extent supported by the subeasement ("Subeasement") and compensation agreement cited, which are the best evidence of their contents. Admits the allegations contained in the third sentence of paragraph 15 that DOE executed a written consent approving the terms of the Subeasement, but denies the allegation that DOE executed a written consent approving the terms of the

compensation agreement.

16. Denies the allegations contained in the first and second sentences of paragraph 16 as vague, as plaintiff have failed to identify specifically which person or persons on behalf of DOE "expressed concerns," when those expressions or statements were made, and the precise content of those alleged concerns or statements; but defendant admits that various negotiation discussions were held between various representatives of DOE, NTSDC, and plaintiff prior to the execution of the Easement. Denies the allegations contained in the third sentence of paragraph 16 for lack of information sufficient to formulate a response.

17. Admits to the extent supported by agreement referred to, which is the best evidence of its contents.

18. Admits to the extent supported by agreement referred to, which is the best evidence of its contents.

19. Admits to the extent supported by agreement referred to, which is the best evidence of its contents.

20. Denies. In addition, defendant alleges that plaintiff previously filed suit in 2003 in the United States District Court for the District of Nevada, MNS Wind Company, LLC v. United States Dept. of Energy, Case No. CV-S-03-0952, KJD-LRL (D.C. Nev), seeking, among other things, an order compelling defendant to engage in mandatory arbitration. On September 23, 2004, the United States District Court for the District of Nevada entered an order in that case granting defendant's motion to dismiss on the ground that the government was not required to engage in mandatory arbitration with the plaintiff.

21. Admits to the extent supported by the agreements cited, which are the best evidence

of their contents.

22. Admits the allegations contained in the first sentence of paragraph 22 to the extent supported by the Easement cited, which is the best evidence of its contents. Denies the allegations contained in the second sentence of paragraph 22 that the copy of the Easement attached to the complaint is "a true and correct copy" of that document because it appears that one or more its pages are missing. Accordingly, defendant reserves the right to provide or introduce a true and correct copy of the document.

23. Admits to the extent supported by the Easement cited, which is the best evidence of its contents.

24. Admits to the extent supported by the Subeasement cited, which is the best evidence of its contents.

25. Admits to the allegations contained in paragraph 25 to the extent supported by the compensation agreement cited, which is the best evidence of its contents. Denies the allegation that compensation agreement attached to the complaint is "a true and accurate copy" of that document because, on its face, it appears that at least one of its pages is missing.

26. Denies, but alleges that DOE representatives, on or about January 17, 2001, executed a document titled "Consent of Master Permittor," which is best evidence of its contents. A true and accurate copy of that document is attached as Exhibit D to plaintiff's complaint.

27. The allegations contained in paragraph 27 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the agreements cited, which are the best evidence of their contents.

28. Admits to the extent supported by the Easement cited, which is the best evidence of its contents.

29. The allegations contained the first sentence of paragraph 29 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the Easement cited, which is the best evidence of its contents. Defendant specifically denies the second sentence of paragraph 29.

30. Admits to the extent supported by the Subeasement cited, which is the best evidence of its contents.

31. The allegations contained in paragraph 31 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the Easement cited, which is the best evidence of its contents.

32. Admits the allegations in the first sentence of paragraph 32 to extent supported by the Easement cited, which is the best evidence of its contents. Denies the second sentence of paragraph 32 for lack of information sufficient to formulate a response.

33. Admits the first and second sentence of paragraph 33 to the extent supported by the Easement cited, which is the best evidence of its contents. Denies the third sentence of paragraph 33 for lack of information sufficient to formulate a response.

34. Denies for lack of information sufficient to formulate a response, but alleges that defendant was aware that plaintiff took certain steps to develop the project, including wind assessment and initiating the steps necessary to comply with the requirements of the National

Environmental Policy Act, 42 U.S.C. §4321 *et seq.* ("NEPA").

35. Denies the allegations contained in the first sentence of paragraph 35. Denies the allegations contained in the second sentence of paragraph 35 for lack of information sufficient to formulate a response. Denies the allegations contained in the third sentence of paragraph 35.

36. Admits the allegation contained in the first sentence of paragraph 36 that plaintiff requested permission from DOE in 2001 to develop additional sites within the National Test Site; otherwise the allegations in the first sentence of paragraph 36 are legal conclusions and plaintiff's characterizations of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the Easement cited, which is the best evidence of its contents. Denies the allegations contained in the second sentence of paragraph 36.

37. Admits the allegations contained in the first sentence of paragraph 37 to the extent supported by the Easement cited, which is the best evidence of its contents. The second and third sentences of paragraph 37 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the statutes and regulations referred to, which are the best evidence of their contents. Admits the fourth sentence of paragraph 37 to the extent supported by the Subeasment cited, which is the best evidence of its contents.

38. Admits the allegation contained in the first sentence of paragraph 38 that plaintiff undertook a NEPA study, but denies the introductory phrase "[w]ith this understanding," for lack of information sufficient to formulate a response. Denies the allegations contained in the second sentence of paragraph 38, but alleges that, at least, one draft Environmental Impact Statement

("EIS") had been prepared by a contractor and that such draft was being reviewed by DOE and it had not been published for public comment. Admits the third sentence of paragraph 38 to the extent supported by the draft EIS, which is the best evidence of its contents. Denies the fourth sentence of paragraph 38 for lack of information sufficient to formulate a response.

