No. 04-1569C
(Judge Wolski)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

November 21, 2005

## TABLE OF CONTENTS

ARGUMENT . . . . . . . . . . 2

I. The Easement's Revocation Clause Is Irrelevant . . . . . . . . . . 2

II. DOE Acted Properly Under NEPA . . . . . . . . . . 6

A. DOE Did Not "Interfere" With The Easement's Condition Precedent . . . 6

B. DOE Properly Considered The Air Force's Concerns . . . . . . . . . . 9

C. MNS Failed To Establish that DOE Acted In Bad Faith . . . . . . . . . . 12

D. MNS Misconstrues The Finality Of The NEPA Process . . . . . . . . . . 17

III. No Valid Contract Arose Between DOE And MNS . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

A.L. Pickens Co., v. Youngstown Sheet & Tube Co.,
650 F.2d 118 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Addington v. Texas,
441 U.S. 418 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Barron Bancshares, Inc. v. U.S.,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cessna Aircraft Co. v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Ciaramella v. Reader's Digest Ass'n, Inc.,
131 F.3d 320 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Communities Against Runway Expansion, Inc. v. F.A.A.,
355 F.3d 678 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Gemini Electronics, Inc. v. U.S.,
65 Fed.Cl. 55 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Heuser v. Kephart,
215 F.3d 1186 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Hometown Financial, Inc. v. U.S.,
409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kim v. United States,
121 F.3d 1269 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Marsh v. Oregon Natural Resources Council,
490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

McDonnell-Douglas Corp. and General Dynamics Corp. v. United States,
183 F.3d 1319 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

NVT Technologies, Inc. v. U.S.,
370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

National Audubon Society v. Department of Navy,
422 F.3d 174 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Quantum Management Group, Ltd. v. University of Chicago Hospitals,
283 F.3d 901 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ridge Runner Forestry v. Veneman,
287 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ryco Const., Inc. v. United States,
55 Fed. Cl. 184 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Sands v. Ridefilm Corp., ,
212 F.3d 657 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Torncello v. United States,
231 Ct. Cl. 20,
681 F.2d 756 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Total Medical Management, Inc., v. United States,
104 F.3d 1314 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S. v. Blair,
321 U.S. 730 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. v. Turner,
287 F.2d 821 (8th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Vitkus v. Beatrice Co.,
11 F.3d 1535 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Woll v. United States,
45 Fed. Cl. 475 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATUTES & REGULATIONS


42 U.S.C. 4321 . . . . . . . . . . . . . . . . . . . . 9

10 C.F.R. § 1021.212 . . . . . . . . . . . . . . . . . . . . 5

10 C.F.R. § 1021.216(i) . . . . . . . . . . . . . . . . . . . . 21

10 C.F.R. § 1021.313 . . . . . . . . . . . . . . . . . . . . 17, 18

10 C.F.R. § 1021.313(a) . . . . . . . . . . . . . . . . . . . . 18

10 C.F.R. § 1021.313(c) . . . . . . . . . . . . . . . . . . . . 18

10 C.F.R. § 1021.315 . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. § 1502.19(a) . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1502.2(g) . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1503.1(a)(1) . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1505.1 . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. § 1506.1 . . . . . . . . . . . . . . . . . . . . 22

40 C.F.R. § 1508.14 . . . . . . . . . . . . . . . . . . . . 9

**INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX**

Declarations from Col. Wilhelm Percival and Kevin Thornton . . . . . . . . . . . . . . . . . . . Attached

Selected DOE, Air Force, and MNS e-mails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Letter from MNS to Kathy Carlson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Selected DOE, Air Force, and MNS e-mails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fax from NTSDC referencing Kathy Carlson letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Weekly EIS conference call minutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Easement draft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Summary of Air Force communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Letter conditioning Easement on DOE authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Selections from the April, 2002, DEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-1569C<br>(Judge Wolski) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States, respectfully submits this response to plaintiff's "Motion for Partial Summary Judgment," filed on October 5, 2005. Plaintiff, MNS Wind Company ("MNS"), hinges its claim upon a clause in the Easement that provided a mechanism for DOE to revoke the Easement for national security reasons. PM8-9.[1] Without the protection provided by this clause, MNS claims, it would never have undertaken development on the Nevada Test Site ("NTS"). PM8. MNS thus asserts that when DOE terminated the project based upon concerns raised by the Air Force, it reneged in bad faith on its promise to revoke via eminent domain. PM13.

MNS's argument has one overarching, and fatal, flaw: by its terms, the Easement was not to "become effective until DOE [had] completed the NEPA process." App. 37. That NEPA process was not successfully completed. The Easement thus remained inchoate, binding no one. MNS's total reliance upon the Easement's revocation clause is unavailing; DOE could not

[1] "Plaintiff's Motion for Partial Summary Judgment" will be cited as: "PM ___." The Government's "Motion for Summary Judgment" will be cited as "GM ___." Plaintiff's Complaint will be cited as "Pl. Compl. ___." The Appendix attached to the Government's initial "Motion for Summary Judgment" will be cited "App. ___." The Supplemental Appendix attached to this brief will be cited as "Supp. App. ___."

