IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC,<br>a Delaware limited liability company<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-1569C<br>(Judge Wolski) |

DECLARATION OF WILHELM F. PERCIVAL

I, Wilhelm F. Percival, make the following declaration pursuant to 28 U.S.C. § 1746.

1. I am a retired Air Force Colonel. While on active duty, I served as the Commander of the 98th Range Wing, headquartered at Nellis Air Force Base, outside Las Vegas, Nevada. The mission of the 98th Range Wing was to manage, for the U.S. Government, the Nevada Test and Training Range ("NTTR"), which encompasses approximately 3 million acres of land (and 12,000 square miles of airspace) and is located northwest of Las Vegas, Nevada. The NTTR surrounds DOE's Nevada Test Site ("NTS") and utilizes the airspace over DOE's NTS. At the 98th Range Wing, our responsibilities, among others, included: (a) arranging for a conducive test and training environment; (b) scheduling and sequencing of test and training activities; (c) gathering data; (d) coordinating with those other agencies which had interests or activities at or near the range; and (e) construction or maintenance of facilities. I arrived at the 98th Range wing in August 2001.

2. I first became aware of the proposed wind farm electric project in late September or early October of 2001. I attended a meeting of the Joint Military Affairs Committee, which is

a committee of select local military and civilian agencies that coordinates federal and state governmental interests on the range (NTTR and NTS). Participants include the DOE, USAF, DOI, and Nevada State agencies concerned with wildlife management and environmental protection. At that meeting, there was a presentation describing the scope and plans for the proposed wind farm project. After this presentation, I stood up and expressed my concerns about the potential adverse impacts such a project might have upon current Air Force operations at the NTTR.

3. Later in October 2001, I attended a meeting at the offices of Carlson & Associates in Las Vegas, Nevada, to discuss to the proposed wind farm project. Attendees at the meeting included, among others, Warren Lee from my staff, Colonel Jack Schofield from the AF/DOE Liaison Office, Mr. Carlson, and several representatives from the developer of the project, Siemens. At that meeting, Mr. Carlson and the representatives from the developer explained the project, and attempted to understand and address Air Force concerns. Mr. Carlson repeatedly stated that he was sure we could work out any problems so the wind farm project could go forward. I disagreed, saying that I wasn't at all sure that this could be worked out, and again, expressed my general reservations about potential adverse impacts upon our current operations and indicated that we would require additional, specific details about their plans. To assess their plans, we requested a technical description of the windmills themselves, including the material composition of the towers and blades, the height of each tower, and the longitude and latitude of each individual windmill. The representatives of the developer and Mr. Carlson agreed to provide such data. I requested that they work with the AF/DOE Liaison Officer, Col. Schofield, to forward that information to us.

4. It took several months to get the requested data from the developer and Carlson & Associates. During this time period, individuals from my staff, including Warren Lee and Jim Towery, worked with Col. Schofield and Lt. Col. Johnson of the AF/DOE Liaison Office and DOE personnel to obtain the necessary information from the developer. My staff told me that delays were due in part to the constantly changing locations and models/types of the proposed windmills. Much of the requested data was not provided until December 2001 and some data was not provided until later.

5. Thereafter, the Air Force convened a special study group to evaluate the information provided and to make an assessment as to whether the proposed project would have an adverse impact upon current and planned operations at the NTTR. That study was completed in the spring of 2002 and concluded that the proposed wind farm project would have significant adverse impacts upon our current and planned operations. I, along with others, briefed our concerns to senior Air Force and DOE officials and key Congressional staffers, specifically those from Senator Harry Reid's office.

6. On July 3, 2002, I drafted and forwarded to Ms. Kathy Carlson, Director of DOE's (National Nuclear Security Administration) Las Vegas office, a letter expressing our concerns about the proposed project and objecting to continuation of the project.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection.

Wilhelm F. Percival

Executed on November 9, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC,<br>a Delaware limited liability company<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-1569C<br>(Judge Wolski) |

DECLARATION OF KEVIN THORNTON

I, Kevin D. Thornton, make the following declaration pursuant to 28 U.S.C. § 1746.

