IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1569C |
| v. | ) | (Judge Wolski) |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Defendant, the United States, through its undersigned attorneys, hereby provides its response to Plaintiff's "Proposed Findings of Uncontroverted Fact" under Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"):

1. On or about December 22, 2000, the Department of Energy ("DOE") entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the Nevada Test Site Development Corporation ("NTSDC"). Declaration of Tim Carlson ("Carlson Decl."), Exhibit A.

Defendant's response:

**Disagree.**

**Basis for the objection:** This proposed finding mischaracterizes the nature of the agreement between DOE and MNS.

**Proposed revision:** On or about December 22, 2000, the Department of Energy ("DOE") entered into a Grant of Easement for Wind Powered Electric Generating Facility

(hereinafter "Easement") with the Nevada Test Site Development Corporation ("NTSDC"), with the express condition that no agreement would come into effect until a review process mandated by the National Environmental Policy Act ("NEPA") was completed. App. 37. Because that process was never completed, the Easement remained ineffective.

2. In the Easement, both the DOE and the NTSDC "acknowledge and agree for the benefit of [MNS], that [MNS] shall have the right to enjoy and directly enforce against the [DOE] any and all rights and remedies of [the NTSDC] under the Easement." Carlson Decl., Ex. A at Part I, ¶5(b), p. 3.

Defendant's response:

**Agree.**

3. In the Easement, the parties agreed that the DOE was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain." Carlson Decl., Ex. A at Part 1I, ¶E(1), p. 3.

Defendant's response:

**Agree**.

4. In addition, in the Easement, the DOE covenanted to, among other things: "not unreasonably interfere with the construction, maintenance or operation of the Project[,] . . . act in a manner that is not arbitrary or capricious" in revoking the Easement, and "act prudently and in good faith" in taking any action, exercising any discretion or making any determination under

the Easement. Carlson Decl., Ex. A at Part I, ¶1(a), p. 2; Part II, ¶E(1), p. 3; and Part II, ¶X(1), p. 11.

Defendant's response:

**Agree.**

5. Prior to executing the Easement, the United States Air Force ("USAF") informed the DOE that a wind farm on the NTS could impact on its operations. Declaration of Bryant S. Delgadillo ("Delgadillo Decl."), Exhibits B, C, and D; Declaration of Thomas Williams ("Williams Decl."), ¶¶ 5-6.

Defendant's response:

**Disagree.**

**Basis for objection:** This proposed finding omits the continuing dialogue between DOE, MNS, and the Air Force.

**Proposed revision:** Prior to executing the Easement, the United States Air Force ("USAF") informed the DOE that a wind farm on the NTS could impact on its operations. Over the course of the following two years, DOE and MNS communicated about any such impacts, and MNS fully understood the Air Force's concerns. App. 68-73; Supp. App. 1, 2, 8, 9, 12, 13, 14, 16.

6. Prior to executing the Easement, the DOE's chief counsel, Bud Bornhoft, understood that the use of a non-revocable document for an extended term, such as an easement, was essential in order to secure commercial funding if the wind farm was to proceed. Delgadillo Decl. Ex. C;

Williams Decl., ¶ 9.

Defendant's response:

**Agree.**

7. Prior to executing the Easement, John Johansen, the President of MNS, informed representatives of the DOE, including, but not limited to, Tom Williams, that MNS would not agree to invest time and resources in the wind farm project only to have its rights terminated for national security reasons without compensation for its involvement. In addition, Johansen informed representatives of the DOE that a revocable use permit was unacceptable, and that a non-revocable use permit for an extended term was essential to secure commercial funding for the wind-farm project. Williams Decl., ¶ 9.

Defendant's response:

**Agree.**

8. The Easement was subject to compliance with the National Environmental Policy Act ("NEPA"). Carlson Decl., Ex. A at Part I, § 1, p.1.

Defendant's response:

**Agree.** See, also, App. 37.

9. MNS retained the sole and absolute right to approve any costs required to comply with the environmental assessment and the property condition report. Carlson Decl., Ex. B ("Subeasement"), ¶ 18.7(iii); Delgadillo Decl., Ex. A, ¶ 37.

Defendant's response:

**Agree.**

10. Prior to terminating the NEPA process, Kathleen A. Carlson, Manager, Nevada Operations Office, recommended that the Administrator of the NTS approve the Draft EIS for the proposed wind farm at the NTS for release for public review and comment contingent on resolution of the USAF mission conflicts. Delgadillo Decl., Ex. E.

Defendant's response:

**Disagree.**

**Basis for objection:** We cannot confirm that the "recommendation" cited was ever forwarded to or considered by the Administrator of NNSA. The cited document "Delgadillo Decl., Ex. E." is an unsigned draft of such a recommendation. We have confirmed that on July 3, 2004, Ms. Carlson forwarded to the Administrator of NNSA, General Gordon, a recommendation that the NEPA process be terminated and that he elect the "no action" outcome under the EIS. App. 76-77.

11. On or about April 29, 2002, Kevin Thornton informed MNS that the DOE had decided to hold the Draft Environmental Impact Statement ("EIS") for release to the public until certain issues raised by the United States Air Force were resolved. Declaration of Michelle K. Conway ("Conway Decl."), ¶7 and Ex. B.

Defendant's response:

**Agree.**

12. On July 12, 2002, the DOE sent a letter to the NTSDC, which asserted that because of possible national security concerns, the DOE had decided to terminate the NEPA process and that the Easement would not go into effect according to the terms of the agreement. Carlson Decl. ¶ 27 & Ex. E.

Defendant's response:

**Agree.**

13. Even though the cost of mitigation under the Draft EIS would have been modest under the circumstances, MNS was unable to exercise its discretion to comply with the environmental condition because the DOE unilaterally terminated the NEPA process. Conway Decl., ¶¶ 6-7.

Disagree.

**Basis for objection:** This proposed finding mischaracterizes the nature of the NEPA process.

**Proposed revision:** The costs of mitigation under NEPA remained unknown until the completion of the EIS and approval of the project by agency decision-makers. See 10 C.F.R. §§ 1021.313, 1021.315; 40 C.F.R. § 1505.1. DOE, not MNS, retained the ultimate discretion to approve or disapprove the project under NEPA.

14. During the two years after the parties executed the agreements, MNS and its affiliates created an organization for this specific project requiring concentration of its efforts to the exclusion of developing other projects, and spent valuable resources performing various tasks to develop the project, including but not limited to, conducting wind assessments, transmission

studies, engineering studies, access and road building studies, and construction studies, complying with the NEPA process; obtaining various permits from Nevada; and executing a power purchase agreement with Nevada Power for the first 85 MW's of power production. Conway Decl., ¶ 9; Delgadillo Decl., Ex. F.

Defendant's response:

**Disagree.** By agreement of the parties, we have conducted no discovery of damages-related issues, so we are unaware to what extent or how "valuable" were the resources expended by MNS prior to the termination of the NEPA process. Moreover, we are unaware of the details as to specifically what planning or "studies" were completed by MNS. See Conway Decl. ¶ 9. DOE was generally aware that MNS was engaged in start-up or mobilization-type activities. Additionally, we know that MNS never took physical possession of any DOE property nor initiated any construction under the Easement. See Thornton, Decl. ¶ 5.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

November 21, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on November 21, 2005, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee
BRYANT G. SNEE