No. 04-1569
Judge Wolski

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

George T. Caplan, Counsel of Record
Bryant S. Delgadillo
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

Dated: November 21, 2005

23180598.WPD

TABLE OF CONTENTS

Page

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. The Parties Negotiated a Binding and Irrevocable Agreement to Develop a Wind Farm on the NTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. The Parties Enter Into A Binding and Enforceable Easement. . . . . . . . . . . . . . . . . . . . . . 7

C. MNS Proceeds with the Development of the NTS Wind Farm, Including Compliance With the NEPA Condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D. After Determining It Could Not Resolve the Air Force's National Security Concerns, the DOE Decides to Conclude the NEPA Process With A "No Action" Decision . . . . . . 9

E. The DOE Reverses Course and Breaches the Easement by Unilaterally "Terminating" the NEPA Process (Instead of "Concluding" the NEPA process with a "No Action" Decision), Attempting to Avoid its Obligation to Compensate MNS Pursuant to the Revocation Provision of the Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The DOE's "No Action" Decision Did Not "Terminate" the NEPA Process or the Easement, but Rather "Concluded" the NEPA Process, Thereby Implementing the Easement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. If the NEPA Condition is Concluded, the DOE Does Not Dispute that The Easement is Otherwise Valid and Enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C. The Government's Termination of the NEPA Process as Expressed in Ms. Carlson's July 12, 2002 letter and the January 10, 2003 Federal Register, Improperly Interfered the Environmental Condition to the Easement In Breach of the Terms and Conditions of the Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D. This Court Cannot Grant Summary Judgment on MNS' Claim for Equitable Estoppel Because Material Issues of Fact Regarding the DOE's Misconduct Are in Dispute . . . . 18

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

Page

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Anthuis v. Colt Industrial Operating Corp.*,
971 F.2d 999 (3rd Cir. 1992) . . . . . 17

*Glass v. United States*,
258 F.3d 1349 (2001) . . . . . 16

*Lobensein v. United States*,
91 U.S. 324 (1975) . . . . . 18

*Southern California Edison v. United States*,
58 Fed. Cl. 313 (2003) . . . . . 17

*Vanadium Corp. v. Fidelity & Deposit Co.*,
159 F.2d 105 (2nd Cir. 1947) . . . . . 17

## STATE CASES

A.C. Shaw Construction, Inc. v. Washoe County,
(1989) 784 P.2d 9 . . . . . 17

*Elizabeth E. v. ADT Security System West, Inc.*,
(1992) 839 P.2d 1308 . . . . . 16

*NGA #3 LLC v. Rains, Jr.*,
946 P.2d 163 (Nev. 1997) . . . . . 17

## OTHER FEDERAL MATERIAL

10 Code of Federal Register, § 1021.210(d) . . . . . 14, 20

10 Code of Federal Register, §1021.315(b) . . . . . 12

10 Code of Federal Register, §1021.315(c) . . . . . 12

40 Code of Federal Register, § 1502.14(a) . . . . . 14

40 Code of Federal Register, § 1502.14(d) . . . . . 14

68 Fed. Reg. 1448-01, 2003 WL 69209 (Jan. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 21

## MISCELLANEOUS

Cobin on Contracts, § 40.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12 America Jurist § 885 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2 Farnsworth on Contracts § 8.6 (2d ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 04-1569C<br><br>(Judge Wolski)<br><br>**MNS WIND COMPANY, LLC'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Filed Concurrently with MNS Wind Company LLC's Response to the Government's Proposed Findings of Uncontroverted Fact, MNS' Proposed Findings of Uncontroverted Fact in Support of MNS' Opposition to the Government's Motion, and the Declaration of Thomas Williams** |

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff, MNS Wind Company LLC ("MNS"), through its undersigned attorneys, hereby opposes the Government's Motion for Summary Judgment. The Government's motion is based entirely on its contention that the Easement between MNS and the Department of Energy ("DOE") -- an agreement which the DOE's lead negotiator described as being "non-revocable" once it was signed -- never became an effective, binding contract, but rather was a mere proposal because the NEPA, environmental process condition to the Easement was terminated by the DOE before it could be completed. *See* Government's Motion for Summary Judgement, at 3, 8 & 11. The Government contends that this condition was not satisfied because the DOE "terminated" the NEPA review process when it decided to adopt a "No Action" alternative. *Id.* at 2, 11. The Government's disingenuous argument not only ignores the Easement's revocation provision which required the DOE to terminate the Easement for national security reasons through eminent

domain, but it is also based upon a complete misunderstanding of the NEPA process, the memorandum approving the "No Action" decision, the subsequent actions of the DOE disregarding the "No Action" decision, the explicit proposed alternatives identified in the Draft EIS, and the DOE's own NEPA implementing regulations.

