No. 04-1569C
(Judge Wolski)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

December 22, 2005

Attorneys for Defendant

## TABLE OF CONTENTS

ARGUMENT .......... 2

I. The NEPA Process Was Not Successfully "Completed" .......... 2

II. MNS Has Failed To Establish That DOE Acted in Bad Faith .......... 6

III. DOE's Actions Following The No-Action Election Are Irrelevant .......... 9

CONCLUSION .......... 13

## TABLE OF AUTHORITIES

### CASES

Andersen Consulting v. United States,
959 F.2d 929 (Fed. Cir. 1992) .......... 10

Anderson v. United States,
490 F.2d 921 (Ct. Cl. 1974) .......... 4

Arizona v. United States,
575 F.2d 855 (Ct. Cl. 1978) .......... 4

Aylett v. Secretary of Housing and Urban Development,
54 F.3d 1560 .......... 7

Ethicon, Inc. v. U.S. Surgical Corp.,
135 F.3d 146 (Fed. Cir. 1998) .......... 12

Ford Motor Co. v. U.S.,
378 F.3d 1314 (Fed. Cir. 2004) .......... 3

Hol-Gar Mfg. Corp. v. United States,
351 F.2d 972 (1965) .......... 3

ITT Arctic Servs., Inc. v. United States,
524 F.2d 680 (1975) .......... 10

Kim v. United States,
121 F.3d 1269 (9th Cir.) .......... 10

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) .......... 3, 4

Metric Constructors, Inc. v. NASA,
169 F.3d 747 (Fed. Cir. 1999) .......... 3

NVT Technologies, Inc. v. U.S.,
370 F.3d 1153 (Fed. Cir. 2004) .......... 3, 4, 10

PCL Const. Services, Inc. v. U.S.,
47 Fed. Cl. 745 (2000) .......... 10

Prineville Sawmill Co. v. United States,
859 F.2d 905 (Fed. Cir. 1988) .......... 13

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989) ........................................................................................ 5

Ryco Const., Inc. v. United States,
55 Fed. Cl. 184 (2002) .................................................................................... 10

Winstar Corp. v. United States,
64 F.3d 1531 (Fed. Cir. 1995) ......................................................................... 3

Wright v. Southland Corp.,
187 F.3d 1287 (11th Cir. 1999) ....................................................................... 7

**STATUTES and REGULATIONS**

42 U.S.C. § 4321 ................................................................................................. 3

10 C.F.R. § 1021.216(I) ......................................................................................... 5

10 C.F.R. § 1021.313(a) ...................................................................................... 6, 7

10 C.F.R. § 1021.315 ............................................................................................ 6

10 C.F.R. § 1021.315(b) ........................................................................................ 8

40 C.F.R. § 1502.2(f) ............................................................................................ 5

40 C.F.R. § 1506.1 ................................................................................................ 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1569C |
| | ) | (Judge Wolski) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION**

MNS's response to our Motion for Summary Judgment reveals the fundamental weakness at the core of MNS's case. In lieu of any plausible claim, MNS advances the nonsensical argument that DOE's election of "no action" on the wind turbine project "completed" the NEPA process, upon which the Easement was conditioned, and bound DOE to an otherwise meaningless Easement. That Easement was expressly contingent upon a process with a potential outcome—no action—that would negate the need for an agreement. To assert that an agreement survived after that outcome was realized promotes form over function and reason. DOE's election of "no action" here precluded the Easement from coming into effect. MNS offers no logical or credible argument to the contrary.

In its response to the Government's motion for summary judgement, MNS effectively concedes that DOE did not, in fact, "interfere" with the NEPA condition precedent to contract formation. This concession flows from MNS's admission that DOE properly selected the "no action" alternative provided for in the EIS. P. Opp. 2, 9.[1] MNS primarily quarrels, instead, with

[1] We cite "Plaintiff's Opposition to Government's Motion for Summary Judgment," as "P. Opp. ___." and "Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact" as "P. Resp. D. PFUF. ____." The Appendix attached to our "Motion for Summary Judgment" is cited "App. ___." The Supplemental Appendix attached to our "Response" brief is cited "Supp. App. ___." An additional declaration is attached to this brief.

DOE's behavior after it elected "no action." Specifically, MNS proffers a story that Ms. Kathleen Carlson, the Manager of the Department of Energy's ("DOE") Nevada Site Office ("NSO"), intended to cause the Easement to come into effect – and thus compensate MNS – when she recommended to her superior that he approve the "no action" alternative under NEPA. MNS claims that just days after her recommendation was approved, Ms. Carlson reversed course and, in an act of bad faith, informed NTSDC and MNS that the NEPA process had been "terminated" and wrongfully asserted that the Easement would not go into effect. P. Opp. 1-4. Although MNS repeats this story three times within 20 pages, see P. Opp. 1-4, 9-12, 18-22, the reiteration improves neither its logic nor its plausibility.

As we established in our opening papers and confirm here, DOE acted properly in this case and was correct that, under the Easement's terms, the Easement never became effective or enforceable. Accordingly, summary judgment in defendant's favor is the just and correct outcome here.

## ARGUMENT

### I. The NEPA Process Was Not Successfully "Completed"

MNS asserts that by DOE's election of the "no action" alternative – that is, by its disapproval of the project – the NEPA process was "completed" and the condition precedent to contract formation was satisfied, entitling MNS to a remedy under the Easement's revocation clause. P. Opp. 3, 10, 11, 14, 19, 20. MNS's position contradicts the plain language of the Easement, contravenes the purpose of NEPA, and fails to acknowledge NEPA's procedural requirements.

1. The plain language of the Easement vitiates MNS's position. Contract interpretation begins with the plain language of the agreement. NVT Technologies, Inc. v. U.S., 370 F.3d

1153, 1159 (Fed. Cir. 2004). The goal of interpreting contract language is to "discern the parties' intent at the time the contract was signed." Ford Motor Co. v. U.S., 378 F.3d 1314, 1321 (Fed. Cir. 2004) (quoting Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc)).

Most importantly for our purposes, the language of a contract must be interpreted reasonably and in its context. It must be given "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (1965)) (emphasis added). Similarly, "the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Technologies, 370 F.3d at 1159 (emphasis added). The same point has been stated slightly differently: "We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (emphasis added).

Here, the Easement twice specified that the existence of the Easement was conditioned upon NEPA. First, the very language granting and conveying a right of easement to MNS was "subject to compliance with" NEPA. Second, the parties further confirmed this condition by repeating that the Easement "will not become effective" until the NEPA process is "completed." App. 13, 37.[2]

[2] The precise language is as follows: "The Government, subject to compliance with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., hereby grants and conveys to Grantee . . . an easement . . ." A13. "DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process." A37.

It is neither "reasonable" nor does it "make sense" to interpret these words to mean that the Easement would become "effective" even if DOE disapproved the project – in NEPA parlance, if DOE elected "no action." Likewise, no "reasonably intelligent person" could construe the Easement's NEPA clauses to mean that MNS had vested rights under the Easement regardless of the outcome of the NEPA process. To the contrary, the only reasonable and sensible interpretation of the plain meaning of the Easement's NEPA language is that if the proposal was disapproved under the NEPA review, then no right was conveyed. To construe the language otherwise would be to recognize a right of easement which was granted without "compliance" with NEPA – which requires scrutiny before an irrevocable right can be conveyed.

Additionally, MNS's position – that disapproval under NEPA meant the Easement became binding nonetheless – runs afoul of two other cannons of contract interpretation. First, the interpretation advanced must not only be "reasonable," but it must give reasonable or sensible meaning "to all parts" of the Easement, leaving none out. NVT Technologies, 370 F.3d at 1159; McAbee Construction, 97 F.3d at 1435. While MNS strains to reach a hyper-technical interpretation of "completion" (*i.e.*, that "no action" – or disapproval – equals "completion"), see A37, MNS ignores entirely the provision that the grant of Easement was "subject to compliance with" NEPA, see A13. See, e.g., P. Opp. 14. MNS fails to offer any interpretation of this term because it cannot do so, as MNS's position fundamentally violates both the letter and spirit of NEPA. Second, and in a similar vein, MNS's interpretation that disapproval of the project under NEPA renders the Easement binding and enforceable is truly an "absurd" or "weird" result, which must be rejected. Arizona v. United States, 575 F.2d 855, 863 (Ct. Cl. 1978); Anderson v. United States, 490 F.2d 921, 928 (Ct. Cl. 1974).

2. MNS's interpretation also would subvert the very purposes of NEPA. As we established in our moving brief, the Easement by virtue of its express language and of free-standing regulation was contingent upon the completion of the NEPA process. See 10 C.F.R. § 1021.216(I). The point of this regulation, and of NEPA as a whole, is to require agencies to carefully evaluate the consequences of a proposed action before irrevocably committing resources to a project. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989); 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1)"); 40 C.F.R. § 1506.1 (limiting an agency's actions during the EIS process).

Under MNS's reading of the Easement, DOE irrevocably committed resources to the wind farm project as soon as it signed the Easement, because – according to MNS – the results of the NEPA process were irrelevant to the enforceability of the agreement. See P. Opp. 14-15. Indeed, MNS does not shy away from this extremist position. To the contrary, MNS baldly declares: "The Easement was binding and irrevocable once signed." P. Resp. D. PFUF 2 (¶ 2) (emphasis added); see P. Opp. 19 ("In other words, any decision . . . based upon the EIS would have concluded and satisfied the NEPA process (including the "No Action" alternative) and would have required DOE to compensate MNS . . .") (emphasis added). This interpretation of the Easement would contravene directly NEPA's requirements for deliberative agency decision-making. The only reasonable view of the Easement's "subject to compliance with [NEPA]" term is that the Easement was truly contingent upon the approval of the project by DOE.

3. Finally, MNS's position is inaccurate as MNS ignores the extent of NEPA's procedural requirements. Even if one chose to ignore the Easement's separate requirement that it was "subject to compliance with" NEPA, A13, and focused solely upon the Easement's

requirement that it would not become effective until "completed," A37, MNS incorrectly asserts that the NEPA process was, in fact, "completed." To the contrary, as we established in our earlier filings, there were several other steps required before the NEPA process could be "completed." These additional steps included a decision by the agency's headquarters to release the draft EIS for public comment, a minimum 45-day public review and comment period for the draft EIS, preparation and publication of a final EIS, a minimum 30-day public review and comment period on the final EIS, and a final decision by the designated agency official. See 10 C.F.R. §§ 1021.313(a), (c); 1021.315. Thus, even if one indulges MNS in its hyper-technical, literalist interpretation of the phrase "will not become effective until DOE has completed the NEPA process," A37, MNS is incorrect that the process was "complete."

In sum, even MNS's hyper-technical, "gotcha" interpretation of the Easement is unavailing as the "NEPA process," as described by the Easement, was not in fact "completed." The Court need not indulge in such "weird" or "absurd" conclusions given that the only "reasonable" interpretation of the plain language of the Easement was that if the project was not approved under NEPA, the Easement would not become effective.

## II. MNS Has Failed To Establish That DOE Acted in Bad Faith

MNS has failed to carry its burden of proof that DOE's action in electing the "No Action" option under NEPA was done in bad faith.

MNS's entire bad faith claim rests solely upon inferences, innuendo, and the artful deployment of the term "apparently." See P. Opp. 2, 11, 20, see also P. Opp. 10 ("DOE appears to have . . . "). What is lacking from MNS's case is any direct evidence that proves that Ms. Carlson or General Gordon had the motives, intents, or beliefs which MNS (and Mr. Williams) freely ascribes to them. Id. See Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir.

1999) (direct evidence is that "which if believed, proves the existence of fact in issue without inference or presumption"); Black's Law Dictionary 460 (6th ed. 1990). We produced to MNS almost 9,000 pages of Government documents related to this project and MNS has failed to cite a single one which directly supports its claim of bad faith. MNS's practice of liberally ascribing subjective intent to Ms. Carlson and General Gordon is all the more remarkable given that MNS elected not even to depose these witnesses, or any other Government witness for that matter. In short, MNS's entire bad faith argument rests upon only lawyer-argument and unsupported inferences. Aylett v. Secretary of Housing and Urban Development, 54 F.3d 1560, 1569 (10th Cir. 1995) (reasonable inferences "cannot be mere speculation, intuition, or guessing.").

Thus, notwithstanding MNS's repeated assertions to the contrary, P. Opp. 2-3, 11-12, 20-21, Ms. Carlson did not act improperly, let alone in bad faith, when she informed NTSDC and MNS that the NEPA review process was "terminated" and that the grant of Easement would not go into effect. Indeed, that is literally and precisely what occurred. Ms. Carlson recommended to her superior that he elect the "no action" alternative, a recommendation which he accepted. In turn, Ms. Carlson informed both the plaintiffs, via a letter to NTSDC on July 12, 2002, and the public, via a subsequent Federal Register notice, that the balance of the NEPA process remaining, which had previously been planned and announced, see App. 61-62, would not be completed. These statements, on their face, were literally true and factually accurate. See generally Declaration of Kathleen Carlson, December 20, 2005 ("Carlson Decl.") at ¶¶ 6-7.

General Gordon was the DOE official charged with approving or disapproving the NEPA alternatives, as MNS well knew. See Supp. App. 6. He elected "no action." App. 76-77. As discussed above and in our earlier papers, this election terminated the NEPA process and precluded the Easement, by its terms, from coming into effect. DOE then used the word

"terminated" to describe the wind farm project, which was appropriate because the project had been disapproved. DOE officials did not "backpedal" away from the "no action" decision; they relied upon it and communicated it to MNS and the public. Simply failing to use the technical words "no action" did not undo the decision, and that decision is what terminated MNS's rights here.

Likewise, MNS's reliance upon the absence of a Record of Decision ("ROD"), as additional evidence of Ms. Carlson's "bad faith," is equally misguided. P. Opp. 3, 4, 12, 14, 20. DOE regulations (the very same regulations that MNS cites) make plain that an ROD is required only "If DOE decides to take action on a proposal covered by an EIS." 10 C.F.R. § 1021.315(b). Here, DOE was not required to prepare an ROD because it never decided to "take action." Instead, as MNS admits, DOE elected the "no action" alternative in the EIS. The regulation is couched in terms of "action," not alternatives; just because DOE picked an alternative identified in the EIS does not mean DOE was required to prepare an ROD.

MNS continues to paint itself as the victim of a Government cabal so extensive that, according to MNS, the very foundations of the Government procurement system are in jeopardy. P. Opp. 21 ("[T]he Government's position is truly indefensible and, if sustained, will seriously chill future endeavors with the Government."). The truth is not so sinister or so consequential. MNS entered into an easement which was expressly dependent upon a subsequent review and approval process. MNS was not required to undertake the project at all, let alone commence any efforts or invest any funds in the project on any particular schedule. It was free to wait until the necessary approval was obtained. Apparently in the hopes of reaping favorable tax benefits, App. 70-71, <u>see</u> Thornton Decl. ¶ 5, MNS elected to commence detailed planning of the project and incurred some initial start-up costs, notwithstanding that it was aware of the Air Force's

objections to the project. That the Air Force's objections led to the disapproval of the project may have been a disappointment to MNS, but the business risks MNS accepted were entirely of its own choosing and, under the Easement, were allocated solely to MNS.

**III. DOE's Actions Following The No-Action Election Are Irrelevant**

MNS's case principally rests upon the two declarations submitted to date by MNS of Mr. Tom Williams, a former employee of DOE. See Williams Declaration, October 14, 2005 ("Williams Decl. I") and Williams Declaration, November 14, 2005 ("Williams Decl. II"). Among the many topics he covers, Mr. Williams: (a) provides his understanding of the meaning and intent of the Easement, Williams. Decl. I at ¶ 11& Decl. II at ¶ 7; (b) describes his "oversight" responsibilities concerning the agency's compliance with NEPA, Williams Decl. II at ¶ 3; (c) avers that he advised Ms. Carlson on a strategy whereby she could recommend that the "no action" alternative under NEPA be adopted, while ensuring that MNS receives compensation, id. at ¶¶ 6-7; (d) supplies his belief that Ms. Carlson accepted and implemented his advice, yet later "changed courses," id. at ¶¶ 9-10; and (e) expresses his "embarass[ment]" that DOE has refused to compensate MNS, Williams Decl. I at ¶ 19 & II at ¶ 11.

MNS's reliance upon these declarations to establish its case is misplaced. In large measure, much of Mr. Williams' declarations, even if true, are irrelevant to the legal issue pending before the Court – an issue of contract interpretation. Additionally, we directly dispute many of the factual assertions contained in Mr. Williams' declarations, thus precluding the entry of summary judgment in MNS's favor.

1. Mr Williams' professed understandings of the meaning, intent, and effect of the Easement are simply irrelevant. In interpreting and construing the Easement, the Court is limited generally to the plain language of the agreement, aided by the principles and cannons of

contract interpretation. See generally, NVT Technologies, 370 F.3d at 1153. The subjective personal intent of individuals regarding an agreement is irrelevant to that inquiry, especially where that subjective understanding is manifested in post-hoc "interpretations" of a party's intent. See Andersen Consulting v. United States, 959 F.2d 929, 934 (Fed. Cir. 1992); ITT Arctic Servs., Inc. v. United States, 524 F.2d 680, 684 (1975); PCL Const. Services, Inc. v. U.S., 47 Fed. Cl. 745, 785 (2000). Likewise, declarations should not contain conclusions of law or of ultimate facts. Kim v. United States, 121 F.3d 1269, 1276-77 (9th Cir.); see Ryco Const., Inc. v. United States, 55 Fed. Cl. 184, 186 n.6 (2002); see generally 10 A Wright, Miller & Kane, Federal Practice and Procedure 2738 at 486 (1983).

Here, Mr. Williams does not even possess the veneer of a legal degree or education. Moreover, although his declarations carefully mimic the legal arguments advanced by MNS's counsel, such matters were far outside Mr. Williams' areas of responsibility at DOE at the time of the wind farm project, which included customer development and community relations. See Carlson Decl. at ¶ 3. Even putting aside the patent shortcomings in Mr. Williams' capacity to opine on legal matters, such opinions are simply irrelevant to the issue before the Court.

2. In any event, we directly dispute many of the factual assertions contained in Mr. Williams' declarations.

Although Mr. Williams, in fact, held the title of "Program Manager," he was not, contrary to the impression created by his declarations, see Williams Decl. I at ¶¶ 1-4 & Decl. II at ¶¶ 2-3, a supervisor. He held no "oversight" responsibilities. Most specifically, he had no oversight responsibilities with respect to the agency's compliance with NEPA. See Carlson Decl. at ¶¶ 3-4. Contrary to Mr. Williams' declaration, see Williams Decl. II at ¶ 6, Ms. Carlson never told Mr. Williams that the Administrator of NNSA, General Gordon, "supported

compensation" for MNS. Carlson Decl. at ¶ 5. Additionally, Ms. Carlson believes she never received advice from Mr. Williams concerning what recommendations she should make to the Administrator of NNSA regarding the NEPA process, but if so, she would have disregarded such advice as it was far outside Mr. Williams' areas of responsibility and expertise. Id. at ¶ 6.

Additionally, contrary to Mr. Williams' suggestion, see Williams Decl. II at ¶¶ 7-8, Ms. Carlson, in forwarding her recommendation to General Gordon to elect the "no action" option, never formed any specific intent or plan to do so in a manner so as to cause the Easement to come into effect. Carlson Decl. at ¶ 6. Likewise, contrary to Mr. Williams' suggestion, see Williams Decl. II at ¶¶ 7-8, Ms. Carlson's later act of informing NTSDC and MNS that the NEPA process was terminated and that the Easement would not go into effect was fully consistent with the recommendation she made to General Gordon and did not represent a change in course or reversal of her recommendation. Carlson Decl. at ¶ 7.

Both MNS and Mr. Williams patently misread a line from Ms. Carlson's recommendation of "no action" to General Gordon. That line requests that Gen. Gordon "[A]pprove the 'No Action' recommendation to implement the easement allowing development of a wind farm at NTS." App. 76; see P. Opp. 2, 11, 13, 20; Williams Decl. II at ¶ 8. MNS cites this sentence, in combination with Mr. Williams' declaration, as support for MNS's contention that Ms. Carlson recommended to Gen. Gordon that he approve "no action" and "implement the Easement," thereby entitling MNS to a remedy here. Aside from contradicting Ms. Carlson's own declaration, see Carlson Decl. at ¶¶ 6-7, this reading is irrational. MNS ignores the second half of the sentence, "allowing development of a wind farm at NTS." Obviously, it was not Gen. Gordon's intent to implement the easement and allow the project to go forward; his intent was

just the opposite. MNS's selective quotation of the sentence and cramped reading to the contrary is erroneous.

Finally, although Mr. Williams makes much in both of his declarations concerning his former employment with DOE, it appears that Mr. Williams has failed to inform the court that today, in addition to his position with the University of Nevada Las Vegas, he also serves as an employee of the NTSDC, the organization which was the grantee of the Easement and which stood to earn substantial fees from MNS had the Easement gone into effect. See Tim Carlson Decl., Ex. C at ¶ B.1 (Compensation Agreement between NTSDC and MNS). See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 146, 1465 (Fed. Cir. 1998) (witness's pecuniary interest in the outcome of the case can affect probative value of testimony); see also 81 Am. Jur. 2d Witnesses § 842.

Accordingly, we directly dispute the foundations upon which MNS's case rests. As these alleged "facts" are apparently material to MNS's position, this is a genuine dispute of material fact that precludes the entry of summary judgment in MNS's favor. Conversely, as the Government's motion turns on a question of law and rests upon the plain language of the Easement, there is no impediment to granting summary judgement in the Government's favor. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (in evaluating cross motions for summary judgment, the court must evaluate each party's motion independent of the other).

**Conclusion**

For the reasons given above, we respectfully request the Court to deny MNS's partial motion for summary judgement and, instead, grant our motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

December 22, 2005

# ATTACHMENT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC,<br>a Delaware limited liability company<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-1569C<br>(Judge Wolski) |

DECLARATION OF KATHLEEN A. CARLSON

I, Kathleen A. Carlson, make the following declaration pursuant to 28 U.S.C. § 1746.

1. I am Manager of Department of Energy's ("DOE") Nevada Site Office. The Nevada Site Office manages and maintains DOE's Nevada Test Site and is responsible for all matters relating to the Nevada Test Site, including, but not limited to, nuclear test readiness, stockpile stewardship, environmental management, alternate energy, and other science and technology development. In my capacity as Manager, I am the senior-most DOE official at the Nevada Site Office and have overall responsibility for the policy, programs, and personnel of the Nevada Site Office, including DOE employees at the Nevada Test Site. I have held this position since July 5, 1999.

2. I have read two declarations signed by Mr. Thomas Williams, dated November 14, 2005 and October 4, 2005, and submitted by MNS Wind Company in this matter.

3. I was Mr. Williams' supervisor in the Nevada Operations Office. While it is accurate to say that Mr. Williams held the position of "Program Manager" in our office, that does not mean that Mr. Williams was the Program Manager of the wind farm proposal, or, indeed, of

any other specific program. Rather, "Program Manager" is a generic job series title and there are numerous "program managers" within our office. Indeed, at the time the wind farm proposal was under consideration, one of Mr. Williams' principal responsibilities was to work as the Director of Strategic Programs, a position which I created and to which I appointed Mr. Williams in February 2001. The focus of his efforts in that regard were in the nature of customer development and community relations. His function did not include any supervisory responsibility for employees, including those carrying out NEPA functions for the Nevada Site Office.

4. I am aware that in his declaration of November 14, 2005, Mr. Williams stated that he was "involved with DOE's oversight and compliance" with NEPA. Williams Decl., November 14, 2005, ¶ 3. While Mr. Williams may have been aware of or somehow generally "involved" in the agency's efforts to fulfill its NEPA obligations, I believe that Mr. Williams did not have what I would call "significant" or "direct" involvement, nor did he have any "oversight" responsibilities with respect to NEPA compliance. That responsibility rested with Kevin Thornton, who was the NEPA Document Manager for this project, and with Michael Skougard, who was the office's full-time NEPA Compliance Officer, and with Skougard's assistant, Linda Cohn.

5. I disagree with the assertion, contained in Mr. Williams' declarations, that I told him that General Gordon, the Administrator of NNSA, "supported compensation to MNS for its investment in the wind farm." Williams Decl., November 14, 2005, ¶ 6. General Gordon never made such a statement to me, nor did I make such a statement to Mr. Williams. What General Gordon had said was that *if* compensation was due MNS, then DOE/NNSA would comply.

6. Additionally, notwithstanding the assertions in his declarations, I do not recall receiving advice or guidance from Mr. Williams regarding the appropriate method or procedure to terminate the NEPA process, or regarding the effect of such a termination upon the grant of easement. Williams Decl., November 14, 2005, ¶¶ 6-9. Even if Mr. Williams had offered such advice, I would have disregarded those subjects as they were outside his areas of responsibility and expertise. In any event, I never formed an intent to take any specific action or to make any specific recommendation to General Gordon that would cause the grant of easement to come into effect.

7. Rather, I did what my memorandum to General Gordon, dated July 3, 2002, states: I recommended that General Gordon approve the "No Action" alternative under NEPA. I also signed the letter to NTSDC, dated July 12, 2002, which informed NTSDC that the NEPA process had been terminated and that the project would not go forward. I believe that letter is consistent with the recommendation I made to General Gordon on July 3, 2005. Specifically, contrary to the assertion in Mr. Williams' declaration, in notifying NTSDC I did not "change course" or otherwise fail to "follow through with the 'No Action' alternative" recommendation I had made to General Gordon. See Williams Decl. November 14, 2005, ¶ 7.

8. Mr. Williams retired from DOE on February 8, 2003, and, while he currently works as the Executive Director of the Research Foundation at the University of Nevada, Las Vegas, we understand that he also holds the position of the Executive Director of the NTSDC.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection.

K A Carlson

Kathleen A. Carlson

Executed on December 20, 2005

CERTIFICATE OF FILING

I hereby certify that on December 22, 2005, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee

BRYANT G. SNEE