No. 04-1569
Judge Wolski

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# MNS WIND COMPANY, LLC'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MNS' MOTION FOR SUMMARY JUDGMENT

George T. Caplan, Counsel of Record
Bryant S. Delgadillo
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

Dated:December 22, 2005

23180598.WPD

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | CASE NO. 04-1569C<br><br>(Judge Wolski)<br><br>**MNS WIND COMPANY, LLC'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MNS' MOTION FOR SUMMARY JUDGMENT** |

**REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

In both its Motion for Summary Judgment and its Response to MNS Wind Company LLC's ("MNS") Motion for Partial Summary Judgment, the Government repeatedly claims that the DOE elected the "no action" alternative identified in the draft EIS. *See* Government's Motion for Summary Judgment at 2; Response to MNS' Motion for Partial Summary Judgment at 8; *see also* Government's Proposed Findings, ¶ 4. If the DOE had truly elected and implemented the "No Action" alternative identified in the EIS, there would be no dispute here -- the NEPA process would have been completed, the Easement would have become effective by its plain terms, and the DOE would have been required to terminate the Easement for national security reasons and pay MNS eminent domain damages just as the parties had negotiated.

Under the DOE's own NEPA regulations, any decision based on an alternative set forth in an EIS -- including a "No Action" decision -- completes and concludes the NEPA process. When the DOE renders a decision on a proposal, the decision "*shall* be within the range of alternatives analyzed in the EA or EIS." *See* 10 C.F.R. § 1021.210(d) (emphasis added). In addition, under the DOE's NEPA regulations, one of the alternatives analyzed in an EIS must be

the "alternative of no action." *See* 40 C.F.R. § 1502.14(d). Lastly, under the DOE's NEPA regulation, if the DOE takes an action on a proposal covered by an EIS, the DOE must prepare a Record of Decision and must publish that Record of Decision in the Federal Register, thereby completing the NEPA process. *See* 10 C.F.R. § 1021.315(b)-(c).

As noted in Bud Bornhoft's memorandum (the DOE's chief counsel), *see* Declaration of Bryant S. Delgadillo ("Delgadillo Decl."), Ex. C ("Bornhoft Memo."), under most Government contracts, the Government reserves the right to terminate without incurring liability. Therefore, in most circumstances, after the DOE elects a "No Action" alternative identified in an EIS and publishes a Record of Decision of the No Action in the Federal Register, the NEPA process would be completed, and the Government would have the right to revoke the proposal and terminate the project without financial consequence. In contrast, here, the parties specifically agreed that the Government would compensate the private party for the termination of the project for national security reasons. *See* Easement, Part II, ¶E(1).

It is undisputed that the parties agreed that if the DOE terminated the project for national security reasons, the DOE would compensate MNS. *See* MNS' Proposed Findings of Uncontroverted Facts ("Undisputed Fact"), No. 3. Indeed, representatives of the DOE, including Bud Bornhoft, the attorney who negotiated the agreement, clearly understood that a non-revocable permit that required the Government to pay eminent domain damages if it terminated the agreement for national security reasons would involve significant financial consequences to the Government, and differed from the revocable permits that the DOE usually granted. *See* Delgadillo Decl., Ex. C; Declaration of Thomas Williams ("Williams Decl."), ¶¶ 8, 9 & 11; Undisputed Fact, No. 6. In Bornhoft's memorandum, he explicitly recognized the unique feature

of the Easement and the risk the Government was taking in agreeing to the national security provision, stating that:

> "In prior permits, [the DOE's ultimate control] can be exercised through administrative approvals required in the permit and by virtue of the fact that the commercial organization assumes financial risk of termination in the event of an unalterable conflict between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

Delgadillo Decl. Ex. C (Bornhoft Memo); Undisputed Fact, No. 6. Nevertheless, the DOE decided to take this risk because it understood that this was necessary given the nature of the project and the financial commitment that would be required by MNS to develop the wind farm. *See* Williams Decl., ¶ 11; Delgadillo Decl., Ex. C ("Such a non-revocable document for an extended term is essential to secure commercial funding if [the wind farm project] is to proceed."); Undisputed Fact, No. 6.

Notwithstanding this agreement to compensate MNS if the project was terminated for national security reasons, the Government has done everything in its power to avoid this promise, including disavowing the "No Action" decision, and instead "terminating" the NEPA process. In addition, the Government has made arguments that violate both the spirit and language of the agreements between the parties. The DOE now completely disregards the significance of the national security issue -- going so far as to call the national security revocation clause "irrelevant." The Government conveniently ignores the history of the parties' respective positions regarding the national security issue, how the parties resolved it, and the explicit language in the Easement concerning how the parties agreed to deal with the issue of national

security. Instead, the Government directly contradicts the Bornhoft Memo and baldly asserts that MNS, despite making the national security issue a critical component of the deal, nevertheless took a calculated risk that the NEPA process could go unsatisfied (and the Easement not become effective pursuant to its terms) due to *national security* issues raised by the DOE during the NEPA process. Nothing could be further from the truth.

In reality, the undisputed facts show that the parties specifically agreed that the DOE would compensate MNS if national security issues prevented MNS from developing the wind farm at any time during the development process, including the NEPA process. It is undisputed that prior to executing the Easement, the United States Air Force informed the DOE that a wind farm on the NTS could possibly impact on national security. *See* Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Facts ("Defendant's Response to Proposed Findings"), ¶ 5. Indeed, the DOE made it clear to MNS that it wanted the right to terminate the agreements at *any time* for national security reasons. *See* Williams Decl., ¶ 7.

The Government does not dispute that prior to executing the Easement, MNS responded to the DOE's requirement that it have the right to terminate the Easement at *any time* for national security reasons, by informing the DOE that it would not agree to invest time and resources in the wind farm project only to have its rights terminated for national security reasons without compensation for its involvement. Defendant's Response to Proposed Finding, ¶ 7. It also is undisputed that the parties ultimately negotiated and agreed that if the DOE determined that issues of national security prevented the continued development of the proposed wind farm, the DOE could cancel the project at any time and revoke the Easement. In such an instance, however, the parties expressly agreed that the DOE would implement any such revocation through eminent domain. *Id.* at ¶ 3. The parties, thus, in effect agreed that if the DOE

terminated the project *at any time*, even during the NEPA process, due to national security concerns, the DOE would compensate MNS. This would be accomplished by completing the NEPA process with a "No Action" decision, which would implement the Easement and require the DOE to revoke the Easement for national security reasons.

Indeed, the Government's action immediately following the Air Force's final determination that the project could not go forward due to national security concerns confirms the parties' understanding that the DOE would compensate MNS if the project was terminated for national security reasons, regardless of when the national security issue arose. Once the Air Force determined that national security issues prevented the continued development of the wind farm, the DOE, initially took steps to *complete* the NEPA process with a "No Action" decision in order to implement the Easement, terminate the Easement according to its terms, and compensate MNS as the parties had agreed.

As the Government admits, in the July 3, 2002 memorandum from Ms. Kathleen Carlson (the Manager of the NNSA) to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No Action' recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added). There is no dispute that the decision maker responsible for the NEPA process, General John Gordon, approved and adopted the "No Action" alternative under the Draft Environmental Impact Statement. *See* Defendant's Proposed Findings of Uncontroverted Fact, ¶ 4. Since under NEPA and the DOE's regulations, a "No Action" decision, in fact, would conclude the NEPA

process, and as a result, satisfy the environmental condition to the Easement, the DOE clearly understood the terms of the Easement, its own NEPA regulations, and the promise it had made to compensate MNS if the wind farm project was terminated due to national security reasons.

Nevertheless, as discussed in MNS' Response to the Government's Motion for Summary Judgment, the DOE in fact did not implement the "No Action" decision which would have satisfied and completed the NEPA process, and would have required the DOE to revoke the Easement through eminent domain pursuant to the national security revocation clause specifically negotiated by the parties for this very circumstance and included in Part II, ¶ E(1) of the Easement. Instead, the DOE improperly (and in bad faith) reversed its initial decision and, in breach of the Easement and in violation of its own NEPA regulations, interfered with the NEPA condition by withdrawing its notice of intent to prepare an EIS -- in effect revoking and terminating the NEPA process before it could be concluded by the issuance of a record of decision which either accepted the proposal, modified the proposal or selected a "no action" decision. Any one of these alternatives provided in the Draft EIS and in the CEQ rules would have completed and satisfied the NEPA process.

By unilaterally revoking the notice of intent to prepare the EIS and "terminating" the NEPA process before reaching any decision provided in the EIS, the DOE improperly interfered with the environmental condition in breach of its contractual obligations, thereby legally eliminating the condition as any sort of impediment to the effectiveness of the Easement. As discussed more fully in MNS' Motion for Partial Summary Judgment, the Easement is binding and enforceable, and this Court should grant MNS' Motion for Partial Summary Judgment holding the Government liable under Part II, ¶E(1) of the Easement.

## ARGUMENT

### A. Under the DOE's NEPA Regulations, A "No Action" Decision Completes and Satisfies the NEPA Condition to the Easement.

Pursuant to the DOE's own NEPA regulations, when considering the environmental impacts of a proposal to develop land, the DOE must "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a). One alternative that the DOE must consider in the EIS is "the alternative of no action." *Id.* § 1502.14(d). In addition, under the DOE's NEPA regulations, "if an EIS or EA is prepared for a DOE proposal, DOE *shall* consider the alternatives analyzed in that EIS or EA before rendering a decision on that proposal; [and] the decision on the proposal *shall* be within the range of alternatives analyzed in the EA or EIS." 10 C.F.R. § 1021.210(d) (emphasis added). Lastly, under the DOE's NEPA regulation, if the DOE takes an action on a proposal covered by an EIS, the DOE must prepare a Record of Decision and must publish that Record of Decision in the Federal Register. *See* 10 C.F.R. § 1021.315(b)-(c). If the DOE took all these steps, it will have completed and satisfied the NEPA process.

Here, it is undisputed that a "No Action" alternative was identified in the EIS for the NTS wind farm project. *See* Declaration of Michelle Conway ("Conway Decl."), Ex. A at S-3. In addition, as the Government admits, the DOE's initial decision was to adopt the "No Action" alternative identified in the Draft EIS. *See* Government's Appendix ("App.") at 76 (emphasis added). Under the DOE's NEPA regulations, if the DOE had actually implemented this "No Action" decision, the NEPA process would have been completed.

Instead, as discussed below, the DOE did everything it could to disregard its "No Action" decision, and instead decided to revoke the notice of intent to prepare the EIS and "terminate" the

NEPA process. The DOE never issued a Record of Decision implementing its "No Action" decision, nor did it publish any Record of Decision implementing the "No Action" alternative in the Federal Register as should have occurred when a federal agency approves an action recommended in an EIS.

The Government may attempt to disavow its contention that it elected the "No Action" decision, and instead argue that it simply had the discretion to revoke the notice of intent and "terminate" the NEPA process. A federal agency does not have the authority under any statute or regulation cited by the DOE in its briefs, including 40 C.F.R. § 1502.14, to revoke a notice of intent to prepare an EIS or include a "termination" alternative in an EIS.[1] Moreover, the Government has cited no authority -- because none exists -- to support a contention that a "No Action" decision revokes the notice of intent to prepare an EIS and "terminates" rather than completes the NEPA process.

The Government may also argue that the NEPA condition needed to be "successfully" completed with the result that the project could be developed. The DOE's own NEPA regulations do not support this argument. As discussed above, the DOE's NEPA regulations require the all proposals considered by the DOE include a "No Action" alternative in an EIS. *See, e.g.*, 40 C.F.R. §1502.14(a); 40 C.F.R. §1502.14(d);10 C.F.R. §1021.210(d). In addition, any decision the DOE takes on a proposal must be within the range of alternatives identified in the EIS. 10 C.F.R. §1021.210(d). Thus, these regulations clearly contemplate that the NEPA process can be concluded with a "No Action" decision that does not permit development of the project.

---

1 Moreover, as discussed more fully in MNS' Motion for Partial Summary Judgment, the DOE also lacked the authority to consider "national security" in the NEPA process.

The Easement also does not contain language requiring that the NEPA process be "successfully" completed. Importantly, the Easement simply provides that the Easement is "subject to *compliance* with [NEPA]" and "will not be effective until the DOE has *completed* the NEPA process." Easement, Part I ¶; Easement, Ex. A, ¶12. There is no language requiring "successful" compliance or completion of the NEPA process, i.e., that compliance or completion of the process can only occur if the NEPA process results in the development of the project. To the contrary, the Easement simply requires compliance with and completion of the NEPA process. The NEPA process includes a "No Action" alternative and the Easement itself provides for revocation for national security reasons. The NEPA process and the Easement are therefore in harmony with one another.

**B. The National Security Clause is Not Irrelevant, But Instead Was A Critical Component to MNS' Decision to Commit to the Wind Farm Project.**

As discussed in MNS' Motion for Partial Summary Judgment, "national security" was a critical issue for both parties. There is no dispute that during the negotiations, the DOE indicated that it wanted the right to terminate the agreements at any time for national security reasons. *See* Declaration of Tim Carlson ("Carlson Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶10; Williams Decl., at ¶ 7. The DOE also expressed concerns about the availability for development of portions of the NTS for national security reasons. Williams Decl., ¶ 7; *see also* Delgadillo Decl., Ex. C ("Bornhoft Memo").

MNS responded by informing the DOE that it would not agree to invest time and resources in a project only to have the project terminated at any time for national security reasons without compensation. Carlson Decl. ¶ 10; Williams Decl., ¶ 9; MNS' Proposed Findings of Uncontroverted Fact ("Undisputed Facts"), filed with MNS' Motion for Partial Summary

Judgment, Undisputed Fact, No. 7. In addition, MNS informed the DOE that a revocable use permit was unacceptable, and that a non-revocable use permit for an extended term, such as an easement, was essential to secure commercial funding for the wind farm project. Williams Decl., ¶ 9.

Representatives of the DOE, including the attorney who negotiated the agreement, clearly understood that a non-revocable permit that required the Government to pay eminent domain damages if it terminated the agreement *for national security* reasons could involve significant financial consequences to the Government, and differed from the revocable permits that the DOE usually granted. *See* Delgadillo Decl., Ex. C (Bornhoft Memo); Williams Decl., ¶¶ 8, 9 & 11; Undisputed Fact, No. 6. In a memorandum the DOE's counsel authored before the signing of easement, he explicitly recognized the risk the Government was taking in agreeing to the national security provision, stating that:

> "should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

Delgadillo Decl. Ex. C; Undisputed Fact, No. 6. Nevertheless, the DOE decided to take this risk because it understood that this was necessary given the nature of the project and the financial commitment that would be required by MNS to develop the wind farm. *See* Williams Decl., ¶ 11; Delgadillo Decl., Ex. C (Bornhoft Memo) ("Such a non-revocable document for an extended term is essential to secure commercial funding if [the wind farm project] is to proceed."); Undisputed Fact, No. 6.

Ultimately, the parties agreed that MNS would immediately commence development of the project for a timely completion and the DOE would have the right to revoke the easement for national security reasons, but that the DOE would have to implement the revocation through

eminent domain. Carlson Decl. ¶14. In the Easement, the parties specifically agreed that the DOE was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement *shall* be accomplished by eminent domain." Carlson Decl. ¶ 18; Ex A. at Part II, ¶ E(1), p. 3. (emphasis added); Undisputed Fact, No. 3. On the other hand, there is no evidence to support the conclusion that the parties agreed that the DOE would have the right to unilaterally terminate the environmental process condition based on national security concerns and, thereby, render meaningless the specific national security revocation clause that the parties negotiated to protect the interests of both sides.

**C. The DOE's Actions Following the Air Force's Determination That National Security Issues Prevented the Development of the Wind Farm Affirm the Parties' Understanding That the DOE Must Compensate MNS if the Project Was Terminated at Any Time for National Security Reasons.**

As discussed in detail in MNS' Response to the Government's Motion for Summary Judgment, after the USAF concluded that national security concerns would not allow the project to continue, the DOE initially took actions to complete the NEPA process, implement the Easement, and compensate MNS as promised. *See* Declaration of Thomas Williams, filed with MNS' Response to the Government's Motion for Summary Judgment ("Williams Opposition Decl.") at ¶ 5-8. As Mr. Williams described, he met with Ms. Kathleen Carlson, the DOE Manager of NNSA Nevada Operations Office, to discuss how the DOE would terminate the wind farm project. *Id.* at ¶ 6. During this meeting, Mr. Williams informed Ms. Carlson that Senator Reid's office had expressed the strong desire that the DOE compensate MNS for the termination of the wind farm project. *Id.* Ms. Carlson also informed Mr. Williams that the Administrator of the NNSA, General John Gordon ("General Gordon") similarly supported compensation to MNS for its investment in the wind farm. *Id.*

Mr. Williams advised Ms. Carlson that the DOE could complete NEPA, implement the Easement, and compensate MNS. *Id.* at ¶ 7. Mr. Williams told Ms. Carlson that the DOE was authorized to complete the NEPA process with a Record of Decision ("ROD") that recommended a "No-Action" alternative. *Id.* Mr. Williams also told her that under this option, the DOE would recommend that the decision-maker approve the "No Action" alternative as provided in the Draft EIS, and complete the NEPA process. *Id.* Mr. Williams further informed her that this would complete and satisfy NEPA, implement the Easement, and require that the DOE terminate the Easement for national security concerns through eminent domain as provided in the termination provision in the Easement. *Id.*

The DOE apparently heeded Mr. Williams' advice, and initially decided to complete the NEPA process with a "No Action" decision. In a July 3, 2002 memorandum from Ms. Carlson to General Gordon, Ms. Carlson recommended that General Gordon "[A]pprove the 'No Action' recommendation *to implement the easement* allowing development of a wind farm at NTS." *See* Government's Appendix ("App.") at 76 (emphasis added). Ms. Carlson further recommended that General Gordon "select the 'No Action' alternative in the Draft Environmental Impact Statement for the proposed wind farm at the NTS and *conclude* the National Environmental Policy Act process for this project." App. at 76 (emphasis added). It is undisputed that General Gordon "approved" Ms. Carlson's recommendation, and authorized the "No Action" alternative. App. at 77. Tellingly, nowhere in her memorandum to General Gordon did Ms. Carlson discuss revoking the notice of intent to prepare an EIS or "terminating" the NEPA process before the process could be concluded or asserting that the Easement would not become effective.

**D. The DOE Reverses Course and Breaches the Easement and Its Own NEPA Regulations by Unilaterally "Terminating" the NEPA Process (Instead of "Concluding" the NEPA process with a "No Action" Decision), Attempting to Avoid its Obligation to Compensate MNS Pursuant to the Revocation Provision of the Easement.**

As discussed in above, under the DOE's own NEPA regulations, any decision based on an alternative set forth in an EIS -- including a "No Action" decision -- completes and concludes the NEPA process. *See* 10 C.F.R. § 1021.210(d) (Requiring that any decision the DOE renders on a proposal "*shall* be within the range of alternatives analyzed in the EA or EIS.") (emphasis added). In addition, under the DOE's NEPA regulation, if the DOE takes an action on a proposal covered by an EIS, the DOE must prepare a Record of Decision and must publish that Record of Decision in the Federal Register, thereby completing the NEPA process. *See* 10 C.F.R. § 1021.315(b)-(c).

Based on its subsequent conduct, the DOE obviously knew that its decision to adopt the "No Action" alternative would in fact satisfy and conclude the NEPA process and require the DOE to compensate MNS as promised. After initially agreeing to honor its promise to compensate MNS, the DOE -- in a display of bad faith -- attempted to undo or disregard its initial decision. On July 12, 2002, the DOE sent a letter to the NTSDC, that asserted that because of possible "major impacts to National Security," the DOE decided to "*terminate* the NEPA process" and asserted that the Easement would not go into effect "according to the terms of the agreement." Carlson Decl. ¶ 27 (emphasis added); Williams Decl. ¶ 18; Undisputed Fact, No. 12. The DOE claimed "the National Security impacts identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward." Carlson Decl. ¶ 27; Undisputed Fact, No. 12.

In addition, the DOE never published a Record of Decision in the Federal Register implementing the "No Action" alternative as would normally occur when a federal agency approves, as it must, an action recommended in an EIS. Instead, in its final public statement regarding the NTS wind farm project, the DOE attempted to rescind and cancel the NEPA process by withdrawing its notice of intent to prepare an EIS for the NTS. *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003). In the statement published in the Federal Register on January 10, 2003, the DOE withdrew its prior announcement that it was preparing an EIS for the wind farm at the NTS. *Id.* The DOE also repeated the statements in Ms. Carlson's July 12, 2002 letter as the basis for its decision to withdraw the notice of intent. The DOE stated in the Federal Register that:

> "the Administrator of the NNSA [General Gordon] decided *to cancel consideration* of the wind farm proposal on the NTS due to potentially significant adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is *withdrawn* and the NEPA process is hereby *terminated*." (emphasis added). *Id.*

Nowhere in the Federal Register does the DOE mention or refer to General Gordon's approval of the "No Action" alternative. Indeed, the DOE's statement in the Federal Register in effect completely disavows both the recommendation in Ms. Carlson's July 3, 2002 memorandum that General Gordon approve the "No Action' alternative, and General Gordon's subsequent approval of the "No Action" alternative.

As discussed above, the parties negotiated explicit terms to deal with national security. The DOE initially understood that it had an obligation to compensate MNS if the wind farm project was terminated due to national security reasons and decided to complete the NEPA condition with a "No Action" decision. As noted in the July 3, 2002 memorandum, the "No

Action" decision would satisfy the NEPA condition, implement the Easement, and thus require the DOE to revoke the Easement for national security reasons pursuant to its terms.

The DOE, however, reversed course, and tried to find a way to avoid its promise. Instead of exercising its contractual right to revoke the easement for national security reasons and compensate MNS, the DOE attempted to avoid that promise by interfering with the environmental process condition and *withdrawing* the notice of intent to prepare an EIS and improperly "terminate" the NEPA process. *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003). The statements in the Federal Register read exactly like a termination of the Easement for national security reasons, but obviously disregards the decision alternatives in the EIS itself. Under these circumstances, unilaterally terminating the NEPA condition on grounds of national security was a bad faith attempt to avoid the specific terms of the Easement and the DOE's NEPA regulations. There is no other explanation for the DOE's refusal to properly implement its "No Action" decision than bad faith and its desire to avoid compensating MNS.

**E. The Easement is Valid and Enforceable.**

The Government did not object to the validity of the Easement in its answer, nor did it raise any affirmative defenses to MNS' claims. *See* Delgadillo Decl., Ex. A. Thus, the Government has waived any attempt to object to the validity of the Easement. *See* RCFC 8(c) (requiring a party to affirmatively plead certain defenses, including the defense of "failure of consideration"). Nevertheless, the Government has belatedly objected to the validity of the Easement based an alleged lack of consideration and lack of authority. These arguments are without merit.

First, the Easement is supported by ample and valuable consideration. The Easement itself states that "valuable consideration" was received by each party to the agreement and the

parties acknowledged the sufficiency of the consideration. *See* Easement, Part I, ¶ B(1), pg. 1. In the Easement, MNS expressly promised to deliver energy to the DOE at reduced rates. *See* Easement, Ex. A, ¶11(a-b), pg. 6 ("The [NTSDC] through [MNS] agrees to provide a benefit to the DOE equivalent to a ten percent (10%) reduction in energy usage based upon total NTS consumption for a fiscal year 2000."). In addition, in a related agreement, MNS agreed to provide the DOE's private economic development corporation -- the NTSDC -- an annual fee of $47,000 for the rights granted to the NTSDC under the Easement and Subeasement. *See* Carlson Decl., Ex. C (Compensation Agreement), at ¶ 1(A), pg. 1. More importantly, not only was MNS obligated to perform under the Easement, MNS actually spent valuable time and resources in performing. Indeed, the DOE cannot dispute that MNS had taken many steps to develop the project as promised. *See* Conway Decl., ¶ 9 (identifying various tasks MNS performed during the two years after the parties executed the Easement, including but not limited to, conducting wind assessments, transmission studies, engineering studies, access and road building studies, and construction studies, obtaining various local and state permits, and executing a power purchase agreement with Nevada power).

Second, the DOE expressly represented that it had authority to enter into the Easement. *See, e.g.*, Easement, Part I, pg.1; DOE's Supplemental Appendix ("Supp App.") at 34. Indeed, the head of the DOE, Secretary of Energy, Bill Richardson, expressly approved and consented the terms of the agreements between the parties. *See* Carlson Decl., Ex. D. There can be no dispute that the DOE had the express authority to enter into the Easement and agree to compensate MNS if the project was terminated for national security reasons. Moreover, there is no dispute that the DOE was authorized to "conclude" the NEPA process with a "No Action" decision. *See* 40 C.F.R. § 1502.14(d). Indeed, this is what the DOE first attempted to

accomplish, before changing its mind and deciding to disavow its promise to compensate MNS if the wind farm project was terminated for national security reasons.

The Government presents the strawman argument that the DOE did not have the "authority to enter into a binding contract until the NEPA process was completed." Opp'n at 21. MNS does not contend that the DOE should disregard the NEPA process. Rather, as discussed above, and in MNS' Response, the DOE was authorized to complete the NEPA process, and could have done so with a "No Action" decision, which would have satisfied the NEPA condition and implemented the Easement. Instead of doing this, the DOE breached the Easement and violated its own NEPA regulations, in order to *terminate* instead of *complete* the NEPA process. The DOE took these steps solely to avoid its promise to compensate MNS pursuant to the terms of the Easement

## CONCLUSION

For the reasons discussed above, this Court should deny the Government's Motion for Summary Judgment, and grant MNS' Motion for Partial Summary Judgment as to the Government's liability under the Easement.

Dated: December 22, 2005

s/ George T. Caplan
George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on December 22, 2005, a copy of the foregoing MNS' Reply to the Government's Response to MNS' Motion for Partial Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo