No. 04-1569
Judge Wolski

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

MNS WIND COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# MNS WIND COMPANY, LLC'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

George T. Caplan, Counsel of Record
Bryant S. Delgadillo
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

Dated:February 24, 2006

23180598.WPD

# TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . 1

II. ARGUMENT . . . . . 5

A. This Court Can Consider Extrinsic Evidence To Interpret Ambiguous Terms in the Easement . . . . . 5

1. Prior Drafts of the Easement, as Well as Other Contemporaneous Documents Show That The Term "National Security" in Section E(1) of the Easement Had an Expansive Meaning, and the "National Security" Issues Contemplated by the Parties Included Air Force Radar Concerns.. . . . . 6

2. The Express Language of the Easement, as Well as Other Contemporaneous Documents, Support Plaintiff's Interpretation That the Easement Was "Effective" Once Signed, and the Government Had the Authority to "Revoke" the Easement for National Security Reasons Before Completion of NEPA. . . . . 11

B. MNS Has Alleged that the Government Breached the Easement by Failing to Terminate for "National Security" Reasons and Compensate MNS for Its Investment . . . . . 15

III. CONCLUSION . . . . . 17

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*American Capital Corp. v. United States*, 59 Fed. Cl. 563, 573-74 (Fed. Cir. 2004) .......... 15

*Beta Systems, Inc. v. United States*, 16 Ct. Cl. 219, 221 (1989) .......................... 6

*Cray Research, Inc. v. United States*, 41 Fed. Cl. 427, 436 (1998) ........................ 5

*Dureiko v. United States*, 209 F.3d 1345 (Fed. Cir. 2000) ............................ 5

*Hendricks v. United States*, 10 Cl. Ct. 703 (1986) .................................. 5

*Information Systems and Networks Corp. v. United States*, 68 Fed. Cl. 336, 344 (2005) ....... 5

*Nat'l Australia Bank v. United States*, 63 Fed. Cl. 352 (2004) ......................... 5

*Nicholson v. United States*, 29 Fed. Cl. 180, 193 (1993) .............................. 6

# INDEX TO PLAINTIFF'S APPENDIX


Draft Economic Use Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

October 31, 2000 Email From Jack C. Schofield, Col. to Kathy Carlson . . . . . . . . . . . . . . . . . 17

November 8, 2000 Email from Lt. Col. Glen Johnson to Jack C. Schofield, Col. . . . . . . . . . . . 18

December 15, 2000 Memorandum From Richard Bradshaw, Special Assistant, Office of Energy Efficiency and Renewable Energy to Madelyn Creedon, Deputy Administrator, National Nuclear Security Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Memorandum From Kathleen Carlson to General John Gordon . . . . . . . . . . . . . . . . . . . . . . . 22

December 14, 2000 Memorandum From Kathleen Carlson to Madelyn Creedon . . . . . . . . . . . 31

July 12, 2002 Letter From Kathleen Carlson to George Ormiston, NTSDC . . . . . . . . . . . . . . . 32

December 13, 2000 Memorandum From Budd Bornhoft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company, | ) | CASE NO. 04-1569C |
| | ) | (Judge Wolski) |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

At oral argument, the Court questioned whether the phrase "national security" in Part II, Section E(1) of the Easement contemplated and included "interference with Air Force operations, as they were currently being done, as opposed to say, nuclear tests resuming or something of that nature" and therefore whether the phrase was sufficiently ambiguous to allow consideration of extrinsic evidence. *See* Transcript of January 25, 2006 Hearing, at 151:21-25; 152:1-3. The Court therefore permitted additional briefing on the parole evidence rule, as well as the submission of any extrinsic evidence supporting the parties' interpretation of that clause.

The term "national security" is sufficiently ambiguous to require the consideration of extrinsic evidence in order to determine its true meaning under the Easement. MNS contends that the phrase "national security" in the revocation section of the Easement encompasses any and all potential national security issues that could arise *at any time* during the development of the wind project, including the Air Force's concern that the wind farm could negatively impact

the Air Force's operations. In fact, this interpretation is consistent with MNS' position that the Easement was effective and binding once executed, and that one such binding promise that the Government made was that it would compensate MNS if, at any time during the project, national security issues required the Government to terminate the project. In contrast, the Government contends that the phrase "national security" is limited to the resumption of nuclear testing or other similar activities on the NTS, and does not encompass the Air Force's radar concerns. This is consistent with the Government's position that, even though the parties expressly negotiated and included a "national security" termination provision in the Easement, the Government was free to avoid this obligation by terminating the NEPA process for "national security" reasons, and thereby claim that the Easement was never "effective." Because the meaning of "national security" is unclear, this Court's consideration of extrinsic evidence is entirely appropriate in the context of this case.

The relevant extrinsic evidence supports MNS' interpretation that the "national security" clause included the Air Force's radar concerns and was not limited to the resumption of nuclear testing. The extrinsic evidence shows that:

- The first draft of the agreement was in the form of an Economic Use Permit, which expressly referenced the Government's right to terminate for national security connected to nuclear testing; subsequent drafts, including the Easement as signed, contained no such reference or limitation.
- During negotiations and before the Easement was signed, the parties discussed the fact that the Air Force was concerned that the wind farm could have potential adverse impact on Air Force radar;

- During negotiations and before the Easement was signed, the wind farm project was limited in scope from a development with 545 turbines with no phases, to a three phase development, with only the first phase of 175 turbines expressly approved, due, in part, to "national security" objections raised by the Air Force, including interference with radar; and
- The site of the first phase was selected by the Government in response to, among other things, the radar concerns expressed by the Air Force.

Thus, the extrinsic evidence will show that all parties clearly understood that the Air Force had raised "national security" objections to the wind farm based on the potential of interference with radar, and it was this type of "national security" matter that the parties addressed in Part II, Section E(1) of the Easement.

It is undisputed that the Government terminated the project for "national security" reasons, and not simply for "environmental" reasons as the Government now contends. In both the July 12, 2002 termination letter and its Notice of Intent to Withdraw the EIS published in the Federal Register, the DOE unambiguously states that the DOE decided to cancel consideration of the wind farm proposal on the NTS due to "potentially significant adverse impacts to national security missions of the Air Force" at the NTS. Nowhere in either Ms. Carlson's letter or the Federal Register statement did the DOE characterize the Air Force's concern as a mere an environmental impact. The Air Force's radar concern falls squarely within the scope of the "national security" provision in Part II, section E of the Easement.

In addition, the express language of the Easement, as well as contemporaneous documents, illustrate that the Easement was "effective" once signed, and the Government had the authority to "revoke" the Easement for national security reasons before completion of NEPA.

The Easement provided, in part, that the "duration of this Easement shall be 35 years *from the date of execution* . . . ." *See* Easement, Ex. A, p.1, ¶ 3(a) (emphasis added). In addition, under the Easement, MNS was under a time constraint and had to immediately begin development of the project. In Exhibit A of the Easement, MNS was granted the ***exclusive*** right for the installation of the first 545 wind turbines on the NTS. *See* Easement, Ex A., p. 1, ¶2. However, in order to exercise this right, MNS had only 24 months from the date the Easement was executed to develop and obtain Government approval for other sites. This exclusivity right was negotiated in response to the Government's demand that the project be completed in three phases, with MNS granted the right to develop the first phase effective immediately upon execution of the Easement. These provisions support MNS' interpretation that the Easement was "effective" once signed.

The extrinsic evidence similarly supports MNS' interpretation. Indeed, the lawyer primarily responsible for drafting the Easement -- Budd Bornhoft -- clearly believed that the Easement was binding and enforceable once signed. In a memorandum Mr. Bornhoft drafted ***two*** days before the Easement was signed, he explained the Government's obligations, once the Government executed the Easement. Mr. Bornhoft explained that a "non-revocable" permit (like this Easement) that required the Government to pay eminent domain damages if it terminated the agreement at any time for national security reasons would involve significant financial consequences to the Government, and differed from the "revocable" permits that the DOE usually granted because in the Easement, unlike in revocable permits, the Government did not enjoy the same level of administrative approvals and control. Nowhere in this memorandum, however, does Mr. Bornhoft assert that the Government is protected from any risk because the Easement would not be "effective" until the completion of NEPA or that the Government would

have a right to "terminate" NEPA for these "national security" concerns. The thrust of the memorandum is the opposite and is compelling evidence of the parties' intent and the true meaning of the "national security" revocation paragraph of the Easement. Under the Easement, once executed, the Government was obligated to compensate MNS for its investment in the project if the Government terminated the agreement for "national security" reasons.

## II. ARGUMENT

### A. THIS COURT CAN CONSIDER EXTRINSIC EVIDENCE TO INTERPRET AMBIGUOUS TERMS IN THE EASEMENT.

In the Court of Federal Claims, the parole evidence rule "forbids the admission of additional evidence when the applicable language is complete and unambiguous, and when there is no contention that the contract was executed as a result of fraud, accident or mistake." *Information Systems and Networks Corp. v. United States*, 68 Fed. Cl. 336, 344 (2005). Parole evidence may be used, however, to help establish the meaning of a term in an agreement where it is unclear or ambiguous or not integrated. "If a written contract is unclear, ***or not integrated***, prior or contemporaneous extrinsic evidence that does not contradict the written language of the contract may be introduced to establish its meaning." *Cray Research, Inc. v. United States*, 41 Fed. Cl. 427, 436 (1998) (denying summary judgment because the court needed to hear extrinsic evidence regarding ambiguous terms in a contract) (emphasis added); *see also Nat'l Australia Bank v. United States*, 63 Fed. Cl. 352 (2004); *Hendricks v. United States*, 10 Cl. Ct. 703 (1986) (denying summary judgment where the term "occasionally" was inherently ambiguous and therefore extrinsic evidence is appropriate to help determine its meaning); *Dureiko v. United States*, 209 F.3d 1345 (Fed. Cir. 2000) (utilizing extrinsic evidence of intent to aid the court in interpreting an ambiguous contract). Furthermore, "application of the parole evidence rule

depends ***substantially*** on whether an instrument constitutes a 'total integration.'" *Nicholson v. United States*, 29 Fed. Cl. 180, 193 (1993) (emphasis added).

Here, the Easement does ***not*** contain an integration clause. In addition, as was made clear in the parties' papers and in oral argument, the parties are applying differing meanings to various terms and phrases in the Easement, including the phrase "national security" in Part II, Section E(1) of the Easement. In such circumstances, the Court should consider extrinsic evidence, and once the Court considers the extrinsic evidence, the case is no longer suitable for summary judgment. *See Beta Systems, Inc. v. United States*, 16 Ct. Cl. 219, 221 (1989) ("Where the provision in question is uncertain or ambiguous and parole evidence is advanced as an aid in interpretation of said provision, then the matter, a question of interpretation and conduct, becomes a question of fact, not a question of law, and summary judgment may accordingly be inappropriate."). As discussed below, the extrinsic evidence discussed supports MNS' interpretation that the parties agreed that if the DOE terminated the project at *any* time for national security reasons, the DOE would compensate MNS for its investment. Further, the evidence demonstrates that the Air Force concerns were discussed before the agreement was executed and that both parties considered Air Force concerns to be part of the "national security" concerns referenced in the Easement.

**1. Prior Drafts of the Easement, as Well as Other Contemporaneous Documents Show That The Term "National Security" in Section E(1) of the Easement Had an Expansive Meaning, and the "National Security" Issues Contemplated by the Parties Included Air Force Radar Concerns.**

The term "national security" is subject to more than one interpretation and therefore is ambiguous. The term "national security" is not defined in the Easement, however, as reflected in various drafts of the Easement, the meaning of the phrase "national security" evolved as the

negotiations continued, from a narrow clause dealing only with the resumption of nuclear testing into a broader phrase encompassing potential "national security" issues that could arise at any time during the development of the wind farm project. Further, it is undisputed that one such "national security" issue being discussed while the parties were negotiating the Easement was the Air Force's concern about the wind farm's potential negative effect on radar.

In August 2000, the DOE first forwarded to MNS a standard Economic Use Permit to MNS for its review. This draft contained a revocation clause that permitted the DOE to revoke the permit any time "at the sole discretion of DOE." Appendix ("App.") at 8. However, such discretion to revoke could only be exercised in certain circumstances, including an "exercise by the President of the rights under the 'supreme national interests' clause of the Comprehensive Test Ban Treaty and the conduct of testing activities, or other national security considerations determined by the Secretary of Energy, that require the immediate access to the Permitted Property or vacation of the NTS by [MNS] . . .". *Id.* The revocation provision was subsequently revised to remove any reference to the "Comprehensive Test Ban Treaty." The revised language, as reflected in Part II, Section E(1) of the Easement provided that the Government was permitted to revoke the Easement "in the interest of national security, in which event the revocation of this Easement shall be accomplished by eminent domain." This change is consistent with MNS' interpretation that the term national security included more than simply the resumption of nuclear testing.

Moreover, contemporaneous documents show that during the negotiations and before the Easement was signed in December 2000, the parties discussed the fact that the Air Force was concerned that the wind farm could negatively impact on the Air Force's operations and thereby prevent the development of the project because of a potential Doppler effect of the turbines on

the Air Force's radar. The Air Force concern was one of the "national security" issues that the parties discussed when drafting and negotiating both the scope of the project and the national security revocation provision of the Easement. The Government's contention that the term "national security" in the Easement was limited to the resumption of nuclear testing at the NTS and did not include the Air Force's radar concerns is simply not supported by the extrinsic evidence.

For example, as early as October 2000, two months before the Easement was executed, the Air Force expressed concerns that the "Doppler effect of those big blades might be a big impact." *See* App. at 17 (October 31, 2000 email from Jack Schofield, Col., USAF to Kathleen Carlson); *see also* App. at 18 (November 8, 2000 email from Lt. Col. Glen Johnson to Jack Scholfield ("I told [the DOE's Kevin Thornton] of a general 'Doppler problem' based on blade composition, etc."). In fact, while negotiating the scope of the NTS wind farm project (i.e., where the turbines could be located on the NTS), the Government eliminated certain areas of the NTS from consideration due to national security considerations raised by the Air Force. *See* App. at 20 (December 15, 2000 Memorandum from Richard Bradshaw to Madelyn Creedon ("during mid-December, NTS negotiators introduced several demands/restrictions that were not on the table previously, and which seriously jeopardize the ability of [MNS] to construct the project. Chief among them is the reversal of NTS' prior approval of Paiute Mesa as a site for wind turbines . . . . No reason was given to [MNS] and NTSDC other than unspecified ***national security*** objections raised by the Air Force.") (emphasis added). This document, as well was the correspondence between the parties all refer to the Air Force concerns as issues of "national security."

Indeed, Kathleen Carlson, the manager of the NNSA, memorialized how the Air Force's radar issues affected the development and scope of the NTS wind farm project, and how the Government limited the development of the wind farm to three distinct phases:

> Since the inception of this project, we have been aware of possible interference with on-going activities at the Nevada Test Site and the Nevada Test and Training Range from the rotation and movement of turbine blades and the creation of uncontrolled energy emissions. In ***negotiating*** the easement with the project sponsor for the use of Test Site land, we were extremely cautious in segmenting the geographic areas of interest to the sponsor into definable, "phased," permit areas. Phase One, in Shoshone Mountain area of the Test Site, was expected to provide isolation from most ***National Security*** operations on the NTS as well as a line-of-site "ridge line" buffer from operations on the NTTR to the east of Shoshone Mountain. At this time this is the only phase of the project that the Nevada Operations office has allowed the sponsor to perform preliminary engineering on.

*See* App. at 29 (Memorandum from Kathleen Carlson to General John Gordon) (emphasis added);[1] *see also* App. at 31 (December 14, 2000 Memorandum from Kathleen Carlson to Madelyn R. Creedon) ("The project will be constructed in three phases. The first phase, shown in Attachment A-1 to the easement, consists of approximately 85 MW of generation to be constructed in the Shoshone Mountain area of the NTS."). In this same memorandum, Ms.

---

[1] This extrinsic evidence was previously attached as Exhibit F to the Declaration of Bryant S. Delgadillo ("Delgadillo Decl.") filed in Support of MNS' Motion for Partial Summary Judgment. For the Court's ease of reference, the document also is part of the Appendix.

Carlson also recognized that MNS "had invested approximately $2,000,000 on engineering and environmental studies . . . and [MNS] continues to expend funds." App. at 23. Ms. Carlson also recognized that if the project was cancelled, MNS "will seek compensation for losses . . .". App. at 24.

Ms. Carlson states that the Air Force had raised concerns which she characterized as "national security" objections to the development of the wind farm project during the negotiation and drafting of the Easement. These concerns were addressed in two ways: 1) requiring the wind project to be developed in three, distinct phases, with MNS being permitted initially to only develop the first phase of the project; and 2) the national security clause in the Easement, which permitted the Government to revoke the Easement at any time if it determined national security concerns prevented further development of the project. As quoted above, Ms. Carlson acknowledges that MNS would seek compensation for the cancellation of the project for national security reasons. The extrinsic evidence supports MNS' interpretation of the national security provision as including the Air Force's radar concerns, and required the Government to compensate MNS if, at any time, the Government terminated the Easement for "national security" reasons.

Moreover, it is undisputed that the Government terminated NEPA for "national security" reasons, and not simply for "environmental" reasons as the Government now contends. In the July 12, 2002 termination letter, Ms. Carlson unambiguously stated that because of possible "major impacts to ***National Security***," the DOE had decided to terminate "the NEPA process" and that the Easement would not go into effect "according to the terms of the agreement." *See*

App. at 32.[2] The DOE claimed "the ***National Security impacts*** identified by the Air Force [at the Nevada Test Site] are so significant that further action with respect to the NEPA process is unwarranted." Therefore, the "development of the project will not be allowed to go forward." *Id.* These reasons were repeated in the DOE's statement in the Federal Register withdrawing the Notice of Intent to prepare an EIS for the NTS. *See* 8 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003) ("the Administrator of the NNSA [General Gordon] decided to cancel consideration of the wind farm proposal on the NTS due to potentially significant adverse impacts to ***national security missions of the U.S. Air Force*** at the Nevada Test and Training Range . . . "). (emphasis added). Nowhere in either Ms. Carlson's letter or the Federal Register statement does the DOE characterize the Air Force's concern as a mere an environmental impact. The Government specifically placed the Air Force's radar concern within the scope of the "national security" provision in Part II, section E of the Easement. These documents demonstrate beyond doubt that the Air Force concerns were in fact characterized by both parties as "national security" concerns that should have triggered the "national security" termination clause.

**2. The Express Language of the Easement, as Well as Other Contemporaneous Documents, Support Plaintiff's Interpretation That the Easement Was "Effective" Once Signed, and the Government Had the Authority to "Revoke" the Easement for National Security Reasons Before Completion of NEPA.**

The Government's contention that the Easement was merely a proposal, and MNS had no rights under the Easement until the completion of NEPA is contrary to the express language of

---

[2] This extrinsic evidence was previously attached as Exhibit E to the Declaration of Tim Carlson ("Carlson Decl."), filed in Support on MNS' Motion for Partial Summary Judgment.

the Easement, as well as the understanding of the DOE lawyer responsible for drafting the Easement.

First, the Easement expressly provides that the "duration of this Easement shall be 35 years *from the date of execution*, unless earlier revoked in the event of default under the terms of this Easement, plus an additional ten (10) year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties." *See* Easement, Ex. A, p.1, ¶ 3(a) (emphasis added); *see also* Easement, Part I, p.2, ¶ 3 ("This Easement shall remain effective for a term as set forth in Exhibit A of thirty-five (35) years, plus an additional (10) ten year period if approved by the DOE, unless otherwise extended by mutual agreement of the parties."). In addition, under the Easement, MNS was required to immediately begin development of the project, thereby supporting MNS' interpretation that the Easement was effective once signed. MNS could not have waited until NEPA was finished before beginning to develop the project (a question raised during oral argument).

In Exhibit A of the Easement, MNS was granted the ***exclusive*** right for the installation of the first 545 wind turbines on the NTS. *See* Easement, Ex A., p. 1, ¶2. However, in order to exercise this right, MNS had 24 months from the date the Easement was executed to obtain DOE approval of additional easements. *Id.* This exclusivity right was negotiated in response to the Government's demand that the project be completed in three phases, with MNS granted the right to develop the first phase effective immediately upon execution of the Easement. The Government's interpretation concerning the "effectiveness" of the Easement would render the exclusivity clause meaningless.

Tellingly, the Government could not respond to the Court's question during oral argument whether the Government was free to find a better offer from another company to

develop a wind farm on the NTS prior to completion of the NEPA process, since under the Government's interpretation, no rights were granted and the easement was not effective until the completion of NEPA. Obviously, this was not the case, and the Government was not free to find a "better" proposal since MNS was granted a 24 month exclusive period from the date of execution within which to obtain additional site approvals. If the Government refused to allow MNS to exercise this exclusivity and seek approval of additional sites to install the first 545 wind turbines, then the Government would have breached the agreement. The juxtaposition of time is further evidence that the Government was duty bound to terminate the Easement as soon as it realized that "national security" concerns would require termination regardless of the progress of the NEPA process.

Second, the lawyer primarily responsible for drafting the Easement -- Bud Bornhoft -- clearly believed that the Easement was binding and enforceable once signed. Indeed, in a memorandum Mr. Bornhoft drafted ***two*** days before the Easement was signed, he succinctly explained the Government's obligations, as he understood them, once the Government executed the Easement. *See* App. at 33.[3] Mr. Bornhoft explained that a "non-revocable permit," like this Easement, that required the Government to pay eminent domain damages if it terminated the agreement for national security reasons would involve significant financial consequences to the Government, and differed from the "revocable permits" that the DOE usually granted because the DOE did not enjoy the same level of administrative control (i.e., NEPA and other administrative

---

3 This extrinsic evidence was previously attached as Exhibit C to the Delgadillo Decl. filed in Support of MNS' Motion for Partial Summary Judgment. For the Court's ease of reference, the document also is part of the Appendix.

hurdles) in this Easement. He explicitly recognized the unique features of the Easement and the risk the Government was taking in agreeing to the national security provision, stating that:

> "In prior permits, [the DOE's ultimate control] can be exercised through administrative approvals required in the permit and by virtue of the fact that the commercial organization assumes financial risk of termination in the event of an unalterable conflict between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

App. at 33. An "unalterable conflict" did arise, one that had been present since day one -- the Air Force's radar concerns -- which ultimately resulted in the Government's termination of the project. Not surprisingly, nowhere in his memorandum does Mr. Bornhoft assert that the Government is protected from any risk because the Easement would not be "effective" until the completion of NEPA or that the Government would have a right to "terminate" NEPA for these "national security" concerns.

The Bornhoft Memo is compelling evidence of the parties' intent and the true meaning of the terms of the Easement since it was drafted two days before the Easement was executed and was prepared by the DOE's primary drafter and negotiator of the Easement. Although MNS has cited this document throughout its papers, the Government has not once addressed Mr.

Bornhoft's understanding of the DOE's obligations under the Easement. At a minimum, this Court should permit Mr. Bornhoft to testify as to his understanding of the terms of the Easement. Contrary to the Government's position, MNS' contention that the Government is obligated to compensate MNS for a "national security" termination does not violate the DOE's NEPA regulation that requires the DOE to "complete" NEPA before making a "decision" on a proposal. *See* 10 C.F.R. § 1021.210(b). The Government's agreement to compensate MNS for a "national security" termination is not a "decision" to develop the wind farm, has no impact on the NEPA process and would likely have resulted in the termination of the project prior to the completion of the NEPA process.

**B. MNS Has Alleged that the Government Breached the Easement by Failing to Terminate for "National Security" Reasons and Compensate MNS for Its Investment.**

The "national security" clause provides that the revocation of the Easement "shall be accomplished by eminent domain." Easement, Part II, p.3, §E(1). In oral argument, the Government maintained that the "eminent domain" language was included to simply affirm the Government's obligation to comply with the Fifth Amendment to provide just compensation in the event that the Government took MNS' property right. *See* Transcript of January 25, 2006 Hearing at 82:4-12. In other words, the Government maintains that the "eminent domain" language was unnecessary and superfluous since the Government was already obligated to provide just compensation in the event of a taking. *See id.* at 87:19-25, 88:1-10. The Government's position misses the mark.

MNS is pursuing an action based on the Government's breach of the contract. MNS alleges that the Government breached its obligations by, among other things, failing to terminate the project for "national security" reasons and compensate MNS for its investment. This clause

was inserted into this contract specifically as a contract remedy, not a constitutional eminent domain remedy. The damages MNS seeks in this action are breach of contract damages, including among other things, its reliance damages in this case. *See American Capital Corp. v. United States*, 59 Fed. Cl. 563, 573-74 (Fed. Cir. 2004) ("where a breach of contract has occurred, an award of expenses based on plaintiff's actual outlay of funds as special damages for 'essential reliance' *i.e.,* those that are 'necessary or essential for the plaintiff's performance of his promises under the contract . . . Essential reliance expense would normally be within the contemplation of the parties, so its recovery would not be forbidden under the *Hadley v. Baxendale* rule limiting consequential damages.").

The extrinsic evidence in this case illustrates that all parties understood that the Government would compensate MNS if it terminated the project for "national security" reasons. MNS brought this breach of contract action to enforce its right to contract damages for the Government's refusal to honor the bargained for consideration for MNS' efforts under the agreement.

## III. CONCLUSION

For the reasons discussed above, MNS respectfully submits that the phrase "national security" in Part II, Section E(1) of the Easement is sufficiently ambiguous to permit the consideration of extrinsic evidence. The relevant extrinsic evidence in this case supports MNS' interpretation that the phrase "national security" in the revocation section of the Easement encompasses all potential national security issues that could arise *at any time* during the development of the wind project, including the Air Force's concern that the wind farm could negatively impact on the Air Force's operations. This interpretation also is consistent with MNS' claim that it had the right to enforce the revocation provision and require the Government to

compensate it for the termination of the project for "national security" reasons. MNS believes that there is more than sufficient evidence to support its Motion for Partial Summary Judgment on the issue of liability and to overrule the Government's Motion for Summary Judgment.

Dated: February 24, 2006

Respectfully submitted,

s/ George T. Caplan
George T. Caplan

KAYE SCHOLER LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1200
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on February 24, 2006, a copy of the foregoing Plaintiff's Supplemental Brief In Support of Plaintiff's Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo