**U. S. DEPARTMENT OF ENERGY**
**NEVADA OPERATIONS OFFICE**
**ECONOMIC DEVELOPMENT USE PERMIT**
**NO. DE-RO08-00NVXXXXX**

*PART I*
*SPECIFIC PROVISIONS*

This Permit, which is revocable as provided herein, is granted as of XXXX,XX,XXX by the UNITED STATES OF AMERICA, hereinafter referred to as the "GOVERNMENT," acting by and through the Nevada Operations Office of the U.S. Department of Energy, hereinafter referred to as the "DOE," and NTS DEVELOPMENT CORPORATION, a Nevada not-for-profit corporation, hereinafter referred to as the "PERMITTEE."

**WITNESSETH:**

1. That the Secretary of Energy, under the authority of Section 161 of the Atomic Energy Act of 1954, as amended (Public Law 83-703), Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), and other applicable law, having determined that the property hereby permitted is not excess property as defined by Section 3(e) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 472), is not for the time needed for public use, and the permitted use thereof will be advantageous to the Government and in the public interest, hereby grants to the Permittee the property described in the attached Exhibit A (hereinafter referred to as the "PERMITTED PROPERTY"), located at the Government's Nevada Test Site (hereinafter referred to as the "NTS").

2. Included within Exhibit A is a description of the land and improvements, including a map of the area; a map of the installation depicting common areas to include means of ingress and egress and restricted areas; a description of the Economic Development Activity; and inventory of personal property; limits of operations within the Permitted Property and common areas not addressed in *Part II-General Provisions*; description and charges for utility, maintenance, and other services not covered under *Part II-General* provisions; a real property conditions report; and an environmental conditions report.

3. This Permit shall remain effective for a nominal term as set forth in Exhibit A (not exceeding XX years), unless sooner revoked by written notice from the Government as provided in *Part II--General Provisions* or unless extended by mutual agreement of the parties.

4. The Permittee shall pay the Government an annual fee as set forth in Exhibit A in advance at the start of each permit year. Any charges for services specified in Exhibit A will not begin until the property is subpermitted unless services are

used sooner by the Permittee. The Permittee is permitted to charge fees for its subpermitted property, but any fees that are collected which exceed Permittee's cost must be reinvested into economic development endeavors. The Permittee shall report semiannually to the DOE its uses for such economic redevelopment and associated dollars.

5. The sole purpose for which the Permittee shall use the Permitted Property is to support Economic Development as part of the mission of the U.S. Department of Energy. For the purpose of this Permit, Economic Development includes, but shall not be limited to, the following: activities relating to furthering the employment of displaced and current contractor employees; creating or enhancing new business opportunities at the facility or in the surrounding community; providing funding for such activities; and educating the employees or the community regarding such activities. The Permittee must obtain the written approval of DOE prior to using the Permitted Property for any purpose other than that specified above. The Government hereby gives the Permittee the permission to subpermit the Permitted Property on a revocable basis as provided herein. The Permittee shall present any potential subpermits to the Government for approval prior to any subpermit taking effect. Subpermitting the Permitted Property does not release the Permittee of any responsibilities stated in this Permit. The approval of the Government shall be related to requirements specified in this Permit and ancillary documents, and shall not be unreasonably withheld.

6. In the event DOE or its **prime contractors at the NTS** (which reference as used throughout this Permit shall include Wackenhut Services, Inc., Bechtel Nevada Corporation, Lockheed Martin Nevada Technologies, Inc., Johnson Controls Nevada, Inc., and such other NTS contractors as may be specified by the Local Government Representative) observe an unsafe practice or unsafe condition that poses a threat of imminent danger to persons or property under Permittee's or Subpermittee's control, Permittee and Subpermittee shall, upon notification by DOE or a regulatory authority having jurisdiction over the activity, promptly respond to assure that such activity is performed in a safe manner consistent with applicable law or regulation.

7. Permittee shall require its Subpermittee to comply with all Federal Government and State of Nevada laws and regulations and NTS rules applicable to the transportation, storage, use and disposal of hazardous materials or substances. Permittee or its Subpermittee shall immediately file with the NTS fire department copies of all material safety data sheets applicable to hazardous materials or substances stored or used by Subpermittee at the NTS.

8. Permittee shall cause the Subpermittee to certify to DOE that it currently has and/or is in the process of obtaining all required regulatory permits and licenses. It is agreed that the Subpermittee must obtain and comply in all respects with

regulatory agency permits during the term of this Permit, especially if the specific activity impacts DOE's ability to comply with a regulatory agency permit condition. Any excursion of regulatory agency permit requirements that are the fault of the Permittee or its Subpermittee and that result in fines or penalties will be the responsibility of the Permittee and Subpermittee to the extent caused by the Permittee or its Subpermittee. If the agency of competent jurisdiction determines that Permittee or Subpermittee is out of compliance with a regulatory permit or license and Permittee or Subpermittee thereafter fails to take appropriate measures as determined by the regulatory authority to achieve compliance, and if such noncompliance poses a threat of imminent danger to the health and safety of personnel on the NTS, DOE shall have the right to direct Permittee or Subpermittee to stop operations. Operations will resume only after review and approval by the agency of competent jurisdiction.

9. Permittee acknowledges that construction, maintenance and operational activities performed on the NTS for DOE programs are subject to project specific labor agreements with the Nevada Building and Construction Trades. Permittee agrees to consult with the Nevada Building and Construction Trades and to conduct its construction, maintenance and operational activities on the NTS in a manner that is compatible with the activities conducted for DOE.

10. Security measures will be determined on a building-by-building or area-by-area basis according to the nature of the activities undertaken by the DOE within the particular security zone. Detailed in Exhibit A are generic requirements for security and badging.

11. This Permit consists of this *Part I--Specific Provisions, Part II--General Provisions,* and Exhibit A. In the event of inconsistencies between this *Part I--Specific Provisions*, and *Part II--General Provisions*, *Part I* shall control; in the event of inconsistencies between Exhibit A to this Permit and *Parts I* or *II*, Exhibit A shall control.

12. For the purpose of this Permit, the Local Government Representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at U.S. Department of Energy, Nevada Operations Office, P.O. Box 98518, Las Vegas, NV 89193-8518.

    For the purpose of this Permit, the Permittee Representative is specified in Exhibit A, and notices as required hereunder shall be forwarded to such individual at NTS Development Corporation, 2330 Paseo Del Prado, Suite C-101, Las Vegas, NV 89102.

IN WITNESS WHEREOF, the parties hereto have caused this Permit to be executed on their behalf by their duly authorized representative as of the date first above written.

**PERMITTEE:**

NTS Development Corporation

By: ______________________________
Tim Carlson, President

**GRANTEE:**

The United States of America
U.S. Department of Energy,
Nevada Operations Office

By: ______________________________
Kathleen A. Carlson, Manager

# U. S. DEPARTMENT OF ENERGY
# NEVADA OPERATIONS OFFICE
# ECONOMIC DEVELOPMENT USE PERMIT

*PART II*
*GENERAL PROVISIONS*

A. <u>Availability of Site Facilities and Support Services</u>

1. Permittee may arrange with DOE and its prime contractors at the NTS for use of site facilities and support services, which may include the use of general infrastructure facilities such as roads, utility systems, water wells, etc. and services such as maintenance, repairs emergency response and other such support services. Exhibit A sets forth a schedule of available site facilities and support services, and the basis for assessing charges and conditions of use therefor, which may be provided under this Permit. Site facilities and support services that are required to accomplish the Economic Development Activity and which are not otherwise provided or furnished by the Permittee shall be provided and furnished consistent with Exhibit A.

2. The site facilities set forth in Exhibit A will be maintained by DOE to a maintenance level necessary to conduct its authorized programs and activities at the NTS. The Government and Permittee acknowledge that roads do not and will not be maintained to meet U.S. Department of Transportation load bearing standards. If DOE determines to reduce its maintenance commitment under this paragraph, DOE will notify Permittee of the reductions at least 180 days in advance of such reduced maintenance commitment (exclusive of maintenance reductions caused by emergency circumstances). DOE makes no representation that the facilities are suitable for the use intended.

3. Nothing in this Permit is intended to restrict or impair the right of Permittee or Subpermittee, as the case may be, from securing site facilities and services, including those available from DOE or its contractors, from any other vendor at any time during this Permit; however, it is the desire of DOE and Permittee that subpermittees will use current DOE management and operating contractors, to the maximum extent feasible consistent with sound commercial practices, to provide those support services commonly provided to NTS users. Such vendors shall be treated in a manner equal to that of vendors providing services for DOE or the prime contractors at the NTS, consistent with applicable law and the conditions of this Permit, including access requirements and security procedures.

4. Permittee may agree in any subpermit to fees, charges, terms and conditions for site facilities and support services, or any other services

secured by Permittee and provided to Subpermittee, that are greater than or less than the charges, terms and conditions for site facilities and support services as provided in this Article A. No such agreement, however, shall alter Permittee's rights and obligations under this Permit.

B. Insurance

1. Permittee shall procure and maintain and shall require Subpermittee to procure and maintain, each at its own expense, the following insurance coverage in the respective, minimum amounts specified in Exhibit A: (I) Permitted Property structures loss and damage (Subpermittee only), (ii) Comprehensive General Liability (including contractual liability), (iii) Automobile Liability, and (iv) Statutory Workers' Compensation coverage. The Government and the prime contractors at the NTS shall be named as additional insureds under the Comprehensive General Liability and Automobile Liability policies of insurance (Permittee shall be an additional insured on the Subpermittee's policies).

2. All insurance which this Permit requires to be carried for general liability and on the Permitted Property shall be with such insurers as the Government may from time to time approve. Each policy of insurance shall contain a provision for thirty (30) days written notice to the Local Government Representative prior to the making of any material change in or the cancellation of the policy. Permittee shall deliver promptly to the Local Government Representative a certificate of insurance or a certified copy of each insurance policy required by this Permit and shall also deliver, no later than thirty (30) days prior to the expiration of any such policy, a certificate of insurance or a certified copy of each renewal policy covering the same risks. Each policy of insurance against loss of or damage to the Permitted Property shall contain a loss payable clause reading as follows:

> "Loss, if any, under this policy shall be adjusted with the Permittee and the Government and shall be payable to the Government; and proceeds, except those needed for any repair or replacement or constituting compensation for the loss of non-Government improvements, shall belong to the Government."

C. Condition of Permitted Property

1. Permittee has examined, knows, and accepts the condition and state of repair of the Permitted Property and the NTS of which it forms a part, and acknowledges that except as set forth in Exhibit A, the Government has made no representation concerning such condition and state of repair, nor any agreement or promise to alter, improve, adapt, repair, or keep in repair the same, or any item thereof, which has not been fully set forth in

this Permit which contains all agreements made and entered into between Permittee and the Government. To the extent requested by the Permittee, the Government has provided Permittee with current, known information concerning anticipated impacts, including seismic loads, airborne release potentials, and the like, potentially arising from DOE activities that could adversely affect the Permittee's activities. It is Permittee's and Subpermittee's joint and several obligation to ensure, through an inspection prior to occupancy and thereafter through continuing inspections, that the Permitted Property is safe and free from hazards that may cause injury or death to persons or damage to property.

2. The Government has provided Permittee with current, known information concerning environmental conditions on the Permitted Property. The Government makes no representation concerning the environmental condition of the Permitted Property outside the information provided in the environmental condition report as shown in Exhibit A as appropriate for the particular property.

3. The Permittee at its own expense shall maintain and repair the Permitted Property and all means of ingress and egress dedicated specifically (i.e., access not available for other uses) to the Permitted Property, and that the same will at all times be kept in at least as good condition as when received hereunder, subject, however, to ordinary wear and tear and loss or damage for which Permittee is not liable hereunder. Permittee shall insure any structure(s) as provided in Article B above.

4. The Government has entered into a Federal Facilities Agreement (FFA) with the State of Nevada which describes the activities the Government intends to undertake in regard to environmental conditions at the NTS. No representations are made concerning further activity on behalf of the Government, either in regard to environmental conditions or otherwise. Financial responsibility for compliance with the FFA shall remain with the Government, except as noted in Article H below. The Permittee agrees that the Government assumes no liability to the Permittee should implementation of the FFA interfere with Permittee's or any Subpermittee's use of the Permitted Property, and neither Permittee nor any Subpermittee shall make claim therefor.

D. <u>Existing and Future Easements and Rights of way</u>

This Permit is subject to all outstanding easements and rights of way over, across, in, and upon the Permitted Property, or any portion thereof, and to the right of the Government to grant such additional easements and rights of way over, across, in, and upon the Permitted Property as the Government shall determine to be in the public interest and which shall not unreasonably interfere with Permittee's use of the Permitted Property. Nothing herein shall preclude the

Government from exercising its revocation rights as provided herein. To the extent that services cannot be adequately and economically provided by DOE's service systems to the satisfaction of Permittee, the Government acknowledges that Permittee, or service providers, may seek easements or rights of way over, across, in, and upon the NTS in order to provide utilities and other services to the Permitted Property. In such event, DOE shall grant, when authorized, or otherwise support Permittee's applications to appropriate jurisdictional authorities for, such easements or rights of way which do not unreasonably interfere with DOE's use of the NTS.

E. Revocation by Government or Termination by Permittee

1. This Permit may be revoked at the sole discretion of DOE; however, in recognition of the consequences that revocation could adversely impact the Permittee and Subpermittee and harm the achievement of the Government's economic development initiatives pursuant to Section 3161 of the National Defense Authorization Act of 1993 (Public Law 102-484), such discretion to revoke will only be exercised in the following circumstances and in a manner that is not arbitrary or capricious: failure of the Permittee or Subpermittee to perform or otherwise comply with the terms and conditions of this Permit; initiation of litigation wherein DOE in consultation with the U.S. Department of Justice determines that revocation is in the best interest of the Government; formal investigations initiated by duly authorized agencies or offices of the Government that inquire into the Permit wherein DOE determines that revocation is in the best interest of the Government; notices from duly authorized agencies of the Government that the Permit is not in conformity with matters for which they are the responsible agency and DOE determines that revocation is in the best interest of the Government; exercise by the President of the rights under the "supreme national interests" clause of the Comprehensive Test Ban Treaty and the conduct of testing activities, or other national security considerations determined by the Secretary of Energy, that require the immediate access to the Permitted Property or vacation of the NTS by the Permittee and Subpermittee; or an applicable law or regulation that specifically requires revocation of this Permit. In the event it is necessary to invoke this provision, the Government assumes no liability to Permittee or Subpermittee by virtue of such interference with activities on the Permitted Property, and neither Permittee nor Subpermittee shall make any claim therefor except as may be allowed under subparagraph 3 below.

2. DOE will provide Permittee with the maximum advance notice that is practicable under the circumstances that revocation of the Permit has been proposed or is under consideration and the opportunity to comment in advance of such revocation. In the event of notices or inquiries from other agencies or offices or in the event of the initiation of litigation which

could lead to revocation of the Permit, DOE will provide immediate notice of such information to the Permittee.

3. If at the time of revocation Permittee and Subpermittee are not in default of any terms and conditions of this Permit, DOE will make reasonably available alternative locations on the NTS to Permittee for the Economic Development activity authorized by this Permit to the extent permitted by the action causing revocation of this Permit as to the Permitted Property. If such alternatives are not available, the Permittee or Subpermittee, as the case may be:

   (a) Shall be entitled to an equitable adjustment of any advance fees or charges paid by either hereunder.

   (b) May also be entitled to reimbursement as detailed in Exhibit A of reasonable relocation or storage expenses for personal property when caused to vacate the Permitted Property.

4. Permittee may terminate this Permit at any time, but such termination shall not relieve Permittee of any continuing obligations under this Permit except as may be specified in Exhibit A.

F. <u>Damage or Destruction</u>

1. If, during the term of this Permit, the Permitted Property, or any part thereof, is damaged by fire or other casualty so as to be rendered untenantable either in whole or in part, and cannot reasonably be restored to substantially its former condition within one hundred twenty (120) days following such fire or other casualty, then DOE or the Permittee may terminate this Permit as to the portion of the Permitted Property so damaged effective the date of such casualty by giving notice to the other within thirty (30) days following such casualty. If the Permit is so terminated, the proceeds of insurance shall belong to DOE if, and only to the extent that, the damage in question is suffered by a facility constructed and/or improved by DOE.

2. In the event of any such damage which does not render all or any portion of the Permitted Property untenantable, either in whole or in part or if no party terminates pursuant to the preceding provisions, the damaged area or areas, with all due diligence, will be repaired and restored by the Permittee to substantially the same condition they were in prior to such casualty or as otherwise will be suitable for the Permittee's purposes. Such restoration shall be commenced and completed as quickly as is reasonably possible. The party making such restoration shall be entitled to receive and use the proceeds of the insurance specified in Exhibit A. Also during the time of such restoration, and to the extent that the

Permitted Property was not rendered untenantable by the Permittee's or Subpermittee's negligent acts or omissions or wrongful conduct, any annual permit fees shall be abated to the extent that all or any portion of the Permitted Property is not usable by the Permittee.

G. Surrender

Upon the termination of this Permit or any prior revocation under Article E, Permittee shall quietly and peacefully remove itself and its property from the Permitted Property and surrender the possession thereof to the Government; provided, Permittee shall be allowed a reasonable period of time, as reasonably determined by the Local Government Representative, in which to remove all of its property from and terminate its operations on the Permitted Property. During such period prior to surrender, all obligations assumed by Permittee under this Permit shall remain in full force and effect.

H. Restoration of Permitted Property

Upon reasonable notice before any revocation or termination of this Permit, or otherwise within a reasonable period after revocation, at the direction of the Local Government Representative, Permittee shall restore the Permitted Property and each item thereof to the condition in which it was received, or to such improved condition as may have resulted from any improvement made therein by the Government or by Permittee during the Permit term, subject however, to ordinary wear and tear and loss or damage for which Permittee is not liable hereunder. If so required in Exhibit A, Permittee shall set aside in a special account the specified percentage of revenues from the Subpermittee for purposes of assuring restoration of the Permitted Premises.

I. Installation, Alterations, and Removals

1. It is expressly agreed and understood that Permittee will make no permanent alterations, additions, or betterments to installations upon the Permitted Property without the prior written approval of the Local Government Representative, and then only subject to the terms and conditions of such approval which may include an obligation of removal and restoration upon the revocation or termination of this Permit, as the Local Government Representative may direct. Except insofar as said terms and conditions may expressly provide otherwise, all such alterations, additions, betterments, and installations made by Permittee shall remain the property of Permittee.

2. During the term of this Permit, or any extension thereof, with the prior written approval of the Local Government Representative, and consistent with the purposes and conditions of this Permit, Permittee shall have the right, at its own expense, to install such improvements and additions and

to attach such removable fixtures in or upon the Permitted Property pursuant to this Permit, and to remove same upon revocation or termination of this Permit or any extension thereof. All property not so removed shall be deemed abandoned by Permittee and may be used or disposed of by the Government in any manner whatsoever without any liability to account to Permittee therefore, but such abandonment shall in no way reduce any obligation of Permittee to perform restoration under Article H of this *Part II*. In the event that the Permitted Property is not restored to the condition at the time of Permit commencement, ordinary wear and tear excepted, then the Government may cause the Permitted Property to be restored at the sole expense of Permittee.

J. Allocation of Liability.

1. Permittee covenants that it shall cause the Subpermittee to indemnify and hold harmless the Government, Permittee, and DOE's prime contractors at the NTS, with respect to any and all judgments, awards of damages, penalties, or fines by a court of competent jurisdiction or through a regulatory enforcement action, or arbitration awards or settlements reached with the participation and concurrence of the Permittee and Subpermittee (including reasonable attorneys fees and expenses related to such litigation), to the extent they do not arise from the negligent acts or omissions of the Government, its prime contractors at the NTS, or Permittee, and arise from or are incident to (i) conduct by Subpermittee in its use and occupancy of the Permitted Property (including conduct by third parties entering the NTS to conduct business with Subpermittee) giving rise to the judgment, award of damages, penalty, fine, arbitration award or settlement; (ii) damages to the Permitted Property or injuries to or death of any person, including without limitation, employees and officers of Permittee or Subpermittee; (iii) any "release" by Subpermittee or its agents as defined in Section 101(22) of CERCLA of any "hazardous substance" as defined in Section 101(14) of CERCLA or petroleum (including crude oil or any fraction thereof) onto or from the Permitted Property at any time while this Permit is in effect; (iv) failure of Subpermittee to comply with applicable environmental laws; and (v) the transportation, deposit, storage, or disposal by Subpermittee of hazardous substances or petroleum offsite of the Permitted Property.

2. Permittee shall require Subpermittee to covenant that any property of the Government lost, damaged, or destroyed by the Subpermittee incident to its conduct in the use and occupancy of the Permitted Property shall be promptly repaired and replaced by Subpermittee to the satisfaction of the Local Government Representative, or in lieu of such repair or replacement, Subpermittee shall, if so required by the said officer, pay to the Government money in an amount sufficient to compensate for the loss sustained by the Government by reason of the destruction of the property.

3. The Government accepts that, without conditions, the Permittee and Subpermittee shall not be responsible for any claims, damages, causes of action, proceedings, judgments, or suits, and all liabilities, losses, costs or expenses, (including without limitation, technical consultant fees and reasonable attorneys fees) to the extent they do not arise from the negligent acts or omissions of the Subpermittee and may arise from or be incident to (I) conduct of the Government or the prime contractors at the NTS in providing services to the Permittee; (ii) any "release" by the Government or its agents as defined in section 101(22) of CERCLA or any "hazardous substance" as defined in Section 101(14) of CERCLA, or petroleum (including crude oil or any fraction thereof) onto or from the Permitted Property at any time prior to the effective date of this Permit; (iii) the failure of the Government to comply with applicable environmental laws; or (iv) the transportation, treatment, deposit, storage, or disposal by the Government of hazardous substances or petroleum off-site of the Permitted Property.

K. Abandonment of Permitted Property

In the event Subpermittee fails to utilize the Permitted Property for the economic development activity for a sustained period of time, the Local Government Representative may make written inquiry of the Permittee of future plans for use of the Permitted Property. If Subpermittee provides written notice to either Permittee or DOE that Subpermittee no longer intends to utilize the Permitted property, or if the Subpermittee fails to respond to the written inquiry within 30 days, this Permit may be terminated by the Government. Nothing herein shall preclude Permittee from submitting for approval alternate economic development activities for the Permitted Property and nothing herein shall relieve Permittee or Subpermittee from complying with applicable requirements and obligations of this Permit which continue beyond termination.

L. Laws, Ordinances, Rules and Regulations

The Permittee shall, and shall require Subpermittee to, comply with all applicable laws, ordinances, rules and regulations of the Federal Government, State, county and municipality wherein the Permitted Property is located with regard to health, safety and the environment and shall obtain all applicable licenses or permits to do business or otherwise conduct regulated activities (except that DOE shall arrange for any necessary water rights on the NTS). It is understood that Permittee's activities are considered commercial in nature and, as such, shall be subject to the same requirements as would apply to such activities if not conducted on public property. It is expressly understood that DOE assumes no oversight or enforcement responsibility for safety and health, and DOE specifically defers to the jurisdiction of the appropriate authorities for such matters. However, because the Permitted Property is public property and will be

used concurrently with DOE's own mission, DOE reserves the right to review the Permittee's safety plans which shall be consistent with the Safety and Health Program Management Guidelines of the Occupational Safety and Health Administration as published in the Federal Register (54 F.R. 3908 on January 26, 1989). Any regulatory gap issues must be resolved prior to the commencement of construction or operational activities.

M. Cultural Items

The Permittee shall, and shall require Subpermittee to, protect and preserve any historical, archaeological, architectural, or other cultural artifacts, relics, vestiges, remains, or objects of antiquity. In the event such items are discovered, the Permittee shall immediately notify the Local Government Representative and protect the area and the material from further disturbance until DOE, Permittee, or Subpermittee, as the case may be, has completed the required coordination with the appropriate authorities and otherwise complied with applicable law.

N. Liens

Permittee shall promptly discharge or cause to be discharged any valid lien, right in rem, or claim, caused by Permittee and/or any Subpermittee which at any time may arise or exist with respect to the Permitted Property or materials or equipment furnished therefor, or any part thereof, on behalf of Permittee.

O. Payments and Interest

All payments to the Government required under this Permit shall be made by check or money order made payable to the U.S. Department of Energy and delivered to the Local Government Representative. Notwithstanding any other provision of this Permit, all amounts that become payable by Permittee to the Government under this Permit shall bear interest from the date due until paid. The interest rate per annum shall bear the interest rate in effect which has been established by the Secretary of the Treasury pursuant to Public Law 92-42; 85 STAT 97 for the Renegotiation Board, as of the date the amount becomes due as herein provided. Amounts shall be due upon the earliest one of (I) the date fixed pursuant to this Permit; (ii) the date of the first written demand for payment, consistent with this Permit, including demand consequent upon revocation or termination; (iii) the date of transmittal by the Government to the Permittee of a proposed supplemental agreement to confirm completed negotiations fixing the amount; or (iv) if this permit provides for revision of prices, the date of written notice to the Permittee stating the amount of refund payable in connection with a negotiated pricing agreement not confirmed by Permit amendment.

P. Access to Permitted Property

The Government or its designated representatives shall have the right to gain

access to the Permitted Property, consistent with the Permittee's and Subpermittee's rights of quiet enjoyment, for the sole purpose of providing agreed services, maintenance and repair, conducting inspections authorized under this Permit, or responding to a health or safety emergency. In all instances except for emergency response and inspections by regulatory authorities, access to the Permitted Property shall be scheduled in advance through the Local Government Representative or in accordance with agreements for the provision of services, maintenance and repair. The Permittee shall provide the Local Government Representative with a schedule of operations and hours for the Permitted Property. The Permittee and Subpermittee shall have the right to accompany the Local Government Representative, the Government or its designated representatives in their exercise of this right to access to the Permitted Property.

Q. State and Local Taxes

In the event that as a result of any future Act of Congress subjecting Government-owned property to taxation, any taxes, assessment, or similar charges are imposed by state or local authorities upon the Permitted Property (other than upon Permittee's possessory interest therein), Permittee shall pay the same when due and payable.

R. Failure of Government to Insist on Compliance

The failure of the Government to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Permit shall not be construed as waiver or relinquishment of the Government's right to the future performance of any such terms, covenants, or conditions, and Permittee's obligations with respect to such future performance shall continue in full force and effect.

S. Assignment or Subletting

Permittee shall not transfer or assign this Permit or any interest herein nor subpermit or otherwise make available to any third party or parties any portion of the Permitted Property or rights therein without the prior written consent of the Government. Under any assignment made, with or without consent, the assignee shall be deemed to have assumed all of the obligations of Permittee hereunder, but no assignment shall relieve the assignor of any of Permittee's obligations hereunder.

T. Conduct Standards

1. Equal Employment Opportunity

In connection with the performance of work under this Permit, Permittee

agrees to comply with applicable laws prohibiting discrimination against any employee or applicant for employment because of race, religion, color, age, sex, or national origin or disability.

2. Covenant Against Contingent Fees

Permittee warrants that no person or selling agency has been employed or retained to solicit or secure this Permit upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bonafide employees or bonafide established commercial or selling agencies maintained by Permittee for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Permit without liability or in its discretion to add to the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee. (Licensed real estate agents or brokers having listings on property for rent, in accordance with general business practices, and who have not obtained such licenses for the sole purpose of effecting this Permit, may be considered as bonafide employees or agencies within the exception contained in this clause.)

3. Officials Not to Benefit

No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Permit, or to any benefit arising from it. However, this clause does not apply to this Permit to the extent that this Permit is made with a corporation for the corporation's general benefit.

4. Gratuities

The right of Permittee to proceed may be revoked if, after notice and hearing, the agency head or a designee determines that Permittee, its agents, or another representative:

a. Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

b. Intended, by the gratuity, to obtain a lease or permit or favorable treatment under a lease or permit.

U. Notices

No notice, order, direction, determination, requirement, consent, or approval under this Permit shall be of any effect unless in writing. All notices required under this Permit shall be addressed to Permittee, or to the Local Government

Representative, as may be appropriate, at the addresses thereof specified in this Permit or at such other addresses as may from time to time be agreed upon by the parties hereto.

V. Administration

The Local Government Representative specified in Exhibit A of this Permit shall have complete charge of the administration of this Permit, and shall exercise full supervision and general direction thereof insofar as the interests of the Government are affected.

W. Severability and Substitution

1. In the event that any provision or portion of this Permit is declared unlawful or unenforceable by a court of law of competent jurisdiction, the remainder of this Permit shall continue and remain in full force and effect, as if the unlawful or unenforceable provision or portion had been stricken from this Permit. Nothing herein, however, shall preclude revocation as provided above.

2. In the event that the authority or rights of DOE in relation to the Permitted Property or the NTS is modified by statute, regulation, court order, or other lawful order, DOE shall, as appropriate, affirm this Permit or enter into a Lease or other binding lawful instrument with Permittee that implements and sets forth the spirit, purposes, terms, and conditions of this Permit (except for the circumstances of revocation set forth in Article E of this *Part II* and not excluded below). Permittee agrees to enter into such other lawful instrument so long as the other lawful instrument implements and sets forth the spirit, purposes, terms, and conditions of this Permit (except for the circumstances of revocation set forth in Article E of this *Part II* and not excluded below).

3. In the event that Permittee requests a lease or other lawful instrument from another agency of government having competent jurisdiction over the NTS, DOE agrees to support the request, grant permission to Permittee to engage in the Economic Development activity authorized by this Permit under such lease or instrument, and administer such lease or other instrument under an agreement or understanding with the agency in question; provided, however, that DOE will retain the right to require termination of such lease or instrument (including any lawful instrument referenced in 1. or 2. above) in the event Permittee fails to perform its terms and conditions or in the event of exercise by the President of the rights under the "supreme national interests" clause of the Comprehensive Test Ban Treaty and the conduct of testing activities that require the immediate access to the Permitted Property or vacation of the NTS by the Permittee and Subpermittee.

**Robertson George Civ AF/TEZ**

**From:** Schofield, Jack C. Col.
**Sent:** Wednesday, November 01, 2000 10:44 AM
**To:** Norman, Jay H.
**Subject:** RE: WREN

Got it.

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

-----Original Message-----
**From:** Norman, Jay H.
**Sent:** Tuesday, October 31, 2000 3:58 PM
**To:** Schofield, Jack C. Col.
**Subject:** RE: WREN

Jack, Thanks for the prompt response. Ken Powers is heading the negotiations for us on this project. Jay

-----Original Message-----
**From:** Schofield, Jack C. Col.
**Sent:** Tuesday, October 31, 2000 7:54 AM
**To:** Carlson, Kathy; Norman, Jay H.
**Cc:** Williams, Tom; Johnson, Glen Lt. Col
**Subject:** WREN

Kathy-I passed the WREN Briefing to all my AF brethren several weeks ago and as expected, there is a little concern about the Pahute/Rainer Mesa location. No problems with Shoshone or Skull.

Main concern is not flyover considerations, but interference. Doppler effect of those big blades might be a big impact. They're also trying to find out what the blades and towers are composed of. They're still working the details.

Knowing that you want to give them a preliminary recommendation on the 1st, thought I would arm you with what I have. Will forward any other information as soon as I get it.

Is there a better POC for me?

Thanks

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Norman, Jay H. | Read: 11/1/2000 2:42 PM |



G-MNS09069

**Robertson George Civ AF/TEZ**

**From:** Schofield, Jack C. Col.
**Sent:** Thursday, November 09, 2000 10:45 AM
**To:** Johnson, Glen Lt. Col
**Subject:** RE: WREN project

Puuurfect!

**JACK C. SCHOFIELD, Col, USAF**
Director, USAF/DOE Liaison Office
1-702-295-1147
mailto:schofieldj@nv.doe.gov

-----Original Message-----
**From:** Johnson, Glen Lt. Col
**Sent:** Wednesday, November 08, 2000 3:43 PM
**To:** Schofield, Jack C. Col.
**Subject:** WREN project

Ken Powers relayed to Kevin Thornton the WREN project information you sent him. Kevin stopped by to discuss tower placement and line-of sight concerns. I told him of a general "Doppler problem" based on blade composition, etc. He accepts the explanation as is, and is not interested in getting into any classified discussions. He will provide us with a detailed map indicating proposed tower locations. He would like us to liaise with "the Air Force" to determine exactly which locations depicted on the map are unacceptable. If you speak to Shelby anytime soon, let him know he can expect a copy of the map for their coordination. Or not.

Gnome

**Tracking:**

| Recipient | Read |
|---|---|
| Johnson, Glen Lt. Col | Read: 11/9/2000 11:19 AM |

G-MNS09068

December 15, 2000

MEMORANDUM TO: **Madelyn Creedon, Deputy Administrator**
**National Nuclear Security Agency**

FROM: **Richard Bradshaw, Special Assistant**
**Office of Energy Efficiency and Renewable Energy**

THROUGH: **Dan Reicher, Assistant Secretary**
**Office of Energy Efficiency and Renewable Energy**

SUBJECT: **NEVADA TEST SITE WIND GENERATION FACILITY**

We understand that on the agenda for your meetings early next week in Las Vegas will be the topic of NNSA approval of an agreement between NVOO and the Nevada Test Site Development Corporation (NTSDC), on behalf of M&N Wind Power, to grant an easement for use of NTS lands (approx. 250 acres) for construction of a wind turbine power generation facility. These background points are meant to familiarize you with the history, issues, and opportunities relating to the agreement and the project.

BACKGROUND:

The initial proposition to NVOO encompassed a 600 MW facility on NTS land, via a land-use transfer to NTSDC as agent for the WREN consortium, composed of:

- 200+ MW of wind generation
- 250 MW of natural gas turbine generation
- 160 MW of solar trough generation

The initiation of phases 2 and 3 of the project are dependent upon the installation of the full 200+ MW of wind generation, which will permit the facility to offer "blended" gas/renewable baseload power for sale. In turn, the construction of the solar farm–whose role is supply peaking power supplies during daylight–is dependent upon the prior construction of the wind and gas facilities in order to offset the higher costs of solar generation.

Negotiations between NTS/NVOO, NTSDC, and M&N Wind Power Company (on behalf of the WREN consortium, including El Paso Energy and Duke Solar) began over six months ago. The wind portion of the combined facility originally envisioned three distinct sites at NTS, **all approved by NVOO early in the negotiations process** as available for the construction of wind turbines and transmission lines. The largest of these sites (120 MW) was on Paiute Mesa on the north end of the NTS. The second largest (85 MW) was on Shoshone Mtn. A third site was on a ridge line between Paiute Mesa and the Nellis AF bombing range—this site was ruled out by security considerations about halfway through the negotiations.



G-MNS01569

Since August 2000, M&N Wind Power has spent approximately $150,000 to erect a dozen wind anemometers to measure wind speed at the three locations. They were required by NVOO to employ Bechtel as the contractor, at hourly rates significantly higher than local construction contractors whom M&N preferred to use. M&N has spent an additional $350,000 to employ NTS Development Corporation as its intermediary agent and to cover a preliminary Environmental Assessment, as well as estimates of needed transmission upgrades at the Test Site. M&N has made a $500,000 investment in the project to date.

By mid-November, negotiations were nearly complete, with a near-final draft document covering the land use transfer and construction and operation of the wind facility. In the document, M&N Wind had agreed to supply the Test Site with up to 20 MW of "green" wind electricity, at a 10% discount from market rates for 20+ years (an exceedingly good deal for DOE in a growing market for green power). M&N Wind also agreed to comply with all national-security related restrictions and covenants demanded by NTS, including the use of Bechtel as contractor for some aspects of construction and subsequently for emergency repairs to the transmission lines and substations.

However during mid-December, NTS negotiators introduced several demands/restrictions that were not on the table previously, and which seriously jeopardize the ability of M&N Wind to construct the project. Chief among them is the reversal of NTS' prior approval of Paiute Mesa as a site for wind turbines (Paiute was to be the main site for 120MW of generation). No reason was given to M&N and NTSDC other than unspecified national security objections raised by the Air Force. (One has to ask why NVOO did not consult the Air Force about Paiute Mesa when it ruled out, early in the process, a third potential location at NTS based upon Air Force objections.)

NVOO negotiators have been reluctant to provide written assurance that M&N Wind will be able to secure alternate sites at NTS in sufficient quantity to match the sites at Paiute that they are being required to concede. Thus the project–in effect–has been scaled back to 85 MW from the original 600 MW, since planning for the gas and solar components of the project cannot proceed without assurance that the full 200 MW of wind generation will be in place. Additionally, NVOO is now resisting a clear, and limited, delineation of the types of work that will have to be contracted by M&N to Bechtel, as opposed to outside (less expensive) contractors.

These two uncertainties seriously jeopardize M&N's ability to retain financing for the project and to meet its obligation to other WREN partners, since the economic viability of first, gas, and then solar components depends on the full build-out of the wind farm and on keeping construction and maintenance costs down at a reasonable and predictable level.

The ability of NTSDC and of M&N WindPower Company to continue negotiations, in the face of repeated revisions to a near-final land use agreement, is in doubt; M&N's deadline for beginning construction is 1 Jan 01, and its financial partners are indicating that the economics of the project are now looking unfavorable—due largely to concessions requested by NVOO and the Test Site.

We understand that Kathy Carlson has a document ready for signatures, and to which NTSDC and M&N Wind Power have acquiesced. She has indicated her strong personal support for the project, as has her deputy; however, they apparently have encountered strong resistance from

senior personnel within the NVOO/NTS structure, who have insisted on the latest restrictions as conditions for project approval. The latest draft document represents the absolute minimum to which the private sector partners and NTSDC can agree; any further revisions demanded by NVOO and the project will be dead.

Moreover, there must also be a clear acceptance by NVOO that this represents only the first phase of the entire gas/wind/solar facility; that NTS' 10% discount on power is predicated upon the economics of the entire facility, and not just the one-eighth represented by the first phase (wind) of the project, and that NVOO/NTS must be committed to approving–in the near future—locations for the wind machines displaced from Paiute Mesa.

EERE and NTSDC have invested heavily in this project, to show that national security objectives and renewable energy objectives are not incompatible, that they can coexist at NTS and lead to an increased acceptance of both. If, after all this work, DOE's own bureaucratic infighting and stove piping prevents us from moving ahead with what would be the largest single renewable energy facility in the U.S., on DOE lands, it will be a major blow private to sector willingness to partner with the Federal government to build new power generation capacity on Federal lands (over two-thirds of all landholdings in the West). The signal to the private sector, that DOE enthusiastically supports renewable power generation to the point of assisting its deployment on Federal lands, cannot be underestimated in importance. If DOE cannot be a genuine partner in this project, in a way that makes economic sense for the developers, the agency risks becoming irrelevant to the issue of building more "clean" power generation capacity in the West.

If the project goes forward, it will be the first of a large number of private power facilities in the West designed explicitly to meet the needs of California and other rapidly growing electricity demand centers, like Las Vegas, with cleaner, renewable power. If it fails, construction of new, cleaner power generation in the West is certainly going to lag further behind demand growth.

Finally, the Nevada Test Site Development Corporation has devoted a major investment of resources, time, and credibility to the success of this project. If the project does not succeed, or is crippled, due in large part to re-design, downsizing, and higher construction and operations costs imposed by NVOO's demands, the negative impact on NTSDC will be significant. As the designated "community reuse organization (CRO)" for the NTS, the whole rationale for the Development Corporation is to stimulate economic diversity and new jobs through the re-development of excess DOE property. In this instance, if the NTSDC cannot succeed with a project that inevitably would become a "showcase" for high-tech growth while supplying critically important new power for the region, the whole notion of a CRO for the Test Site would be called into question—and along with it, Senator Reid's commitment to and support for diversification at the Test Site.

**Memorandum to**: General John Gordon

**From**: Kathleen Carlson

**Subject**: Air Force concerns with the proposed Wind Turbine Generation Project at the Nevada Test Site

**Action Required**: Decision to implement the easement allowing development of a wind farm at the Nevada Test Site or to request that Project Proponent terminate project.

**Issue**: Since the inception of the Wind Generation project, as a result of more precise engineering data being made available by the project proponent (M&N Wind/WREN/MNS Windpower/Global Renewable Energy Partners), and because of changing and evolving U.S. Air Force mission needs among the tenants and users of the Nevada Test and Training Range (NTTR), it would appear that Wind Generation operations can not be conducted on the NTS without causing major disruptions to vital National Security operations conducted on the Nellis Range.

Of primary concern to the Air Force are the impacts to NTTR missions within the ranges surrounding the Nevada Test Site (NTS). Some of these mission capabilities are unique to the NTTR and may cause major impacts to National Security. Theoretically, these disruptions will be created by the radio frequency (RF) interference created by the wind turbines when they are highlighted by ground based and airborne radar emissions. This interference contaminates the RF environment (RF pollution) and hinders the Air Force's capabilities to assess the military worth of technologies, and operational readiness of aircrews.

Degradation of the Air Force's capability to test and train within the NTTR will result in an unacceptable level of risk in determining the survivability of aircrews and could result in higher attrition of critical military resources.

Specific issues are:

Radio Frequency (RF) reflective characteristics of the towers, nacelles and blades. This will cause significant background noise on the NTTR tracking system reducing their ability to provide accurate tracking and testing of aircraft on the range

RF line-of-sight (including local propagation anomalies) of the farms to NTTR radar/receiver pad locations will interfere with the USAF ability to train pilots in a realistic environment.

Reflected RF effects on NTTR receivers and subsequent effects on the Red Flag Kill Chain based on receiver interference.

G-MNS08993

**Current Status**: The project proponent continues to collect wind data at approximately 30 anemometer sites on the NTS. These anemometer sites are located in the Shoshone Mountain Area (Areas 29,30) and the Pahute Mesa Area (Area 19).

The environmental consultant continues to draft an Environmental Impact Statement along with reports based on the cultural resource surveys performed. The Draft EIS is due out for public review and comment in May. Final Record of Decision could be by mid summer.

The project proponent has invested approximately $2,000,000 on engineering and environmental studies. The project proponent continues to expend funds.

An Air Force, DOE and Laboratory (SNL) technical team is currently analyzing engineering issues, myths and "feelings." The team will attempt to determine whether engineering or operational resolutions are feasible.

**Options:**

1.) Continue with wind data gathering and environmental studies for the project as described in the Alternatives of the EIS. Perform an independent analysis of the USAF position with recommendations for mitigating the interference. Have USAF provide a classified appendix to the EIS. Make the EIS Record of Decision the decision document.
2.) Provide NTS Development Corporation and the project proponent with a formal letter explaining that development of this project will be limited to the area described in the December 22, 2000 Easement. (Phase One) Allow the project proponent to continue with the necessary NEPA and cultural resource activities required for construction.
3.) Following joint AF/NNSA discussions with Senator Reid, Air Force and the NNSA provide the NTS Development Corporation and the project proponent with a letter explaining that development of the project will not be allowed to go forward. AF/NNSA publicly announce that the increased tempo of activities at Nellis and the NTS have made the Wind Farm activities incompatible with those operations.

**Sensitivities**: This project has received considerable support from Senator Reid and key staff. The original permit for this project was signed in Washington D.C. with much fanfare and a number of dignitaries including yourself and the Secretary of Energy present. Much was made of the "Renewables Project Located on a DOE Weapons Site."

Additionally, local news media has given this project coverage. This includes recent coverage of the local utility's plans to purchase power from this project. MNS Wind proponents will continue to "ratchet up" political pressure to move forward with this project through news releases and briefings to local political leaders.

The Secretary of the Air Force has recently been briefed by project consultants on these issues as well as related political issues involving Senator Reid's support for this project as well as Nellis Air Force Base.

Wind data for the original easement area (Phase One) has not shown a sufficient wind regime to support an economically viable project.

Successful implementation of this project would provide considerable benefit to the NTS Development Corporation allowing them to continue with economic development activities in Southern Nevada. NNSA and some Air Force activities would receive considerable amounts of free electrical power as a royalty for the easement.

Though the easement granted to the project proponent is legally defensible by the government, it is likely that if project is cancelled, the project proponent will seek compensation for losses and attempt to prevail on Senator Reid to support AF or NNSA to provide these funds

Texan, President Bush political supporter and entrepeneur T.Boone Pickens has acquired a majority interest in this project.

Appendix 1 Chronology

Appendix 2 Draft Correspondence
K.Carlson/MG Pearson (Edwards)
K.Carlson/MG Johnston (Nellis)

Appendix 1

Chronology:

July 2000 – NTSDC and M&N Wind approached the Nevada Operations Office about establishing a Wind Farm on the Nevada Test Site. Initial interest was in the Shoshone Mountain Area.

31 Jul 2000 - Email from Col Schofield to Col Cazessus and Yvonne Gresnick re: Kathy Carlson request to meet with Col Cazessus about wind turbines on NTS.

10 August 2000 - M&N Wind received approval from SUD Working Group to begin collecting wind data in at Shoshone Mountain, Skull Mountain and Pahute Mesa.

12 October 2000 – Notice of Intent to prepare an Environmental Assessment for the Wind Farm

17 Oct 2000 - Email from Col Schofield to Kevin Thornton requesting electronic copy of WREN brief. Received and forwarded to Col Cazessus, Col Hopper, Yvonne Gresnick

31 Oct 2000 - Email from Col Schofield to Kathy Carlson, Jay Norman, Tom Williams. Relay concerns from AF. Pahute/Rainer Mesa not good. No problems with Shoshone or Skull. Problems are electronic interference.

7 Nov 2000 - Email from Col Schofield to Ken Powers. Official update from AF. Placement on crest or eastern slope of Shoshone/Rainier/Pahute Mesa ridge would cause significant data corruption of a USAF $100M investment."

15 & 16 November 2000 – Public Scoping Meetings held in Las Vegas and Pahrump.

13 December 2000 –SUD Board recommends Kathy Carlson approve M&N request to place additional anemometers on the NTS.

13 December 2000 – SUB Board Recommends approval of the Project Screening and Location Request for the first phase of the project with several concerns about future expansion into Areas 27, 16, 25, 26, and 19.

19 December – Kathy Carlson approves Project Screening and Location request for the first phase of project.

22 December 2000 – DOE/NV and NTSDC enter into an easement for the first phase of the wind project. Project site limited to area in "Attachment A-1". Implementation of the Easement is contingent upon completion of NEPA.

G-MNS08996

17 January 2000 – NTSDC and MNS enter into a Sub-easement for the first phase of the Wind Farm. Gordon concurs, Reid and Richardson witness.

14 March 2001 – Draft Environmental Assessment released for public review and comment.

23 Mar 2001 - Letter proposing to issue a FONSI by DOE
30 April 2001 – Letter from G. Ormiston to K. Carlson requesting expansion of the Phase 1 Area.

24 May 2001 – Memo for USAF/DOE Liaison Office from Col Eidsaune expressing AF concerns with the wind turbines. Requests close coordination with AF.

31 May 2001 – Meeting with NTSDC and MNS Wind to discuss paths forward for the project. Includes discussion of the April 30, 2001 request to expand the Pahse 1 area, preparation of an EIS, additional changes to requirements beyond those identified in the Easement and the need for a project plan for design and construction of the project.

5 June 2001 – Letter to G. Ormiston, NTSDC requesting a project plan, a request for changes in requirements beyond the original Easement, and a plan for completing the NEPA process. Letter reminds NTSDC that the only approved area is that shown in Attachment A-1 of the December 22, 2000 Easement.

12 June 2001 – Letter from Ken Powers to Col Schofield re: Col Eidsaune memorandum. Only Phase 1 approved at this time.

14 Jun 2001 – Email from Lt Col Johnson to James Towery with electronic map of proposed new Phase I attached. Proposal to expand to include Repeater Hill and Dome Mtn. Approval/disapproval tabled until AF can do an assessment.

3 July 2001 – Letter from M&N Wind to K. Carlson requesting changes to the December 22, 2000 Easement.

16 Jul 2001 - Email from Kevin Thornton to Col Schofield and Lt Col Johnson. Specs for the 900KW turbine, still trying to get more info on larger turbines

17 Jul 2001 – Email from Jim Towery to Col Cazessus, Yvonne Gresnick outlines path forward with the Air Force looking for a consolidated Air Staff position. Acknowledges the RMO would provide a technical assessment to USAFLO by end of June—and states an assessment was not available

25 July, 2001 – Notice of Intent to prepare an EIS for the Wind Project. Due to comments raised in March 2001 by Nevada State agencies, other federal agencies, affiliated American Indian tribes, and other interest parties, determined that EA would not support a FONSI.

G-MNS08997

16&17, August, 2001 – Public Scoping Meeting held in Las Vegas and Pahrump for Wind Farm EIS.

23 August, 2001 – Letter from K. Carlson to G. Ormiston, NTSDC in response to the July 3, 2001 letter from M&N Wind. Denies all requests to modify the Easement.

17-19 Oct 2001 - Emails from/to: Col Schofield, Col Hopper, Col Percival, Col Eulberg. Rumors about Nellis meeting with Carlson & Associates confirmed. Col Schofield/Ken Powers recommend postpone meeting. AF/DOE pre-meeting on 30 October, meeting on 31 October Percival supports the plan.

22 Oct 2001 - Meeting between Carlson & Associates and Nellis representatives and Col Bill Percival, Col Bob Lynn, Warren Lee. USAF/NNSA Liaison office and NNSA/NV **not** invited.

22 Oct 2001 - Email from Col Percival to Col Schofield after Nellis and Carlson meeting. States Carlson & Associates will provide detailed information on wind turbines to Col Schofield.

24 Oct 2001 - Email from Kevin Thornton to Col Schofield provides wind turbine heights, lengths, and speeds

2 Nov 2001 - Col Percival called to state the RMO had not received the tech info from the contractor yet. He had received a call from Carlson and Associates stating they had passed the information to NNSA-NV.

30 Nov 2001 – Email From Lt Col Johnson to Kevin Thornton request more information on Wind Turbines. Jay Norman had been in a meeting with the Air Force and the Wind Turbine subject came up. The Air Force needs additional information before they can continue

3 Dec 2001 – Email from Kevin Thornton to Col Schofield, Lt Col Johnson. Letter from Ken Powers stated the project is now proposed to be in three phases. Turbines are to be assumed to be 98 meters tall with 72 meter blades

7 Dec 2001 - Meeting between Col Schofield, Tim Carlson, Janice Weideman, John Johansen, Kevin Thornton, Linda Cohn. They discussed their need for Timber and Repeater to be fiscally viable. They have a construction start date meeting on 21 Dec and need the AF assessment. Col Schofield told them the AF is still waiting for exact site coordinates.

10 Dec 2001 - Email from Janice Wiedeman to Col Schofield. Site location data for the 1.5MW turbines

10-11 Dec 2001 - Emails from/to: Col Percival, Col Schofield, Lt Col Takenaka. Discussion on AF needs for turbine height and elevations in addition to placement

G-MNS08998

12 Dec 2001 – Email from Janice Wiedeman to Col Schofield. Forwarded "most recent information on elevations".
21 Dec 2001 - Email from Jim Towery to Col Schofield, Col Percival, Yvonne Gresnick. Building turbines anywhere on NTS not in best interest of the AF. Do not support any expansion of Phase I.

6 Feb 2002 - Classified Meeting to discuss Wind Turbines on NTS. Attendees: MGen Johnston, MGen Pearson, Col Eidsaune, Col Hooper, Col Schofield, Lt Col Johnson, Jim Towery, Warren Lee. Pre-brief for NNSA

7 Feb 2002 - Classified Meeting to discuss Wind Turbines on NTS. Attendees: Kathy Carlson, Ken Powers, Jay Norman, Tom Williams, Col Hooper, Col Eidsaune, Col Lanny, Col Schofield, Lt Col Johnson, Lt Col Takenaka, Jim Towery, Warren Lee. Group in agreement on negative impact of Wind Turbines on NTS.
Assignments:

-- Re-run the line-of-sights for easement composite using all NTTR assets
-- Determine if there might be an alternate location - non-RF line-of-sights
-- Develop unclassified briefing to give to Tim Carlson on 5 March

12 Feb 2002 - Meeting to discuss Wind Turbines with BGen Haeckel. Attendees: Gen Haeckel, Kathy Carlson, Col Schofield, Lt Col Johnson, Tom Williams, Kevin Thornton, Sharon Hejazi, and Kathy Izell. Unclassified discussion on AF concerns with Wind Turbine. NNSA legal concerns and possible $2M - $3M law suit. Follow-on meeting included Tim Carlson. Kathy mentioned off-line recommendation from AF for an independent review of data. Gen Haeckel and Kathy mentioned desire for "win-win" solution

-- Technical
-- AF to find some alternative land
-- NNSA to find some alternative land
-- Col Schofield stated he would try to get Gen Haeckel program brief ASAP

12 Feb 2002 - Col Schofield_Meeting with Kathy Carlson on Special Access Program requirements. Discussed program brief status for Gen Gordon and BGen Haeckel. Discussed "independent review"

20 Feb 2002 - Col Schofield_Meet with Kathy Carlson -
- Assignment: by 5 March

-- Technical Solution
-- Move turbines to another location on NTS.
-- Find alternate AF property for project
-- Within the next 2 weeks give Gen Gordon and BGen Haeckel classified brief

G-MNS08999

Appendix 2

General Pearson,

General Johnston,

As you are aware, the National Nuclear Security Administration, Nevada Operations Office is preparing an Environmental Impact Statement on the Construction and Operation of a Wind Turbine Generation facility on the Nevada Test Site.

The Record of Decision (ROD) on this proposal is expected to be released this summer. The ROD could range from 1.) approval of the entire 600 MW project, 2.) approval of a portion of the project or 3.) to not proceed with the project Though I expect to provide my recommendation to General John Gordon, USAF, Ret;. the Administrator of the National Nuclear Security Administration, he will be the final decision maker.

It has been the policy of this office for some time, as I am sure it is also the policy of your respective commands, to work diligently to assist each other in advancing our missions when possible. Through coordination and scheduling of improvements, operations and activities we have always tried to find solutions that mutually accommodate our program requirements. For this reason I am very concerned about finding a solution, if possible, to operational issues that have been raised by the Air Force in regard to the Wind Turbine Generation Facility.

Since the inception of this project, we have been aware of possible interference with on-going activities at the Nevada Test Site and the Nevada Test and Training Range from the rotation and movement of turbine blades and the creation of uncontrolled energy emissions. In negotiating an easement with the project sponsor for the use of Test Site land, we were extremely cautious in segmenting the geographic areas of interest to the sponsor into definable, "phased," permit areas. Phase One, in the Shoshone Mountain area of the Test Site, was expected to provide isolation from most National Security operations on the NTS as well as a line-of-site "ridge line" buffer from operations on the NTTR to the east of Shoshone Mountain. At this time this is the only phase of the project that the Nevada Operations office has allowed the sponsor to preform preliminary engineering on.

I have received technical and programmatic briefings from your staff members in the last two months and have become aware that we may not be able to resolve these issues through either engineering or operational means. I am however concerned, and feel that it is our joint responsibility to assure that all possible solutions to this problem be explored before referring this action to higher levels for a decision.

G-MNS09000

Though this project does not fit the traditional National Security mission role performed at the Test Site, it certainly is fully within the statutorily authorized program area of the Department of Energy. As such it requires my full commitment to pursue this so that the final decision is in the best interest of the Federal Government.

I look forward to meeting with you both to reach a final recommendation.

Sincerely

KAC

cc: B Gen Haeckel

G-MNS09001

AMPIA (R)
AMPIA (RF)
MGR (RF)

OED
THORNTON
12/13/2000

D/AMPIA
MORGAN
12/13/2000

AMPIA
HAMER
12/13/2000

USAF
SCHOFIELD
12/13/2000

OCC
BORNHOFT
see note
12/13/2000

DMGR/TO
NORMN
12/12/2000

I still think we are giving away too much.

D/MGR
ROWERS
12/13/2000

MGR
CARLSON
12/13/2000

AMPIA
SECRETARY
12/14/2000
5-5603

DEC 14 2000

Madelyn R. Creedon, Deputy Administrator for Defense Programs, DOE/HQ (DP-1), FORS

GRANT OF EASEMENT FOR A WIND POWERED ELECTRIC GENERATING FACILITY AT THE NEVADA TEST SITE

We have enclosed the subject grant of easement for a proposed wind powered electric generating facility to be located at the Nevada Test Site (NTS) for your review and approval. The easement will allow the NTS Development Corporation, the Department of Energy/Nevada Operations Office's (DOE/NV) Community Reuse Organization, in conjunction with the Western Renewable Energy Network, to construct, operate, and maintain up to 545 wind turbines with a capacity of approximately 382 MW at the NTS.

The project will be constructed in three phases. The first phase, shown as Attachment A-1 to the easement, consists of approximately 85 MW of generation to be constructed in the Shoshone Mountain area of the NTS. This generation will be interconnected to the existing NTS transmission and distribution system providing additional voltage support and increased reliability for the NTS users. The other two phases of the project will be developed over the next 18 months and will require separate approval.

This project contributes to DOE/NV's ability to support the National Security Mission of the NTS. Prorated over the three phases of the project, the project proponents will provide no cost energy equivalent to 10% of the NTS FY 2000 electrical consumption to DOE/NV. Potential construction, operation, and maintenance work from this project may also reduce infrastructure and site services costs to Defense Programs and other users of the NTS.

This project also supports the goals of the Worker and Community Transition Program and the goals of the Energy Efficiency and Renewable Energy Program. The project will provide up to 200 construction jobs and approximately 30 full time jobs during operation. In addition the project provides DOE the opportunity to meet the goals of Executive Order 13123 that requires all Federal Agencies to increase their use of renewable energy.

I recommend your approval of this easement.

Original Signed By:
Kathleen A.Carlson

Kathleen A. Carlson
Manager

AMPIA:kdt-30

Enclosure:
As stated



G-MNS08183

**Department of Energy**
National Nuclear Security Administration
Nevada Operations Office
P.O. Box 98518
Las Vegas, NV 89193-8518

JUL 12 2002

George D. Ormiston, Chief Executive Officer
NTS Development Corporation
4045 S. Spencer, #314
Las Vegas, NV 89119-5248

PROPOSED WIND TURBINE GENERATION PROJECT AT THE NEVADA TEST SITE

In December of 2000, the Nevada Operations Office and the NTS Development Corporation signed a "Grant of Easement for Wind Powered Electric Generating Facility". This agreement provided that the "Grant of Easement will not become effective until DOE has completed the NEPA process".

As part of the ongoing NEPA process, the United States Air Force has stated in a letter dated July 3, 2002, from the 98th Range Wing Commander that wind turbine operations at the NTS are incompatible with the mission of the Nevada Test and Training Range (NTTR) and has recommended that no wind turbines be installed on the NTS. This recommendation came as the result of an SF/AQ Red Team study of a wind farm located on the NTS. Of primary concern to the Air Force are the impacts to the NTTR missions within the ranges surrounding the NTS. Some of these mission capabilities are unique to the NTTR and may cause major impacts to National Security.

John Gordon, Administrator of the National Nuclear Security Administration (NNSA), has decided to terminate the NEPA process at this time in light of the Air Force recommendation. A draft Environmental Impact Statement has been prepared and is ready for release for public review and comment. However, the National Security impacts identified by the Air Force are so significant that further action with respect to the NEPA process is unwarranted. The Nevada Operations Office is hereby notifying you that development of the project will not be allowed to go forward. The easement will not go into effect, according to the terms of the agreement.

KA Carlson

Kathleen A. Carlson
Manager

OCC:KAH

Office of Chief Counsel – Notes on Concurrence December 13, 2000
Easement for Wind Generation with NTS Development Corporation

I have concurred in the easement document that grants use of the NTS for the construction and operation of a commercial wind powered electric generating facility. The proposed document, however, varies in several substantial respects from prior documents we have used to permit commercial activities at the NTS. Because of uncertainties concerning DOE's authority to grant real estate interests in the withdrawn lands comprising the NTS, we have previously granted only revocable use permits for commercial activities at the NTS. This document is a non-revocable easement for a term of 35 years. Such a non-revocable document for an extended term is essential to secure commercial funding if this activity is to proceed. While I think that DOE has the legal authority under Section 161q. of the Atomic Energy Act of 1954, as amended, to grant a 35 year easement in withdrawn lands under DOE's control, that opinion may not have universal acceptance, particularly within the Department of Interior (DOI) who issued the public land orders comprising the NTS.

In addition to the issue of DOE's authority to grant a non-revocable easement, the binding nature of a non-revocable instrument involves some significant consequences that we have previously avoided or mitigated with a revocable permit. Given DOE's mission at NTS, DOE must retain the ultimate control of activities at the site. In prior permits, that control can be exercised through the administrative approvals required in the permit and by virtue of the fact that the commercial organization assumes the financial risk of termination in the event of an unalterable conflict between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operation of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government.

Issues can also be raised that the proposed commercial activity is inconsistent with the purpose for which the public lands comprising the NTS were withdrawn. DOE is currently in a consultation process with DOI on the issue of other uses at the NTS. We do not view the subject commercial activity as inconsistent with, or limited by, the purpose for which the NTS was created.

As with the use permit for the Desert Rock Sky Park (see attached Note to Ladder dated May 24, 2000), this document likewise does not conform to the current guidance that Headquarters has issued for the conduct of 3161 activities. As indicated in the prior Note, we have not been informed that the guidance document is other than advisory in nature. The comments in that Note are also relevant to this action.

Budd Bernhoft
Chief Counsel