IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1569 |
| | ) | (Judge Wolski) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF**

Defendant, the United States, respectfully submits this response to plaintiff's supplemental brief addressing the issue of additional documents to aid in the interpretation of the Easement's revocation clause. The arguments raised by MNS are unsupportable, for three reasons. First, MNS fails to demonstrate any ambiguity in the revocation clause. The Court should thus decline to consider the evidence MNS submits regarding the clause. Second, even if the Court finds an ambiguity in the clause, that ambiguity can only be described as patent, and MNS cannot now seek protection from a patent ambiguity about which it failed to inquire before signing the Easement. Finally, the additional arguments raised by MNS to support its interpretation of the revocation clause are wholly unpersuasive. Accordingly, the Court should disregard MNS's supplemental brief and grant the Government's motion for summary judgment.

**ARGUMENT**

**A. This Court Should Not Consider Extrinsic Evidence**

When the provisions of a contract are clear and unambiguous, a court should not resort to parol evidence. See Forman v. U.S., 329 F.3d 837, 842 (Fed. Cir. 2003). Here, neither the phrase "national security," nor the Easement as a whole, is ambiguous. Accordingly, the Court should decline to accept MNS's suggestions that the court review extrinsic evidence, or even,

hold a trial to determine what the Easement means. See Tr. 73, 75.

MNS claims that the term "national security" is "subject to more than one interpretation and therefore is ambiguous." Pl. Supp. Br. 6.[1] MNS further asserts that because "the parties are applying differing meanings to various terms and phrases in the Easement," the Court should consider extrinsic evidence to determine the Easement's meaning.[2] Id. If the Court considers extrinsic evidence, MNS contends, it cannot decide this case upon summary judgment. Id.

MNS jumps too quickly to the conclusion that the phrase "national security" is ambiguous. A contract is ambiguous "when its language supports more than one reasonable interpretation." City of Tacoma, Dept. of Public Utilities v. United States, 31 F.3d 1130, 1134 (Fed. Cir. 1994) (emphasis added). A mere argument between the parties about interpretation of a contract term, however, is not enough to establish ambiguity. Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999). Rather, both parties' interpretations must fall within a "zone of reasonableness." Id. Further, outside evidence "may not be brought in to create an ambiguity where the language is clear." Tacoma, 31 F.3d at 1134. Thus, MNS must establish that its proffered interpretation is reasonable, and must establish that solely from within the four corners of the Easement. This MNS cannot do, for at least two reasons.

---

[1] Pl. Supp. Br. ___ refers to MNS's supplemental brief. Supp. App. ___ refers to the supplemental appendix attached to that brief. App. ___ refers to the appendix attached to the Government's motion for summary judgment.

[2] MNS also argues that the Easement's lack of an integration clause opens the door to extrinsic evidence. Pl. Supp. Br. 5. The United States Court of Appeals for the Federal Circuit has clarified, however, that even when a party seeks to interpret a term contained in a partially integrated contract, a court will consider extrinsic evidence only if the term is ambiguous. McAbee Const. Inc. v. U.S., 97 F.3d 1431, 1434 (Fed. Cir. 1996). Because the "national security" term is not ambiguous, the partial integration of the Easement is irrelevant, and the Court should not consider MNS's extrinsic evidence.

First, MNS fails to acknowledge that a reasonable interpretation of a contract involves harmonizing all parts of the contract, leaving none superfluous. NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Here, MNS focuses myopically upon the revocation clause and the phrase "national security" to argue that immediately upon signing the Easement, the only means by which Easement could be terminated was for the Government to invoke the eminent domain provision of the revocation clause; in MNS' own words, "the Easement was effective and binding once executed." Pl. Supp. Br. 2. But, Exhibit A of the Easement plainly states the contrary: "DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process." App. 37 (emphasis added). MNS's reading of the revocation clause would render the explicit agreement in Exhibit A entirely superfluous. The Government's interpretation of the revocation clause, in contrast gives meaning to both the revocation clause and the Easement's NEPA provision; following the NEPA process, the revocation clause would have been entirely viable; but until the project was approved under NEPA, none of the provisions of the Easement – including the revocation clause – were "effective."[3]

Second, MNS proffered interpretation is not reasonable because MNS ignores that the Easement contained an order of precedence clause, which was included to resolve any potential conflict in the agreement's language. App. 16. The order of precedence clause established that

---

[3] If the parties' agreement were as MNS postulates, the NEPA provision in Exhibit A would read: "DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process, except that the revocation clause is effective and binding upon the signing of this Easement in the event that the Government, during the NEPA process, elects to terminate this Easement for reasons related to 'national security,'" or words to that effect. That the Easement does not contain such language is dispositive of MNS's erroneous assertion that the parties so agreed.

the provisions of Exhibit A (which includes the provision that the agreement "will not become effective" until the NEPA process is completed, App. 37 ) are superior to any other section of the agreement. App. 16. That order of precedence clause also establishes that the provisions of Part 1, Specific Provisions (which includes the provision that the grant of easement is "made subject to compliance with" NEPA, App. 13), is also superior to Part II, General Provisions (which includes the revocation clause, upon which MNS relies, App. 20). To be clear, the Government's interpretation of the agreement places none of these clauses into conflict with another. But, even if one were to consider MNS's proffered interpretation, which necessarily elevates the revocation clause above all others, as plausible the order of precedence clause agreed to by the parties before a dispute arose establishes that the Government's interpretation controls. Thus, MNS's proffered interpretation is unreasonable, given that it conflicts the parties' agreement on the order of precedence.

Because MNS does not proffer a reasonable interpretation of the revocation clause, the Court is free to and, respectfully, should decline to consider MNS's "evidence" about the meaning of the Easement.

**B. <u>Any Ambiguity Present Was Patent</u>**

Even if the Court finds that MNS's interpretation of the phrase "national security" is within the zone of reasonableness and, thus, creates an ambiguity, the Court must inquire further about the nature of the ambiguity. <u>Metric</u>, 169 F.3d at 751. If an ambiguity is latent, <u>i.e.</u>, not obvious upon the face of the contract, it will be construed against the Government. <u>NVT Technologies</u>, 370 F.3d at 1162. If, however, an ambiguity "is obvious and a bidder fails to inquire with regard to the provision," than the contractor's interpretation of that ambiguity will

fail. Id.

As even MNS recognizes, any claim to damages under the revocation clause depends upon the effectiveness of the Easement; if the Easement was never effective, it could not be revoked. Thus, MNS points to the phrase "from the date of execution" contained in the Easement, as well as the phased nature of the project and a memorandum written by a DOE lawyer who participated in negotiating the Easement, for the proposition that the Easement was effective when signed. Pl. Supp. Br. 11-15. If, as MNS claims, the Easement was effective upon execution, this would patently and directly contradict the language in the Easement's Exhibit A: "DOE and the Grantee agree that this Grant of Easement will not become effective until DOE has completed the NEPA process." App. 37.

MNS cannot now claim that an obvious discrepancy in the Easement weighs in its favor. If the phrase "not become effective" was somehow unclear to MNS when it signed the Easement, the company had a duty to inquire about the meaning of the term. See NVT Technologies, 370 F.3d at 1162. MNS made no such inquiry, and it cannot now ask the Court to remedy its own lack of diligence.

**C. MNS Proffers No Relevant Extrinsic Evidence**

Even if the Court accepts that the "national security" term of the revocation clause is ambiguous, allowing for resort to extrinsic evidence, MNS puts forward no relevant evidence concerning the clause.[4] Instead, MNS offers disparate pieces of the record, stitched together by

---

[4] It is worth noting that the Court granted the parties the opportunity to submit "any additional documents" relating to the interpretation of the Easement's revocation clause. Order filed January 25, 2006. MNS has submitted a 33-page appendix, yet all but one of the included documents were already identified in the parties' earlier submissions. The one exception (Supp. App.31) is cited for the innocuous proposition that the project would be "constructed in three

weak inferences not to explain an alleged ambiguity, but to contradict the final expression of the Easement as a whole. This it cannot do. See Marathon Oil Co. v. U.S., 42 Fed. Cl. 267, 275 (1998), aff'd, 215 F.3d 1343 (Fed. Cir. 1999) (table) citing Restatement (Second) of Contracts § 214 (1979) (noting that "the court may rely on parol evidence to explain or clarify an ambiguity, but not to contradict [a contract's] final expression.").

Curiously, MNS abandons its claim, expressed in its complaint, that DOE kept hidden the concerns of the Air Force. See, e.g., Compl. ¶ 63, 72 (asserting that DOE "either intentionally withheld . . . information from MNS or misrepresented the scope and impact of the national security issues on the NTS project."). In a complete about-face, MNS now contends that the "parties discussed the fact that the Air Force was concerned that the wind farm could have [a] potential adverse impact on Air Force radar." Pl. Supp. Br. 2. According to MNS, these discussions led to an understanding between the parties that the revocation clause encompassed the Air Force's issues and was valid from the moment the Easement was signed. Pl. Supp. Br. 3. Yet none of the extrinsic "evidence" offered by MNS proves that the Easement was effective upon signing, or that the parties agreed that concerns of the Air Force were encompassed by the revocation clause.

MNS points first to an early draft of the Easement's revocation clause that included reference to the resumption of nuclear testing. Pl. Supp. Br. 7. MNS asserts that the removal of the reference to nuclear testing signified the broadening of the clause to include the Air Force's concerns. Pl. Supp. Br. 7. As initially worded, however, the clause covered "other national

---

phases." Pl. Supp. Br. 9. Thus, at bottom, all of the arguments raised by MNS in its supplemental brief could have been advanced in its earlier briefing.

security considerations." Supp. App. 8. The clause, then, was not broadened; it was merely shortened. Such an excision is hardly evidence of the parties' alleged contemporaneous intent to include the concerns of the Air Force.

MNS next claims that "the parties discussed the fact that the Air Force was concerned that the wind farm could negatively impact on the Air Force's operations." Pl. Supp. Br. 7. In particular, MNS cites internal government emails and memoranda noting that Air Force concerns emerged late in the negotiation process (well after the "national security" phrase appeared in drafts of the Easement). Pl. Supp. Br. 7-8; Supp. App. 20. MNS then rehashes its argument that DOE used the phrase "national security" in documents after terminating the project, alleging again that DOE manager Kathleen Carlson believed that MNS would "seek compensation" following the project's termination. Pl. Supp. Br. 9-11. From these disparate threads, MNS spins the conclusion that the "Air Force concerns were in fact characterized by both parties as 'national security' concerns that should have triggered the 'national security' clause." Pl. Supp. Br. 11.

Whether or not the parties discussed certain of the Air Force's concerns before signing the Easement, MNS does not offer even a single piece of evidence that those concerns were tied to the Easement's revocation clause. Instead, MNS relies solely upon an inference that because the Air Force's concerns related to "national security" and because the revocation clause contained the phrase "national security," the parties must have intended the clause to cover the Air Force's concerns. However, MNS has not identified a single piece of evidence suggesting that either party, let alone both parties, contemporaneously held such an understanding or belief. Further, to the extent that inferences have any relevance to this inquiry at all, the Court is

constrained to draw inferences regarding the revocation clause in the Government's favor, as we are the nonmovant with respect to MNS's cross-motion for summary judgment. See Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002) (noting that the "standard is not changed when the parties bring cross-motions for summary judgment").

Aside from the scope of the revocation clause, MNS also fails to offer any persuasive evidence affecting the issue of the timing of the effectiveness of the clause. Instead, MNS points to provisions in the Easement providing for its effective term and for exclusivity. Pl. Supp. Br. 12. Neither of these provisions, however, state that the Easement was effective from the date it was signed as opposed to the date of the completion of the NEPA process, as required by the language contained in Exhibit A. Even if, in its view, MNS could not have "waited until NEPA was finished before beginning to develop the project," if MNS thought the risk of proceeding was too great without an effective Easement, it should not have acquiesced in a contingent agreement.

Finally, MNS offers a memorandum written by DOE counsel Budd Bornhoft as evidence of the Easement's effectiveness, suggesting that Mr. Bornhoft should testify as to his understanding of the Easement. Pl. Supp. Br. 13-15. Again, Mr. Bornhoft's memorandum says nothing regarding the effectiveness of the Easement. The memorandum instead discusses the risks of entering into the Easement. Supp. App. 33. In particular, Mr. Bornhoft was contrasting this easement from the "use permit" more typically used by DOE to permit access and other activities upon Federal lands. Id. The memorandum does not say, expressly or even by implication, that the Easement's revocation clause would be effective immediately upon signing.

Moreover, evidence of Mr. Bornhoft's personal understanding of the Easement is irrelevant to the determination of the objective meaning of the words to which the parties agreed. PCL Const. Services, Inc. v. U.S., 47 Fed. Cl. 745, 785 (2000) ("The subjective, unexpressed intent of one party . . . is irrelevant for interpreting the contract").

At bottom, MNS has failed to identify even a single contemporaneous document in which any individual – whether associated with the Government or MNS – expressed the interpretation of the Easement which MNS's counsel now advances. Most certainly, MNS has failed to identify any contemporaneous document which evidences that both sides agreed to the interpretation MNS now posits. Thus, when the Government filed its post-argument supplemental brief, we informed the Court that we could find no contemporaneous documents which supported MNS' interpretation. Having reviewed MNS's supplemental brief, it is clear that MNS found none either.

In short, the Court should reject MNS's extrinsic evidence because that evidence is offered solely for the purpose of altering an otherwise unambiguous agreement. In any event, even if the Court adds MNS's evidence to its calculus, no part of that evidence establishes that MNS's post-hoc interpretation – that, notwithstanding the express language in the Easement to the contrary, the revocation clause trumps the Easement's NEPA provisions – was actually agreed to by the parties.

**CONCLUSION**

For the reasons given above, we respectfully request the Court to grant our motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

April 7, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on April 7, 2006, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee
BRYANT G. SNEE