IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company, | ) | CASE NO. 04-1569C |
| Plaintiff, | ) | (Judge Wolski) |
| v. | ) | **MNS WIND COMPANY, LLC'S SUR-REPLY TO THE GOVERNMENT'S REPLY TO MNS' SUPPLEMENTAL BRIEF** |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**SUR-REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF**

The Government has *never* disputed MNS's description of the intent expressed by each party prior to forming this Easement. For example, it is undisputed that during the negotiations, that representatives of the DOE told MNS' representatives that it wanted the right to terminate the agreements *at any time* for national security reasons. *See* Declaration of Tim Carlson ("Carlson Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶10 ("representatives of the DOE . . . indicated that the DOE wanted the right to terminate the agreements *at any time* for national security reasons") (emphasis added); Declaration of Thomas Williams ("Williams Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶ 7 ("[T]he DOE wanted the right to terminate the agreements *at any time* for national security reasons."). The DOE also expressed its intent not to permit MNS to develop certain portions of the NTS due to "national security reasons." Williams Decl., ¶ 7. It is further undisputed that MNS responded by informing the DOE that it "would not agree to invest time and resources in a project only to have its rights terminated for national security reasons, without compensation." Carlson Decl. ¶ 10; Williams Decl., ¶ 9; MNS' Proposed Findings of Uncontroverted Fact ("Undisputed Facts"), filed with MNS' Motion for Partial Summary Judgment, Undisputed Fact,

No. 7 ("Prior to executing the Easement, John Johansen, the President of MNS, informed representatives of the DOE, including but not limited to, Tom Williams, that MNS would not agree to invest time and resources in the wind farm project only to have its rights terminated for national security reasons without compensation for its involvement.") (undisputed by the Government). In addition, it is undisputed that MNS informed the DOE "that a revocable use permit was unacceptable, and that a non-revocable use permit for an extended term was essential to secure commercial funding for the wind farm project." Williams Decl., ¶ 9. The parties' expressed intent prior to entering into this agreement is clear and undisputed.

What is disputed, however, is whether the language of the Easement unambiguously and correctly articulated the parties' undisputed expressed intent. From the inception of this lawsuit, MNS has maintained that the parties reached the following basic agreement, which is consistent with the expressed intent of each party: the Government granted MNS the exclusive right to immediately develop, in three distinct phases, a wind farm on the NTS. Because the wind farm was to be developed on a former nuclear test site and would be surrounded by other classified federal areas, including Nellis Air Force Base, the parties agreed that the Government could revoke the Easement and cancel the project at any time for "national security" reasons, and in that event, the Government would compensate MNS for any termination based on "national security." Therefore, the parties agreed that if "national security" issues arose at any time during the development, including during the NEPA process, and prevented any further development of the wind farm, the Government would compensate MNS. It is a corollary to this understanding that the Government would terminate the Easement as soon as it realized that there was an unalterable conflict that would prevent any further development so as to minimize unnecessary expense to or investment by MNS (even if that realization occurred before the completion of the

NEPA process.) As discussed in detail in MNS's Supplemental Brief, each piece of extrinsic evidence MNS supplied to the Court supports this basic understanding.

In particular, the memorandum written by Budd Bornhoft, the DOE's chief-counsel responsible for negotiating, structuring and drafting the Easement, demonstrated that the Government similarly understood that it would be required to compensate MNS if the wind farm project was terminated due to national security concerns. Contrary to the Government's assertion, Mr. Bornhoft's memorandum is not the subjective, unexpressed intent of a party, but rather the Government's counsel's *contemporaneous* understanding and explanation of the Government's obligations and duties under the Easement – the very document he negotiated and drafted on behalf of the Government.

In his memorandum, Mr. Bornhoft explained that a "non-revocable" permit (like this Easement) that obligated the Government to pay eminent domain damages "in the event of an unalterable conflict between the needs of the Government and the conduct of the commercial activity," would involve significant financial consequences to the Government, and differed from the "revocable" permits that the DOE usually granted. In this Easement, unlike in revocable permits, the Government did not enjoy the same level of "administrative approvals and control." In other words, Mr. Bornhoft recognized that the Government irrevocably committed to compensate MNS if an "unalterable conflict" – such as the Air Force's radar concerns – arose at any time during the development. By characterizing the Easement as "non-revocable," Bornhoft is simply making the point that in the instance of an unalterable conflict involving "national security" concerns, the Government had agreed to compensate MNS for its investment. This is because Mr. Bornhoft, like MNS, recognized that the Government could not use the usual administrative "approvals and controls," (such as those available in the usual NEPA process) to

terminate further development or operation of the project without compensating MNS. Thus, Mr. Bornhoft's understanding of the Easement is consistent with both parties' expressed intent, as well as the extrinsic evidence in this case. The Government insisted that it have the right to terminate the Easement for "national security" reasons and MNS insisted that it be compensated under those circumstances. Therefore, under the Easement, once executed, the Government was obligated to compensate MNS for its investment in the project if the Government terminated the Easement based on "national security" concerns, and could not avoid this agreement to compensate by using the usual administrative approvals and controls to avoid this promise.

Instead of addressing the content and language of Bornhoft's memorandum[1] and the other extrinsic evidence cited in MNS's Supplemental Brief, the Government instead merely argues that if there was any ambiguity in the Easement, any such ambiguity cannot be construed against the Government because the ambiguity was patent and obvious to MNS. To the extent the Government even attempts to address the extrinsic evidence cited by MNS, the Government simply dismisses the evidence as irrelevant since it does not support the Government's narrow and unreasonable interpretation of the Easement. As discussed below, the Government's arguments miss the mark.

---

1 Mr. Bornhoft is clearly the best person to explain the Government's understanding of its rights and obligations under the Easement since he was primarily responsible for negotiating and drafting the Easement on behalf of the Government. Interestingly, the Government elected to not submit a declaration from Mr. Bornhoft. As discussed in MNS's Supplemental Brief, MNS believes that Mr. Bornhoft's testimony regarding the Easement could assist the Court in its interpretation of the Easement.

## ARGUMENT

**A. There is A Latent Ambiguity As To Whether the Government Agreed to Compensate MNS for a Termination of the Wind Farm Project Based Upon "National Security" Concerns, Including, But Not Limited to, the Air Force's Radar Concerns, Regardless When the Concerns Arose.**

In its Reply Brief, the Government erroneously maintains that even if certain terms in the Easement were ambiguous, any ambiguity cannot be construed against the Government because the ambiguities were patent and obvious to MNS, since by the "express" terms of the Easement, the revocation clause was not effective until the NEPA process was completed. *See* Gov. Reply at 4-5. The Government's argument, however, is based upon two fatally flawed assumption: (1) that the term "national security" does not include the Air Force's radar concerns; and (2) MNS's interpretation of "national security" directly contradicts the language in Exhibit A regarding the "effectiveness" of the Easement. There is a latent ambiguity in the language of the Easement as to whether the Government agreed to compensate MNS for a termination of the wind farm based upon "national security" concerns (that included the Air Force's radar concerns), and there is a further ambiguity as to whether compensation was required regardless of whether the termination for "national security" concerns arose prior to, during or after the NEPA process.

The relevant extrinsic evidence clearly supports the interpretation that the phrase "national security" included the Air Force's radar concerns, and was not limited to the resumption of nuclear testing. The extrinsic evidence demonstrates, among other things, that: (1) during the negotiations and before the Easement was signed, the parties discussed the fact that the Air Force was concerned that the wind farm could have a potential adverse impact on Air Force radar, *see* App. at 17 (October 31, 2000 email from Jack Schofield, Col., USAF to Kathleen Carlson); *see also* App. at 18 (November 8, 2000 email from Lt. Col. Glen Johnson to

Jack Scholfield ("I told [the DOE's Kevin Thornton] of a general 'Doppler problem' based on blade composition, etc."); (2) during negotiations and before the Easement was signed, the wind farm project was limited in scope from a development with 545 turbines with no phases, to a three-phase development, with only the first phase of 175 turbines expressly approved, due, in part, to "national security" concerns raised by the Air Force, including interference with radar, *see* App. at 29 (Memorandum from Kathleen Carlson to General John Gordon); and (3) the site of the first phase was selected by the Government in response to, among other things, the radar concerns expressed by the Air Force, *see* App. at 31 (December 14, 2000 Memorandum from Kathleen Carlson to Madelyn R. Creedon) ("The project will be constructed in three phases. The first phase, shown in Attachment A-1 to the easement, consists of approximately 85 MW of generation to be constructed in the Shoshone Mountain area of the NTS."), *see also* App. at 20 (December 15, 2000 Memorandum from Richard Bradshaw to Madelyn Creedon ("during mid-December, NTS negotiators introduced several demands/restrictions that were not on the table previously, and which seriously jeopardize the ability of [MNS] to construct the project. Chief among them is the reversal of NTS' prior approval of Paiute Mesa as a site for wind turbines. . . . No reason was given to [MNS] and NTSDC other than unspecified ***national security*** objections raised by the Air Force.") (emphasis added). Thus, the extrinsic evidence shows that both parties understood that the Air Force had raised "national security" objections to the wind farm based on the potential of interference with radar, and these types of "national security" concerns were addressed by the parties in Part II, Section E(1) of the Easement.[2]

---

2 Contrary to the Government's claim, MNS has not changed its position regarding whether the DOE kept hidden the concerns of the Air Force. *See* Gov. Reply at 6. As the extrinsic evidence shows, both parties knew, while drafting and prior to executing the (continued...)

The extrinsic evidence also supports MNS's interpretation that the Government agreed to compensate MNS for any termination of the wind farm project based on "national security" concerns even of those concerns arose prior to, during, or after the NEPA process. As discussed in detail in the Supplemental Brief, the lawyer primarily responsible for drafting the Easement -- Bud Bornhoft -- understood that the Government agreed to compensate MNS for any termination based on "national security" concerns. In Mr. Bornhoft's memorandum, drafted ***two*** days before the Easement was signed, he succinctly explained the Government's obligations, as he understood them, once the Government executed the Easement. *See* App. at 33. He recognized the unique features of the Easement and the risk the Government was taking in agreeing to the national security provision, stating that:

> "In prior permits, [the DOE's ultimate control] can be exercised through ***administrative approvals*** required in the permit and by virtue of the fact that the commercial organization assumes financial risk of termination in the event of an ***unalterable conflict*** between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those

---

2 (...continued)
Easement, that the Air Force had expressed concerns about the wind farm's potential impact on radar. Rather, what MNS has alleged is that the DOE misrepresented the "depth" of the national security issues related to this project. As expressed in the DOE's December 15, 2000 internal memo, one must question why the DOE listened to the Air Force in ruling out the second and third phases based on radar concerns, but nevertheless permitted the development of the first phase of the project even though the Air Force had raised the same radar concerns about all three phases. *See* App. at 20. MNS believed, in good faith, that the parties had adequately addressed and resolved the national security issues at least as to the first phase prior to entering into the Easement, and that the Air Force's radar concerns might still be addressed to permit the second and third phases to go forward. Given the undisputed negotiations that took place before the Easement was signed, if the Government believed the entire Easement was affected by these "national security" concerns, it should not have entered the transaction or was duty bound to terminate as soon as it knew there was an unalterable conflict and compensate MNS for its investment. Nevertheless, MNS entered into the Easement, because it believed, in good faith, that it was adequately protected in the event of a termination based on national security concerns under the language of the Easement. *See* Compl, ¶ 73.

> controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

App. at 33 (emphasis added).

Mr. Bornhoft recognized that the Government irrevocably committed to compensate MNS if an "unalterable conflict" arose at any time during the development. An "unalterable conflict" in fact did arise, one that had been present since day one -- the Air Force's radar concerns -- which ultimately resulted in the Government's termination of the project. Mr. Bornhoft's memorandum confirms the parties' understanding that the Government could not exercise its usual "administrative approvals" when it came to national security concerns identified in Part II, Section E(1) of the Easement without compensating MNS for its investment.

Contrary to the Government's claim, MNS's interpretation that the Government agreed to compensate MNS if the Government terminated the project for "national security" concerns (even if it arose prior to or during the NEPA process), does not contradict the "effectiveness" language in Exhibit A to the Easement. The Government still had to comply with NEPA before MNS could begin constructing the wind turbines. However, as discussed in MNS' Supplemental Brief, there were other promises the Government made, including but not limited to, its promise to compensate MNS for a termination based on "national security" concerns, that were immediately effective and enforceable once the Easement was signed. *See, e.g.*, Easement, Ex. A, p.1, ¶ 3(a) (the "duration of this Easement shall be 35 years *from the date of execution*, unless earlier revoked in the event of default under the terms of this Easement, plus an additional ten (10) year period if approved by the DOE") (emphasis added); Easement, Ex A., p. 1, ¶2 (MNS

was granted the ***exclusive*** right for the installation of the first 545 wind turbines, but in order to exercise this right, MNS had 24 months from the date the Easement was ***executed*** to obtain DOE approval of additional easements) (emphasis added). The Government's interpretation concerning the "effectiveness" of the Easement would render these promises meaningless, and directly contradict the expressed intent of the parties that the Government would compensate MNS for a termination based on "national security" concerns.

There is no dispute that the Government terminated for "national security" reasons. *See* Undisputed Fact. No. 12 ("[B]ecause of ***national security*** concerns, the DOE had decided to terminate the NEPA process. . . .") (emphasis added) (citing July 12, 2002 Letter) (not disputed by Government); *see also* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003) (DOE stated in the Federal Register that "the Administrator of the NNSA decided to cancel consideration of the wind farm proposal on the NTS due to potentially significant adverse impacts to ***national security*** missions of the U.S. Air Force at the Nevada Test and Training Range") (emphasis added). And there is no dispute that the Government always expected MNS to seek compensation for its losses. *See* App at 24. (Even before the Government "cancelled" the project and NEPA was "completed," Kathleen Carlson confirmed that the Government expected MNS "to seek compensation for its losses") (Kathleen Carlson memo to General Gordon).

Consistent with the parties' expressed intent, as well as the extrinsic evidence in this case, the Government could have either "satisfied" and "completed" the NEPA process with a "No Action" decision, which would have implemented the Easement and required the DOE thereafter to revoke the Easement for national security concerns, or it could have terminated the Easement prior to the completion of the NEPA process, and compensated MNS for its investment.

As discussed in MNS's prior papers, however, the Government instead breached its promise to revoke the Easement for "national security" concerns by terminating and revoking the environmental process condition. The Government now claims that the same "national security" concerns the parties discussed prior to entering into the Easement (i.e., the Air Force's radar concerns) were really just "environmental issues" that the Government could use to terminate the NEPA process, prevent the Easement from becoming effective, and avoid its promise to compensate MNS. These positions are inconsistent with the undisputed facts and with the undisputed expressed intent of both parties. These "national security" concerns involving the Air Force radar operations should have resulted in a termination of the Easement with compensation to MNS for its investment.

**CONCLUSION**

For the reasons discussed above, the evidence taken as a whole supports the undisputed expressed intent of the parties that if the Government decided to terminate the Easement for "national security" concerns, it would compensate MNS for its investment pursuant to the termination clause of the Easement. *See* Easement, Part II, Section E(1). Without that understanding, MNS' representatives stated it would not have entered this transaction. The Government breached its promise and should be liable for contract damages.

Dated: May 12, 2006

s/ George T. Caplan
George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285

*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on May 12, 2006, a copy of the foregoing MNS' Sur-Reply to the Government's Reply to MNS' Supplemental Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo