No. 04-1569
Judge Wolski

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MNS WIND COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# MNS WIND COMPANY, LLC'S SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S OCTOBER 31, 2006 ORDER

George T. Caplan, Counsel of Record
Bryant S. Delgadillo
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

Dated: November 28, 2006

23180598.WPD

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. NEITHER THE PLAIN LANGUAGE NOR THE EXPRESSED PURPOSE OF THE NEPA STATUTE AND REGULATIONS, SUPPORTS THE CONCLUSION THAT IMPACTS TO THE NON-PHYSICAL ENVIRONMENT, SUCH AS RADIO FREQUENCY TRANSMISSIONS, CAN BE CONSIDERED DURING THE NEPA PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. IT IS UNDISPUTED THAT THE DOE TERMINATED THE NEPA PROCESS FOR NATIONAL SECURITY REASONS, AND NOT FOR ENVIRONMENTAL REASONS . . . . . . . . . . . . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Aberdeen & Rockfish R.R. v. SCRAP*,
422 U.S. 289 (1975) . . . . . 4

*Andrus v. Sierra Club*,
442 U.S. 347 (1979) . . . . . 4

*Breckinridge v. Rumsfeld*,
F.2d 864 (1976) . . . . . 6

*Douglas County v. Babbitt*,
48 F.3d 1495 (9th Cir. 1995) . . . . . 6

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) . . . . . 2

*Nevada Land Action Association v. United States Forest Service*,
8 F.3d 713 (9th Cir. 1993) . . . . . 1

*Western Radio Services Company, Inc. v. Espy*,
79 F.3d 896 (9th Cir. 1996) . . . . . 1

**FEDERAL STATUTES**

40 Code of Federal Regulations, Section 1500.1(a) . . . . . 7

40 Code of Federal Regulations, Section 1508.8(a) . . . . . 7

40 Code of Federal Regulations, Section 1508.8(b) . . . . . 7

40 Code of Federal Regulations, Section 508.14 . . . . . 7

115 Congressional Record 40416 (1969) . . . . . 6

115 Congressional Record 40417 (1969) . . . . . 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company, | CASE NO. 04-1569C |
| Plaintiff, | (Judge Wolski) |
| v. | **MNS WIND COMPANY, LLC'S SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S OCTOBER 31, 2006 ORDER** |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

**INTRODUCTION**

In its October 31, 2006 Order, this Court asked the parties to file supplemental briefs addressing whether "the potential interference of the proposed wind turbines with the Air Force's radio frequency transmission is a factor that may properly be considered under the National Environmental Policy Act (NEPA)." The simple answer is no – interference with "radio frequency transmission" is not an "environmental" harm that may be considered under NEPA. In fact, in the only reported NEPA case on point involving potential interference with radio frequency transmissions, the Ninth Circuit concluded that such alleged interference was not an "environmental impact" under NEPA. *Western Radio Services Company, Inc. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996) ("Western Radio"). In *Western Radio*, the Ninth Circuit recognized that "NEPA's purpose is 'to protect the environment, not the economic interests of those adversely affected by agency decisions.'" *Id.* at 902-903 (*citing Nevada Land Action Ass'n v. United States Forest Service*, 8 F.3d 713, 716 (9th Cir. 1993)). Accordingly, the Ninth Circuit concluded that

complaints of alleged interference with radio transmissions are purely economic, and not an environmental impact, and "therefore not one that NEPA aims to redress." *Id.* at 903.

The result in *Western Radio* is completely consistent with both the plain meaning of the NEPA statute (and its regulations), as well as the overwhelming case law applying NEPA. NEPA does not address socio-economic issues such as a potential interference with radio frequency transmissions. Rather, as the United States Supreme Court held in *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983), "NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the *physical environment*." *Id.* at 772 (emphasis added). Courts have consistently and narrowly interpreted the phrase "physical environment" as limited to the world around us – "the air, land and water which supports life on Earth." *Id.* Radio frequency transmissions or radio waves are simply not part of the "physical environment" under NEPA.

In addition, the Court's question relies upon a critical assumption that is *not* supported by the factual record in this case – that the DOE terminated the NEPA process, and the wind farm project, for reasons related solely to the "Air Force's radio frequency transmission." It is undisputed that the DOE actually terminated the NEPA process and the wind farm project because of the wind farm's perceived interference with the Air Force's *operations* at Nellis Air Force base, with potentially adverse impacts upon "national security." The undisputed record shows that the DOE terminated the NEPA process and the wind farm project solely because of these "national security" concerns:

- The DOE terminated the NEPA process, and the wind farm project "because of national security concerns . . . ." *See* MNS' Proposed Findings of Uncontroverted Fact, ¶12;

DOE's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 12 (Admitting);

- The Air Force was concerned about a whole range of *non-environmental* impacts of the potential wind farm project upon its *operations* at Nellis Air Force base, including but not limited to, line of site issues, potential interference with Air Force radar, and electronic interference from the generating system; each of which deals with the Air Force's operations at Nellis Air Base, not impacts to the "physical environment." *See* Declaration of Wilhelm F. Percival (filed with DOE's Opposition to MNS' Motion for Partial Summary Judgment); DOE's Supplemental Appendix ("Supp. App.") at 29, 30; and
- Months before the DOE began the NEPA process (and well before the DOE terminated the NEPA process for national security reasons), the Air Force had originally "approved" the first phase of the wind farm project because, at the time, the Air Force believed that the first phase would not interfere with the Air Force's operations. *See* Supp. App. at 29.

Therefore, the uncontroverted evidence supports the conclusion that each of the Air Force's concerns, no matter how they were characterized, were: 1) related solely to the Air Force's *operations* in and around Nellis Air Force base; and 2) perceived by the Air Force and the DOE as raising "national security" concerns. The potential disruption or interference with the Air Force's *operations* is not, however, an environmental issue. Moreover, NEPA precludes an analysis of purely non-environmental issues such as interference with radio frequency transmissions and potential impacts on "national security."

What has occurred in this case is similar to what happened in *Western Radio*. The DOE has improperly attempted to inject a non-environmental impact (the potential impact to the Air Force's operations) into the NEPA process in order to obstruct a business transaction that had no

adverse impact upon the "physical environment." The DOE has parsed through the litany of concerns the Air Force raised about the wind farm's potential impact on its operations, and has seized upon the one concern – potential inference with radio frequency transmission – that it thinks it can at least argue is somehow related to the environment. The Court, in *Western Radio*, however, specifically rejects this premise. The unfortunate part is that the DOE has made this argument in order to avoid its promise to compensate MNS for a termination of the wind farm project for national security reasons.

## ARGUMENT

### A. NEITHER THE PLAIN LANGUAGE NOR THE EXPRESSED PURPOSE OF THE NEPA STATUTE AND REGULATIONS, SUPPORTS THE CONCLUSION THAT IMPACTS TO THE NON-PHYSICAL ENVIRONMENT, SUCH AS RADIO FREQUENCY TRANSMISSIONS, CAN BE CONSIDERED DURING THE NEPA PROCESS.

"NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the *physical environment*." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) (emphasis added). The thrust of NEPA's analysis requirements is "that *environmental* concerns be integrated into the very process of agency decision making. The 'detailed statement' it requires is the outward sign that *environmental* values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (emphasis added); *see also Aberdeen & Rockfish R.R. v. SCRAP*, 422 U.S. 289, 327 (1975) (typical "environmental consequences" of agency action include "increased solid waste disposal and accelerated depletion of natural resources.").

In interpreting the scope of NEPA, the United State Supreme Court, in *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) concluded that, "although

NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." *Id.* at 773 (emphasis in original). The Supreme Court concluded that the exclusive focus of NEPA was protecting the *physical environment*:

> "To paraphrase the statutory language in light of the facts of this case, where an agency action significantly affects the quality of the human environment, the agency must evaluate the "environmental impact' and any unavoidable adverse environmental effects of its proposal. The theme of § 102 is sounded by the adjective "environmental': NEPA does not require the agency to assess *every* impact or effect on the environment." *Id.* at 772.

The Court then went on to narrowly defined the word "environment" as used in the NEPA statute to mean solely the *physical environment*:

> "If we were to seize the word 'environmental' out of its context and give it the broadest possible definition, the words 'adverse environmental effects' might embrace virtually any consequence of a governmental action that some one thought 'adverse.' But we think the context of the statute shows that Congress was talking about the physical environment - the world around us, so to speak." *Id.*

The Supreme Court also noted that the legislative history of NEPA supported its narrow interpretation of the term "environment" as limited solely to actions which endanger the air, land, or water which sustains life on Earth:

> "What is involved [in NEPA] is a declaration that we do not intend as a government or as a people to initiate actions which endanger the continued existence of the health of mankind: That *we will not intentionally initiate actions which do irreparable damage to*

> *the air, land and water* which supports life on earth.'" *Id.* at 773 (*citing* 115 Cong. Rec. 40416 (1969)) (Remarks of Sen. Jackson).

The Supreme Court thus concluded that "[I]f a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply." *Id.* at 778; *see also Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) ("If the purpose of NEPA is to protect the *physical* environment, and the purpose of preparing an EIS is to alert agencies and the public to potential adverse consequences to the land, sea or air, then an EIS is unnecessary when the action at issue does not alter the natural, untouched physical environment at all."). The Air Force's "radio frequency transmissions" clearly do not endanger the "air, land and water which supports life on earth." Rather, the Air Force's radio waves are man-made, and not part of the physical environment, and were perceived by the DOE as potentially endangering Air Force operations at Nellis Air base, not the environment.

Other courts have applied a similar, narrow view of the purpose of NEPA. For example, the Sixth Circuit, in *Breckinridge v. Rumsfeld*, 537 F.2d 864 (1976), in concluding that the closing of an army base and transfer of personnel and functions did not affect the "human environment," within the meaning of NEPA, applied a focused and limited definition of the term "human environment." In defining the term "human environment," the court cited the word's of NEPA's primary sponsor, Senator Jackson: "[NEPA] is concerned with the integrity of man's life support system – the human environment." *Id.* at 867 (*citing* 115 Cong. Rec. 40417 (1969)) (Sen. Jackson). The Sixth Circuit then concluded that to extend the meaning of "human environment" to a situation that was purely social, such as the impact of the closing of an army base, and not at all related to the physical environment, "would distort the congressional intent." *Id.* at 867.

The NEPA regulations similarly narrowly define the purpose of NEPA as protecting the physical environment. *See* 40 C.F.R. § 1500.1 (a) ("The National Environmental Policy Act (NEPA) is our basic national charter for protecting the *environment*.") (emphasis added). This narrow definition is also reflected in other NEPA regulations." *See, e.g.*, 40 C.F.R. § 1508.8 (a)-(b) (defining "effects" solely in terms of the *physical* or *natural* environment); 40 C.F.R.§1508.14 (defining "human environment" to include "the natural and physical environment and the relationship of people with that environment.").

It is critical to note that each and every regulation reflects NEPA's focus on changes or impacts to the "natural or physical environment." Nowhere in the NEPA statute or its regulations is there authority to consider the effects of a federal agency action on non-environmental, non-physical impacts such as "radio frequency transmissions." Here, the DOE has failed to show any relationship between the potential interference with Air Force radio frequency transmissions and a harm to the "natural or physical environment."

More importantly, in the only reported NEPA case involving a potential interference with radio transmission, the Ninth Circuit has concluded that alleged electromagnetic interference was not an "environmental impact" within the meaning of NEPA. *Western Radio*, 79 F.3d at 903. In *Western Radio*, a radio communication company (Western) filed an action challenging the United States Forest Service's issuance of a special-use permit for relocation of a competitor's radio tower facility in a national forest on the basis of alleged broadcast interference. *Id.* at 898-899. Western alleged, among other things, that the Forest Service's decision to issue its competitor a building permit violated NEPA. *Id.* at 899. The district court concluded that Western did not have standing to bring a claim under NEPA, and Western appealed. *Id.* In affirming the lower court's decision, the Ninth Circuit recognized that in order to bring a claim

under NEPA, a plaintiff must "'assert an interest arguably within the zone of interests to be protected or regulated'" by NEPA. *Id.* at 902 (*citing Nevada Land Action Ass'n v. United States Forest Service*, 8 F.3d 713, 715-16 (9th Cir. 1993)). The Ninth Circuit further stated that "NEPA's purpose is 'to protect the environment, not the economic interests of those adversely affected by agency decisions.'" *Id.* at 902-903 (*citing Nevada Land*, 8 F.3d at 716). Thus, the Ninth Circuit concluded that such complaints of alleged interference were purely economic, and not an environmental impact, and "therefore not one that NEPA aims to redress." *Id.* at 903. Indeed, there is not a single reported NEPA decision that recognizes alleged interference with radio transmissions as an environmental impact.

**B. IT IS UNDISPUTED THAT THE DOE TERMINATED THE NEPA PROCESS FOR NATIONAL SECURITY REASONS, AND NOT FOR ENVIRONMENTAL REASONS.**

As discussed above, there is no support for the conclusion that the potential interference with the Air Force's radio frequency transmissions is an environmental impact that may properly be considered under NEPA. The Court's question, however, relies upon a flawed assumption – that the DOE in fact terminated NEPA and the wind farm project for reasons related to alleged interference with the "Air Force's radio frequency transmission." The factual record is to the contrary.

Rather, it is undisputed that the DOE actually terminated the NEPA process, and the wind farm project "because of national security concerns . . . ." *See* MNS' Proposed Findings of Uncontroverted Fact, ¶12; DOE's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 12 (Agreeing); *see also* Declaration of Tim Carlson ("Carlson Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶27; Declaration of Thomas Williams ("Williams Decl."), filed with MNS' Motion for Partial Summary Judgment, at ¶ 18. In addition, in her July

3, 2002 memorandum to General John A. Gordon, Administrator of NNSA, Ms. Carlson identified the issue with respect to the Air Force's problems with wind farm as follows:

> "The United States Air Force has stated in the enclosed letter from the 98th Range Wing Commander that Wind Generation operations at the NTS are incompatible with the mission of the Nevada Test and Training Range (NTTR) and has recommended that no wind turbines be installed on the NTS. This request came as the result of an SAF/AQ Red Team study of a wind farm located on the NTS. Of primary concern to the Air Force are the impacts of NTRR missions within the ranges surrounding the NTS. Some of these mission capabilities are unique to the NTTR and *may cause major impacts to National Security*."

*See* Government's Appendix ("App.") to Motion for Summary Judgment at 76 (emphasis added). Furthermore, in the DOE's final public statement regarding the NTS wind farm project, the DOE repeated that it was terminating NEPA (and the wind farm) for *national security* reasons:

> "the Administrator of the NNSA [General Gordon] decided to cancel consideration of the wind farm proposal on the NTS due to potentially significant *adverse impacts to national security missions of the U.S. Air Force at the Nevada Test and Training Range* . . . Therefore, further proceedings of the preliminary draft EIS, which was under review in NNSA, is no longer warranted. The notice of intent to prepare an EIS is withdrawn and the NEPA process is hereby terminated."

*Id.* (emphasis added); *see also* MNS' Appendix to Supplemental Brief in Support of Motion for Summary Judgment ("MNS Supp. App."), filed on February 4, 2006, at 20 (December 15, 2000 Memorandum from Richard Bradshaw to Madelyn Creedon) ("during mid-December, NTS negotiators introduced several demands/restrictions that were not on the table previously, and

which seriously jeopardize the ability of [MNS] to construct the project. Chief among them is the reversal of NTS' prior approval of Paiute Mesa as a site for wind turbines. . . . No reason was given to [MNS] and NTSDC other than unspecified ***national security*** objections raised by the Air Force.") (emphasis added). Nowhere in any of the DOE's statements describing its reasoning for terminating the NEPA process, did the DOE mention or refer to the potential interference with the Air Force's "radio frequency transmissions" as the reason for scuttling the NEPA process. Tellingly, the DOE has never contended that the potential interference with radio frequency transmissions pose a threat to human health or the physical environment.

This is because, in fact, the Air Force was concerned about a whole range of *non-environmental* impacts with respect to the Air Force's operations, including but not limited to, line of site issues, potential interference with Air Force radar, and electronic interference from the generating system. *See, e.g.*, Supp. App. 29 (summarizing meeting with Air Force officials and MNS, where the Air Force advised that the issues with the proposed wind farm "appear to be line of sight (air based and land based), radar (Doppler effect) and electronic interference from generating systems."); *id.* at 30 (noting that "Air Force made determination that everything outside of Phase 1 (and some places insider [sic] Phase 1) will have negative impacts on Air Force. It does not matter if we move to different sites or build lower towers – the impact is line of site and radar."); MNS Supp. App. at 29 (Memorandum from Kathleen Carlson to General John Gordon) ("Phase One, in the Shoshone Mountain area of the Test Site, was expected to provide isolation from most National Security operations on the NTS as well as line-of-site "ridge line' buffer from operations on the NTTR to the east of Shoshone Mountain."); Declaration of Wilhelm F. Percival (filed with DOE's Opposition to MNS' Motion for Partial Summary Judgment) at ¶ 5 (describing impact of proposed wind farm to Air Force "operations at

the NTTR."). It is clear that each and every one of the Air Force's concerns dealt with impacts to the Air Force's *operations* at Nellis Air Base, and not impacts to the *physical* or *human* environment.

Indeed, months after the NEPA process had been initiated (and a year before the DOE terminated the NEPA process for national security reasons), the Air Force "approved" the first phase of the wind farm project. *See* Supp. App. at 29 (noting that "Col. Schofield indicated that Phase 1 was approved and is a go. However the Air Force could not give additional phases okay until they can touch, feel and see a turbine in operation at the NTS."). Since the Air Force gave its approval to the first phase outside of the NEPA process, the Air Force clearly did not believe that the potential impacts were related to the "environment." It was only after the events of September 11th that the Air Force began to reconsider the impact of the entire wind farm project, including the first phase, on the Air Force's overall *operation* at Nellis. *See* Supp. App. at 30 (noting that on January 7, 2002, the Air Force, in both classified and non-classified briefings indicated to MNS that "there are Doppler and line of site issues over the entire test site and that the Air Force will be using the site more since 9/11."). Therefore, there is abundant uncontroverted evidence in the record that supports the conclusion that the Air Force's concerns were non-environmental, and related solely to its operations at Nellis Air Force base. The potential impact on the Air Force's operations, whether characterized as line of site, radar, or radio frequency transmissions, does not impact the "physical or human environment" as contemplated under NEPA.

As outlined in MNS' prior briefs, the precise reason the DOE gave for terminating the NEPA process (and the wind farm project) is critically important because MNS maintains that the Government promised to compensate MNS for any termination for "national security

reasons" (including, but not limited to the Air Force's concerns about potential adverse impacts to its operations), regardless of whether the termination for "national security" concerns arose prior to, during or after the NEPA process.

As discussed in detail in the MNS' Supplemental Brief, the Government lawyer primarily responsible for drafting the Easement -- Bud Bornhoft -- understood that the Government agreed to compensate MNS for any termination based on "national security" concerns. Before the Easement was finalized, the parties discussed the possibility that "national security" concerns could have an adverse impact on the project. In Mr. Bornhoft's memorandum, drafted ***two*** days before the Easement was signed, he succinctly explained the Government's obligations, as he understood them, once the Government executed the Easement. *See* App. at 33. He recognized the unique features of the Easement and the risk the Government was taking in agreeing to the national security provision, stating that:

> "In prior permits, [the DOE's ultimate control] can be exercised through ***administrative approvals*** required in the permit and by virtue of the fact that the commercial organization assumes financial risk of termination in the event of an ***unalterable conflict*** between the needs of the Government and the conduct of the commercial activity. In a non-revocable document such as this easement, those controls and risks are altered. DOE does not enjoy the same level of administrative approvals in this easement as in prior permits. While an unalterable conflict is viewed as highly unlikely with regard to this commercial activity, should it be necessary to terminate the easement and the operations of the commercial activity, DOE must effect a taking under eminent domain, which would involve significant financial consequences to the Government."

App. at 33 (emphasis added). Mr. Bornhoft recognized that the Government committed to compensate MNS if an "unalterable conflict" arose at any time during the development. An "unalterable conflict" in fact did arise – the Air Force's concerns about potential adverse impact on its operations – which ultimately resulted in the Government's termination of the project. Mr. Bornhoft's memorandum confirms the parties' understanding that the Government could not

exercise its usual "administrative approvals" when it came to national security concerns identified in Part II, Section E(1) of the Easement without compensating MNS for its investment. The Government's latest effort to avoid compensating MNS is a legally and factually unsupported attempt to re-characterize the Air Force's concerns as purely environmental, rather than related to national security. To do so would render the Government's promises meaningless, and directly contradict the expressed intent of the parties that the Government would compensate MNS for a termination based on "national security" concerns.

## CONCLUSION

As discussed above, it is clear that the DOE terminated the NEPA process and the wind farm project for reasons perceived and characterized by the DOE as "national security" concerns. These concerns, now being re-characterized by the DOE as the "potential interference of the proposed wind turbines with the Air Force's radio frequency transmissions," have nothing to do with the physical environment, and as such may *not* be properly considered under NEPA.

Dated: November 28, 2006

s/ George T. Caplan

George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on November 28, 2006, a copy of the foregoing MNS' Supplemental Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo