IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1569 |
| | ) | (Judge Wolski) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE COURT'S OCTOBER 31, 2006, ORDER**

Defendant respectfully submits this reply to the Court's October 31, 2006, order regarding whether radio wave interference is a factor that may properly be considered under the National Environmental Policy Act ("NEPA"). As we show below, agencies may indeed consider such interference in evaluating their actions under NEPA, and in fact such consideration is commonplace. We have found numerous examples, in case law and elsewhere in the public record, of NEPA documents that scrutinize radio spectrum interference. Such scrutiny is entirely consistent with the framework of NEPA, which provides Federal agencies with broad discretion in evaluating the environmental consequences of their actions. Within this discretion, agencies have drafted regulations requiring NEPA documents to consider the needs of surrounding land users, and those needs reasonably can encompass the electromagnetic spectrum. Accordingly, because the Department of Energy's consideration of the Air Force's radio spectrum needs was within its discretion and consistent with Federal law, and because the Easement by its terms was contingent upon the completion of the NEPA process, the Easement never came into existence. Therefore, the Court should grant our motion for summary judgment, and deny the plaintiff's motion for summary judgment.

## ARGUMENT

### A. The NEPA Framework

As we established in our opening brief, NEPA imposes procedural requirements upon Federal agencies with "a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." Department of Transp. v. Public Citizen, 541 U.S. 752, 756-57 (2004). NEPA is a procedural statute that requires only that an agency consider the effects of its action; it does not require the agency to reach a particular result. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."). NEPA is designed to ensure that the environmental impact of the chosen alternative is presented so the decisionmaker may be properly informed of the environmental consequences of his action. Id.; accord, City of Alexandria, Virginia v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999).

When reviewing a NEPA document, it "does not matter whether [the Court] agree[s] with the agency's conclusions." City of Olmsted Falls, Ohio v. Federal Aviation Admin., 292 F.3d 261, 273 (D.C. Cir. 2002). Instead, the court employs a "rule of reason" test to determine whether NEPA analysis contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." Hells Canyon Alliance v. United States Forest Service, 227 F.3d 1170, 1177 (9th Cir. 2000). The court's review of an EIS is narrow, and the court must not substitute its judgment for that of the agency. Id. To this end, when an agency drafts an environmental impact statement ("EIS"), the adequacy of that statement is reviewed for reasonableness under the Administrative Procedure Act's arbitrary and capricious standard. See,

e.g., Nevada v. Department of Energy, 457 F.3d 78, 87-88 (D.C. Cir. 2006) (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 376 (1989)).

NEPA does require, however, that agencies consider the "effects" of their actions upon the "human environment." 42 U.S.C. § 4332(2)(C). Regulations promulgated by the Council on Environmental Quality ("CEQ") specify that the term "human environment" shall be "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 48 C.F.R. 1508.14. The regulations define "effects" to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. 40 C.F.R. § 1508.8; see, e.g., Lee v. United States Air Force, 354 F.3d 1229, 1240-1245 (10th Cir. 2004) (considering, under NEPA, the effect of Air Force flyovers upon, among other things, land values and livestock).

Reflecting NEPA's call that the human environment be treated broadly, agencies have promulgated regulations that specifically provide for the consideration of, among other things, the needs of adjacent land users. For example, the CEQ regulations themselves state that an EIS must consider "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 48 C.F.R. 1502.16(c). These regulations have been specifically adopted by DOE. 10 C.F.R. § 1021.103.

Other agencies have adopted similar regulations. The Bureau of Land Management's NEPA Handbook contains language comparable to the CEQ regulations' land use terms. See

App. 70[1] (available at http://www.blm.gov/planning/policy_nepa.html). The National Park Service ("NPS") has also adopted similar regulations for determining when a NEPA document must be prepared for a project. See Bicycle Trails Council of Marin v. Babbit, 82 F.3d 1445, 1457 (9th Cir. 1996) (noting that an NPS rulemaking would not trigger NEPA requirements unless it involved, among other things, a "[c]onflict with adjacent ownerships or land uses" or a "nuisance to adjacent owners or occupants."). Finally, the Federal Communications Commission's NEPA guidance provides that, in preparing a NEPA document, the agency "may also direct that objections be raised with appropriate local, state or Federal land use agencies or authorities (if their views have not been previously sought)." 47 C.F.R. 1.1314(d).[2]

In short, under NEPA, agencies consider the needs of surrounding land users, and DOE's consideration of the Air Force's concerns was consistent with the requirements of NEPA.

**B. Examples Of Interference In NEPA Documents**

As the scope of their regulations would suggest they should, agencies frequently consider the effects of radio spectrum interference on adjacent land users in NEPA analyses. We have identified below a number of specific examples of such consideration. We discuss wind turbine project examples first, other projects that cause radio interference second.

**1. Wind Turbine Examples**

We have found three recent examples involving wind turbines. First, the Bureau of Land

---

[1] "App. ___" refers to the appendix filed with this brief.

[2] The Federal Communications Commission requires its licensees to review their proposed actions, such as the construction of wireless communication towers, for environmental consequences, which may involve the filing of an environmental assessment ("EA") or EIS. See http://wireless.fcc.gov/siting/npaguid.html.

Management ("BLM") recently completed a Programmatic Environmental Impact Statement ("EIS") to "evaluate issues associated with wind energy development on Western public lands," an undertaking that involves amendments to 52 BLM land use plans. See http://windeis.anl.gov/. This EIS discusses the potential interference that wind turbines may cause with radar and other parts of the electromagnetic spectrum. App. 3-4. It also explores the specific possibility that wind turbines might interfere with military radar. App. 8.

Second, the United States Army Corps of Engineers ("COE") recently completed a draft EIS for a large wind farm project off the coast of Massachusetts. See http://www.nae.usace.army.mil/projects/ma/ccwf/deis.htm. This EIS contains an extensive discussion about the possible effects of electromagnetic interference caused by the proposed wind turbines. App. 9-16. Third, the Bonneville Power Administration, an agency of DOE, recently drafted an EIS for a wind turbine project in Oregon. App. 17-20. Again, this EIS specifically considers the effects of radio wave interference. Id. at 19-20.

We have also located four examples of NEPA analyses exploring the possibility of radio interference from wind turbines that pre-date the Easement at issue here. The first is a draft EIS from January, 1995, involving a wind project in Wyoming and prepared by the Department of Interior. App. 21-26. This EIS specifically considered the effects of interference upon radio and television signals. Id. at 23-24. The second is a draft and final EIS from DOE, also from 1995, for a project in Washington state. App. 27-37. These documents contain a detailed discussion of the potential effects of electromagnetic interference. Id. Third and fourth are DOE NEPA documents from a 1995 project in Washington state and a 1998 project in Alaska that also consider the electromagnetic effects of turbine projects. App. 38-47.

### 2. Non-Wind Turbine Examples

We have also identified a number of other examples of agencies' consideration of radio wave interference under NEPA in both case law and the public record. For example, the final NEPA document for a proposed doppler weather radar system in New York City specifically considers the system's potential to cause radio wave interference. See http://www.faa.gov/and/and400/and420/ TDWR/ROD_JFK/ROD-INDX.HTM; App. 66-69; see also Friends of Gateway v. Slater, 257 F.3d 74, 77 (2d Cir. 2001) (referencing NEPA documents for the doppler project prepared by the FAA, though the decision does not turn upon NEPA). Electromagnetic interference has also been considered in NEPA documents in the context of a power line project, App. 48-53, a ballistic missile shield project, App. 53-58, and an Air Force training range project, App. 59-65. See also No GWEN Alliance of Lane County v. Aldridge, 855 F.2d 1380, 1386 (9th Cir. 1988) (noting that the Air Force discussed "[n]oise, radio interference, radiation hazards and other effects" in an environmental assessment of a military messaging system).

## C. DOE's DEIS Analysis Comported With NEPA

The Air Force here used land and airspace surrounding the Nevada Test Site ("NTS") on three sides. MSJ App. 11-12[3]. The Air Force objected to MNS's proposed wind turbine project at the EA and EIS stages based upon the project's impact on the land surrounding the NTS. MSJ App. 58-60. Indeed, objections from surrounding land users, among other issues, contributed to DOE's decision to undertake an EIS following its completion of the EA. MSJ App. 61 ("Commentators raised several issues, including surrounding NTS land use . . ."). The resulting

---

[3] "MSJ App. ___" refers to the appendix filed with our motion for summary judgment.

draft EIS specifically identified "interference with U.S. Air Force radio frequency transmissions" in the "Land Use" portion of its environmental consequences section, and did not identify any possible mitigation strategy. MSJ App. 6.

DOE's treatment of the Air Force's concerns in the DEIS mirrors that of the numerous other NEPA analyses that we identify above. In all of these cases, agencies acting within the broad framework of NEPA have legitimately considered the needs of surrounding land users. Here, DOE's proper consideration of the Air Force's serious concerns legitimately led to the cancellation of the project. In turn, the Easement, which explicitly did "not become effective" until the completion of the NEPA process, never came into effect. MSJ App. 37. Accordingly, MNS has no rights under the Easement, its motion for summary judgment should be denied, and our motion for summary judgment should be granted.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant our motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:
Sharon Hejazi
Paul Michael
Office of Counsel
Department of Energy

Sean B. McNamara
Department of Justice

November 28, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on November 28, 2006, a copy of the foregoing "DEFENDANT'S REPLY TO THE COURT'S OCTOBER 31, 2006, ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Bryant G. Snee

BRYANT G. SNEE