DOE/EIS-0255

File Copy

U.S. Department of Interior
Bureau of Land Management
Rawlins District

January 1995

# DRAFT
# KENETECH/PacifiCorp Windpower Project Environmental Impact Statement



## EXECUTIVE SUMMARY

This Draft Environmental Impact Statement (DEIS) was prepared in accordance with the National Environmental Policy Act (NEPA) of 1969, as amended, to consider potential environmental consequences (both positive and negative) of a proposed 500-megawatt (MW) Windplant™ in the Foote Creek Rim - Simpson Ridge area between the towns of Hanna and Arlington in southeastern Wyoming. The proposed KENETECH Windpower, Inc. (KENETECH)/PacifiCorp, Inc. (PacifiCorp) project area (KPPA) is defined as the Foote Creek Rim and Simpson Ridge project areas plus three alternate transmission line routes. Under the Proposed Action, the Bureau of Land Management (BLM) would issue a 30-year renewable right-of-way (ROW) grant to KENETECH for construction of the full 500-MW Windplant and a ROW grant to PacifiCorp to construct a 230-kilovolt (kV) transmission line along one of the three alternate routes. The BLM is the lead agency for Environmental Impact Statement (EIS) preparation; the Bonneville Power Administration (BPA), which would buy a portion of the electric power, is a cooperating agency. Two alternatives (Alternative A and a No Action Alternative) were analyzed. Alternative A would involve construction of a 300-MW Windplant plus the 230-kV transmission line. Under the No Action Alternative, BLM would deny the ROW grant and BPA would not execute a power purchase agreement with PacifiCorp. The No Action Alternative is not expected to result in direct development of another energy source within the KENETECH/PacificCorp Project Area, the Great Divide Resource Area, or the area serviced by Bonneville Power Administration, PacifiCorp, Tri-State Generation and Transmission Company, Public Service Company of Colorado, or Eugene Water and Electric Board. A scoping statement was mailed to potentially interested parties and the media in January 1994. Issues and concerns identified by the public, BLM, and other governmental organizations regarding the proposed action and analyzed in this EIS are as follows:

**Key issues**

- wind turbine effects on birds,
- direct and indirect wildlife habitat loss,
- big game winter range and migrations,
- threatened, endangered, candidate, and state sensitive (TEC&S) and priority plants and animals and their habitats,
- cultural resources and Native American spiritual values, and
- reasonable access to public land.

**Other issues and concerns raised during public scoping**

- visual resources and aesthetics,
- benefits/disadvantages of wind energy vs. other energy sources,
- noxious weed control,
- highly erodible and unstable soils,
- wetlands and riparian areas,
- paleontological resources,
- reclamation potential,
- surface and groundwater,
- conformance with current and future land uses,
- compatibility with management plans and objectives,
- noise impacts on residents and wildlife,
- impacts to recreation (e.g., hunting and access),
- social and economic effects on local communities,
- revenue generation and job availability,
- areawide transmission capabilities,
- impacts to existing pipelines,
- impacts to other potential wind developers,
- compatibility with other energy industries,
- increased traffic on roads and increased human activity, and
- public safety, law enforcement, and travel management.

All written and verbal comments received on the proposed project were considered in the preparation of this DEIS. The proposed project, as planned, is in conformance with the BLM Great Divide Resource Area Resource Management Plan,

Table 4.8 Typical Construction Equipment Noise.

| Type of Equipment | Maximum Level, dBA at 50.0 ft (15.2 m) |
|---|---|
| Bulldozer | 87 |
| Heavy truck | 88 |
| Backhoe | 85 |
| Pneumatic tool | 85 |

Cunniff (1977).

locate further development on the Foote Creek Rim area away from nearby residences, thereby avoiding a potentially significant impact. Noise and odor impacts would be reduced by approximately 40%, since fewer WTGs would be erected and commissioned. Noise and odor impact mitigations identified for the Proposed Action would be implemented under Alternative A, and thus, impacts would be moderate during construction and negligible for the LOP.

4.1.8.4 No Action

No additional impact from noise and odor above existing levels on the KPPA would occur under the No Action Alternative.

4.1.8.5 Cumulative Impacts

Noise. Existing land uses within the KPPA (e.g., livestock grazing, oil and gas production, transportation, recreation) contribute to noise levels, but wind is generally the primary noise source. The proposed project would increase the number of noise-producing facilities within the KPPA, which may augment the level of impacts to other resources (e.g., increased acreage of wildlife habitat loss, increased impacts to recreational users) (see Sections 4.2.3 and 4.5.2.5). The addition of the proposed Medicine Bow windfarm would further contribute to increased noise levels. Large turbines (i.e., 500-2000 kW) are proposed for the Medicine Bow project, but exact models have not been identified, and thus, expected noise levels are unknown. If noise is a factor that contributes to big game or avian displacement, cumulative impacts could be significant (Section 4.2.3). Because turbine noise is typically masked by the wind at short distances from WTGs and because there are few occupied residences within or adjacent to the KPPA, cumulative impacts would probably be negligible for the LOP. Sage grouse use within the KPPA would be monitored, and additional mitigations would be developed if changes in sage grouse use patterns are attributed to the Windplant.

Odor. Most odors in the KPPA would be associated with Windplant construction equipment and would be short-term. Odors from O&M vehicles would be negligible for the LOP; therefore, cumulative impacts from odors would be negligible.

**4.1.9 Electric and Magnetic Fields**

4.1.9.1 Significance Criteria

Significant impacts from EMFs would occur if transmission line operation resulted in direct adverse health effects on humans residing in or using the KPPA. Significant effects on radio and

TV frequencies would occur if Windplant operation resulted in the interruption of permitted TV or radio transmissions.

4.1.9.2 Proposed Action and Alternative A

Because EMF levels generated by the 230-kV transmission line are low, impacts would be negligible for the LOP and beyond for the Proposed Action and Alternative A. Future residential development may be limited due to the transmission line, but this potential impact would be negligible because the area is rural and alternate building sites are numerous.

Turbines with metal rotors are known to interfere with radio and TV transmissions; however, the 33M-VS uses only fiberglass rotors, and thus, no impacts on EMFs would occur under the Proposed Action or Alternative A.

4.1.9.3 No Action and Cumulative Impacts

Under the No Action Alternative, no impacts to/from EMFs would occur. There are only two small segments of other transmission lines within the KPPA, and the proposed Medicine Bow windfarm would probably be connected to an existing WESTERN transmission line. Cumulative impacts to/from EMFs would be negligible for the LOP and beyond.

## 4.2 BIOLOGICAL RESOURCES

### 4.2.1 Vegetation

4.2.1.1 Significance Criteria

Impacts to vegetation resulting from the proposed project would be considered significant if:

- an overall change in land use occurs due to changes in vegetation;
- vegetation productivity is not restored to at least predisturbance levels within five years after reclamation;
- species composition or diversity change by greater than 20%, due to unsuccessful reclamation of disturbed areas or snow redistribution; and/or
- uncontrolled weed invasion of project area or adjacent areas occurs.

These criteria do not have a regulatory or scientific precedence, but have been used in recent EISs (BLM 1994d) by the GDRA and the Rawlins District Office.

4.2.1.2 Proposed Action

Impacts to vegetation would be potentially significant to negligible for the LOP and beyond. Potentially significant impacts would occur due to localized changes in plant community species composition due to changes in snow deposition patterns caused by Windplant facilities. Vegetation removal, temporary changes in vegetation types (e.g., shrubland to grassland conversions during reclamation), weed infestations, and the potential for accelerated erosion constitute both short-term and LOP impacts. Mitigation measures to limit vegetation impacts include minimizing the extent of disturbance, using appropriate erosion and sedimentation controls, using weed control practices as deemed appropriate by the BLM, and implementing prompt revegetation using an appropriate locally adapted seed mixture. With the application of these mitigation measures, impacts to vegetation resulting from the Proposed Action due to disturbance are anticipated to be negligible for the LOP unless reclamation is unsuccessful after five years. Because only 3% of the KPPA would be disturbed by Windplant development, impacts to vegetation would not create an overall land use change (Section 4.5).

The acreage of vegetation types that would be disturbed by Phase I of the project was determined from the facilities location map (Map 2.1). The Phase I, 70.5-MW development would affect 319 ac (Table 4.9). Grassland and meadow/riparian vegetation community types would be most heavily impacted, with 14% (2 ac) and 13% (4 ac) of the total acreage of these types in the KPPA being disturbed, respectively (see Section 4.2.2 for a

Claims Settlement Act of December 18, 1971, 43 U.S.C. 1601, 1613(a), will be issued to the Port Graham Corporation for approximately 42,101.88 acres. The lands involved are in the vicinity of Port Graham, Alaska.

**Seward Meridian, Alaska**

T. 3 S., R. 2 W.;
T. 3 S., R. 3 W.;
T. 5 S., R. 4 W.;
T. 6 S., R. 4 W.;
T. 6 S., R. 5 W.;
T. 7 S., R. 5 W.;
T. 7 S., R. 6 W.;
T. 8 S., R. 6 W.;
T. 7 S., R. 7 W.;
T. 8 S., R. 7 W.;
T. 7 S., R. 8 W.;
T. 8 S., R. 8 W.

A notice of the decision will be published once a week, for four (4) consecutive weeks, in the Anchorage Daily News. Copies of the decision may be obtained by contacting the Alaska State Office of the Bureau of Land Management, 222 West Seventh Avenue, #13, Anchorage, Alaska 99513–7599 ((907) 271–5960).

Any party claiming a property interest which is adversely affected by the decision, an agency of the Federal government or regional corporation, shall have until October 2, 1995, to file an appeal. However, parties receiving service by certified mail shall have 30 days from the date of receipt to file an appeal. Appeals must be filed in the Bureau of Land Management at the address identified above, where the requirements for filing an appeal may be obtained. Parties who do not file an appeal in accordance with the requirements of 43 CFR Part 4, Subpart E, shall be deemed to have waived their rights.

**Linda J. Resseguie,**

*Acting Chief, Branch of Gulf Rim Adjudication.*

[FR Doc. 95–21621 Filed 8–30–95; 8:45 am]

**BILLING CODE 4310–JA–M**

---

**[OR–110–1220; G5–205]**

## Emergency Closure and Restriction on Public Lands Near West Fork of Wiliams Creek

**AGENCY:** Bureau of Land Management, Medford District, Grants Pass Resource Area.

**ACTION:** Public notice.

**SUMMARY:** Pursuant to regulations contained in Title 43 CFR 8364–1(a) and for the purpose of protecting persons, property and public lands, the Bureau of Land Management is closing entry to and prohibiting physical presence upon all lands, roads and trails, within the following areas: All Bureau of Land Management administered lands within: Township 39 South, Range 6 West, Willamette Meridian; Sections 25 and 26; Township 39 South, Range 5 West, Willamette Meridian; Sections 29, 30, 31 and 32.

The following persons are exempt from this order:

1. Persons with a permit authorizing the otherwise prohibited act.
2. Any Federal, State or local officer or employee in the performance of an official duty.

**DATES:** This closure shall be in effect immediately, August 31, 1995, and shall remain in effect until rescinded by the authorized officer.

**PENALTIES:** Violators are subject to fines not to exceed $1000.00 and/or imprisonment not to exceed 12 months.

**FOR FURTHER INFORMATION CONTACT:** David Jones, District Manager, Medford District, 3040 Biddle Road, Medford, Oregon 97501 or telephone (503) 770–2200.

Dated: August 23, 1995.

**David A. Jones,**

*District Manager.*

[FR Doc. 95–21375 Filed 8–30–95; 8:45 am]

**BILLING CODE 4310–33–M**

---

**[WY–030–94–5101–00–K014; WYW–130382]**

## Kenetech Windpower, Wyoming Wind Energy Project, Availability of Final Environmental Impact Statement

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of availability of final environmental impact statement (FEIS) for the Kenetech Windpower, Wyoming Wind Energy Project, Carbon County, Wyoming.

**SUMMARY:** The Bureau of Land Management (BLM), Wyoming State Office announces the availability of the FEIS for the Kenetech/PacifiCorp Windpower Project. A total of 1,390 wind turbines and associated facilities (including approximately 29 miles of 230 kV powerline) would be constructed on 60,619 acres of private, Federal, and State lands, over a 10 to 12 year development period, in Carbon County, Wyoming. BLM will issue a right-of-way grant under Section 501 of the Federal Land Policy and Management Act of 1976 for the wind energy facilities and powerline.

The U.S. Bonneville Power Administration (BPA) is a cooperating agency for this project. BPA will base a decision to purchase 25 megawatts (Mw) of power from the project under Public Law 96–501 upon this analysis.

**DATES:** BLM and BPA will accept comments on the FEIS for 30 days following the date that the Environmental Protection Agency (EPA) publishes their Notice of Availability in the **Federal Register**. The EPA notice is expected to be published September 1, 1995.

**ADDRESSES:** Comments should be sent to Bureau of Land Management, Rawlins District Office, Walter E. George, Project Leader, 1300 3rd Street, Rawlins, WY 82301 or Bonneville Power Administration, Richard Stone, Environmental Specialist (ECN–3), P.O. Box 3621, Portland, OR 97208.

**SUPPLEMENTARY INFORMATION:** The Environmental Impact Statement (EIS) assesses the environmental consequences of the Federal approval of Kenetech's proposal to construct a 500 Mw windplant at two sites in east central Carbon County, Wyoming, in a phased approach, over a 10 to 12 year period. The FEIS is a supplement to the Draft Environmental Impact Statement (DEIS), published on January 13, 1995, and contains the following material:

- Incorporates by reference most of the material presented in the DEIS and identifies the charges to the DEIS required as a result of additional information.
- Public comments subsequent to publishing of the DEIS.
- The corrections and additions to the DEIS.
- Comments received on the DEIS.
- Responses to the comments.

Forty-seven comments were received by the BLM on the DEIS. Twenty-two supported the project, 9 provided information and did not state a position on the project, 3 were concerned with a potential conflict with coal resources, 1 expressed concern with the economic rationale for the project, and 13 opposed the project. The EPA, based on procedures they use to evaluate the adequacy of the information in an EIS, gave the DEIS a rating of EC–2 (Environmental Concern, Insufficient Information).

No substantive changes were made to the proposed action. BLM has agreed to evaluate all subsequent phases under complete NEPA procedures. BLM also proposes the creation of a technical review committee whose function will be to review nomitoring data and make recommendation to the BLM authorized officer on further studies and modification to windplant facilities regarding impacts to birds and other wildlife.

Dated: August 24, 1995.

**Alan R. Pierson,**

*State Director.*

[FR Doc. 95-21617 Filed 8-30-95; 8:45 am]

BILLING CODE 4310-22-M

---

[AZ-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-01; AZA 29195)

## Arizona, Conveyance of Federally-Owned Mineral Interests; Correction

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Correction.

**SUMMARY:** In notice document 95-18507 beginning on page 38852 in the issue of Friday, July 28, 1995, make the following correction: On page 38852 in the first column, the mineral interests for Douglas Land Company, L.L.C. (AZA 29195) will be segregated from the mining and the mineral leasing laws from the date of receipt of the application (July 13, 1995) instead of the date of publication. The segregation for AZA 29195 will expire upon issuance of a patent, upon final rejection of the application, or July 12, 1997, whichever occurs first.

Dated: August 22, 1995.

**Mary Jo Yoas,**

*Chief, Lands and Minerals Operations Section.*

[FR Doc. 95-21639 Filed 8-30-95; 8:45 am]

BILLING CODE 4310-32-P

---

[AZ-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-05; AZA-12731]

## Notice of Realty Action; Recreation and Public Purposes (R&PP) Act Classification; Arizona

**AGENCY:** Bureau of Land Management.

**ACTION:** Correction.

**SUMMARY:** In notice document published Friday, July 14, 1995, (Volume 60, No. 135), make the following correction: On page 36302 in the third column, the legal land description should be corrected to read as follows:

**Gila and Salt River Meridian, Arizona**

T. 5 N., R. 3 E.,
Sec. 5, lots 6, 7, 11, 14, 15, 16, 18, 19, NE¼SW¼NW¼, NW¼SE¼NW¼.

All other details of the notice remain as originally published.

Dated: August 23, 1995.

**David J. Miller,**

*Associate District Manager.*

[FR Doc. 95-21641 Filed 8-30-95; 8:45 am]

BILLING CODE 4310-32-M

[NV-030-1430-01; NVN 58492]

## Notice of Realty Action; Recreation and Public Purposes Act Classification; Douglas County, NV

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The following described land, comprising 40.00 acres, has been examined and is determined to be suitable for classification for lease or conveyance pursuant to the authority in the Recreation and Public Purposes Act, as amended (43 U.S.C. 869 *et seq.*):

**Mt. Diablo Meridian, Nevada**

T. 12 N., R. 21 E.
Sec. 18, NW¼SE¼.
Containing 40.00 acres.

**SUPPLEMENTARY INFORMATION:** The public land is located southeast of Gardnerville in Douglas County. The land is not needed for Federal purposes. Lease or conveyance is consistent with current BLM land use planning and would be in the public interest. Douglas County has expressed an interest in constructing a public shooting range on the site. The lease/patent, when issued will be subject to the provisions of the Recreation and Public Purposes Act and to all applicable regulations of the Secretary of the Interior, and the following reservations to the United States:

1. A right-of-way thereon for ditches and canals constructed by the authority of the United States. Act of August 30, 1890 (43 U.S.C. 945).
2. All mineral deposits in the land so patented, and to it, or persons authorized by it, the right to prospect for, mine and remove such deposits from the same under applicable law and regulations to be established by the Secretary of the Interior.

Upon publication of this notice in the **Federal Register**, the lands will be segregated from all other forms of appropriation under the public land laws, including the general mining laws but not the mineral leasing laws, the material disposal laws, or the Geothermal Steam Act. The segregation shall terminate upon issuance of a conveyance document or publication in the **Federal Register** of an order specifying the date and time of opening.

**DATES:** By no later than October 16, 1995, interested parties may submit comments.

**ADDRESSES:** Written comments should be sent to: Walker Resource Area Manager, Bureau of Land Management, 1535 Hot Springs Road, Carson City, NV 89706-0638. Any adverse comments will be reviewed by the State Director. In the absence of any adverse comments, the classification will become effective 60 days from the date of publication of this notice in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Charles J. Kihm, Walker Area Realty Specialist, Bureau of Land Management, 1535 Hot Springs Road, Carson City, NV 89706-0638; (702) 885-6000.

Dated: August 22, 1995.

**John Matthiessen,**

*Walker Resource Area Manager.*

[FR Doc. 95-21581 Filed 8-30-95; 8:45 am]

BILLING CODE 4310-HC-M

---

[NM-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-00]

## Notice of Filing of Plats of Survey; New Mexico

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The plats of survey described below are scheduled to be officially filed in the New Mexico State Office, Bureau of Land Management, Santa Fe, New Mexico, on September 20, 1995.

**New Mexico Principal Meridian, New Mexico**

T. 13 N., R. 3 E., Accepted July 7, 1995, for Group 926 NM.
T. 20 N., R. 10 E., Accepted July 6, 1995, for Group 781 NM.
T. 23 N., R. 10 E., Accepted July 5, 1995, for Group 769 NM.

Texas and Pacific Railway Block 67, T. 1, Texas, for Group 1 Texas, Accepted July 6, 1995.

If a protest against survey, as shown on any of the above plats is received prior to the date of official filing, the filing will be stayed pending consideration of the protest. A plat will not be officially filed until the day after all protests have been dismissed and become final or appeals from the dismissal affirmed.

A person or party who wishes to protest against a survey must file with the State Director, Bureau of Land Management, a notice that they wish to protest prior to the proposed official filing date given above.

A statement of reasons for a protest may be filed with the notice of protest to the State Director, or the statement of reasons must be filed with the State Director within thirty (30) days after the protest is filed.

The above-listed plats represent dependent resurveys, surveys, and subdivisions.

These plats will be in the open files of the New Mexico State Office, Bureau

File Copy

# JOINT NEPA/SEPA

# DRAFT

# ENVIRONMENTAL IMPACT STATEMENT

# WASHINGTON WINDPLANT #1

PROPOSED BY: KENETECH WINDPOWER, INC.

LEAD AGENCIES:

KLICKITAT COUNTY, WASHINGTON

BONNEVILLE POWER ADMINISTRATION

FEBRUARY 1995

DOE/EIS-0205

### 2.12.2.2 Communication Services

Communication systems in the general project vicinity include microwave, television, radio, and navigation systems as listed in Table 2.12.1. Microwave signals are transmitted in either a direct "line of sight" path, from the transmitter to the receiving station, or in an omnidirectional manner in which the signal radiates in all directions. The path of the microwave signal is dependent on its frequency and the type and location of the receiver. Interference to both modes of microwave signal transmission could potentially occur due to disruptions caused by physical obstructions, electrostatic effects, or electromagnetic forces.

Television, radio, and navigation communications are generally transmitted at lower frequencies than microwave signals, and are broadcast in a radial manner (360°). Multiple communication signals at different frequencies can be transmitted from and received at the same location. Primary causes of interference to television, radio, and navigation communications are electrostatic effects or electromagnetic forces.

To support police, medical and fire dispatching, Klickitat County operates a main repeater station on Juniper Point. The repeater station relays messages, using an omnidirectional microwave signal, to emergency and support vehicles and other communication stations throughout the County. In addition to the Juniper Point Repeater Station, there are also repeater stations at Haystack Butte and Luna Point.

Communication facilities and signals are also associated with nearby dam and shipping vessel operations on the Columbia River. Government users associated with river or John Day Dam operations include the National Marine Fisheries Service (NMFS), the Corps of Engineers and the BPA. These agencies primarily transmit and receive signals from John Day Dam, but BPA also utilizes communications systems located at the Harvalum Substation. Vessels utilizing the river employ electronic navigation and radio communication systems. Approximately 7 to 27 vessels equipped with these systems pass the site each day. (Jim Williams, pers. communication, 1994.)

**TABLE 2.12.1**
**COMMUNICATION SYSTEMS NEAR THE WASHINGTON WINDPLANT #1 SITE**

| Owner/Operator | Type | Location | Description/ Direction |
|---|---|---|---|
| Klickitat County Rural Fire District # 7 | Microwave Repeater | Juniper Point | UHF, 2.3 GHz to Goldendale omnidirectional |
| Klickitat Valley Hospital | 2 Radio Repeaters | Juniper Point | UHF repeater, VHF transmission, omnidirectional |
| Mid Columbia Medical Center | Radio Repeater | Juniper Point | VHF, 75 Mhz, omnidirectional |
| Klickitat County Sheriff's Department | 2 Radio Repeaters | Juniper Point | VHF, omnidirectional and UHF, link to Goldendale |
| Klickitat County Roads Division | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Klickitat County Public Utility District | Microwave Repeater and Radio Repeater | Juniper Point | VHA and microwave to Goldendale, omnidirectional |

| Owner/Operator | Type | Location | Description/ Direction |
|---|---|---|---|
| Intertribe Fisheries Department | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Wheeler Communication | 2 Radio Repeaters | Juniper Point | UHF, omnidirectional |
| Immigration Department | 2 Radio Repeater possibly | Juniper Point | VHF, omnidirectional |
| Department of Natural Resources | 2 Radio Repeaters, possibly | Juniper Point | VHF, omnidirectional |
| Army Corps of Engineers | Radio Repeaters | Juniper Point | VHF, omnidirectional |
| Columbia Aluminum | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Not Known | Ham Repeater | Juniper Point | 140 MHz |
| BATS Towing | 2 Radio Repeaters | Juniper Point | VHF link to Biggs and UHF base to Pasco |
| Don Coats | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Columbia Basin Cable | Microwave Repeater | Observatory Hill | To Goldendale |
| Cellular One | 2 Microwave Repeaters | Luna Point and Haystack Butte | To Roosevelt and to Goldendale |
| Valley Communication | Radio Repeater | Haystack Butte | To Goldendale |
| KLCK Radio | Microwave Repeater | Haystack Butte | To Goldendale |
| KMCQ Radio | 2 Microwave Repeaters | Haystack Butte and Stacker Butte | To Goldendale |
| KYYT Radio | Microwave Repeater | Haystack Butte | To Goldendale |

### 2.12.2.3 Utilities

Three-phase electrical power is available near the Project site from a 12.5-kV overhead distribution line that runs along Hoctor Road. Electrical power is provided by the Klickitat County Public Utility District (Tom Swenson, pers. communication, 1994).

A number of existing utility corridors currently transverse portions of the Project site (see Figure 1.2). Two BPA high-voltage transmission lines are partially located on Project lands: the 230-kV Midway-Big Eddy line crosses the northwestern corner of the site; and the 500-kV Hanford-John Day line passes through the far eastern portion of the site. A 115-kV Klickitat County PUD transmission line crosses the western portion of the site enroute from John Day Dam to Goldendale. A natural gas pipeline runs east-west just south of Hoctor Road and passes through the northern portion of the Project site.

Potable water use by residents south of Hoctor Road in the general vicinity of the Project site is provided by individual domestic wells. There is currently no sewer system serving the Project site, and none is expected to be required for the Project.

Solid waste collection in the general vicinity of the Project is provided by a private collection company. In addition, a transfer station is located in Goldendale. Disposal service is provided by the Regional Disposal Company which operates three transfer stations and the Roosevelt Regional Landfill in the eastern part of the County.

## 2.12.3 Proposed Action

### 2.12.3.1 Environmental Impacts

**Public Services**

During Project construction, the installation of the turbines and turbine towers would require welding, which can generate sparks and temporarily increase the potential for fires on the Project site, especially during dry weather. An average of approximately 40 workers would be required for Project construction. Careless smoking could also temporarily increase the potential for fires in the area. The relatively high-risk nature of heavy construction and the number of construction workers involved may temporarily increase the likelihood of medical service being required at the Project site.

Approximately nine full-time staff would be required for Project operation. Operations staff would maintain and repair equipment and also monitor Project operation and site conditions from a remote location. Project operation could somewhat increase the chance of fire from human causes from mechanical or electrical equipment failure. In addition, any welding during ongoing equipment maintenance and repair could also increase the chance of fire at turbine locations. Because of the small number of operations staff, Project operation is not expected to create a significant new demand for medical services. However, Project security measures which may include installation of electronically controlled gates could delay access to the site in any emergency situations that did occur.

Section 2.8.4 discusses recreational impacts including the tendency for the Project to attract unauthorized visitors. Any increase in number of unauthorized visitors to the site would create the potential for increased demand for police services to the site.

By County Ordinance, the Klickitat County Department of Public Services issues permits and provides site inspections for buildings and structures in accordance with administrative requirements established in the Uniform Building Code, 1991 Edition. Chapter 3 of the Code sets requirements for permit application inspections and fees. Through its building permit process, the County will conduct plan reviews and inspections of certain construction activities including concrete reinforcing bar placement, structural welds, and bolting systems.

**Communication Systems**

Based on the location of the proposed turbine strings, the closest distance between an individual turbine and the communication facilities on Juniper Point is approximately 1 km (0.6 mile); for Luna Point and Haystack Butte, these distances are 0.4 and 6.4 km (0.25 and 4 miles), respectively. This is beyond the distance where electrostatic or electromagnetic field interference is expected and, therefore, no impact to omnidirectional communication signals are expected.

The potential for interference with communication systems also exists where turbines or other Project structures are located in the pathway of microwave signals from the transmitter to the receiver. Obstruction of microwave signals by turbine blades or towers could result in interrupting or weakening of these signals. This effect would depend on the specific location and height of turbine structures, the frequency of signal, and the location of the receiver. However, interference with directional microwave signals could potentially occur wherever the

path of a directional signal intersects a turbine string. Table 2.12.2 lists communication stations and turbine string where this potential for impacts exists. Actual impacts would depend on the path and elevation of directional microwave signals and on the precise location and elevation of turbines.

**TABLE 2.12.2**
**POTENTIALLY AFFECTED COMMUNICATION SYSTEMS**

| Owner/Operator | Location | Turbine Strings Potentially Affecting Station |
|---|---|---|
| Klickitat County Rural Fire District #7 | Juniper Point | M |
| Klickitat County Sheriff's Department | Juniper Point | M |
| Klickitat County Public Utility District | Juniper Point | M |
| BATS Towing | Juniper Point | G, I, K |
| Cellular One | Luna Point | NN, OO |

### Utilities

The existing powerlines that traverse portions of the Project site are not expected to be affected by Project construction. Some Project construction activity would occur in the vicinity of the existing natural gas pipeline south of Hoctor Road, which traverses the Project site. Specifically, construction of turbine strings Y, AA, and BB; the access road from Hoctor Road to turbine string U; the overhead powerline in Section 5, T3N, R18E; and the new/upgraded road to turbine string M would occur in the general vicinity of the pipeline.

The Project site is not expected to require routine water, electrical, or sewer service since operations staff would be located at the off-site operations and maintenance facility. Portable sanitary facilities may be needed when operations or maintenance staff would be on site for more than a few hours. Demand for water at the site would result from firefighting activities. However, as much as 45,000 liters (12,000 gallons) over a 1-hour period could be provided by Fire District #7 tanker trucks (Roberta Hoctor, pers. communication, 1994).

It is not anticipated that a significant amount of construction-related debris would be generated over the construction period. Any construction debris that is generated could be disposed of at the Roosevelt Regional landfill. Workers could create the potential for littering during Project construction. Because only nine workers would be required for Project operation, they would create relatively small potential for generating litter. As discussed in Section 2.8, however, the Project could attract unauthorized visitors. Any unauthorized visitors to the site would create a relatively greater potential for litter than would Project operations staff. During Project operation, impacts could also result from broken or decommissioned equipment being stored on site.

### 2.12.3.2 Mitigation Measures

In addition to the decommissioning plan discussed in Section 2.7, the following mitigation measures could be employed by the Applicant to minimize or eliminate impacts to local public services and utilities due to the construction and operation of the Project:

- During Project construction and all Project welding operations, have a readily accessible water truck and chemical fire suppression materials available on site to allow immediate fire response.
- Minimize or restrict high fire-risk activities during extreme dry weather periods.
- Provide Project staff with cellular phones to enable timely communication with the Fire Department and other emergency services.
- Provide appropriate sanitation facilities and potable water on site during construction and, if needed, operation.
- Prohibit construction and operating personnel from smoking on the Project area except within designated areas.
- Provide all County emergency departments and vehicles with controls to electronic gates.
- Provide fire extinguishers on vehicles and equipment used during construction.
- Field locate and flag the existing natural gas pipeline and avoid construction in its immediate vicinity, if possible. Where avoidance is not feasible, use hand excavation methods.
- Precisely determine the location and frequency of potentially impacted communications transmitters and receivers when siting individual turbines in turbine strings M, G, I, K, NN, and OO to guard against potential signal interference.
- Remove all turbine structures and associated equipment that are permanently taken out of operation, and restore lands to a natural condition (see Section 2.7, Aesthetics).
- Monitor the site for evidence of unauthorized use and provide additional security as appropriate.

## 2.12.4 Alternative Powerline Route

This alternative would result in the same impacts to public services and utilities as the Proposed Action. Therefore, mitigation measures would be the same as those discussed in Section 2.12.3.2.

that would occur if either project were being constructed. Specifically, the traffic on Hoctor Road from both projects would interfere with the County's plans to repair the two western sections of Hoctor Road (a 0.8-mile stretch immediately east of US-97 and a 2.0-mile stretch from No. 12 Road to Willis Road) during the summer of 1995. During this time, site access would be more difficult for the two projects, which could potentially affect the projects' construction schedules. In addition, the increased concentration of heavy traffic during construction of the two projects would also accelerate or increase structural damage to Hoctor Road, which was constructed over compacted native soils without an engineered subgrade. These native soils are moisture-sensitive, making the road bed susceptible to failure from heavy loads that cause lateral displacement of the subgrade material.

**TABLE 3.6**
**CUMULATIVE IMPACTS FROM HEAVY CONSTRUCTION VEHICLE TRAFFIC**

| | Projected 1995 | KENETECH | | | CARES | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Const. | Total | % Incr. | Const. | Total | % Incr. | Const. | Total | % Incr. |
| US-97 | 4,700 | 141 | 4,841 | 3 | 20 | 4,720 | 0.4 | 161 | 4,861 | 3 |
| SR-14 | 1,466 | 29 | 1,495 | 2 | 20 | 1,486 | 1.4 | 49 | 1,515 | 3 |
| Hoctor Road | 208 | 92 | 300 | 44 | 20 | 228 | 10 | 112 | 320 | 54 |

## 3.3.12 Public Services and Utilities

The Kenetech and CARES projects would receive public services from the same agencies, including the Klickitat County Fire District No. 7 for fire service, and the Klickitat County Sheriff's Department for police and emergency medical service. Neither project would require potable water or sewage service. The CARES project would require electric service.

Cumulative impacts to public services could result during the simultaneous construction of the Kenetech and CARES projects. Proportionally-higher demand for fire, police, and emergency medical service due to the combined construction activities could result. During operation, cumulative demand for fire, police, and emergency medical service would be much less than during construction because of reduced staffing levels and site activities. Because operation of the CARES Project would include full-time on-site staffing, it may somewhat reduce the potential for trespass and vandalism on adjacent portions of the KENETECH site.

The Kenetech and CARES projects could create cumulative impacts to communication systems located on Juniper Point if turbines or other project structures are located in the pathway of directional microwave signals. Obstruction of microwave signals by turbine blades or towers could interrupt or weaken these signals. Actual impacts would depend on the path and elevation of the microwave signals and the precise location and elevation of turbines. Mitigation identified to reduce impacts of the two projects individually would also reduce cumulative impacts.

File Copy

# JOINT NEPA/SEPA

# FINAL ENVIRONMENTAL IMPACT STATEMENT

# WASHINGTON WINDPLANT #1

PROPOSED BY: KENETECH WINDPOWER, INC.

LEAD AGENCIES:

KLICKITAT COUNTY, WASHINGTON

BONNEVILLE POWER ADMINISTRATION

MAY 1995

DOE/EIS-0205

# Table of Contents

Cover Memo
Fact Sheet
Table of Contents

**Summary**

**Part 1 – Modifications to the Proposed Action** .................... 1-1

**Part 2 – Preferred Alternative** .................... 2-1
2.1 Introduction .................... 2-1
2.2 Description .................... 2-1
2.2.1 Phasing, Additional Pre-construction Avian Monitoring and Subsequent Environmental Review .................... 2-1
2.2.2 Location of Project Features .................... 2-2
2.2.3 Additional Cultural Resources Surveys .................... 2-2
2.2.4 Hoctor Road Survey .................... 2-3
2.2.5 Environmental Protection Plans .................... 2-3
2.2.6 Additional Mitigation Measures .................... 2-6
2.2.7 Mitigation Proposed by the Applicant .................... 2-9

**Part 3 – Corrections and Modifications to the Draft EIS** .................... 3-1
3.1 Introduction .................... 3-1
3.2 Corrections and Modifications .................... 3-1
Changes to Summary .................... 3-1
Changes to Part 1 – Alternatives Including the Proposed Action .................... 3-1
Changes to Part 2 – Affected Environment, Environmental Consequences, and Mitigation Measures .................... 3-5
Section 2.1 Earth .................... 3-5
Section 2.2 Water .................... 3-6
Section 2.3 Plants .................... 3-7
Section 2.4 Wildlife (Non-Avian) .................... 3-10
Section 2.5 Birds .................... 3-11
Section 2.6 Cultural Resources .................... 3-13
Section 2.7 Aesthetics .................... 3-18
Section 2.8 Land Use .................... 3-18
Section 2.11 Transportation .................... 3-19
Section 2.12 Public Services and Utilities .................... 3-20
Changes to Part 3, Cumulative Impacts .................... 3-21

## Section 2.12 Public Services and Utilities

*Make the following modification to Table 2.12.1, Communication Systems Near the Washington Windplant #1 Site:*

**TABLE 2.12.1**
**Communication Systems Near the Washington Windplant #1 Site**

| Owner/Operator | Type | Location | Description/ Direction |
|---|---|---|---|
| Klickitat County Rural Fire District # 7 | Microwave Repeater | Juniper Point | UHF, 2.3 GHz to Goldendale omnidirectional |
| Klickitat Valley Hospital | 2 Radio Repeaters | Juniper Point | UHF repeater, VHF transmission, omnidirectional |
| Mid Columbia Medical Center | Radio Repeater | Juniper Point | VHF, 75 Mhz, omnidirectional |
| Klickitat County Sheriff's Department | 2 Radio Repeaters | Juniper Point | VHF, omnidirectional and UHF, link to Goldendale |
| Klickitat County Roads Division | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Klickitat County Public Utility District | Microwave Repeater and Radio Repeater | Juniper Point | VHA and microwave to Goldendale, omnidirectional |
| Intertribe Fisheries Department | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Wheeler Communication | 2 Radio Repeaters | Juniper Point | UHF, omnidirectional |
| Immigration Department | 2 Radio Repeater possibly | Juniper Point | VHF, omnidirectional |
| Department of Natural Resources | 2 Radio Repeaters, possibly | Juniper Point | VHF, omnidirectional |
| Army Corps of Engineers | Radio Repeaters | Juniper Point | VHF, omnidirectional |
| Columbia Aluminum | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Not Known | Ham Repeater | Juniper Point | 140 MHz |
| BATS Towing | 2 Radio Repeaters | Juniper Point | VHF link to Biggs and UHF base to Pasco |
| Don Coats | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Columbia Basin Cable | Microwave Repeater | Observatory Hill | To Goldendale |
| Cellular One | 2 Microwave Repeaters | Luna Point and Haystack Butte | To Roosevelt and to Goldendale and between Luna Point and Haystack Butte |
| Valley Communication | Radio Repeater | Haystack Butte | To Goldendale |
| KLCK Radio | Microwave Repeater | Haystack Butte | To Goldendale |
| KMCQ Radio | 2 Microwave Repeaters | Haystack Butte and Stacker Butte | To Goldendale |
| KYYT Radio | Microwave Repeater | Haystack Butte | To Goldendale |

*Make the following modification to Table 2.12.2:*

**TABLE 2.12.2**
**Potentially Affected Communication Systems**

| Owner/Operator | Location | Turbine Strings Potentially Affecting Station |
|---|---|---|
| Klickitat County Rural Fire District #7 | Juniper Point | M |
| Klickitat County Sheriff's Department | Juniper Point | M |
| Klickitat County Public Utility District | Juniper Point | M |
| BATS Towing | Juniper Point | G, I, K |
| Cellular One | Luna Point and Haystack Butte | Z, CC, DD, EE, NN, OO |

*Add the following paragraph to Section 2.12.3.1, Impacts - Communication System, following Table 2.12.2:*

There are methods used to determine required clearances that are generally accepted by the communication industry. Based on known locations of turbine strings and transmitter locations, required clearances can be calculated. Standard methods consider both the tendency of microwave signals to bend downward as a result of atmospheric conditions and the increasing area required to transmit signal energy the further it is from other transmitters. Information from Cellular One indicates that required clearances where their signals cross turbine strings would likely be less than 100 feet.

*Make the following modifications to Section 2.12.3.2, ninth bulleted item:*

- Precisely determine the location and frequency of potentially impacted communications transmitter and receivers when siting individual turbines in turbine strings M, G, I, K, Z, CC, DD, EE, NN, and OO. Required clearances between turbines and signals should be determined using methods generally accepted by the communications industry.

# Changes to Part 3, Cumulative Impacts

*Modify Section 3.2.1, Summary Project Descriptions - Washington Windplant #1, third paragraph, second bulleted item as follows:*

- ~~24.6~~ 22.9 kilometers (~~15.3~~ 14.2 miles) of overhead 34.5-kV powerline.

*Modify Section 3.2.1, Summary Project Descriptions - Washington Windplant #1, fourth paragraph, last two sentences as follows:*

Up to ~~155 hectares (382 acres)~~ 153 hectares (376 acres) or about three percent of the site would be disturbed during construction. Project features would permanently occupy about ~~79 hectares (193 acres)~~ 76 hectares (187 acres), or about 1.5 percent of the site.

# Proposed Columbia Wind Farm #1

File Copy

## Joint NEPA/SEPA
## Final Environmental Impact Statement

September 1995

BONNEVILLE
POWER ADMINISTRATION

1.2.5.1 Design ..... 1-5
1.2.5.2 Construction ..... 1-6
1.2.5.3 Operation ..... 1-7
1.2.6 Mitigation Proposed by the Applicant ..... 1-8

## PART 2 - CORRECTIONS AND MODIFICATIONS TO THE DRAFT EIS

2.1 Introduction ..... 2-1
2.2 Corrections and Modifications ..... 2-1
2.2.1 Changes to Summary ..... 2-1
2.2.2 Changes to Chapter 1 - Alternatives Including the Proposed Action ..... 2-1
2.2.3 Changes to Chapter 2 - Affected Environment, Environmental Consequences, and Mitigation Measures ..... 2-2
2.2.4 Changes to Chapter 3 - Cumulative Impacts ..... 2-13
2.2.5 Changes to Chapter 5 - References ..... 2-16

## PART 3 - COMMENTS AND RESPONSES

3.1 Introduction ..... 3-1
3.2 General Responses ..... 3-1
3.2.1 General Response No. 1 - "Fast Tracking" ..... 3-1
3.2.2 General Response No. 2 - Need for Regional Windpower/Avian Studies and Supplemental Environmental Review ..... 3-1
3.2.3 General Response No. 3 - Consistency of the Draft EIS with BPA Policies and Responsibilities ..... 3-4
3.2.4 General Response No. 4 - Tradeoffs Between the Impacts and Benefits of Wind Energy Development 3-4
3.2.5 General Response No. 5 - Traditional Cultural Properties ..... 3-5
3.2.6 General Response No. 6 - Opportunities for Yakama Indian Nation Input ..... 3-6
3.2.7 General Response No. 7 - Indian Treaty Reserved Rights ..... 3-8
3.2.8 General Response No. 8 - Priority Habitats and Species ..... 3-8
3.2.9 General Response No. 9 - Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act and Their Relationship to the Proposed Action ..... 3-10
3.2.10 General Response No. 10 - Inadequate Data on Avian Impacts ..... 3-11
3.2.11 General Response No. 11 - Is the Columbia Hills An Important Bird Area? ..... 3-12
3.2.12 General Response No. 12 - Do Tower Guy Wires Represent a potential significant impact to birds? 3-15
3.2.13 General Response No. 13 - Factors Affecting Location of the Project ..... 3-17
3.3 Written Comments and Responses ..... 3-19
Responses to March 30, 1995 Comment Letter From the Department of Trade and Economic Development, OAHP ..... 3-2
Responses to May 22, 1995 Comment Letter from the Washington State Department of Fish and Wildlife 3-2
Responses to April 14, 1995 Letter From the Washington State Parks and Recreation Commission ..... 3-2
Responses to April 11, 1995 Letter from the Confederated Tribes and Bands of the Yakama Indian Nation 3-2
Responses to May 1, 1995 Letter from the Central Cascades Alliance ..... 3-3
Response to April 17, 1995 Letter From the Columbia Gorge Audubon Society ..... 3-3
Response to March 20, 1995 Letter from the Columbia Gorge Audubon Society to Jan Beyea, NAS ..... 3-
Response to March 30, 1995 Letter from the Columbia Gorge Audubon Society to Bill Weiler ..... 3-
Response to April 10, 1995 Letter From James C. Gleason ..... 3-
Responses to April 15, 1995 Letter from Joe Heineck ..... 3-
Response to Comment Letter Dated April 17, 1995 from the Portland Audubon Society ..... 3-
Response to April 5, 1995 Comment Letter from William Weiler ..... 3-
Responses to April 28, 1995 Comment Letter from Northwest Environmental Advocates ..... 3-
Responses to May 1, 1995 Comment Letter from Northwest Environmental Advocates ..... 3-
Response to Comment Letter Dated March 22, 1995 from Porteous Mines ..... 3-
Response to Comment Letter Dated April 15, 1995 from Ray Thayer ..... 3-

## 2.12 Public Services and Utilities

*Replace Table 2.24, Communication Systems On Juniper Point with the following Table:*

**TABLE 2.24**
**Communication Systems on or near Juniper Point**

| Owner/Operator | Type | Location | Description/ Direction |
|---|---|---|---|
| Klickitat County Rural Fire District # 7 | Microwave Repeater | Juniper Point | UHF, 2.3 GHz to Goldendale omnidirectional |
| Klickitat Valley Hospital | 2 Radio Repeaters | Juniper Point | UHF repeater, VHF transmission, omnidirectional |
| Mid Columbia Medical Center | Radio Repeater | Juniper Point | VHF, 75 Mhz, omnidirectional |
| Klickitat County Sheriff's Department | 2 Radio Repeaters | Juniper Point | VHF, omnidirectional and UHF, link to Goldendale |
| Klickitat County Roads Division | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Klickitat County Public Utility District | Microwave Repeater and Radio Repeater | Juniper Point | VHA and microwave to Goldendale, omnidirectional |
| Intertribe Fisheries Department | Radio Repeater | Juniper Point | VHF, omnidirectional |
| Wheeler Communication | 2 Radio Repeaters | Juniper Point | UHF, omnidirectional |
| Immigration Department | 2 Radio Repeater possibly | Juniper Point | VHF, omnidirectional |
| Department of Natural Resources | 2 Radio Repeaters, possibly | Juniper Point | VHF, omnidirectional |
| Army Corps of Engineers | Radio Repeaters | Juniper Point | VHF, omnidirectional |
| Columbia Aluminum | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Not Known | Ham Repeater | Juniper Point | 140 MHz |
| BATS Towing | 2 Radio Repeaters | Juniper Point | VHF link to Biggs and UHF base to Pasco |
| Don Coats | Radio Repeater | Juniper Point | UHF, omnidirectional |
| Columbia Basin Cable | Microwave Repeater | Observatory Hill | To Goldendale |
| Cellular One | 2 Microwave Repeaters | Luna Point and Haystack Butte | To Roosevelt and to Goldendale and between Luna Point and Haystack Butte |
| Valley Communication | Radio Repeater | Haystack Butte | To Goldendale |
| KLCK Radio | Microwave Repeater | Haystack Butte | To Goldendale |
| KMCQ Radio | 2 Microwave Repeaters | Haystack Butte and Stacker Butte | To Goldendale |
| KYYT Radio | Microwave Repeater | Haystack Butte | To Goldendale |

*Make the following modification to Table 2.25:*

**TABLE 2.25**
**Potentially Affected Communication Systems**

| Owner/Operator | Location |
|---|---|
| Klickitat County Rural Fire District #7 | Juniper Point |
| Klickitat County Sheriff's Department | Juniper Point |
| Klickitat County Public Utility District | Juniper Point |
| BATS Towing | Juniper Point |
| Cellular One | Luna Point and Haystack Butte |

*Add the following paragraph to Section 2.12.3.1, Environmental Consequences - Communication System, following Table 2.25:*

There are methods used to determine required clearances that are generally accepted by the communication industry. Based on known locations of turbine strings and transmitter locations, required clearances can be calculated. Standard methods consider both the tendency of microwave signals to bend downward as a result of atmospheric conditions and the increasing area required to transmit signal energy the further it is from other transmitters. Information from Cellular One indicates that required clearances where their signals cross turbine strings would likely be less than 100 feet.

*Make the following modifications to Section 2.12.4, Mitigation Measures, fifth bulleted item:*

- Equip all emergency service departments and vehicles with access to ~~electronic~~ gates.

*Make the following modifications to Section 2.12.4, Mitigation Measures, eighth bulleted item:*

- Precisely determine the location and frequency of potentially impacted communications transmitter and receivers when siting individual turbines in turbine strings to guard against potential signal line-of-sight interference. Required clearances between turbines and signals should be determined using methods generally accepted by the communications industry.

## 2.2.4 Changes to Chapter 3 - Cumulative Impacts

*Modify Section 3.2.1, Summary Project Descriptions - Washington Windplant #1, third paragraph, second bulleted item as follows:*

- ~~24.6~~ 22.9 kilometers (~~15.3~~ 14.2 miles) of overhead 34.5-kv powerline.

*Modify Section 3.2.1, Summary Project Descriptions - Washington Windplant #1, fourth paragraph, last two sentences as follows:*

FILE COPY

DOE/EA-1245

# Environmental Assessment

## Kotzebue Wind Installation Project
## Kotzebue, Alaska

U.S. Department of Energy
Golden Field Office
1617 Cole Boulevard
Golden, Colorado

May 1998

### 4.2 Land Use

In assessing land use impacts, the proposed action was evaluated for consistency with land use plans or guidance, and compatibility with current and future land uses. As stated in Section 3.2, there are no land use plans that govern KIC property. Therefore, it is not possible to evaluate the project with consistency to planned land use. However, according to KIC, the wind installation is considered the best use for the land. With respect to land use compatibility, there are some existing features with which to compare potential land use conflicts, namely the potential for airport relocation, the KOTZ radio tower, and the Kotzebue landfill.

As mentioned in section 3.2, the airport relocation alternative is very unlikely. In the remote chance that the airport is relocated to an area south and east of the current wind installation, potential impacts would be limited to airspace and runway obstruction and possible electromagnetic interference with the aircraft landing systems. With respect to airspace and runway obstruction, runways at Kotzebue are oriented east/west as these are the prevailing wind directions. Since the wind installation is located north of the proposed alternative location, potential conflict with runway space required for take-offs and landings would not be expected. There are FAA regulations for structures alongside runways. Based on conversations with ADOT, the wind turbines could limit future runway locations, but in no way would preclude the relocation alternative since the alternative would still would have to consider compatibilities with the three existing turbines. Since the preferred alternative consists of redevelopment within the airport's existing land, there would be no conflict in land use from installing additional turbines at the existing wind installation (ADOT, 1998).

Other potential conflicts with current land use include the ways in which the wind turbines could possibly interfere with any type of electromagnetic (radio) transmission. The systems of interest include the KOTZ radio antenna, the airport's instrument landing system, and the unmanned White Alice Communication station. The National Renewable Energy Laboratory (NREL) conducted a study to address potential electromagnetic interference (EMI) from the wind turbines. The conclusions from the study are specific to AM broadcasting reception, FM/TV broadcasting, aircraft navigation, cellular telephones, and the Air Force RADAR installation.

It is expected that very little reradiation and essentially no interference will occur with the KOTZ radio broadcast (NREL, 1998). Currently, there is no cellular phone service or conventional FM or TV broadcasting stations in the area, therefore interference with these systems is not expected. Satellite dish antennas have very narrow beam widths and are oriented towards specific satellites. Because of the wind installation's remote location, no interference is expected. The Kotzebue airport has not reported any interference with their navigation systems related to the existing wind turbines. Furthermore, no signal degradation is expected because the system uses narrow beam widths and is relatively far from the wind site. Like navigation systems, radar antennas also use a very narrow beam width for measuring directions accurately. Potential impacts to the White Alice Communication station are considered unlikely, as reception of interfering signals from outside that beam is nearly impossible (NREL, 1998).

### 4.3 Impacts to the Coastal Zone

While the wind installation site is located approximately 0.5 miles from the coast, it does not exhibit any coastal habitat as defined in the ACMP, except for wetlands. As mentioned in Sections 2.4 and 3.3, the USACE and the Alaska DGC reviewed and approved the access road application which allows approximately 8000 $yds^3$ of fill material to be placed in wetland habitat adjacent to the wind installation. The access road proposal was found to be consistent with the ACMP and would not adversely impact resources in the area.

By comparison, the wind installation expansion would not require any filling in of wetlands nor displace any unique or sensitive habitats. KEA would perform all construction activities while the tundra is frozen to minimize impacts to the vegetation. Wind turbine operation would not produce any effluents or emissions, and with respect to visual impacts, the site is not visible from the sea or coastal beaches (KEA, 1997).

### 4.4 Air Quality

The proposed construction and operation of 20 wind turbines would result in a small amount of construction equipment emissions from boring piling holes and raising the towers. As described in Section 2.5, construction equipment will operate on an intermittent basis throughout

NREL (National Renewable Energy Laboratory) 1998. Memo from G. Nix to E.Lurier (Dames & Moore). Information regarding electromagnetic interference and acoustics, January 20, 1998.

Reeve, Brad, 1997(a). Personal Communication. E. Lurier (Dames & Moore) with Brad Reeve, General Manager, Kotzebue Electric Association.

Selkregg, L. 1976.Alaska Regional Profiles - Northwest Region. State of Alaska and Joint Federal-State Land Use Planning Commission for Alaska, Juneau, AK.

USACE (U.S. Army Corps of Engineers), 1997a. Permit No. 4-970322, Kotzebue Sound 60 issued to Kikiktagruk Inupiat Corporation (KIC) for the construction of a 0.7 mile access road, July 31, 1997.

USACE, 1997b. Letter from Allan Skinner (USACE) to Percy Frisby (Alaska Department of Community and Regional Affairs, Division of Energy), September 5, 1997.

USACE, 1997c. Permit Evaluation and Decision Document for Kikiktagruk Inupiat Corporation, No. 4-970322, July 18, 1997

USDOI, (U.S. Department of the Interior), Bureau of Indian Affairs, *The Kotzebue Road Project Proposal, Project # 51(1), A Cultural Resource Report of Investigations and & Section 106 Review*. Prepared for the State Historic Preservation Office, Alaska Department of Natural Resources, January 1995.

## ELECTROMAGNETIC INTERFERENCE ANALYSIS

The purpose of this section is to describe potential electromagnetic interference (EMI) as it is applicable to the proposed wind farm site located near Kotzebue Alaska and the potential effect on radio services. The wind farm site is located approximately 4.5 miles south of Kotzebue Alaska, and the Kotzebue Electric Association leases the site from the Kikiktagruk Inupiat Corporation. The site currently has three AOC wind turbines in place that were installed in the spring of 1997. A site visit was conducted during the fall of 1997, and at that time, the current condition of the wind farm site was primarily undeveloped open space. A local airport is located between the wind farm site and the town of Kotzebue; it is approximately four miles north of the site. A local AM radio station (KOTZ) is located in the town of Kotzebue and operates at the frequency of 700 kilohertz. The KOTZ antenna is located approximately 1000 feet to the west of the wind farm site. Also the abandoned U.S. Air Force White Alice Communications station is located less than one mile to the west of the site. The local topography is nearly uniform with a general low relief. There are no significant terrain barriers in the immediate area, or pronounced local variation in temperature or precipitation.

The potential EMI effects of wind turbines on radio services involve multiple parameters including: the type of wind turbine, whether it is on a vertical or horizontal axis, the diameter and number of blades, the shape of the blades and properties of their materials, and the height of the support tower. Also applicable for wind turbines with blades made of dielectric materials, or materials which are an electrical insulator, are the shape and location of any metal parts such as lightning conductors or spars. The electromagnetic scattering properties of a wind turbine is a complex condition and involves three dimensional vector fields incident upon a time varying structure and requires many parameters for its description. The analytical descriptions use electromagnetic analysis techniques to categorize the EMI situation into three classes dependent upon their dimensions in terms of a wavelength, (Expert Group Study 1986).

The vulnerability of various radio services to EMI effects is dependent upon some primary parameters of the radio service. The primary parameters are: spatial positions of the transmitter and receiver with respect to the wind turbine; carrier frequency; polarization of the signal; modulation type and frequency; time constants of the automatic gain or other controls; and the symbol rate of digital systems, (Expert Group Study 1986).

A semi-quantitative analysis has been performed and is documented in a paper titled, "Some Comments on Possible Electromagnetic Interference Attributable to Wind Machines," (Nix, 1998) This paper specifically evaluates the EMI situation at Kotzebue against the background of the existing technical literature on this subject. The conclusions are specific to AM broadcast reception, FM/TV broadcasting, aircraft navigation, cellular telephones, and the Air Force Radar Installation. It is expected that very little reradiation and essentially no interference will occur with the KOTZ radio broadcast because the wind turbines/wind machines near the radio antenna present only about 5% of a wavelength in any dimension. Currently there are no conventional TV or FM broadcasting stations in the

Kotzebue area and therefore interference is not an issue. In addition, receiving dish antennas for satellite reception have beam widths of only a few degrees and they are oriented to a specific satellite(s), therefore, wind farm interference is not expected. The airport is located approximately four miles north of the wind farm site and has not observed any wind machine related interference with their aircraft navigation systems. In addition, a report by D.L. Sengupta and T.B.A. Senior indicates that no significant degradation of VHF Omnidirectional Ranging (VOR) systems will occur assuming wind turbines are sited according to FAA guidelines, (Sengupta, Senior 1977). There is currently no cellular service in the Kotzebue area and therefore interference is not an issue. The abandoned U.S. Air Force White Alice Communications station is no longer in operation, therefore interference is also not considered an issue. In addition, radar antenna systems typically have very narrow beams in order to measure directions accurately, therefore interference is not anticipated even if the systems were operational.

Based on the reviewed information, and assuming the electromagnetic related services do not change in the Kotzebue area, it is not anticipated that the planned wind farm will cause any noticeable EMI issues.

## REFERENCES

(Sengupta, Senior 1977), Sengupta, D.L., Senior, T.B.A., "Electromagnetic Interference by Wind Turbine Generators. Final Report," ERA-04-018651; EDB-78-002112; Michigan Univ., Ann Arbor MI, February 1977.

Nix, Gerald. 1998. National Renewable Energy Laboratory . Memorandum to E. Lurier, Dames & Moore. "Some Comments on Possible Electromagnetic Interference Attributable to Wind Machines"

(Expert Group Study 1986), Expert Group Study on Recommended Practices For Wind Turbine Testing And Evaluation, 5. Electromagnetic Interference, Issue 1, February 1986.