39. Admits to the extent supported by the letter cited, which is the best evidence of its contents.

40. Admits to the extent supported by the letter cited in paragraph 39, which is the best evidence of its contents.

41. The allegations contained in paragraph 41 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

42. Admits the allegations contained in the first sentence of paragraph 42 to the extent supported by the Easement cited, which is the best evidence of its contents. The allegations contained in the second, third, and fourth sentences of paragraph 42 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

43. The allegations contained in paragraph 43 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

**COUNT I (BREACH OF CONTRACT)**

44. Defendant's responses, above, to the allegations contained in the cited paragraphs are incorporated by reference.

45. Denies.

46. Denies.

47. Denies the allegations that contained in paragraph 47 that "MNS has made several demands" as vague, but admits that plaintiff has made certain demands of defendant, all of which were and are without merit.

48. The allegations contained in paragraph 48 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

49. Denies.

**COUNT II (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

50. Defendant's responses, above, to the allegations contained in the cited paragraphs are incorporated by reference.

51. The allegations contained in paragraph 51 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the agreements cited, which are the best evidence of their contents.

52. Admits the allegation contained in the first sentence of paragraph 52, that DOE assigned a full-time employee to the NTS project, one Kevin Thorton; otherwise denies the allegations contained in the first sentence of paragraph 52. Denies the second sentence of paragraph 52, but alleges that Mr. Thornton was responsible for monitoring and facilitating all MNS-related activity on the NTS. Denies the third sentence of paragraph 52, but alleges that Kevin Thornton functioned in an administrative/facilitative capacity at the meetings (i.e.,

overseeing agenda, minutes, etc.). Admits the fourth sentences of paragraph 52.

53. Admits.

54. Admits to the extent supported by the Easement cited, which is the best evidence of its contents.

55. Denies the allegations contained in the first sentence of paragraph 55 that "MNS proceeded with development of the NTS" as vague; alleges that defendant was aware that plaintiff took certain steps to develop the project, including wind assessment and initiating the steps necessary to comply with the requirements of NEPA. Admits the allegations contained in the second sentence of paragraph 55 to the extent supported by the draft EIS cited, which is the best evidence of its contents.

56. Denies the allegations contained in the first and second sentences of paragraph 56 for lack of information sufficient to formulate a response. Admits the third sentence of paragraph 56 to the extent supported by the power purchase agreement cited, which is the best evidence of its contents. Denies the allegations contained in the fourth through seventh sentences of paragraph 56 for lack of information sufficient to formulate a response.

57. Admits the allegations contained in the first sentence of paragraph 57 to the extent supported by the letter cited, which is the best evidence of its contents. The allegations contained in the second sentence of paragraph 57 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

58. Denies the allegations contained in the first sentence of paragraph 58, but alleges that during the NEPA process the Air Force, which controls landspace adjoining DOE's National Test

Site raised concerns regarding potential adverse impacts the wind power project may have had on Air Force operations. Denies the allegations contained in the second sentence of paragraph 58.

59. Denies.

60. Denies the allegations contained in the first sentence of paragraph 60. The allegations contained in the second sentence of paragraph 60 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

61. Denies the allegations contained in first sentence of paragraph 61, but alleges that MNS did supply several studies from other wind farm locations in an attempt to establish that the wind farm project proposed for the NTS would not adversely affect Air Force operations. Denies the second sentence of paragraph 61 for lack of information sufficient to formulate a response. Denies the allegations contained in the third sentence of paragraph 61.

62. Admits the allegations contained in the first and second sentences of paragraph 62 to the extent supported by the communications cited, which are the best evidence of their contents. Admits the allegations contained in the third sentence of paragraph 62 to the extent supported by the termination cited, which is the best evidence of its contents.

63. Denies.

64. Denies.

65. Denies.

66. Denies.

67. Denies.

**COUNT III (ESTOPPEL)**

68. Defendant's responses, above, to the allegations contained in the cited paragraphs are incorporated by reference.

69. Denies as vague as plaintiff has failed to identify specifically which person or persons on behalf of MNS "consistently informed" DOE of certain matters as alleged in paragraph 69; but defendant admits that various negotiation discussions were held between various representatives of DOE, NTSDC, and plaintiff prior to the execution of the Easement.

70. The allegations contained in the paragraph 70 are legal conclusions and plaintiff's characterizations of its case, to which no response is required; to the extent they are deemed allegations of fact, they are admitted to the extent supported by the Easement cited which is the best evidence of its contents.

71. Denies the first sentence of paragraph 71, but alleges that the reason DOE terminated the NEPA process is stated in the July 12, 2002 letter from DOE to NTSDC, which is the best evidence of its contents (see paragraphs 39-40, above). Denies the second sentence of paragraph 71.

72. Denies.

73. Denies the allegations contained in paragraph 73 for lack of information sufficient to formulate a response.

74. Denies.

75. Denies.

76. Denies the allegations contained in the first sentence of paragraph 76. Denies the allegations contained in the second sentence of paragraph 76, but alleges that defendant was

aware that plaintiff took certain steps to develop the project, including wind assessment and initiating the steps necessary to comply with the requirements of the NEPA.

77. The allegations contained in paragraph 77 constitute legal conclusions and plaintiff's characterization of its case, to which no response is required; to the extent they are deemed allegations of fact, they are denied.

78. Denies.

79. Denies that plaintiff is entitled to the relief requested in the four "WHEREFORE" subparagraphs immediately following paragraph 78, or to any relief whatsoever.

80. Defendant denies each and every allegation contained in the Complaint that has not been specifically admitted above (specifically including headings and subheadings).

WHEREFORE, defendant respectfully requests the Court enter judgment for defendant, dismiss the complaint, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
PAUL MICHAEL
Office of Counsel
Department of Energy
Washington, D.C.

SHARON HEJAZI
Office of Chief Counsel
NNSA/ Nevada Site Office
Department of Energy
Las Vegas, NV
February 7, 2005

CERTIFICATE OF FILING

I hereby certify that on February 7, 2005, a copy of the foregoing "DEFENDANT'S ANSWER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee
BRYANT G. SNEE

EXHIBIT B

**Robertson George Civ AF/TEZ**

**From:** Schofield, Jack C. Col.
**Sent:** Tuesday, November 07, 2000 1:32 PM
**To:** Powers, Ken W.
**Cc:** Johnson, Glen Lt. Col
**Subject:** WREN

Ken - got an official update from my AF brothers yesterday on the wind turbines. Although most of the information is classified I can offer this.

"Placement of any wind turbines on the crest or eastern slope of the Shoshone/Rainier/Pahute Mesa ridge would cause significant data corruption of a USAF $100M investment."

Basically, no turbines within Line of Sight (LOS). The Skull Mountain site should not cause any problems nor should any systems below the ridge and on the western slope of the S/R/PM ridge line.

Is there anyway that we could use some sort of "test" system to confirm placement before the permanent systems?

If you'd like the classified information, let me know and I will set up a meeting.

Jack

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

| Tracking: | Recipient | Read |
|---|---|---|
| | Powers, Ken W. | Read: 11/7/2000 3:22 PM |
| | Johnson, Glen Lt. Col | Read: 11/7/2000 1:36 PM |

G-MNS09047

EXHIBIT C

Office of Chief Counsel – Notes on Concurrence December 13, 2000
Easement for Wind Generation with NTS Development Corporation

I have concurred in the easement document that grants use of the NTS for the construction and operation of a commercial wind powered electric generating facility. The proposed document, however, varies in several substantial respects from prior documents we have used to permit commercial activities at the NTS. Because of uncertainties concerning DOE's authority to grant real estate interests in the withdrawn lands comprising the NTS, we have previously granted only revocable use permits for commercial activities at the NTS. This document is a non-revocable easement for a term of 35 years. Such a non-revocable document for an extended term is essential to secure commercial funding if this activity is to proceed. While I think that DOE has the legal authority under Section 161q. of the Atomic Energy Act of 1954, as amended, to grant a 35 year easement in withdrawn lands under DOE's control, that opinion may not have universal acceptance, particularly within the Department of Interior (DOI) who issued the public land orders comprising the NTS.

In addition to the issue of DOE's authority to grant a non-revocable easement, the binding nature of a non-revocable instrument involves some significant consequences that we have previously avoided or mitigated with a revocable permit. Given DOE's mission at NTS, DOE must retain the ultimate control of activities at the site. In prior permits, that control can be exercised through the administrative approvals required in the permit and by virtue of the fact that the commercial organization assumes the financial risk of termination in the event of an unalterable conflict between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operation of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government.

Issues can also be raised that the proposed commercial activity is inconsistent with the purpose for which the public lands comprising the NTS were withdrawn. DOE is currently in a consultation process with DOI on the issue of other uses at the NTS. We do not view the subject commercial activity as inconsistent with, or limited by, the purpose for which the NTS was created.

As with the use permit for the Desert Rock Sky Park (see attached Note to Ladder dated May 24, 2000), this document likewise does not conform to the current guidance that Headquarters has issued for the conduct of 3161 activities. As indicated in the prior Note, we have not been informed that the guidance document is other than advisory in nature. The comments in that Note are also relevant to this action.

Budd Bernhoft
Chief Counsel

**Note to Ladder** May 24, 2000

The proposed Use Permit conforms to the prior Use Permits granted by NV to Kistler and Fluid Tech. However, since those actions there have been some changes to the 3161 program that should be noted in connection with this action. Four issues have been identified: (1) the August 1999 DeGrasse guidance memo; (2) occupational safety and health oversight; (3) the Mitchell (BN)/Johnson (NV) memo on use of BN services for 3161 activities; and (4) consultation with Department of Interior on NTS activities.

The first issue is most problematic. DeGrasse initially developed a fairly non-restrictive 3161 policy which we followed in developing the first two permits. Apparently as a result of some problems with privatization activities at other sites, the August 1999 guidance memo was issued (with extensive input from EH). We are not in conformance with that guidance for this action. The guidance, which involves extensive coordination with HQ and EPA and prohibits non-DOE activities until oversight responsibility is transferred to an external regulator, is a 180 from the prior policy, and compliance, if even achievable, would require an extensive amount of time. The guidance is poorly written and not well thought out. Since the guidance reads like mandatory policy, we sought some clarification as to its intent. No one is willing to say it is any more than guidance. Thus, we are presumably free to deviate from it. Given that this is an uncertainty in the equation, management must weigh the risk of proceeding with an action that does not conform to guidance versus a significant delay or not proceeding at all.

Even if we deviate from the guidance memo on external regulation, we must still assure that we have an effective oversight plan for occupational safety and health pending assumption of that function by OSHA. I recollect that the Department of Labor recently agreed to assume oversight for privatized activities once DOE notified them of the activities and the change in jurisdictional status was published in the Federal Register. So, while a process may be in place, it will take some time and perseverance to put in effect for NTS commercial activities.

I don't have a copy of the Mitchell/Johnson memo, but if we intend to apply the policy in that memo regarding use of BN services to this action, someone should determine if Exhibit A to the Use Permit conforms to that policy.

The final issue is not so much a problem, but rather a factor that should be considered by management. Both the State of Nevada and the BLM have questioned whether some NTS activities conform to the purposes for which the NTS was withdrawn from the public domain. In view of these concerns and as part of a settlement agreement with the State of Nevada, DOE has been consulting with the Department of Interior on this issue. In a paper provided to DOI, the Desert Rock Sky Park was described. While we think the Sky Park is consistent with the type of activities that should be permitted at the NTS, there is always the possibility that such an activity will be challenged.

Budd Bornhoft
Chief Counsel

EXHIBIT D

December 15, 2000

**MEMORANDUM TO:** **Madelyn Creedon, Deputy Administrator**
**National Nuclear Security Agency**

**FROM:** **Richard Bradshaw, Special Assistant**
**Office of Energy Efficiency and Renewable Energy**

**THROUGH:** **Dan Reicher, Assistant Secretary**
**Office of Energy Efficiency and Renewable Energy**

**SUBJECT:** **NEVADA TEST SITE WIND GENERATION FACILITY**

We understand that on the agenda for your meetings early next week in Las Vegas will be the topic of NNSA approval of an agreement between NVOO and the Nevada Test Site Development Corporation (NTSDC), on behalf of M&N Wind Power, to grant an easement for use of NTS lands (approx. 250 acres) for construction of a wind turbine power generation facility. These background points are meant to familiarize you with the history, issues, and opportunities relating to the agreement and the project.

BACKGROUND:

The initial proposition to NVOO encompassed a 600 MW facility on NTS land, via a land-use transfer to NTSDC as agent for the WREN consortium, composed of:

- 200+ MW of wind generation
- 250 MW of natural gas turbine generation
- 160 MW of solar trough generation

The initiation of phases 2 and 3 of the project are dependent upon the installation of the full 200+ MW of wind generation, which will permit the facility to offer "blended" gas/renewable baseload power for sale. In turn, the construction of the solar farm–whose role is supply peaking power supplies during daylight–is dependent upon the prior construction of the wind and gas facilities in order to offset the higher costs of solar generation.

Negotiations between NTS/NVOO, NTSDC, and M&N Wind Power Company (on behalf of the WREN consortium, including El Paso Energy and Duke Solar) began over six months ago. The wind portion of the combined facility originally envisioned three distinct sites at NTS, **all approved by NVOO early in the negotiations process** as available for the construction of wind turbines and transmission lines. The largest of these sites (120 MW) was on Paiute Mesa on the north end of the NTS. The second largest (85 MW) was on Shoshone Mtn. A third site was on a ridge line between Paiute Mesa and the Nellis AF bombing range—this site was ruled out by security considerations about halfway through the negotiations.

Since August 2000, M&N Wind Power has spent approximately $150,000 to ere t a dozen wind anemometers to measure wind speed at the three locations. They were required by NVOO to employ Bechtel as the contractor, at hourly rates significantly higher than local construction contractors whom M&N preferred to use. M&N has spent an additional $350,000 to employ NTS Development Corporation as its intermediary agent and to cover a preliminary Environmental Assessment, as well as estimates of needed transmission upgrades at the Test Site. M&N has made a $500,000 investment in the project to date.

By mid-November, negotiations were nearly complete, with a near-final draft document covering the land use transfer and construction and operation of the wind facility. In the document, M&N Wind had agreed to supply the Test Site with up to 20 MW of "green" wind electricity, at a 10% discount from market rates for 20+ years (an exceedingly good deal for DOE in a growing market for green power). M&N Wind also agreed to comply with all national-security related restrictions and covenants demanded by NTS, including the use of Bechtel as contractor for some aspects of construction and subsequently for emergency repairs to the transmission lines and substations.

However during mid-December, NTS negotiators introduced several demands/restrictions that were not on the table previously, and which seriously jeopardize the ability of M&N Wind to construct the project. Chief among them is the reversal of NTS' prior approval of Paiute Mesa as a site for wind turbines (Paiute was to be the main site for 120MW of generation). No reason was given to M&N and NTSDC other than unspecified national security objections raised by the Air Force. (One has to ask why NVOO did not consult the Air Force about Paiute Mesa when it ruled out, early in the process, a third potential location at NTS based upon Air Force objections.)

NVOO negotiators have been reluctant to provide written assurance that M&N Wind will be able to secure alternate sites at NTS in sufficient quantity to match the sites at Paiute that they are being required to concede. Thus the project–in effect–has been scaled back to 85 MW from the original 600 MW, since planning for the gas and solar components of the project cannot proceed without assurance that the full 200 MW of wind generation will be in place. Additionally, NVOO is now resisting a clear, and limited, delineation of the types of work that will have to be contracted by M&N to Bechtel, as opposed to outside (less expensive) contractors.

These two uncertainties seriously jeopardize M&N's ability to retain financing for the project and to meet its obligation to other WREN partners, since the economic viability of first, gas, and then solar components depends on the full build-out of the wind farm and on keeping construction and maintenance costs down at a reasonable and predictable level.

The ability of NTSDC and of M&N WindPower Company to continue negotiations, in the face of repeated revisions to a near-final land use agreement, is in doubt; M&N's deadline for beginning construction is 1 Jan 01, and its financial partners are indicating that the economics of the project are now looking unfavorable—due largely to concessions requested by NVOO and the Test Site.

We understand that Kathy Carlson has a document ready for signatures, and to which NTSDC and M&N Wind Power have acquiesced. She has indicated her strong personal support for the project, as has her deputy; however, they apparently have encountered strong resistance from

senior personnel within the NVOO/NTS structure, who have insisted on the latest restrictions as conditions for project approval. The latest draft document represents the absolute minimum to which the private sector partners and NTSDC can agree; any further revisions demanded by NVOO and the project will be dead.

Moreover, there must also be a clear acceptance by NVOO that this represents only the first phase of the entire gas/wind/solar facility; that NTS' 10% discount on power is predicated upon the economics of the entire facility, and not just the one-eighth represented by the first phase (wind) of the project, and that NVOO/NTS must be committed to approving–in the near future—locations for the wind machines displaced from Paiute Mesa.

EERE and NTSDC have invested heavily in this project, to show that national security objectives and renewable energy objectives are not incompatible, that they can coexist at NTS and lead to an increased acceptance of both. If, after all this work, DOE's own bureaucratic infighting and stove piping prevents us from moving ahead with what would be the largest single renewable energy facility in the U.S., on DOE lands, it will be a major blow private to sector willingness to partner with the Federal government to build new power generation capacity on Federal lands (over two-thirds of all landholdings in the West). The signal to the private sector, that DOE enthusiastically supports renewable power generation to the point of assisting its deployment on Federal lands, cannot be underestimated in importance. If DOE cannot be a genuine partner in this project, in a way that makes economic sense for the developers, the agency risks becoming irrelevant to the issue of building more "clean" power generation capacity in the West.

If the project goes forward, it will be the first of a large number of private power facilities in the West designed explicitly to meet the needs of California and other rapidly growing electricity demand centers, like Las Vegas, with cleaner, renewable power. If it fails, construction of new, cleaner power generation in the West is certainly going to lag further behind demand and growth.

Finally, the Nevada Test Site Development Corporation has devoted a major investment of resources, time, and credibility to the success of this project. If the project does not succeed, or is crippled, due in large part to re-design, downsizing, and higher construction and operations costs imposed by NVOO's demands, the negative impact on NTSDC will be significant. As the designated "community reuse organization (CRO)" for the NTS, the whole rationale for the Development Corporation is to stimulate economic diversity and new jobs through the re-development of excess DOE property. In this instance, if the NTSDC cannot succeed with a project that inevitably would become a "showcase" for high-tech growth while supplying critically important new power for the region, the whole notion of a CRO for the Test Site would be called into question—and along with it, Senator Reid's commitment to and support for diversification at the Test Site.

EXHIBIT E

MEMORANDUM FOR THE ADMINISTRATOR

FROM: Kathleen A. Carlson
Manager, Nevada Operations Office
Department of Energy/National Nuclear Security Administration

SUBJECT: Pre Decision Daft Environmental Impact Statement (DEIS) for the Proposed Wind Farm at the Nevada Test Site.

ISSUE: The Pre Decision Daft Environmental Impact Statement for the Proposed Wind Farm at the Nevada Test Site. is attached for your approval to release for public review and comment.

BACKGROUND: DOE has received a proposal from Global Renewable Energy Partners (GREP) to develop, operate, and maintain a wind farm at the NTS to help fulfill a national need for additional electrical energy generation. The purpose of the proposed facilities would be to provide a viable renewable energy source.

As the Federal agency charged with operating and managing the NTS, DOE, in October 1996, prepared a site-wide EIS for the site, "Final Environmental Impact Statement for the Nevada Test Site and Off Site Locations in the State of Nevada" (DOE/EIS 0243). The Record of Decision (ROD) for that site-wide EIS stated: "This decision will result in the continuation of the multipurpose, multi-program use of the Nevada Test Site, under which DOE will pursue a further diversification of interagency, private industry, and public-education uses while meeting its Defense Program, Waste Management, and Environmental Restoration mission requirements." related facilities. One of the methods DOE uses to implement this Congressional direction was to establish local Community Reuse Organizations (CROs) to assist economic development efforts. The CRO for the NTS is the NTS Development Corporation (NTSDC). Among other things, section 3161 authorized DOE to encourage private sector economic development at DOE sites and facilities. The NTS site-wide EIS ROD indicates that as part of its decision, DOE would continue to support ongoing program operations and pursue diversification of use to include non-defense and private use. The proposed wind farm would be a private sector enterprise located on the NTS. The development of the facilities would be authorized pursuant to an easement issued by NNSA, Nevada Operations Office (NV) to NTSDC, and a subsequent sub-easement from NTSDC to MNS, subject to NNSA/NV approval.

In November 2000, NNSA/NV began preparation of an environmental assessment (EA) for the proposed project. A public scoping meeting for the EA was held in Pahrump, Nevada, at that time. The Draft EA was provided for review and comment to Nevada State agencies, other Federal agencies, affiliated American Indian tribes, and other interested parties in March 2001. Several issues were raised by the commentors including the

surrounding NTS land use, inadequacy of current power distribution systems, and the potential impacts on cultural and biological resources at the proposed sites and the need to gather additional information on these concerns. Based upon its analysis, NNSA/NV has determined that an EA would not support a Finding of No Significant Impact and, therefore, pursuant to the National Environmental Policy Act (NEPA) of 1969, as amended (42 USC 4321 et seq.), and DOE Regulations Implementing NEPA (10 CFR Part 1021), DOE/NNSA decided to prepare an EIS for the Proposed Wind Farm at the NTS. The Wind Farm EIS will evaluate the environmental impacts associated with the proposed construction and operation of a wind turbine farm at the following alternative locations: (1) Pahute Mesa and the Shoshone Mountain area (the Preferred alternative) on the NTS; (2) Shoshone Mountain project area on the NTS; and (3) Pahute Mesa project area on the NTS. The EIS also evaluates the no-action alternative of not establishing a wind farm at the NTS.

The NNSA will invite members of Congress, American Indian Tribal Governments, state and local governments, other Federal agencies, and the general public to provide comments on the Wind Farm Draft EIS.

DISCUSSION: Under this proposal, the National Nuclear Security Administation, Nevada Operations Office (NNSA/NV) would allow the NTSDC and GREP to construct, operate and maintain a wind farm at the Nevada Test Site. This proposal, if fully implemented, would consist of up to 545 wind turbines generating up to 510 megawatts of electricity. The wind farm would be constructed on approximately 4,813 hectares (ha) (11,894 acres (ac.)) within designated areas of the NTS. The Wind Farm DEIS addresses potential environmental impacts of the construction, operation and maintenance of a wind farm on the NTS. Alternative actions for the proposed project would consist of construction of a wind farm with two areas of the NTS. Alternative 1 (Proposed Action) includes construction of a wind farm within the Shoshone Mountain and Pahute Mesa project Areas. Alternative 2 is the Shoshone Mountain area only and Alternative 3 the Pahute Mesa project area only. Also considered is the No Action Alternative.

The Draft Environmental Impact Statement has been reviewed by staff from the Offices of Defense Programs; Environment, Safety and Health; and General Counsel. All comments have been resolved as reflected in the attached document.

SENSITIVITIES: The United States Air Force (USAF) has expressed concerns over the operational impact of this project on the Test and Training Missions of the USAF at the Nellis Test and Training Range. They are preparing a classified appendix for this Environmental Impact Statement. They have expressed a desire to hold the release of this Draft EIS for public review

and comment until the classified appendix is complete.

RECOMMENDATION: That the Administrator Approve the Daft Environmental Impact Statement for the Proposed Wind Farm at the Nevada Test Site for release for public review and comment contingent on resolution of the USAF mission conflicts.

APPROVE:

DISAPPROVE:

DATE:

Attachment

EXHIBIT F

**Memorandum to**: General John Gordon

**From**: Kathleen Carlson

**Subject**: Air Force concerns with the proposed Wind Turbine Generation Project at the Nevada Test Site

**Action Required**: Decision to implement the easement allowing development of a wind farm at the Nevada Test Site or to request that Project Proponent terminate project.

**Issue**: Since the inception of the Wind Generation project, as a result of more precise engineering data being made available by the project proponent (M&N Wind/WREN/MNS Windpower/Global Renewable Energy Partners), and because of changing and evolving U.S. Air Force mission needs among the tenants and users of the Nevada Test and Training Range (NTTR), it would appear that Wind Generation operations can not be conducted on the NTS without causing major disruptions to vital National Security operations conducted on the Nellis Range.

Of primary concern to the Air Force are the impacts to NTTR missions within the ranges surrounding the Nevada Test Site (NTS). Some of these mission capabilities are unique to the NTTR and may cause major impacts to National Security. Theoretically, these disruptions will be created by the radio frequency (RF) interference created by the wind turbines when they are highlighted by ground based and airborne radar emissions. This interference contaminates the RF environment (RF pollution) and hinders the Air Force's capabilities to assess the military worth of technologies, and operational readiness of aircrews.

Degradation of the Air Force's capability to test and train within the NTTR will result in an unacceptable level of risk in determining the survivability of aircrews and could result in higher attrition of critical military resources.

Specific issues are:

Radio Frequency (RF) reflective characteristics of the towers, nacelles and blades. This will cause significant background noise on the NTTR tracking system reducing their ability to provide accurate tracking and testing of aircraft on the range

RF line-of-sight (including local propagation anomalies) of the farms to NTTR radar/receiver pad locations will interfere with the USAF ability to train pilots in a realistic environment.

Reflected RF effects on NTTR receivers and subsequent effects on the Red Flag Kill Chain based on receiver interference.

**Current Status**: The project proponent continues to collect wind data at approximately 30 anemometer sites on the NTS. These anemometer sites are located in the Shoshone Mountain Area (Areas 29,30) and the Pahute Mesa Area (Area 19).

The environmental consultant continues to draft an Environmental Impact Statement along with reports based on the cultural resource surveys performed. The Draft EIS is due out for public review and comment in May. Final Record of Decision could be by mid summer.

The project proponent has invested approximately $2,000,000 on engineering and environmental studies. The project proponent continues to expend funds.

An Air Force, DOE and Laboratory (SNL) technical team is currently analyzing engineering issues, myths and "feelings." The team will attempt to determine whether engineering or operational resolutions are feasible.

**Options:**

1.) Continue with wind data gathering and environmental studies for the project as described in the Alternatives of the EIS. Perform an independent analysis of the USAF position with recommendations for mitigating the interference. Have USAF provide a classified appendix to the EIS. Make the EIS Record of Decision the decision document.
2.) Provide NTS Development Corporation and the project proponent with a formal letter explaining that development of this project will be limited to the area described in the December 22, 2000 Easement. (Phase One) Allow the project proponent to continue with the necessary NEPA and cultural resource activities required for construction.
3.) Following joint AF/NNSA discussions with Senator Reid, Air Force and the NNSA provide the NTS Development Corporation and the project proponent with a letter explaining that development of the project will not be allowed to go forward. AF/NNSA publicly announce that the increased tempo of activities at Nellis and the NTS have made the Wind Farm activities incompatible with those operations.

**Sensitivities:** This project has received considerable support from Senator Reid and key staff. The original permit for this project was signed in Washington D.C. with much fanfare and a number of dignitaries including yourself and the Secretary of Energy present. Much was made of the "Renewables Project Located on a DOE Weapons Site."

Additionally, local news media has given this project coverage. This includes recent coverage of the local utility's plans to purchase power from this project. MNS Wind proponents will continue to "ratchet up" political pressure to move forward with this project through news releases and briefings to local political leaders.

The Secretary of the Air Force has recently been briefed by project consultants on these issues as well as related political issues involving Senator Reid's support for this project as well as Nellis Air Force Base.

Wind data for the original easement area (Phase One) has not shown a sufficient wind regime to support an economically viable project.

Successful implementation of this project would provide considerable benefit to the NTS Development Corporation allowing them to continue with economic development activities in Southern Nevada. NNSA and some Air Force activities would receive considerable amounts of free electrical power as a royalty for the easement.

Though the easement granted to the project proponent is legally defensible by the government, it is likely that if project is cancelled, the project proponent will seek compensation for losses and attempt to prevail on Senator Reid to support AF or NNSA to provide these funds

Texan, President Bush political supporter and entrepeneur T.Boone Pickens has acquired a majority interest in this project.

Appendix 1 Chronology

Appendix 2 Draft Correspondence
K.Carlson/MG Pearson (Edwards)
K.Carlson/MG Johnston (Nellis)

**Appendix 1**

**Chronology:**

July 2000 – NTSDC and M&N Wind approached the Nevada Operations Office about establishing a Wind Farm on the Nevada Test Site. Initial interest was in the Shoshone Mountain Area.

31 Jul 2000 - Email from Col Schofield to Col Cazessus and Yvonne Gresnick re: Kathy Carlson request to meet with Col Cazessus about wind turbines on NTS.

10 August 2000 - M&N Wind received approval from SUD Working Group to begin collecting wind data in at Shoshone Mountain, Skull Mountain and Pahute Mesa.

12 October 2000 – Notice of Intent to prepare an Environmental Assessment for the Wind Farm

17 Oct 2000 - Email from Col Schofield to Kevin Thornton requesting electronic copy of WREN brief. Received and forwarded to Col Cazessus, Col Hopper, Yvonne Gresnick

31 Oct 2000 - Email from Col Schofield to Kathy Carlson, Jay Norman, Tom Williams. Relay concerns from AF. Pahute/Rainer Mesa not good. No problems with Shoshone or Skull. Problems are electronic interference.

7 Nov 2000 - Email from Col Schofield to Ken Powers. Official update from AF. Placement on crest or eastern slope of Shoshone/Rainier/Pahute Mesa ridge would cause significant data corruption of a USAF $100M investment."

15 & 16 November 2000 – Public Scoping Meetings held in Las Vegas and Pahrump.

13 December 2000 –SUD Board recommends Kathy Carlson approve M&N request to place additional anemometers on the NTS.

13 December 2000 – SUB Board Recommends approval of the Project Screening and Location Request for the first phase of the project with several concerns about future expansion into Areas 27, 16, 25, 26, and 19.

19 December – Kathy Carlson approves Project Screening and Location request for the first phase of project.

22 December 2000 – DOE/NV and NTSDC enter into an easement for the first phase of the wind project. Project site limited to area in "Attachment A-1". Implementation of the Easement is contingent upon completion of NEPA.

17 January 2000 – NTSDC and MNS enter into a Sub-easement for the first phase of the Wind Farm. Gordon concurs, Reid and Richardson witness.

14 March 2001 – Draft Environmental Assessment released for public review and comment.

23 Mar 2001 - Letter proposing to issue a FONSI by DOE
30 April 2001 – Letter from G. Ormiston to K. Carlson requesting expansion of the Phase 1 Area.

24 May 2001 – Memo for USAF/DOE Liaison Office from Col Eidsaune expressing AF concerns with the wind turbines. Requests close coordination with AF.

31 May 2001 – Meeting with NTSDC and MNS Wind to discuss paths forward for the project. Includes discussion of the April 30, 2001 request to expand the Pahse 1 area, preparation of an EIS, additional changes to requirements beyond those identified in the Easement and the need for a project plan for design and construction of the project.

5 June 2001 – Letter to G. Ormiston, NTSDC requesting a project plan, a request for changes in requirements beyond the original Easement, and a plan for completing the NEPA process. Letter reminds NTSDC that the only approved area is that shown in Attachment A-1 of the December 22, 2000 Easement.

12 June 2001 – Letter from Ken Powers to Col Schofield re: Col Eidsaune memorandum. Only Phase 1 approved at this time.

14 Jun 2001 – Email from Lt Col Johnson to James Towery with electronic map of proposed new Phase I attached. Proposal to expand to include Repeater Hill and Dome Mtn. Approval/disapproval tabled until AF can do an assessment.

3 July 2001 – Letter from M&N Wind to K. Carlson requesting changes to the December 22, 2000 Easement.

16 Jul 2001 - Email from Kevin Thornton to Col Schofield and Lt Col Johnson. Specs for the 900KW turbine, still trying to get more info on larger turbines

17 Jul 2001 – Email from Jim Towery to Col Cazessus, Yvonne Gresnick outlines path forward with the Air Force looking for a consolidated Air Staff position. Acknowledges the RMO would provide a technical assessment to USAFLO by end of June—and states an assessment was not available

25 July, 2001 – Notice of Intent to prepare an EIS for the Wind Project. Due to comments raised in March 2001 by Nevada State agencies, other federal agencies, affiliated American Indian tribes, and other interest parties, determined that EA would not support a FONSI.

16&17, August, 2001 – Public Scoping Meeting held in Las Vegas and Pahrump for Wind Farm EIS.

23 August, 2001 – Letter from K. Carlson to G. Ormiston, NTSDC in response to the July 3, 2001 letter from M&N Wind. Denies all requests to modify the Easement.

17-19 Oct 2001 - Emails from/to: Col Schofield, Col Hopper, Col Percival, Col Eulberg . Rumors about Nellis meeting with Carlson & Associates confirmed. Col Schofield/Ken ~~Powers recommend postpone meeting~~. AF/DOE pre-meeting on 30 October, meeting on 31 October Percival supports the plan.

22 Oct 2001 - Meeting between Carlson & Associates and Nellis representatives and Col Bill Percival, Col Bob Lynn, Warren Lee. USAF/NNSA Liaison office and NNSA/NV **not** invited.

22 Oct 2001 - Email from Col Percival to Col Schofield after Nellis and Carlson meeting. States Carlson & Associates will provide detailed information on wind turbines to Col Schofield.

24 Oct 2001 - Email from Kevin Thornton to Col Schofield provides wind turbine heights, lengths, and speeds

2 Nov 2001 - Col Percival called to state the RMO had not received the tech info from the contractor yet. He had received a call from Carlson and Associates stating they had passed the information to NNSA-NV.

30 Nov 2001 – Email From Lt Col Johnson to Kevin Thornton request more information on Wind Turbines. Jay Norman had been in a meeting with the Air Force and the Wind Turbine subject came up. The Air Force needs additional information before they can continue

3 Dec 2001 – Email from Kevin Thornton to Col Schofield, Lt Col Johnson. Letter from Ken Powers stated the project is now proposed to be in three phases. Turbines are to be assumed to be 98 meters tall with 72 meter blades

7 Dec 2001 - Meeting between Col Schofield, Tim Carlson, Janice Weideman, John Johansen, Kevin Thornton, Linda Cohn. They discussed their need for Timber and Repeater to be fiscally viable. They have a construction start date meeting on 21 Dec and need the AF assessment. Col Schofield told them the AF is still waiting for exact site coordinates.

10 Dec 2001 - Email from Janice Wiedeman to Col Schofield. Site location data for the 1.5MW turbines

10-11 Dec 2001 - Emails from/to: Col Percival, Col Schofield, Lt Col Takenaka. Discussion on AF needs for turbine height and elevations in addition to placement

12 Dec 2001 – Email from Janice Wiedeman to Col Schofield. Forwarded "most recent information on elevations".
21 Dec 2001 - Email from Jim Towery to Col Schofield, Col Percival, Yvonne Gresnick. Building turbines anywhere on NTS not in best interest of the AF. Do not support any expansion of Phase I.

6 Feb 2002 - Classified Meeting to discuss Wind Turbines on NTS. Attendees: MGen Johnston, MGen Pearson, Col Eidsaune, Col Hooper, Col Schofield, Lt Col Johnson, Jim Towery, Warren Lee. Pre-brief for NNSA

7 Feb 2002 - Classified Meeting to discuss Wind Turbines on NTS. Attendees: Kathy Carlson, Ken Powers, Jay Norman, Tom Williams, Col Hooper, Col Eidsaune, Col Lanny, Col Schofield, Lt Col Johnson, Lt Col Takenaka, Jim Towery, Warren Lee. Group in agreement on negative impact of Wind Turbines on NTS.
Assignments:

-- Re-run the line-of-sights for easement composite using all NTTR assets
-- Determine if there might be an alternate location - non-RF line-of-sights
-- Develop unclassified briefing to give to Tim Carlson on 5 March

12 Feb 2002 - Meeting to discuss Wind Turbines with BGen Haeckel. Attendees: Gen Haeckel, Kathy Carlson, Col Schofield, Lt Col Johnson, Tom Williams, Kevin Thornton, Sharon Hejazi, and Kathy Izell. Unclassified discussion on AF concerns with Wind Turbine. NNSA legal concerns and possible $2M - $3M law suit. Follow-on meeting included Tim Carlson. Kathy mentioned off-line recommendation from AF for an independent review of data. Gen Haeckel and Kathy mentioned desire for "win-win" solution

-- Technical
-- AF to find some alternative land
-- NNSA to find some alternative land
-- Col Schofield stated he would try to get Gen Haeckel program brief ASAP

12 Feb 2002 - Col Schofield_Meeting with Kathy Carlson on Special Access Program requirements. Discussed program brief status for Gen Gordon and BGen Haeckel. Discussed "independent review"

20 Feb 2002 - Col Schofield_Meet with Kathy Carlson
- Assignment: by 5 March

-- Technical Solution
-- Move turbines to another location on NTS.
-- Find alternate AF property for project
-- Within the next 2 weeks give Gen Gordon and BGen Haeckel classified brief

**Appendix 2**

General Pearson,

General Johnston,

As you are aware, the National Nuclear Security Administration, Nevada Operations Office is preparing an Environmental Impact Statement on the Construction and Operation of a Wind Turbine Generation facility on the Nevada Test Site.

The Record of Decision (ROD) on this proposal is expected to be released this summer. The ROD could range from 1.) approval of the entire 600 MW project, 2.) approval of a portion of the project or 3.) to not proceed with the project Though I expect to provide my recommendation to General John Gordon, USAF, Ret;. the Administrator of the National Nuclear Security Administration, he will be the final decision maker.

It has been the policy of this office for some time, as I am sure it is also the policy of your respective commands, to work diligently to assist each other in advancing our missions when possible. Through coordination and scheduling of improvements, operations and activities we have always tried to find solutions that mutually accommodate our program requirements. For this reason I am very concerned about finding a solution, if possible, to operational issues that have been raised by the Air Force in regard to the Wind Turbine Generation Facility.

Since the inception of this project, we have been aware of possible interference with on-going activities at the Nevada Test Site and the Nevada Test and Training Range from the rotation and movement of turbine blades and the creation of uncontrolled energy emissions. In negotiating an easement with the project sponsor for the use of Test Site land, we were extremely cautious in segmenting the geographic areas of interest to the sponsor into definable, "phased," permit areas. Phase One, in the Shoshone Mountain area of the Test Site, was expected to provide isolation from most National Security operations on the NTS as well as a line-of-site "ridge line" buffer from operations on the NTTR to the east of Shoshone Mountain. At this time this is the only phase of the project that the Nevada Operations office has allowed the sponsor to preform preliminary engineering on.

I have received technical and programmatic briefings from your staff members in the last two months and have become aware that we may not be able to resolve these issues through either engineering or operational means. I am however concerned, and feel that it is our joint responsibility to assure that all possible solutions to this problem be explored before referring this action to higher levels for a decision.

Though this project does not fit the traditional National Security mission role performed at the Test Site, it certainly is fully within the statutorily authorized program area of the Department of Energy. As such it requires my full commitment to pursue this so that the final decision is in the best interest of the Federal Government.

I look forward to meeting with you both to reach a final recommendation.

Sincerely

KAC

cc: B Gen Haeckel

CERTIFICATE OF FILING

I hereby certify that on October 5, 2005, a copy of the foregoing Declaration of Bryant S. Delgadillo in Support of MNS' Motion for Partial Summary Judgment on Contract Liability was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant Delgadillo