"revoke" an agreement that never came into effect.

MNS's claims must fail for three broad reasons. First, the Easement's revocation clause is irrelevant because it did not apply before the Easement became effective. Second, the Easement did not become effective because DOE rightfully concluded under NEPA that the project should not go forward. MNS's contentions that DOE somehow acted improperly under NEPA are baseless. DOE followed the applicable regulations, and the NEPA condition precedent to the Easement went unfulfilled. Third, aside from DOE's compliance with NEPA, no contract arose between the parties here because MNS cannot prove the required elements for contract formation. In short, MNS lacks any valid claim to relief.

## ARGUMENT

### I. The Easement's Revocation Clause Is Irrelevant

The express language of the Easement makes clear that the provision upon which MNS solely relies was not binding or effective when the Government, during the NEPA compliance period, elected to disapprove the project.

The Government does not dispute that if DOE were to revoke the Easement for national security reasons, the Easement's revocation clause required DOE to compensate MNS via an eminent domain model. PM8-9. The plain language of the Easement's revocation clause makes this clear. App. 20. However, the plain language of the Easement's NEPA clause makes it equally clear that the Easement "will not become effective until DOE has completed the NEPA process."[2] App. 37. Indeed, the first operative paragraph of the Easement makes clear that the

[2] The "not become effective" language is often used by courts to describe contracts in which a condition precedent has not been met. See, e.g., Quantum Management Group, Ltd. v. University of Chicago Hospitals, 283 F.3d 901, 906 (7th Cir. 2002); Sands v. Ridefilm Corp.,

entire agreement is "subject to compliance with the National Environmental Policy Act." App. 13. This language appears nested in the very "grants and conveys" language that afforded MNS the right to enter the Government's land in the first place. Id. The clarity and unambiguity of the Easement's NEPA language — and the corresponding irrelevance of the Easement's revocation provision — is apparent. Whatever rights MNS could claim under the Easement depended explicitly upon NEPA "compliance" and until such NEPA compliance was obtained, MNS's rights were not "effective." Those rights include the right to enforcement of the Easement's revocation provision — the provision upon which MNS now solely relies.

The fact that the clause upon which MNS solely relies is entitled "Revocation . . .," App. 20, is significant. That is, once the Easement became "effective" (following compliance with NEPA requirements), if the Government changed its mind and decided to oust MNS from the property, it would have been necessary, at that point, to "revoke" the rights it had granted. But until the Easement became effective, DOE had nothing to revoke; it is fundamental that "[r]evocability in itself implies existence and earlier creation; if this were not so, there would be nothing to revoke." U.S. v. Turner, 287 F.2d 821, 826 (8th Cir. 1961) (Blackmun, J.).[3] Thus, the

---

212 F.3d 657, 661-62 (1st Cir. 2000); Heuser v. Kephart, 215 F.3d 1186, 1192 (10th Cir. 2000); Vitkus v. Beatrice Co., 11 F.3d 1535, 1540 (10th Cir. 1993). If an agreement says it shall "not become effective" until a condition is met, no agreement arises. See, e.g., Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 324 (2d Cir. 1997) (finding that an unsigned settlement agreement that stated it would "not become effective" until signed lacked binding force).

[3] That the Easement contained a revocation clause is hardly surprising. Once the easement became effective MNS would enjoy the right to enter, occupy, construct facilities upon, and use, for a period of 35 years, public lands which are closely located to sites previously used by the Government for critical nuclear weapons testing. App. 13-14; Supp. App. 43. The Government naturally reserved to itself the right to require MNS to vacate the property if national interests so required. Indeed, earlier draft versions of the "Revocation" clause in this Easement did not simply use the generic term "national security," but also referred expressly to a

Easement's NEPA provisions and its revocation clause are entirely consistent with one another – the Government's obligation to rely upon the "revocation" clause was not reached because the Easement itself was not yet "effective." NVT Technologies, Inc. v. U.S., 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

In any event, even if there were a conflict between the Easement's NEPA requirements and the revocation clause, MNS's claim would still fail because the Easement's order of precedence clause establishes that the NEPA language controls. See, e.g., Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1454 (Fed. Cir. 1997) (applying an order of precedence clause). Here, the order of precedence clause states that "[i]n the event of inconsistencies" between the first two "Parts" of the Easement and Exhibit A, Exhibit A controls. App. 16. The revocation clause is found in Part II of the Easement. App. 20. The NEPA clause is found in Exhibit A. App. 37. The NEPA requirements, thus, control.

In the same vein, MNS's extensive reliance upon declarations to advance its explanation of the origin, meaning, and interpretation of the Easement is profoundly misplaced. For example, MNS argues that the parties agreed to "share the risk of national security concerns." PM9, 22; Pl. Compl. ¶19; Carlson Decl., ¶14; Williams Decl. ¶¶11, 17-19. MNS's suggestion that post-hoc declarations, describing various individuals' subjective intent, somehow trump the plain language of the Easement's NEPA provisions is patently wrong. Such evidence is barred

---

Presidential decision to resume nuclear testing currently suspended under the Comprehensive Nuclear Test Ban Treaty. Supp. App. 25-26.

from the Court's consideration by the parol evidence rule, which prohibits the introduction of extrinsic evidence to modify, supplement, or interpret the terms of an integrated agreement. Barron Bancshares, Inc. v. U.S., 366 F.3d 1360, 1375-76 (Fed. Cir. 2004); Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1328 (Fed. Cir. 2003). Where the terms of a contract are "clear and unambiguous," they must be given their plain meaning, uninformed by extrinsic evidence. Barron, 366 F.3d at 1375. MNS's proffered declarations regarding the negotiations prior to the execution of the Easement are extrinsic, parole evidence, which this Court should disregard.[4]

Finally, regardless of how one interprets the language in the Easement, DOE also had an independent statutory duty to comply with NEPA. As we establish in our opening brief and discuss further below, DOE officials had no authority to enter into an enforceable contract until the NEPA process was completed. This principle applies with equal force to any specific provision of the Easement that obligated the agency to commit resources to a project. See 10

[4] MNS's declarations are deficient for other reasons, as well. Under Rule 56, affidavits "shall be made on personal knowledge," and "shall set forth such facts as would be admissible in evidence." RCFC 56(e). Affidavits should not contain conclusions of law or ultimate facts, and this Court is free to ignore or strike any such declarations. Kim v. United States, 121 F.3d 1269, 1276-77 (9th Cir. 1997); A.L. Pickens Co., v. Youngstown Sheet & Tube Co., 650 F.2d 118, 121 (6th Cir. 1981); see Ryco Const., Inc. v. United States, 55 Fed. Cl. 184, 196 n.6 (2002); see generally 10A Wright, Miller & Kane, Federal Practice and Procedure 2738 at 486 (1983). The declarations accompanying MNS's motion for summary judgment contain numerous legal conclusions, largely mimicking the legal arguments advanced by MNS in its complaint and partial motion for summary judgment. See Carlson Decl. ¶¶ 13, 14, 16, 18, 23, 28; Williams Decl. ¶¶ 10, 11, 17, 18. To the extent that these statements presume the existence of a valid contract between DOE and MNS, the statements are assertions of law, not of fact "made on personal knowledge . . . admissible in evidence," and the Court should ignore them.

Finally, we believe Mr. Williams' declaration is incomplete. While Mr. Williams takes pains to inform the Court of his prior role as DOE official, Williams Decl. ¶ 1, we understand that in his current capacity at the Research Foundation at the University of Nevada, he has a relationship with and responsibility to the current version of NTSDC, the company which received the Easement which is the subject of this case.

C.F.R. § 1021.212. Thus, the agency could not, under NEPA, agree to pay eminent domain compensation before the NEPA process was complete, and the Easement's revocation provision cannot reasonably be read to include such an obligation.

The Easement's revocation clause, then, is irrelevant. By the express language of the Easement, that clause was not effective and DOE was free to terminate the NEPA process and the wind turbine project without implicating any duties under that clause. See U.S. v. Blair, 321 U.S. 730, 733 (1944) (a party has no duty to comply with a non-existent contractual obligation).

## II. MNS Acted Properly Under NEPA

MNS offers four basic reasons in support of its claim that DOE erred under NEPA, and thus breached the Easement: (A) DOE "interfered" with the Easement's NEPA condition precedent; (B) DOE improperly considered the concerns of the Air Force; (C) DOE acted in bad faith; and (D) the NEPA process was nearly complete when DOE terminated the wind turbine project. As we demonstrate below, each of these contentions lacks merit.

### A. DOE Did Not "Interfere" With The Easement's Condition Precedent

MNS states that a party cannot escape liability under a contract by interfering with a condition precedent to its duty to perform. PM17. Thus, MNS claims, DOE had a duty not to interfere with the Easement's NEPA condition. The implications of this claim reveal its flaws. First, as we show in our opening brief, the Easement was subject to a condition precedent to contract formation, and thus DOE was free to terminate the project. MNS essentially agrees to this proposition with its admission that the NEPA process was a "freestanding condition to the implementation of the Easement." PM17. Second, according to MNS's logic, if DOE was prohibited from "interfering" with its own NEPA review, then approval of the project was a *fait*

*accompli*. Such a result, however, would contravene the express requirements, and indeed the very purposes, of NEPA. The statutory framework of NEPA requires agencies to take a "hard look" at projects before their approval, a process that contemplates the possibility of "no action," as we establish in our opening brief. DOE's election of no action here was not "interference" with the NEPA condition; it was a predictable result of that condition's inclusion in the Easement.

Typical NEPA procedures demonstrate that DOE's actions were not "interference" with the NEPA condition. NEPA provides a mechanism for agencies to make environmentally sound decisions after gathering relevant information. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). The statute "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Id. To that end, agencies are forbidden from using NEPA to paper-over decisions already made. See National Audubon Society v. Department of Navy, 422 F.3d 174, 199 (4th Cir. 2005) (disapproving of mere "post hoc rationalization" in an EIS); 40 CFR § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made").

NEPA, then, is not merely a procedural hurdle for an agency to surmount on a march toward inevitable project approval. The statute requires an agency to cast a "hard look" at its actions. Robertson, 490 U.S. at 350. Such scrutiny is a necessary condition precedent to any contract involving a project subject to NEPA. See, e.g., Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) (noting that less deference is due to an agency's decisions under NEPA when those decisions are preordained by contract). And, as we establish in our opening brief, "hard

look" review may lead an agency to conclude that "no action" on a project is the appropriate outcome.

Thus, DOE did not "interfere" with the NEPA process here; the agency simply conducted its statutorily required review through the production of an EIS. Part of that EIS process entailed obtaining information and comments from users of surrounding land.[5] Here, those users included the Air Force. Percival Decl. ¶ 1; see Thornton Decl., ¶ 4; see generally, App. 12. The Air Force's objections to the project prompted DOE to elect the "no action" alternative identified by the EIS. Because the agency chose "no action," the project was terminated and the Easement never became effective; thus, no breach occurred.

To be precise, the EIS stated that "[t]he decision before the NNSA/NV" was "whether to implement the easement or easements to the NTSDC (and, by extension, subeasements to MNS) and allow for the development of a wind farm on the NTS at Shoshone Mountain and/or Pahute Mesa." Supp. App. 52 (emphasis added). The language of the EIS is telling: the question before the agency was not simply whether to review the project for environmental issues; it was whether to "implement the easement" and "allow for the development" of the project. This language, and other similarly conditioned statements in the EIS,[6] reflects the Easement's own conditional language. That is, until the NEPA process was completed and the proposed action

---

[5] This requirement is found in 40 C.F.R. §§ 1502.19(a) and 1503.1(a)(1), which require EIS circulation to and comment solicitation from any "Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved..."

[6] For example, the second paragraph of the EIS summary notes that, "The Proposed Action would permit NNSA/NY to grant NTSDC an easement . . ." Supp. App. 43. The same summary states: "Under the No Action Alternative, the NNSA/NV would not grant approval, under an easement to the NTSDC and a sub-easement, to construct and operate alternative energy generation facilities at the NTS." Supp. App. 45.

was approved, the Easement was not effective. App. 13, 37. MNS is in error to proclaim that the Easement's language amounts to a "condition of promissory duty," which DOE prevented from happening. PM17. Rather, as the Easement itself and the EIS make clear, DOE made no promises about NEPA approval of the project; the agency's only conceivable duty was to comply with NEPA, which it did. The NEPA condition is thus alive and well, not "eliminated," as MNS claims. That condition bars MNS's recovery here.

**B. DOE Properly Considered The Air Force's Concerns**

DOE properly included consideration of the Air Force's concerns within the NEPA process, and was within its authority to terminate the project under the aegis of NEPA. MNS misconstrues fundamentally both the reach and purpose of NEPA. The issue here is not, as MNS claims, what NEPA "require[s]." PM19, 21. Rather, the issue is what the statute permits. NEPA certainly permits an agency to consider national security concerns in assessing the merits of a project, when that agency elects to consider such factors.

As we make clear in our opening brief, NEPA does not require an agency to make decisions friendly to the environment; it requires an agency only to follow certain procedures designed to lead to well-informed decisions. One of the express purposes of NEPA is "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. This broad goal has been refined through regulations. As MNS admits, CEQ regulations require an agency to consider the effects of its actions upon the "human environment," defined to include "the natural and physical environment and the relationship of people with that environment." 40 C.F.R. §1508.14. When "economic or social" effects are implicated, an EIS must discuss these factors. Id.

The Air Force's concerns here, as identified in the EIS, related to the effect of the wind turbines on "radio frequency transmissions."[7] Supp. App. 46, 54. Radio waves are indisputably a part of the "physical environment" of the NTS, and they are, to the Air Force, a vital part of the "human environment" as well. The importance of keeping that environment free from interference extends also to the physical environment of the nation as a whole, which depends upon the armed forces to keep it secure. Further, given the close proximity of Air Force-controlled land (surrounding DOE's NTS on three sides) and the fact that the Air Force operated in the airspace over the NTS, Percival Decl. ¶ 1, App. 12, it was both reasonable and within DOE's prerogative to include the Air Force's concerns in its NEPA analysis. Indeed, MNS effectively concedes as much when it states, repeatedly, that "NEPA does not require analysis of non-environmental factors." PM19 (emphasis added); see also PM20, 21. What MNS cannot say is that NEPA precludes consideration of such factors, when the agency conducting the NEPA analysis elects to include them.

In any event, MNS is too late and in the wrong place to complain now about DOE's inclusion of the Air Forces's concerns in the EIS. MNS knew not later than March 5, 2002, that the Air Force's concerns would be included in the EIS analysis. Supp. App. 20. Indeed, the preliminary draft version of the EIS from March 2002, which explicitly discussed the Air Force's concerns, was drafted by a consultant group (SWCA) that worked on subcontract to MNS. Thornton Decl. ¶ 3; Supp. App. 6. On May 7, 2002, still two months before the agency took action to terminate the NEPA process, Mr. Johansen, the president of MNS, stated during that week's regular EIS phone conference that MNS "protest[ed]" the inclusion of the Air

[7] MNS does not dispute that these concerns were valid. PM22.

Force's concerns in the EIS and asserted that to do so was "illegal." Supp. App. 22; see also Supp. App. 23. Thus, if MNS believed it was unlawful and contrary to the requirements of NEPA for DOE to include the Air Force's concerns in its EIS analysis, it was incumbent upon MNS, at the time, to contest the agency's action in Federal district court, which has exclusive jurisdiction over challenges to agency's actions regarding NEPA. See, e.g., Communities Against Runway Expansion, Inc. v. F.A.A., 355 F.3d 678, 689 (D.C. Cir. 2004).

Further, MNS's contention that the preliminary draft EIS "failed to identify any significant impacts that would provide a barrier to the implementation of the project," is incorrect. See PM12; Carlson Decl., ¶ 25. The EIS states, in very plain language, that the "[p]roposed action may cause interference with U.S. Air Force radio frequency transmissions, interfering with their training operations on the NTS." Supp. App. 46. On the same page, in equally plain language, the EIS identifies that the benefit of the "no action" alternative was "[n]o potential for interference with U.S. Air Force frequency transmissions or training operations." Id. Later in the same document, the EIS states, equally plainly, that

> The U.S. Air Force has concerns that the proposed action, or any of the action alternatives may cause disturbance to radio frequency transmissions that would interfere with their training operations on the NTS. Potential impacts and mitigations to training operations will be analyzed by decision makers in a classified appendix to this EIS.

Supp. App. 58. Because the relevant considerations involved classified operations, the EIS could not discuss potential impacts or mitigation, but the document (drafted by MNS's own subcontractor) openly identifies the "Air Force's concerns" and makes plain that those concerns were yet to be addressed by "decision-makers." Id. Thus, MNS cannot accurately, let alone

reasonably, argue that the EIS "failed to identify" any significant impediments to the project. See PM12.

### C. MNS Failed To Establish that DOE Acted In Bad Faith

MNS argues that, by terminating the NEPA process and electing the "no action" alternative, DOE was acting in bad faith – indeed, under conditions amounting to "outright fraud." PM6, see id. at13. Notwithstanding the brazen nature of its accusations, MNS has failed to meet its burden to establish that the Government breached any duty owed MNS, let alone that the Government officials involved perpetrated an "outright fraud."[8]

MNS's bad faith argument is supported by only two points: (1), that DOE kept secret from MNS the Air Force's objections to the project and only at the very end sprung these objections upon an unsuspecting MNS, id. at 13; and (2) that because, in informing MNS that the NEPA process was terminated and that the Easement would not go into effect, DOE elected to cite and rely upon the Easement's NEPA provisions in lieu of the revocation clause, DOE could only have done so in bad faith, id. See PM at 19, 22. The first point is overwhelmingly contradicted by the record here and the second point is specious.

1. MNS, in a few carefully worded sentences, implies that the first time it became aware of serious Air Force objections to the project was in late April 2002 and that MNS "did not hear"

---

[8] In addition to its "bad faith" arguments, MNS specifically argues that DOE committed an "outright fraud" and asserts that MNS has a "legitimate, clear and compelling fraud case," PM 6, without a single citation to record evidence that would support such an outrageous accusation. It is precisely this sort of reckless accusation which needlessly "tarnishes reputations." See Addington v. Texas, 441 U.S. 418, 424 (1979). Given the total lack of record support for such a serious accusation, the assertion is inexcusable and should be withdrawn.

further about the matter until DOE announced, in July 2002, that the project would not be going forward. PM13, citing Conway Decl. ¶ 7 and MNS Undisputed Fact No. 7.[9]

The record indisputably establishes otherwise: that MNS was fully aware of the Air Force's objections to the project and was working hard to address or overcome them. A few of the salient events in the history of the project include:

– **December 2000**: DOE requests technical data from MNS for use by Air Force to analyze effect of project. Thornton Decl. ¶ 4; Supp. App. 1.

– **May 2001**: In response to requests for comment during the EA phase of NEPA review, Air Force forwards written statement of concerns and objections. App. 59-60.

– **June 2001**: Tom Williams, then working for DOE, informs MNS "that there may be operational issues that couldn't be resolved and [MNS] shouldn't come to believe that an EIS would resolve this problem." Supp. App. 2. An exchange of data requested by the Air Force from MNS is initiated and continues over several months. E.g., App. 65-68, 80; Supp. App. 8.

– **October 2001**: Col. Percival, the newly-arrived commander of 98th Range Air Wing at Nellis Air Force Base, learns of proposed project and attends meeting with MNS and representatives, where he expresses his objections and

---

[9] Specifically, MNS writes, in part, "DOE later reversed course and informed MNS that DOE had decided to hold the EIS for release until certain issues raised by the United States Air Force were resolved . . . MNS did not hear from DOE about the EIS for several months until the DOE circulated its letter in which it purported to terminate the NEPA process." PM13.

reservations. Agrees to additional study based upon detailed data provided by MNS. Percival Decl. ¶¶ 2-3. Data exchange continues for several more months. Id. at 3; Thornton Decl. ¶ 4; App. 63-64; 68-73; Supp. App. 13-14.

– **January 2002**: MNS internal documents reflect communication by LTC Schofield, of DOE/AF liaison office, that Air Force's preliminary conclusion that project "will have negative impacts for the Air Force." App. 83.

– **February 2002**: EIS weekly conference call notes that the Air Force is "reviewing their concerns" and want "to be sure their technical and operational input is included." Supp. App. 19.

– **March 2002**: EIS weekly conference call notes of March 5 record that Air Force "input" will be included in the EIS. Supp. App. 20. Preliminary draft EIS is circulated that includes discussion of Air Force concerns and indicates that "potential impacts and mitigations" are yet to be addressed by "decision makers." Conway Decl., Ex. A p. 2-24. On March 28, 2002, consultants to MNS record that all issues related to NEPA "have been resolved except the Air Force concerns." App. 85.

– **April 2002**: Kevin Thornton informs all in weekly EIS conference call that EIS is on hold until Air Force concerns are addressed. App. 81. Internal MNS documents indicate that John Johansen, president of MNS, traveled to Europe to meet with turbine blade manufacturers to get additional information on alternative blade materials. Supp. App. 31. MNS documents also indicate that MNS intends

to "continue to work with . . . Senator [Reid's] office" to address Air Force objections. App. 84.

– **May 2002**: EIS weekly conference call notes of May 7, 2002 record: (a) that Kevin Thornton indicate EIS still "on hold" pending Air Force briefing to head of NNSA; (b) that John Johansen objected to inclusion of Air Force concerns in EIS and expressed willingness to work with Air Force to address their concerns, including new blade materials. Supp. App. 23; see also Supp. App. 31. EIS Weekly conference call notes of May 14 record that Kevin Thornton again reports that the draft EIS is "on hold" pending a meeting between the Air Force and Senator Harry Reid. Supp. App. 24. Internal MNS documents indicate that Senator Reid met with the Secretary of the Air Force to discuss issues and that the Senator planned to meet with the Air Force again. Additionally, Mr. Johansen scheduled meetings for late May (later cancelled), with local Air Force officials to discuss alternatives. Supp. App. 31.

– **June-July 2002**: During this approximate time period, Air Force was completing the detailed study of the proposed project. App. 74-75; Supp. App. 16; see Percival Decl. ¶ 5. Results of study are briefed to senior Air Force officials and key Congressional staffers, including those from Senator Reid's office. Percival Decl. ¶ 5. As of July 5, 2002, MNS reports internally that project remains "on hold" pending consideration of Air Force concerns. Supp. App. 32. Col. Percival forwards letter to Kathy Carlson objecting to the project. App. 78. Ms. Carlson forwards the matter to General Gordon, head of NNSA,

who elects the "no action" alternative. App. 76-77. On July 12, Ms. Carlson informs MNS that the NEPA process has been terminated and that, by it very terms, the Easement will not go into effect. App. 37. MNS is informed that NTSDC contacts Senator Reid's office and is told that "matter cannot be resolved." Supp. App. 17.

Thus, it cannot be disputed that MNS was fully aware of the Air Force's concerns and opposition to this project. MNS worked to both address those objections on technical grounds or to overcome them by political means, if necessary. That MNS expected a different outcome may be true, but MNS cannot credibly urge either that it was unaware of the Air Forces' objections or unaware that "decision makers" had yet to address those objections.

2. The second part of MNS' bad faith argument is simply the curious assertion that because DOE, in terminating the project, cited and relied upon the NEPA provisions of the Easement, App. 13, 37, when the Easement also contained a revocation clause, the act must have been in bad faith. PM13, see also id. at 22. However, DOE was fully within its rights under the Easement and, as demonstrated above, correct that Easement depended explicitly upon NEPA "compliance." Thus, until such NEPA compliance was obtained, any rights MNS had under the agreement, including under the revocation clause, were not "effective." App. 37; see App. 13. Additionally, the order of precedence clause in the agreement further establishes that DOE's reading of the Easement was correct and in "good faith." App. 16. Finally, it cannot be "bad faith" for a party to an agreement to rely upon rights given to it under an agreement, when those rights are superior to those enjoyed by the opposing party. See McDonnell-Douglas Corp. and

General Dynamics Corp. v. United States, 183 F.3d 1319, 1329 (1999) (in asserting the government's right under the contract, the contracting officer was not depriving the opposing side of its rights under the agreement, he was merely asserting the government's rights).

At bottom, MNS's disappointment that its project was not approved is understandable, but its allegation that it was the victim of bad faith (let alone, defrauded) by the United States is misguided. MNS may have invested start-up money in the wind turbine project,[10] but it did so with knowledge of the patent contingency upon which the agreement rested. MNS was not, in fact, the victim it now claims to be. Instead, the company made a conscious business decision to press ahead with a tentative project, apparently with hopes of reaping favorable tax benefits. App. 70-71; see Thornton Decl. ¶ 5. As unfortunate as the ultimate outcome was for MNS, it was not the result of misconduct by Government officials.

**D. MNS Misconstrues The Finality Of The NEPA Process**

MNS's contention that the EIS was a "finished product" is both mistaken and irrelevant. PM12.

It is mistaken because even if the preliminary draft EIS was "finished," important and necessary further steps in the NEPA analysis remained to be completed. First, the agency's headquarters in Washington had to approve release of the draft EIS for public comments. 10 C.F.R. § 1021.313; see PM12 (admitting the public comment period needed). If approved for

---

[10] MNS's assertion that it spent two years and millions of dollars "performing under the agreements to develop the site," PM5, is exaggerated. MNS doubtlessly incurred start-up expenses, but it never occupied any lands or constructed a single wind turbine. Thornton, Decl. ¶ 5; compare Conway Decl. ¶ 9. Thus, it is a stretch to say that MNS was "performing" under the agreements or that it "develop[ed] the site."

release, the public review and comment period on a draft EIS would have lasted a minimum of 45 days. 10 C.F.R. § 1021.313(a). This public review period could have elicited additional concerns from interested parties (such as, among others, Native Americans, who along with the Air Force prompted the DOE to undertake an EIS in the first place, App. 61-62; see Thornton Decl., ¶ 3). DOE would next have been required to respond in the final EIS to whatever issues were raised by the public comment and the put that final EIS out for 30-day period of public comments. 10 C.F.R. §§ 1021.313(c), 1021.315. This process would culminate in a review of the final EIS by the designated agency deciding officials who, among other things, could approve the proposed action, select and alternative action, or disapprove the project by electing the "no action" alternative. 40 C.F.R. § 1505.1.[11] Thus, MNS was a long way from having "finished" the required NEPA process.[12]

MNS's contention that the draft EIS was "finished" is also irrelevant. Regardless of how many additional steps remained to be completed under the NEPA review or how much time it might take to accomplish them, the end of that process still required the designated agency officials to exercise their discretion to approve the project, select an alternative, or disapprove the project. 40 C.F.R. § 1505.1. MNS refuses to admit the obvious possibility that, during the NEPA process, interested parties could have raised issues or concerns which were unmitigatable

---

[11] MNS was well aware that the final decision authority to approve or disapprove this project under NEPA rested at the agency's headquarters in Washington, D.C. In July 2001, at the inception of the EIS process, MNS expressed its intent to request DOE to delegate EIS decision-making authority to the local NNSA office in Las Vegas. Supp. App. 6. That delegation of authority was not approved.

[12] Indeed, the "finished" NEPA analysis to which MNS points is the very same document which contains discussion of the Air Force's concerns about the project and indicates that those concerns were yet to be addressed by "decision makers." Supp. App. 58.

and which might have led a decision makers to elect the "no action" alternative. That very possibility is precisely what happened here — the Air Force identified its concerns about the adverse effects the wind farm would have on its operations and the deciding official, General Gordon, elected the "no action" alternative. App. 77. Faced with these undisputable facts, MNS simply presumes that nothing in the NEPA process could ever "provide a barrier to the implementation of the project," see PM12. In short, MNS's assertion that the EIS was "finished" is predicated upon the unsupportable notion that NEPA review is nothing other than a mere formality.

Finally, MNS's claim that DOE delegated the burden of complying with NEPA to MNS is equally misguided. PM17, citing Carlson Decl., ¶ 13.[13] DOE did not, and could not, delegate such authority. NEPA regulates agency action, not the actions of private parties. See, e.g., Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989). Under the Easement, MNS would have been required to bear the costs of NEPA mitigation efforts if the project went forward, but all statutory obligations, under NEPA (including e.g., whether to approve or disapprove the project, or the extent or manner in which mitigation efforts would be conducted) remained the sole prerogative of DOE.[14]

---

[13] This assertion should be distinguished from the undisputed fact that DOE permitted MNS to subcontract directly with the EIS consultant firm SWCA (in lieu of MNS providing funds to DOE to contract with SWCA). That DOE permitted MNS to pay the EIS consultant directly did not alter or affect DOE's NEPA responsibilities. The EIS subcontractor worked under the control and supervision of DOE. Thornton Decl. ¶ 3: Supp. App. 6.

[14] To be precise, even the Carlson Declaration, the only citation provided, does not support MNS's proposition that DOE "delegated" NEPA compliance to MNS. See PM 17. Paragraph 13 of the Carlson declaration merely echoes a clause in the Easement that provided that MNS was not obligated to construct the wind farm and could avoid incurring mitigation costs if it elected not to pursue the project. See App. 53.

## III. No Valid Contract Arose Between DOE And MNS

Even if the Easement could somehow be deemed effective, no contractual relationship arose between DOE and MNS because two of the required elements of a valid contract were not met here. To prove the existence of a valid contract with the United States, a plaintiff must show four things: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States. Hometown Financial, Inc. v. U.S., 409 F.3d 1360, 1364 (Fed. Cir. 2005). MNS cannot demonstrate two of these requirements. First, because MNS could abandon the wind turbine project at any time, no consideration passed between the parties. Second, DOE officials lacked authority to bind DOE to this type of contract without precedent NEPA review.

MNS had no obligation under the Easement to actually construct the wind farm project and thus no consideration passed between the parties, rendering any contract between the parties illusory. A contract is illusory when one party "gives consideration that is so insignificant that an actual obligation cannot be imposed." Woll v. United States, 45 Fed. Cl. 475, 478 (1999) (quoting Torncello v. United States, 231 Ct.Cl. 20, 42, 681 F.2d 756, 769 (1982)). This Court has held that whenever "one of the parties to an agreement can terminate without consequence, an enforceable contract does not exist." Woll, 45 Fed. Cl. at 478. See, also, Ridge Runner Forestry v. Veneman, 287 F.3d 1058, 1061-62 (Fed. Cir. 2002) (noting that a "promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances..." (quoting Restatement (Second) of Contracts § 77)).

Here, MNS admits that it "retained the absolute right to discontinue the project" at any time. PM9. More to the point, MNS was not required by the Easement even to initiate the

project, and the Easement contained no schedule under which the company was obligated to perform. MNS lacked any performance obligations under the Easement; it also paid DOE nothing for the privilege of using government land.[15] Because DOE received no monetary consideration and because the company could abandon the wind turbine project at its discretion, any agreement between the parties amounts to nothing more than an illusory contract. DOE could not, and did not, breach such a contract.

Second, MNS cannot demonstrate that any DOE official had the authority to enter into a binding contract until the NEPA process was completed. Government officials cannot exceed the bounds of their authority when they enter into contracts. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). Agency regulations can delimit an official's authority. Id.; see, also, Total Medical Management, Inc., v. United States, 104 F.3d 1314, 1320-21 (Fed. Cir. 1997) (finding that the elements of a contract were met between a private company and the government, but that the contract was void nonetheless because the agreement conflicted with Department of Defense regulations, stripping contracting officials of their authority); Gemini Electronics, Inc. v. U.S., 65 Fed. Cl. 55, 68-69 (2005) (government official exceeded his authority, defined by Postal Service regulations, when he entered into an agreement for telephone services).

Here, as we establish in our opening brief, agency officials were precluded from entering into a binding contract before the completion of the NEPA process. 10 C.F.R. § 1021.216(i).[16]

---

[15] NTSDC, the company from which MNS obtained its Subeasement, agreed to pay the Government $1 for its Easement. App. 30.

[16] The regulation states in relevant part: "If the NEPA process is not completed before the award of the contract, financial assistance, or joint venture, then the contract, financial assistance, or joint venture shall be contingent on completion of the NEPA process (except as provided at 40 CFR 1506.1 and §1021.211 of this part)." 10 C.F.R. § 1021.216(i).

CEQ regulations frame this same requirement more broadly: until an agency issues a Record of Decision for a project requiring NEPA review, it cannot take actions that would "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1. One of those reasonable alternatives, here, as evidenced by the EIS, was the alternative of no action. If, as MNS suggests, the alternative of no action was precluded by an agreement between DOE and MNS, then this preclusion would violate the CEQ and DOE regulations and, hence, be unenforceable due to a lack of contracting authority. Thus, the only possible agreement which would comply with agency and CEQ regulations would be one contingent upon NEPA review — precisely what DOE and MNS agreed to here. For that contingency to have any meaning, DOE required the power to elect the no action option at its discretion.

## CONCLUSION

For the reasons given above, we respectfully request the Court to deny MNS's partial motion for summary judgement and, instead, grant our motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

November 21, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on November 21, 2005, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee

BRYANT G. SNEE