1. I am a current employee of the DOE's National Nuclear Security Administration ("NNSA"). Beginning in June 2000, I was assigned as the project manager for the proposed electricity-generating wind farm at DOE's Nevada Test Site ("NTS"). My responsibilities included: (a) coordination of wind farm activities on the NTS; (b) oversight of the NNSA/NSO Performance Based Management Contractor activities associated with the wind farm; and c) document manager for development of the Wind Farm environmental assessment and the environmental impact statement necessary for the agency's compliance with the requirements of the National Environmental Policy Act ("NEPA"). In effect, I was NNSA's general "point man" for the project, and I worked on this project on a full-time basis for the period June 2000 to July 2002.

2. In my capacity as project manager, I had frequent and regular contact with many individuals concerning the project. Inside DOE's NNSA, several of the key individuals were Kathy Carlson, Ken Powers, Tom Williams, Budd Bornhoft, and Mike Skougard. My main contacts at the Air Force were the resident AF/DOE Liaison Officers, Col. Jack Scholfield and LTC Glen Johnson. The principal contacts at the Nevada Test Site Development Corporation ("NTSDC") were initially Tim Carlson, who was later replaced by George Ormiston, and Janice Wiedemann. Upon leaving NTSDC, Mr. Carlson formed a private firm called "Carlson & Associates," which worked as a consultant to the developer of the project, MNS Wind Power Company. In addition to Mr. Carlson, I had frequent contact with his associate Janice Wiedemann. The original proponents of the project, Global Renewable Energy Partners ("GREP") and Siemens Energy and Automation, Inc., later formed MNS Wind Company LLC ("MNS"). The key individuals from that organization with whom I interacted included: John Johansson, the president, Bash Nola, vice president; and Michelle Conway.

3. In November of 2000 we began the NEPA process to assess the environmental impacts of the Wind Farm. The environmental assessment ("EA") was conducted by Battelle under a DOE-wide blanket ordering agreement. A pre-approval draft EA was published in March 2001 and provided to stakeholders for review and comment. Based on stakeholder comments, the NNSA concluded it could not support a Finding of No Significant Impact ("FONSI"). This decision was based primarily on the impacts to Native American resources and impacts to United States Air Force operations near the NTS. MNS was informed that for the project to go forward as planned an Environmental Impact Statement ("EIS") would be required. MNS agreed

at that time to move forward with the NEPA process and agreed to provide the financial support necessary to conduct the EIS. MNS requested, contrary to DOE's normal practice, to permit the EIS to be conducted by a consulting firm, in this case SWCA, who was directly contracted for by MNS. The DOE agreed to this request with the clear understanding the DOE would provide all direction and oversight to this contractor. A notice of intent to conduct an EIS was published in the Federal Register in July, 2001. A draft EIS was developed and was undergoing internal review in March 2002. During this time frame there were weekly telephone conference calls regarding the status of the EIS process in which NNSA, SWCA, Carlson & Assoc, and MNS Wind Power participated.

4. In addition, I also was involved in gathering technical data for the Air Force from MNS Wind Power to permit the Air Force to assess impacts of the proposed project. The earliest request I can recall making to MNS, on behalf of the Air Force, was in December 2000 for technical data on the composition of the towers and blades. Over the following months there was a continuing issue of whether MNS had provided the Air Force with all the technical information the Air Force had requested. The bulk of the requested data was supplied by MNS by December 2001.

5. During the period of time I was involved in this project, MNS was consistently pushing to accelerate schedules. The overall driver was tax credits that were scheduled to expire in late 2001. This in turn drove interim dates based on MNS's efforts to secure construction funding for the project. My understanding was that lenders were not willing to provide funds until the NEPA process was complete and a favorable decision was made. This was based on the condition in the easement. At

no time during the EIS process did MNS take possession of land on the NTS under the easement, and MNS never constructed any wind turbines on the property.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection.

Kevin D. Thornton

Executed on November 7, 2005