As the Government admits, the decision maker responsible for the NEPA process, General John Gordon, approved and adopted the "No Action" alternative under the Draft Environmental Impact Statement. *See* Defendant's Proposed Findings of Uncontroverted Fact, ¶ 4. Under NEPA and the DOE's regulations, a "No Action" decision, in fact, concludes the NEPA process, and as a result, satisfies the environmental condition to the Easement. Indeed, in the July 3, 2002 memorandum from Ms. Kathleen Carlson (the Manager of the NNSA) to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No Action' recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added).

Apparently recognizing that the "No Action" alternative would in fact conclude the NEPA process and require the DOE to compensate MNS pursuant to the Easement (Part II, ¶ E(1), p. 3), the DOE -- in the ultimate display of bad faith -- did everything it could to undo its initial decision. Disregarding General Gordon's decision to approve a "No Action" decision and conclude the NEPA process, on July 12, 2002, the DOE instead sent a letter to the NTSDC, that asserted because of possible "major impacts to National Security," the DOE had decided to "*terminate* the NEPA process" (i.e., before it could be concluded) and that the Easement would

not go into effect "according to the terms of the agreement." The DOE further claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward."

The DOE also never published a Record of Decision implementing the "No Action" alternative as would normally occur when a federal agency takes an action recommended in an Environmental Impact Statement. Instead, in its final public statement regarding the NTS wind farm project, the DOE attempted to turn back the clock and completely roll back the NEPA process by *withdrawing* its notice of intent to prepare an EIS for the NTS. In the statement published in the Federal Register on January 10, 2003, the DOE withdrew its prior announcement that it was preparing an EIS for the wind farm at the NTS. The DOE repeated the statements in Ms. Carlson's July 12, 2002 letter as the basis for its decision to withdraw the notice of intent. The DOE stated in the Federal Register that:

> "the Administrator of the NNSA [General Gordon] decided *to cancel consideration* of the wind farm proposal on the NTS due to potentially significant adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is *withdrawn* and the NEPA process is hereby *terminated*." (emphasis added).

Nowhere in the Federal Register does the DOE mention or refer to General Gordon's approval of the "No Action" alternative.

In fact, the DOE did not implement the "No Action" decision which would have satisfied and completed the NEPA process, and would have required the DOE to revoke the Easement through eminent domain pursuant to the national security revocation clause specifically negotiated by the parties for this very circumstance and included in Part II, ¶ E(1) of the

Easement. Instead, the DOE improperly (and in bad faith) interfered with the NEPA condition by terminating the NEPA process before it could be concluded by the issuance of a record of decision which either accepted the proposal, modified the proposal or selected a "no action" decision, any one of which (these are the alternatives provided in the Draft EIS and in the CEQ rules) would have completed and satisfied the NEPA process. By unilaterally "terminating" the NEPA process before reaching any decision provided in the Draft EIS and in the CEQ rules, the DOE improperly interfered with the environmental condition in breach of its contractual obligations, thereby legally eliminating the condition as any sort of impediment to the effectiveness of the Easement. Therefore, as discussed more fully in MNS' Motion for Partial Summary Judgment, the Easement is binding and enforceable, and this Court must deny the Government's Motion for Summary Judgment on MNS' contract claims (Counts I and II).

Lastly, the DOE's decision to complete the NEPA process with a "No Action" decision, but then later reverse course, and disregard the "No Action" decision and terminate the NEPA process in order to avoid compensating MNS, is further evidence of the DOE's bad faith in this matter. This action, along with other evidence of the DOE's misconduct, also precludes summary judgment in favor of the Government on MNS' estoppel claim.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND[1]

### A. The Parties Negotiated a Binding and Irrevocable Agreement to Develop a Wind Farm on the NTS.

As discussed in detail in MNS' Motion for Partial Summary Judgment, the Easement between MNS and the DOE was the result of intense and deliberate negotiations between the DOE, MNS and the Nevada Test Site Development Corporation ("NTSDC"). It is undisputed that during the negotiations, the DOE indicated that it wanted the right to terminate the agreements at any time for national security reasons. *See* Declaration of Tim Carlson ("Carlson Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶10; Declaration of Thomas Williams ("Williams Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶ 7. The DOE also expressed concerns about the availability for development of portions of the NTS for national security reasons. Williams Decl., ¶ 7; *see also* Declaration of Bryant S. Delgadillo ("Delgadillo Decl."), filed with MNS' Motion for Partial Summary Judgment, Ex. C ("Bornhoft Memo").

MNS responded by informing the DOE that it would not agree to invest time and resources in a project only to have the project terminated for national security reasons without compensation. Carlson Decl. ¶ 10; Williams Decl., ¶ 9; MNS' Proposed Findings of Uncontroverted Fact ("Undisputed Facts"), filed with MNS' Motion for Partial Summary Judgment, Undisputed Fact, No. 7. In addition, MNS informed the DOE that a revocable use

---

[1] MNS has provided a more detailed statement of the case and summary of material facts in its memorandum of points and authorities in support of MNS' Motion for Partial Summary Judgment on Contractual Liability. MNS hereby incorporates by reference those sections of its Motion.

permit was unacceptable, and that a non-revocable use permit for an extended term, such as an easement, was essential to secure commercial funding for the wind farm project. Williams Decl., ¶ 9.

Representatives of the DOE, including the attorney who negotiated the agreement, clearly understood that a non-revocable permit that required the Government to pay eminent domain damages if it terminated the agreement for national security reasons could involve significant financial consequences to the Government, and differed from the revocable permits that the DOE usually granted. *See* Delgadillo Decl., Ex. C (Bornhoft Memo); Williams Decl., ¶¶ 8, 9 & 11; Undisputed Fact, No. 6. In a memorandum the DOE's counsel authored before the signing of easement, he explicitly recognized the risk the Government was taking in agreeing to the national security provision, stating that:

> "should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

Delgadillo Decl. Ex. C; Undisputed Fact, No. 6. Nevertheless, the DOE decided to take this risk because it understood that this was necessary given the nature of the project and the financial commitment that would be required by MNS to develop the wind farm. *See* Williams Decl., ¶ 11; Delgadillo Decl., Ex. C ("Such a non-revocable document for an extended term is essential to secure commercial funding if [the wind farm project] is to proceed."); Undisputed Fact, No. 6.

Ultimately, the parties agreed to share the risk of national security concerns. Carlson Decl. ¶14. The parties agreed that MNS would immediately commence development of the project for a timely completion and the DOE would have the right to revoke the easement for national security reasons, but that the DOE would have to implement the revocation through eminent domain. Carlson Decl. ¶14.

MNS also agreed to incur certain other risks associated with the development of the project, including compliance with any environmental conditions, but it retained the absolute right to discontinue the project if, in its sole and absolute discretion, it concluded that the developmental costs, including environmental mitigation costs, were unacceptable. *Id.* ¶13; Undisputed Fact, No. 9. If MNS concluded that it did not want to go forward with the project because the developmental costs were unacceptable, then MNS would have been responsible for its own costs and expenses incurred in the performance of the agreements. On the other hand, the parties did not agree that the DOE would have the right to unilaterally terminate the environmental process condition based on national security concerns and, thereby, render meaningless the specific national security revocation clause that the parties negotiated to protect the interests of both sides.

**B. The Parties Enter Into A Binding and Enforceable Easement.**

In order to implement the agreements reached, the parties entered into three interdependent agreements – an easement, subeasement and compensation agreement – all of which were reviewed, negotiated and expressly approved by the DOE. Carlson Decl. ¶ 15. On or about December 22, 2000, the DOE entered into a Grant of Easement for Wind Powered Electric Generating Facility (hereinafter "Easement") with the NTSDC for the express "use and benefit" of MNS. Carlson Decl. ¶16, Ex. A (Easement); Undisputed Fact, No. 1. The term of the Easement was for thirty-five (35) years from the date of execution of the Easement. Carlson Decl. ¶ 16, Ex A. at Part I, ¶ 3, p. 2.

In the Easement, both the DOE and the NTSDC "acknowledge and agree for the benefit of [MNS], that [MNS] shall have the right to enjoy and directly enforce against the [DOE] any and all rights and remedies of [the NTSDC] under the Easement." Carlson Decl. ¶ 17, Ex A. at

Part I, ¶ 5(b), p. 3; Undisputed Fact, No. 2. In addition, the DOE expressly "approves and consents to [the NTSDC] entering into one or more subeasements . . . with MNS" and further stated it had "reviewed and hereby approves of the terms and conditions of each Subeasement and of the proposed use of the Property . . . . " Carlson Decl. ¶ 17. The DOE also "warrants to [the NTSDC] and [MNS] that it has the power and authority to enter into this Easement. Carlson Decl, ¶ 17.

In the Easement, the parties also agreed that the DOE was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement *shall* be accomplished by eminent domain." Carlson Decl. ¶ 18; Ex A. at Part II, ¶ E(1), p. 3. (emphasis added); Undisputed Fact, No. 3. Lastly, the DOE covenanted to, among other things, not unreasonably interfere with the construction, maintenance or operation of the project, act in a manner that is not arbitrary or capricious in revoking the Easement, and act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. Carlson Decl. ¶ 18, Ex A. at Part I, ¶ 1(a), p. 2; Part II, ¶ E(1), p.3; and Part II, ¶ X(1), p. 11; Undisputed Fact, No. 4.

### C. MNS Proceeds with the Development of the NTS Wind Farm, Including Compliance With the NEPA Process Condition.

Following the execution of the Easement, MNS proceeded with the development of the NTS, including compliance with the NEPA process covering use of all potential sites under the Easement. Carlson Decl. ¶ 25; Williams Decl. ¶ 12. The environmental consultants responsible for the NEPA process had prepared and issued an advanced Draft Environmental Impact Statement ("EIS") that failed to identify any significant impacts that would provide a barrier to the implementation of the project. *See* Declaration of Michelle Conway ("Conway Decl."), ¶ 6.

While the EIS was labeled a "draft" as required by NEPA, the document actually was a finished product that incorporated extensive comments from numerous parties, including the DOE and MNS. *See* Conway Decl. ¶ 5. The EIS was labeled as "draft" due to the fact that it was still subject to public review and comment. Conway Decl. ¶ 5. Indeed, at one time both the local and national offices of the DOE had expressly approved the EIS as written, and the DOE had specifically requested that the EIS be released for public comment. Conway Decl. ¶ 5; Delgadillo Decl., Ex. E; Undisputed Fact, No. 10.

The EIS identified basically four types of mitigation that would have been required: wildlife, cultural (Native American), archaeological, and general environmental/ministerial. Conway Decl. ¶ 6. An initial estimate of the cost of mitigation if the project had gone to construction was approximately $2 million. *Id.* ¶ 6. Despite approving the EIS and agreeing that it was ready to be released to the public, the DOE later reversed course and informed MNS that the DOE had decided to hold the EIS for release to the public until certain issues raised by the USAF were resolved. Conway Decl. ¶ 7; Undisputed Fact, No. 11. A representative from the DOE, Thomas Williams, arranged meetings between representatives of the USAF and United States Senator Harry Reid's office to determine whether there was any way to overcome these concerns. *See* Declaration of Thomas Williams In Support of MNS Opposition to the Government's Motion for Summary Judgment ("Williams Opposition Decl."), filed concurrently herewith, at ¶ 4.

**D. After Determining It Could Not Resolve the Air Force's National Security Concerns, the DOE Decided to Conclude the NEPA Process With A "No Action" Decision.**

After high level discussions between the USAF and Senator Reid's Office, the USAF concluded that national security concerns would not allow the project to continue. Williams

Opposition Decl., at ¶ 5. Thereafter, Mr. Williams met with Ms. Kathleen Carlson, the DOE Manager of NNSA Nevada Operations Office, to discuss how the DOE would terminate the wind farm project. *Id.* at ¶ 6. During this meeting, Mr. Williams informed Ms. Carlson that Senator Reid's office had expressed the strong desire that the DOE compensate MNS for the termination of the wind farm project. *Id.* Ms. Carlson also informed Mr. Williams that the Administrator of the NNSA, General John Gordon ("General Gordon") similarly supported compensation to MNS for its investment in the wind farm. *Id.*

During this same meeting, Mr. Williams advised Ms. Carlson how the DOE could implement the Easement, and compensate MNS. *Id.* at ¶ 7. Mr. Williams told Ms. Carlson that the DOE had the discretion and the authority to complete the NEPA process with a Record of Decision ("ROD") that recommended a "No-Action" alternative. *Id.*[2] Mr. Williams also told her that under this option, the DOE would recommend that the decision-maker approve the "No Action" alternative as provided in the Draft EIS, and complete the NEPA process. *Id.* Mr. Williams further informed her that this would complete and satisfy NEPA, implement the Easement, and require that the DOE terminate the Easement for national security concerns through eminent domain as provided in the termination provision in the Easement. *Id.*

The DOE appears to have heeded Mr. Williams' advice, and initially decided to complete the NEPA process with a "No Action" decision. In a July 3, 2002 memorandum from Ms. Carlson to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No

---

[2] The Draft EIS had four proposed alternative actions: alternative one was a proposal for the full project build-out within two areas of the NTS, Shoshone Mountain Area and Pahute Mesa Area; alternative two was for a project built within the Shoshone Mountain Area only; alternative three was for a project built within the Pahute Mesa Area only; and alternative four was the "no action" alternative. *See* Conway Decl. Ex. A, p. S-2 thru S-3.

Action' recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added). It is undisputed that General Gordon "approved" Ms. Carlson's recommendation, and authorized the "No Action" alternative. App. at 77. Tellingly, nowhere in her memorandum to General Gordon did Ms. Carlson discuss "terminating" the NEPA process before the process could be concluded or asserting that the Easement would not become effective.

**E. The DOE Reverses Course and Breaches the Easement by Unilaterally "Terminating" the NEPA Process (Instead of "Concluding" the NEPA process with a "No Action" Decision), Attempting to Avoid its Obligation to Compensate MNS Pursuant to the Revocation Provision of the Easement.**

Apparently recognizing that the "No Action" alternative would in fact satisfy and conclude the NEPA process and require the DOE to compensate MNS pursuant to the Easement, the DOE -- in a display of bad faith -- attempted to undo or disregard its initial decision. Disregarding General Gordon's decision to approve a "No Action" decision and conclude the NEPA process, on July 12, 2002, the DOE instead sent a letter to the NTSDC, that asserted because of possible "major impacts to National Security," the DOE decided to "*terminate* the NEPA process" and asserted that the Easement would not go into effect "according to the terms of the agreement." Carlson Decl. ¶ 27 (emphasis added); Williams Decl. ¶ 18; Undisputed Fact, No. 12. The DOE claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward."

Carlson Decl. ¶ 27; Undisputed Fact, No. 12.

In addition, the DOE never published a Record of Decision in the Federal Register implementing the "No Action" alternative as would normally occur when a federal agency approves an action recommended in an Environmental Impact Statement. *See, e.g.*, 10 C.F.R. § 1021.315(b) ("If DOE decides to take action on a proposal covered by an EIS, a ROD shall be prepared"); 10 C.F.R. § 1021.315(c) ("DOE RODs shall be published in the Federal Register and made available to the public"). Instead, in its final public statement regarding the NTS wind farm project, the DOE attempted to turn back the clock and completely roll back the NEPA process by withdrawing its notice of intent to prepare an EIS for the NTS. *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003). In the statement published in the Federal Register on January 10, 2003, the DOE withdrew its prior announcement that it was preparing an EIS for the wind farm at the NTS. *Id.* The DOE also repeated the statements in Ms. Carlson's July 12, 2002 letter as the basis for its decision to withdraw the notice of intent. The DOE stated in the Federal Register that:

> "the Administrator of the NNSA [General Gordon] decided *to cancel consideration* of the wind farm proposal on the NTS due to potentially significant adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is *withdrawn* and the NEPA process is hereby *terminated*." (emphasis added).

*Id.* Nowhere in the Federal Register does the DOE mention or refer to General Gordon's approval of the "No Action" alternative. Indeed, the DOE's statement in the Federal Register in effect completely disavows both the recommendation in Ms. Carlson's July 3, 2002 memorandum that General Gordon approve the "No Action' alternative, and General Gordon's subsequent approval of the "No Action" alternative.

As discussed above, the parties agreed that the Easement may be revoked for national security reasons. The parties negotiated explicit terms to deal with this specific possibility. The DOE initially understood its obligation, and decided to complete the NEPA condition with a "No Action" decision. As noted in the July 3, 2002 memorandum, the "No Action" decision would satisfy the NEPA condition, implement the Easement, and thus require the DOE to revoke the Easement for national security reasons.

The DOE, however, reversed course, and tried to find a way to avoid its promise. Instead of exercising its contractual right to revoke the easement for national security reasons and pay MNS the fair market value for the project, the DOE attempted to avoid that promise by interfering with the environmental process condition and withdraw the notice of intent to prepare an EIS and improperly "terminate" the NEPA process. *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003). The statements in the Federal Register read exactly like a termination of the Easement for national security reasons, even going so far as to disregard the decision alternatives in the EIS itself. Under these circumstances, unilaterally terminating the NEPA condition on grounds of national security was a bad faith attempt to avoid the specific terms of the Easement.

## II. ARGUMENT

### A. The DOE's "No Action" Decision Did Not "Terminate" the NEPA Process or the Easement, but Rather "Concluded" the NEPA Process, Thereby Implementing the Easement.

It is undisputed that the DOE decided to conclude the NEPA process with a "No Action" decision. Government's Proposed Findings of Uncontroverted Fact, ¶ 4. In the July 3, 2002 memorandum from Ms. Carlson to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No Action' recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis

added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added). It is also undisputed that General Gordon "approved" Ms. Carlson's recommendation, and authorized the "No Action" alternative. App. at 77.

MNS does dispute, however, the Government's characterization of the "No Action" decision as resulting in a termination of the NEPA process. As the Government is aware, the self-described "heart" of the CEQ rules requires a federal agency to "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a). This includes the alternative of no action. *Id.* § 1502.14(d). Indeed, a "No Action" alternative was identified in the Draft EIS for the NTS wind farm project. *See* Conway Decl., Ex. A at S-3. Pursuant to the DOE's own NEPA regulations, "if an EIS or EA is prepared for a DOE proposal, DOE shall consider the alternatives analyzed in that EIS or EA before rendering a decision on that proposal; [and] the decision on the proposal shall be within the range of alternatives analyzed in the EA or EIS." 10 C.F.R. § 1021.210(d). Here, the DOE's decision was to adopt the "No Action" alternative identified in the Draft EIS. This "decision" would have completed the NEPA process.

The actions taken by the DOE following General Gordon's approval of the "No Action" alternative are admissions that the DOE believed that this interpretation is correct. As discussed above, the DOE did everything it could to disregard its "No Action" decision, and instead decided to "terminate" the NEPA process. Instead of publishing a Record of Decision implementing the "No Action" alternative, as would normally occur when a federal agency approves an action recommended in an Environmental Impact Statement, the DOE attempted to turn back the clock and completely roll back the NEPA process by withdrawing its notice of

intent to prepare an EIS for the NTS. *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003).

In the statement published in the Federal Register, the DOE withdrew its prior announcement that it was preparing an EIS for the wind farm at the NTS. *Id.* The DOE also repeated the statements in Ms. Carlson's July 12, 2002 letter as the basis for its decision to withdraw the notice of intent. The DOE stated in the Federal Register that "the Administrator of the NNSA [General Gordon] decided *to cancel consideration* of the wind farm proposal on the NTS due to potentially significant adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range . . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is *withdrawn* and the NEPA process is hereby *terminated*." (emphasis added). Nowhere in the Federal Register does the DOE mention or refer to General Gordon's approval of the "No Action" alternative.

A federal agency does not have the authority under any statute or regulation, including section 1502.14, to include a "termination" alternative in an EIS. Indeed, the "termination" of the NEPA process is not discussed in the NEPA statute, the CEQ rules, or the DOE's own NEPA implementing procedures. Moreover, the Government has cited no authority -- because none exists -- to support its contention that a "No Action" decision "terminates" rather than completes the NEPA process. Instead, every action taken by the DOE after the execution of the July 3, 2002 memorandum supports the notion that the DOE well knew that the "No Action" alternative would have concluded the NEPA process and required the DOE to revoke the Easement for national security reasons and accomplish the revocation by eminent domain. *See* Easement, Part II, ¶ E(1), p. 3.

**B. If the NEPA Condition is Concluded, the DOE Does Not Dispute that The Easement is Otherwise Valid and Enforceable.**

It is undisputed that the DOE entered into an Easement with the NTSDC for the use and benefit of MNS. *See* Undisputed Fact, No.1. It is further undisputed that in the Easement, both the DOE and the NTSDC acknowledged and agreed, for the benefit of MNS, that MNS had the right to enjoy and directly enforce against the DOE any and all rights and remedies of the NTSDC under the Easement. Undisputed Fact, No. 2.

Given that the DOE, among other things, negotiated the terms of the three interdependent agreements directly with MNS, expressly mentioned MNS in the Easement, required MNS to sign the Easement as a signatory, expressly acknowledged and agreed that the Easement was for the benefit of MNS, and expressly acknowledged that MNS would rely on the terms of the Easement in entering into the other agreements, *see* Carlson Decl. ¶¶ 17-18, there clearly was an intent to benefit MNS under the Easement. Thus, MNS is an express third party beneficiary under the Easement. *See Elizabeth E. v. ADT Security Sys. West, Inc.*, 108 Nev. 889, 894, 839 P.2d 1308 (Nev. 1992) (in order to enjoy the status of third-party beneficiary, there must be an intent to benefit the third party and it must be shown that the third party's reliance thereon is foreseeable) (*citing Lipshie v. Tracy Inv. Co.*, 566 P.2d 819 (Nev. 1977) and *Lear v. Bishop*, 476 P.2d 18 (Nev. 1970)), *see also Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *amended on reh'g* 273 F.3d 1072 (Fed. Cir. 2001) ("In order to prove third party beneficiary status a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.").[3]

---

3 Here, the parties agreed that, to the extent not in conflict with federal law, the laws of the State of Nevada would apply. *See* Easement, Part II, ¶X(6), p. 12.

**C. The Government's Termination of the NEPA Process as Expressed in Ms. Carlson's July 12, 2002 letter and the January 10, 2003 Federal Register, Improperly Interfered the Environmental Condition to the Easement In Breach of the Terms and Conditions of the Easement.**

It is well-settled that "one who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition." 8 Corbin on Contracts (Conditions) § 40.17, at 580 (rev. ed. 1999); *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999 (3d Cir. 1992). A party who "voluntarily prevents the occurrence of a condition established for his or her benefit is estopped from seeking relief from the contract on grounds that the condition precedent to his obligation failed to occur." *NGA #3 v. Rains, Jr.*, 113 Nev. 1151, 1161, 946 P.2d 163 (Nev. 1997) (internal citations and quotations omitted). "Thus that party cannot escape liability by preventing the happening of the condition on which it was promised." Corbin on Contracts § 40.17, at 580-81; *see also*; 12 Am. Jur. § 885 ("One who makes impossible the performance or happening of the condition precedent upon which his liability by the terms of the contract is made to depend, cannot avail himself of its non-performance.").

In addition, the duty of good faith and fair dealing requires at least that a party do nothing to prevent the occurrence of a condition of that party's obligation. *See Vanadium Corp. v. Fidelity & Deposit Co.*, 159 F.2d 105 (2d Cir. 1947) (where sale of mining leases was "subject ... to approval by the Secretary of the Interior ... plainly [purchaser] was obligated to refrain from positive actions to prevent approval by the Secretary.").[4] Indeed, the United States Supreme Court has recognized this basic contract principle for decades. "It will always excuse the

---

4 The covenant of good faith and fair dealing is implied into every commercial contract under both Nevada and federal law. *See A.C. Shaw Construction, Inc. v. Washoe County*, 784 P. 2d 9, 10 (Nev. 1989); *Southern California Edison v. United States*, 58 Fed. Cl. 313, 325 (Ct. Cl. 2003).

performance of a condition precedent when it was hindered or prevented by the other party. No party can insist upon a condition precedent when its non-performance has been caused by himself." *Lobensein v. United States*, 91 U.S. 324, 328 (1875).

A party also may be required to do more than refrain from action that will prevent the occurrence of the condition. A party is also expected to take appropriate affirmative steps to see that the condition occurs. *See* 2 Farnsworth on Contracts § 8.6, at 432 (2d ed. 1998). In addition, the breach that excuses a condition may be a repudiation of a duty instead of non-performance of the duty. *See* 2 Farnsworth on Contracts § 8.6, at 435.

Here, the DOE agreed to, among other things: not unreasonably interfere with the construction, maintenance or operation of the Project, act in a manner that is not arbitrary or capricious in revoking the Easement, and act prudently and in good faith in taking any action, exercising any discretion or making any determination under the Easement and other related documents. Carlson Decl. ¶ 18. As discussed above, it is undisputed that instead of exercising its contractual right to revoke the contract for national security reasons and pay MNS eminent domain damages, the DOE attempted to avoid that promise by, among other things, violating its own rules and regulations by refusing to select an alternative provided in the EIS (10 C.F.R. § 1021.210(d)), disregarding its own "No Action" decision, and interfering with the environmental condition and claiming that the Easement never became effective.

### D. This Court Cannot Grant Summary Judgment on MNS' Claim for Equitable Estoppel Because Material Issues of Fact Regarding the DOE's Misconduct Are in Dispute.

MNS has presented evidence that the Government has taken every possible action to avoid its promise to compensate MNS if the NTS wind farm project was revoked because of national security concerns. *See* Williams Decl., Carlson Decl., and Williams Opposition Decl. It

is undisputed that prior to entering into an agreement with MNS to develop the wind farm project on the NTS, the DOE knew that the United States Air Force ("USAF") was concerned that the proposed wind farm could adversely impact national security. It is further undisputed that the parties thereafter specifically negotiated a provision giving the DOE the right to terminate the agreements for national security reasons so long as the DOE did so by eminent domain, so that MNS would be fairly compensated for its efforts. The DOE knew that, without this provision, MNS would not have entered into this transaction with the DOE, because MNS would not have agreed to risk millions of dollars in development effort, only to be subject, without recourse, to the DOE's sole discretion to terminate for national security reasons. On the other hand, the parties did not agree, that the DOE would have the right to unilaterally terminate the environmental condition based on national security concerns and, thereby, render meaningless the specific national security revocation clause that the parties negotiated to protect the interests of both sides. Indeed, the alternatives provided in the EIS and the DOE's own NEPA regulations that require that the process be completed by a decision based on the alternatives set forth in the EIS which included the "No Action" alternative. In other words, any decision based on the alternatives set forth in the EIS would have concluded and satisfied the NEPA process (including the "No Action" alternative) and would have required the DOE to compensate MNS pursuant to the revocation provision in the Easement.

Unable to overcome the Air Force's concerns that the proposed wind farm could negatively impact national security, and faced with the unmistakable obligation that it had to revoke the easement through eminent domain, the DOE initially decided to complete the NEPA process with a "No Action" decision. In the July 3, 2002 memorandum from Ms. Carlson to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No Action'

recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added). It is undisputed that General Gordon "approved" of Ms. Carlson's recommendation, and authorized the "No Action" alternative. App. at 77. Nowhere in her memorandum to General Gordon did Ms. Carlson discuss "terminating" the NEPA process and asserting that the Easement would not become effective.

In a display of bad faith, apparently recognizing that the "No Action" decision would conclude the NEPA process, satisfy the condition and implement the Easement, the Government disavowed the "No Action" decision, and instead informed MNS that the DOE had decided to "terminate" the NEPA process -- an alternative *not* provided in the EIS or permitted by the DOE's own NEPA rules. *See* 10 C.F.R. 1021.210(d). In the July 12, 2002 letter, the DOE asserted that because of possible "major impacts to National Security," the DOE had decided to "*terminate* the NEPA process" and that the Easement would not go into effect "according to the terms of the agreement." Carlson Decl. ¶ 27 (emphasis added); Williams Decl. ¶ 18; Undisputed Fact, No. 12.

In addition, the DOE never published a Record of Decision implementing the "No Action" alternative as would normally occur when a federal agency approves an action recommended in an Environmental Impact Statement. Instead, in its final public statement regarding the NTS wind farm project, the DOE attempted to turn back the clock and completely roll back the NEPA process by *withdrawing* its notice of intent to prepare an EIS for the NTS.

*See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003). In the statement published in the Federal Register on January 10, 2003, the DOE withdrew its prior announcement that it was preparing an EIS for the wind farm at the NTS. *Id.* The DOE also repeated the statements in Ms. Carlson's July 12, 2002 letter as the basis for its decision to withdraw the notice of intent. The DOE stated in the Federal Register that:

> "the Administrator of the NNSA [General Gordon] decided *to cancel consideration* of the wind farm proposal on the NTS due to potentially significant adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is *withdrawn* and the NEPA process is hereby *terminated*." (emphasis added).

*Id.* Nowhere in the Federal Register does the DOE mention or refer to General Gordon's approval of the "No Action" alternative. Indeed, the DOE's statement in the Federal Register in effect completely disavows both the recommendation in Ms. Carlson's July 3, 2002 memorandum that General Gordon approve the "No Action' alternative, and General Gordon's subsequent approval of the "No Action" alternative. The DOE should not be permitted to manipulate the NEPA process in an attempt to disavow its promises.

It should be obvious that if MNS had known that, despite the intense negotiations resulting in the revocation provisions in Part II of the Easement, that the DOE would disavow the Easement and the EIS and attempt to renege on its promises, MNS would never have entered into the Easement and made the investment in developing a wind farm at the NTS. As a matter of legal policy and business ethics, the Government's position in this case is truly indefensible and, if sustained, will seriously chill future endeavors with the Government. This would not be a good outcome for the Government or business.

## V. CONCLUSION

For the reasons discussed above, this Court should deny the Government's Motion for Summary Judgment, and grant MNS' Motion for Partial Summary Judgment as to the Government's liability under the Easement.

Dated: November 21, 2005

s/ George T. Caplan
George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on November 21, 2005, a copy of the foregoing MNS' Opposition to the Government's Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo