www.eh.doe.gov/NEPA/eis/eis0325/appxI/sch-ha-emf-addendum-082801.pdf

# *SCHULTZ - HANFORD AREA TRANSMISSION LINE PROJECT*

## *ADDENDUM to*

## *APPENDIX I*

## *ELECTRICAL EFFECTS*

August 28, 2001

**Prepared by**
**T. Dan Bracken, Inc.**

**For**

**Parsons Brinckerhoff**

# Table of Contents

**ADDENDUM** ..... **A-1**

A.1 New configurations ..... A-1

A.2 Electric-field levels ..... A-1

A.3 Magnetic-field levels ..... A-1

A.4 Audible noise levels ..... A-1

A.5 Electromagnetic interference ..... A-1

A.6 Conclusions ..... A-2

**List of Preparers** ..... **A-2**

## List of Tables

Table A1 Physical and electrical characteristics of additional Schultz-Hanford Area Project configurations ..... A-3

Table A2: Possible additional segment configurations for Schultz - Hanford Area Project. ..... A-3

Table A3: Calculated electric fields for configurations of the proposed Schultz – Hanford/Wautoma 500-kV line operated at maximum voltage. a) Configuration G: Schultz – Hanford/Wautoma 500-kV line and Pacificorp Wanapum – Pomona Heights 230-kV line; Configuration D-1A: Schultz – Hanford/Wautoma 500-kV and Vantage – Midway 230-kV lines ..... A-4

Table A4: Calculated magnetic fields for configurations of the proposed Schultz–Hanford/Wautoma 500-kV line operated at maximum current. a) Configuration G: Schultz – Hanford/Wautoma 500-kV and Pacificorp Wanapum – Pomona Heights 230-kV line; Configuration D-1A: Schultz – Wautoma 500-kV and Vantage – Midway 230-kV line ..... A-5

Table A5: Predicted foul-weather audible noise (AN) levels at edge of right-of-way (ROW) for proposed Schultz – Hanford/Wautoma 500-kV line. ..... A-6

Table A6: Predicted fair-weather radio interference (RI) levels at 100 feet (30.5 m) from the outside conductor of the proposed Schultz – Hanford/Wautoma 500-kV line. ..... A-7

Table A7: Predicted maximum foul-weather television interference (TVI) levels predicted at 100 feet (30.5 m) from the outside conductor of the proposed Schultz – Hanford/Wautoma 500-kV line. ..... A-7

## List of Tables

Figure A1: Additional configurations for proposed Schultz-Hanford Area Transmission Line Project 500-kV line: a) Proposed line with parallel Pacificorp Wanapum – Pomona Heights 230-kV line (Configuration G); and b) Proposed line on double-circuit tower with existing BPA 230-kV line (Configuration D-1A). ..... A-8/9

Figure A2: Electric-field profiles for additional configurations of proposed Schultz – Hanford/Wautoma 500-kV line: a) Proposed 500-kV line parallel to Pacificorp Wanapum – Pomona Heights 230-kV line (Configuration G); and b) proposed 500-kV line on double-circuit tower with existing BPA Vantage – Midway 230-kV line (Configuration D-1A)........................................................................ A-10/11

Figure A3: Magnetic-field profiles for additional configurations of the proposed Schultz– Hanford/Wautoma 500-kV line under maximum current conditions: a) Proposed 500-kV line parallel to Pacificorp Wanapum – Pomona Heights 230-kV line (Configuration G); and b) proposed 500-kV line on double-circuit tower with BPA Vantage – Midway 230-kV line (Configuration D-1A).............. A-12/13

# ADDENDUM

In the course of evaluating routing options for the proposed Schultz-Hanford Area Transmission Line Project, additional corridor options were identified. These new corridor options entail different configurations than those analyzed in the original Electrical Effects and Health Assessment appendices prepared for the project. The purpose of this addendum is to report the levels of electric fields, magnetic fields, audible noise, radio interference, and television interference anticipated from these new configurations. The calculation methods and impacts related to fields and corona-generated audible noise and electromagnetic interference are discussed in the Electrical Effects appendix.

## A.1 New configurations

The new corridor options for the Schultz - Hanford 500-kV line are as follows: 1) a section of Alternative G where the proposed Schultz – Hanford/Wautoma 500-kV line would parallel the existing Pacificorp 230-kV Wanapum – Pomona Heights line just west of the Columbia River crossing into Vantage Substation; and 2) a section of Alternative D1 where the proposed line would be placed on a double-circuit tower with the existing BPA Vantage – Midway 230-kV line. Figure A1 shows these configurations; their physical and electrical characteristics are given in Tables A1 and A2.

## A.2 Electric-field levels

Calculated electric fields for the two new configurations are summarized in Table A3 and plotted in Figure A2. The levels in Configuration G are very similar to those in the other configurations (D1 to D4) where the proposed 500-kV line parallels existing 230-kV lines. The calculated maximum electric fields under the proposed double-circuit line in Configuration D-1A are slightly higher than those for other configurations of the proposed 500-kV line and exceed 9 kV/m, the BPA limit for electric fields. The maximum field could be reduced below 9 kV/m by an increase in the minimum conductor height of 0.3 feet. The electric fields at the edge of the right-of-way would be lower for the double-circuit configuration (D-1A) than for the single-circuit delta configuration used elsewhere.

## A.3 Magnetic-field levels

Calculated magnetic-field levels for the two new configurations are summarized in Table A4 and plotted in Figure A3. The levels for Configuration G are consistent with those for other configurations that include a single-circuit tower for the proposed 500-kV line. The maximum magnetic field under Configuration G would be 248 mG. Magnetic fields under the proposed double-circuit line of Configuration D-1A are somewhat lower with a maximum field on the right-of-way of 187 mG.

## A.4 Audible noise levels

Corona-generated audible noise levels from the new configurations are shown in Table A5. The foul weather $L_{50}$ and $L_5$ levels predicted for these configurations will be comparable with those for the previously considered configurations. The foul weather $L_{50}$ level at the edge of the right-of-way will not exceed the 50-dBA limit established by BPA.

## A.5 Electromagnetic interference

Corona-generated electromagnetic interference levels for the new configurations are shown in Tables A6 and A7 for radio interference (1 MHz) and television interference (75 MHz), respectively. The levels are comparable with those predicted for the other proposed configurations and are within acceptable levels.

**Table A6:** **Predicted fair-weather radio interference (RI) levels at 100 feet (30.5 m) from the outside conductor of the proposed Schultz – Hanford/Wautoma 500-kV line.** RI levels given in decibels above 1 microvolt/meter (dBμV/m) at 1.0 MHz. $L_{50}$ denotes level exceeded 50 percent of the time. For the parallel-line configurations, the RI level on the side of the proposed Schultz – Hanford Area Transmission Line Project ROW is given first.

| | Fair-weather RI | |
|---|---|---|
| | Proposed | Existing |
| **Configuration[1]** | **$L_{50}$, dBmV/m** | **$L_{50}$, dBmV/m** |
| **G** | 38, 29 | 26 |
| **D-1A** | 41, 38 | 30 |

1 Configurations are described in Tables A1 and A2.

**Table A7:** **Predicted maximum foul-weather television interference (TVI) levels predicted at 100 feet (30.5 m) from the outside conductor of the proposed Schultz – Hanford/Wautoma 500-kV line**. TVI levels given in decibels above 1 microvolt/meter (dBμV/m) at 75 MHz. For the parallel-line configurations, the TVI level on the side of the proposed Schultz – Hanford Area Transmission Line Project ROW is given first.

| | Foul-weather TVI | |
|---|---|---|
| | Proposed | Existing |
| **Configuration[1]** | **Maximum (foul), dBmV/m** | **Maximum (foul), dBmV/m** |
| **G** | 24, 12 | 13 |
| **D-1A** | 24, 19 | 17 |

1 Configurations are described in detail in Tables A1 and A2.

www.mda.mil/mdalink/pdf/peisvol1.pdf

# Missile Defense Agency
# Ballistic Missile Defense System (BMDS)







## *Draft Programmatic Environmental Impact Statement*

**1 September 2004**

**VOLUME 1**
**DRAFT BMDS PEIS**

Department of Defense
Missile Defense Agency
7100 Defense Pentagon
Washington, DC 20301-7100

# EXECUTIVE SUMMARY

## Introduction

The National Environmental Policy Act (NEPA) of 1969, as amended; the Council on Environmental Quality (CEQ) regulations that implement NEPA (Code of Federal Regulations [CFR], Title 40, Parts 1500-1508); Department of Defense (DoD) Instruction 4715.9 *Environmental Planning and Analysis*; applicable service environmental regulations that implement these laws and regulations; and Executive Order (EO) 12114, *Environmental Effects Abroad of Major Federal Actions* (whose implementation is guided by NEPA and the CEQ implementing regulations) direct DoD lead agency officials to consider potential impacts to the environment when authorizing or approving Federal actions.

This Programmatic Environmental Impact Statement (PEIS) evaluates the potential environmental impacts of activities associated with the development, testing, deployment, and planning for decommissioning of the Ballistic Missile Defense System (BMDS). This PEIS considers the current technology components, assets, and programs that make up the proposed BMDS as well as the development and application of new technologies, and considers cumulative impacts of implementing the BMDS. A programmatic NEPA evaluation is the appropriate approach for projects that are large in scope, diverse geographically, and implemented in phases over many years. It provides the analytical framework that supports subsequent NEPA analysis of specific actions at specific locations within the overall system, i.e., tiering.

## Purpose and Need for the Proposed Action

The purpose of the proposed action is for the Missile Defense Agency (MDA) to incrementally develop and field a BMDS that layers defenses to intercept ballistic missiles of all ranges in all phases of flight. The proposed action is needed to protect the United States (U.S.), its deployed forces, friends, and allies from ballistic missile threats. The BMDS is a key component of U.S. policy for addressing ballistic missile threats worldwide.

## Proposed Action

The MDA is proposing to develop, test, deploy, and to plan for related decommissioning activities for an integrated BMDS using existing infrastructure and capabilities, when feasible, as well as emerging and new technologies, to meet current and evolving ballistic missile threats. The Secretary of Defense assigned this critical defense mission to the MDA.

**Exhibit ES-9. Summary of Environmental Impacts of Alternative 1 - C2BMC**

| Resource Area | Computer Terminals and Antennas | Underground Cable |
|---|---|---|
| Air Quality | Activation emissions would be limited to generator exhaust. Impacts from generator emissions are considered in Support Assets. | Impacts would be limited to ground disturbances resulting from construction activities. Impacts from ground disturbance are considered in Support Assets. |
| Airspace | Radio transmission frequencies used by computer terminals and antennas could impact airspace through interference with commercial air traffic control communications. Radio frequency use and testing would be coordinated with the appropriate air traffic control agencies; therefore, no significant airspace impacts would be expected. | Activation of underground cable would not interfere with airspace; therefore, no significant airspace impacts would be expected. |
| Biological Resources | Biological resources could be impacted by activation activities, but the level of impact would vary based on signal frequency and energy, and the proximity of the source to sensitive environments or specific threatened or endangered species. Radio frequency use and testing would be coordinated with the appropriate resource management agencies; therefore, no significant biological resource impacts would be expected. | Activation of underground cable would not interfere with biological resources. Therefore, no significant biological resource impacts would be expected. |
| Geology and Soils | Activation of computer terminals and antennas would not interfere with geology and soils. Therefore, no significant geology and soils impacts would be expected. | Impacts to geology and soils would be limited to site preparation activities. Impacts from ground disturbance are considered in Support Assets. |
| Hazardous Materials and Hazardous Waste | Any hazardous materials or wastes used or generated would be handled in accordance with appropriate regulations. Therefore, no significant hazardous materials and hazardous waste impacts would be expected. | Impacts from hazardous materials and hazardous wastes would be limited to site preparation activities. Impacts from ground disturbance are considered in Support Assets. |
| Health and Safety | Health and safety impacts would vary based on signal frequency and energy, and the proximity of the source to site personnel or the public. No significant health and safety impacts would be expected. | Potential health and safety hazards would be limited to dust/particulate inhalation, improper chemical handling, and improper use of machinery during site preparation and construction. Impacts from ground disturbance are discussed in Support Assets. |
| Noise | Noise impacts associated with activation of computer terminals and antennas would be limited to noise produced by generators. Impacts related to generator noise are discussed in Support Assets. | The activation of underground cable would not produce noise that has the potential to impact sensitive receptors. |
| Transportation | Personnel operating and maintaining computer terminals and antennas would generate traffic as a result of activation. Personnel would be on site only during operating hours and during routine maintenance activities; therefore, no significant transportation impacts would be expected. | Any necessary repairs to underground cable would require excavation of the cable. These activities could result in impacts to transportation through movement of equipment and personnel to the repair site. However, this would occur infrequently, therefore, impacts to transportation would not be significant. |

- Removing all petroleum products from stream surfaces and returning the damaged area to an environmentally sound level.

**Orbital Debris**

***Prelaunch Activities***

No orbital debris would be produced from prelaunch activities.

***Launch/Flight Activities***

Orbital debris could be produced from launch/flight activities in the event of a booster failure while in the exoatmosphere. However, any debris would not be expected to remain in orbit for more than a short time, followed by deorbiting and eventual burn-up during reentry of the Earth's atmosphere.

***Postlaunch Activities***

A failure of a booster in the exoatmosphere may generate orbital debris. The type of orbital debris produced from a booster failure would be similar to that produced from a high altitude successful intercept. However, the amount of debris from a booster failure would be less than that produced from an intercept. The impacts of orbital debris from intercepts are discussed in Section 4.1.2.10 and were found to not pose significant impacts. Therefore orbital debris from a booster failure would similarly not pose significant impacts.

**4.1.1.3 Sensors - Radars**

As described in Exhibit 4-3, the analysis for radars is based upon impacts from the activation of the radar.

**Air Quality**

Activation emissions from radars would be limited to exhaust produced by generators. Impacts related to generator emissions are discussed in Support Assets. These impacts would be the same in all of the biomes considered in this PEIS.

**Airspace**

During activation of land-based radars, NOTAMs would be issued and pilots would be restricted from electromagnetic radiation (EMR) hazard areas. NOTAMs would be sent in accordance with the conditions of the directive specified in Army Regulation 95-10, Operations to notify aircraft of EMR hazard areas during the activation of radars.

Airspace restrictions would be short-term events and would not pose a significant impact on available airspace. Sufficient notice of restricted areas would be provided to allow pilots to select alternate flight paths to avoid restricted areas.

The activation of radars in the Sub-Arctic Taiga Biome may impact small civilian aircraft, which frequently transit the biome at low altitudes. Because many remote civilian airports within this biome do not have operating control towers, some aircraft pilots may be required to upgrade their communication equipment (at their own expense) to ensure that they are aware of activation activities and areas that must be avoided. Civilian aircraft would be required to contact local range control towers when transiting restricted airspace. The controllers would then be able to advise civilian pilots as to their proximity to hazard areas during activation of radars. (U.S. Army Space and Missile Defense Command, 2000) Other biomes including Arctic Tundra and the BOA are unlikely to experience impacts because small civilian aircraft would not readily occur in these regions. The Deciduous Forest, Chaparral, Grasslands, Desert, Tropical, Savanna, and Mountain Biomes are unlikely to experience impacts because these biomes are more likely to have operational control towers that could communicate with civilian aircraft.

For activation activities occurring in international airspace, procedures of the International Civil Aviation Organization (ICAO) would be followed. ICAO Document 4444 is the equivalent air traffic control manual to the FAA Handbook 7110.65, Air Traffic Control. Personnel would ensure coordination with the ICAO through the FAA, to issue NOTAMs, locate ships with radar capable of monitoring the airspace, contact all commercial airlines and civil and private airports, and monitor appropriate radio frequencies to minimize potential safety impacts.

During activation of radars in the BOA, at least one Control Area Extension corridor in the BOA would remain available for use by general aviation and commercial air carriers.

Potential interference to aircraft electronic and emitter units (e.g., flight navigation systems and tracking radars) would be examined before activation of radars. A high-energy radiation area would be configured to mitigate potential impacts to aircraft and other potentially affected systems and a notice would be published on the appropriate aeronautical charts, notifying aircraft of the radio frequency radiation area. Boundaries of these radio frequency radiation areas would be configured to minimize impacts to aircraft operations and other potentially affected systems. In addition information would be published in the Airport Facility section of the FAA Airport Guide. Flight service personnel would brief pilots flying in the vicinity about the radio frequency radiation area. Radar operations would be coordinated with FAA and range officials and if possible would be programmed to limit radio frequency emissions in the direction of airways that pass within the potential interference distance.

EMR from radar activation may interact with and adversely affect aircraft operations by disabling or inadvertently initiating vital electronic equipment, including electroexplosive devices on-board aircraft. Electroexplosive devices on aircraft in flight could be illuminated by a radar main beam. Software controls and coordination with military and commercial aircraft controllers would eliminate this potential hazard. (U.S. Army Space and Missile Defense Command, 2003)

The FAA and DoD have standards, such as MIL-STD-464, for EMR interference with aircraft, which would not be exceeded. To operate in an affected area, military aircraft would have to be hardened or protected from EMR levels up to 3,500 volts per meter (peak power) and 1,270 volts per meter (average power). Commercial aircraft must be hardened or protected from EMR levels up to 3,000 volts per meter (peak power) and 300 volts per meter (average power) as mandated by the FAA by Notice 8110.71, Guidelines for the Certification of Aircraft Flying through High Intensity Radiated Field Environments. Radars would not exceed the 3,000 volts per meter power threshold.

Reducing the time on-board electronic equipment is exposed to EMR would lower the average power threshold experienced. (U.S. Army Space and Missile Defense Command, 2003) Commercial aircraft equipment would be affected only if the main beam illuminated the aircraft long enough to affect on-board electronics. Because radars are typically in constant motion, it is highly unlikely that a radar would illuminate an aircraft long enough to interfere with on-board electronics.

Activation impacts from air- and sea-based radars would be similar to those described for land-based radars. Radars located on sea-based operating environments would most likely be located far enough off the coast to not interfere with existing airfield or airport arrival and departure traffic flows. Activation of space-based radars would not be expected to impact airspace.

**Biological Resources**

Radar activation activities would produce the same impacts on biological resources in all of the biomes considered in this PEIS. The potential for main-beam exposure thermal effects to birds exists from the activation of land- and air-based radars. The *Final Ground-Based Radar Family of Radars Environmental Assessment* (1993) analyzed potential impacts on wildlife from EMR. The main beam would normally be in motion making it extremely unlikely that a bird would remain within the most intense area of the beam for any considerable length of time. The size of the beam is relatively small, which further reduces the probability of birds remaining within this limited region of space, even if the beam remained still. (U.S. Army Space and Missile Defense Command, 2003) A risk assessment performed in 1993 determined that birds in flight had a less than one percent risk of incurring harm from a beam in motion. (U.S. Army Space and Strategic

www.cannon.af.mil/shared/media/document/AFD-061017-084.pdf

NEW MEXICO

# Training Range Initiative



# Environmental Impact Statement

## October 2006

**Cover Sheet**

***FINAL ENVIRONMENTAL IMPACT STATEMENT FOR NEW MEXICO TRAINING RANGE INITIATIVE***

a. *Responsible Agency:* United States Air Force (Air Force)

b. *Cooperating Agency:* Federal Aviation Administration (FAA)

c. *Proposals and Actions:* This Final Environmental Impact Statement (EIS) analyzes the potential environmental consequences of a proposal to modify the training airspace near Cannon Air Force Base (AFB), New Mexico. The proposal would improve airspace for training primarily New Mexico-based pilots. The existing airspace no longer suffices to train aircrews in all of the tactics they will be expected to use in combat. Cumulative actions include Base Realignment and Closure (BRAC) plans to have the 27th Fighter Wing (27 FW) leave Cannon in 2008 and the new Air Force Special Operations Command (AFSOC) mission designation at Cannon AFB and Melrose Air Force Range (AFR). The New Mexico Training Range Initiative (NMTRI) airspace proposal laterally expands the east and west borders of the Pecos Military Operations Area (MOA) respectively, lowers the floor of the Pecos South Low MOA to 500 feet above ground level (AGL) making the airspace symmetrical. The proposed NMTRI airspace will provide a 21st century block of airspace for training New Mexico-based aircrews, including the New Mexico Air National Guard (NMANG). NMTRI would greatly enhance combat training, combat effectiveness, and survivability. A Proposed Action, Alternatives A and B were comprehensively evaluated in the Draft EIS and reviewed by the public and agencies. Following that review, the Air Force identified Alternative A with mitigations as the preferred alternative, as presented in this Final EIS. Alternative A modifies the configuration of existing airspace (including expanding the size, operational altitudes, and usefulness of the Pecos MOA complex); aligns the northern border of the Pecos MOA south of Jet Route J-74 (J-74); does not move J-74; does not create the Capitan MOA, but creates a mitigated Capitan ATCAA to connect the existing Beak and Pecos ATCAAs; permits supersonic training above 10,000 feet above mean sea level (MSL) or approximately 5,000 to 6,000 feet AGL; and extends the use of specific defensive countermeasures (chaff and flares) to the new and modified airspace. Under the preferred alternative, deconfliction methods would be coordinated typically twice per month for large scale exercises in activated Sumner North and Capitan ATCAAs. The Draft EIS Proposed Action and Alternative B included rerouting J-74 and a different Capitan MOA/ATCAA. Under the No-Action Alternative, aircrews would continue to train in the existing airspace with defensive chaff and flares and fly at supersonic speeds above 30,000 feet MSL.

d. *Inquiries:* For future information on this Final EIS, contact NMTRI EIS Project Manager, Mr. Michael H. Jones, HQ ACC/A7ZP, 129 Andrews Street, Suite 102, Langley AFB, VA 23665-2769. Telephone inquiries may be made to Cannon AFB Public Affairs at (505) 784-4131. The Final EIS may be found at www.a7zpintegratedplanning.org and www.cannon.af.mil. The Air Force is allowing a 30-day review period following the Final EIS publication. Although the Air Force is not required to respond to public comments received during this period, comments will be considered in determining any final decisions.

e. *Designation:* Final Environmental Impact Statement

f. *Abstract:* This Final EIS has been prepared in accordance with the National Environmental Policy Act. The Draft EIS public and agency review identified potentially significant airspace impacts from creating a Capitan MOA/ATCAA, moving J-74, and the use of certain types of defensive training flares. This EIS identifies actions taken to remove or reduce the potential for these environmental consequences. The preferred alternative has no Capitan MOA, no relocated J-74, and no flares other than M-206 (or equivalent). The reduced size Capitan ATCAA and Sumner North ATCAA would be used typically twice monthly. This Final EIS discusses cumulative actions, responds to public and agency comments and addresses the environmental consequences for the airspace, noise, safety, physical resources, biological resources, cultural resources, land use and recreational resources, socioeconomics, and environmental justice. The preferred alternative, Alternative A, would have few effects on airspace and noise and no noticeable environmental effects on other resources. The Draft EIS Proposed Action or Alternative B would have greater environmental consequences to airspace. The No-Action Alternative would limit realistic training for New Mexico-based aircrews. The preferred NMTRI alternative, Alternative A, provides realistic training for F-16 pilots to practice combat tactics they currently use in war, a capability that does not exist in the current airspace configuration.

# APPENDIX A CHARACTERISTICS OF CHAFF

Training chaff is currently authorized in the existing airspace. The Proposed Action would employ training chaff in the proposed new and modified airspace. When released from an aircraft, chaff initially forms a sphere, then disperses in the air. The chaff effectively reflects radar signals in various bands (depending on the length of the chaff fibers) and forms a very large image or electronic "cloud" of reflected signals on a radar screen. The aircraft is obscured from radar detection by the cloud, which allows the aircraft to safely maneuver or to leave an area. Since chaff can obstruct radar, its use is coordinated with the Federal Aviation Administration (FAA). Training chaff has D and E band dipoles removed to avoid interference with FAA radar.

## Chaff Composition

The chaff used during training consists of extremely small strands (or dipoles) of an aluminum-coated crystalline silica core. The chaff components (silica, aluminum, and stearic acid) are generally prevalent in the environment. Silica (silicon dioxide) belongs to the most common mineral group, silicate minerals. Silica is inert in the environment and does not present an environmental concern with respect to soil chemistry. Aluminum is the third most abundant element in the earth's crust, forming some of the most common minerals, such as feldspars, micas, and clays. Natural soil concentrations of aluminum ranging from 10,000 to 300,000 parts per million have been documented (Lindsay 1979). These levels vary depending on numerous environmental factors, including climate, parent rock materials from which the soils were formed, vegetation, and soil moisture alkalinity/acidity. The solubility of aluminum is greater in acidic and highly alkaline soils than in neutral pH conditions. Aluminum eventually oxidizes to $Al_2O_3$ (aluminum oxide) over time, depending on its size and form and the environmental conditions. Stearic acid is an animal fat that degrades when exposed to light and air.

The chaff fibers have an anti-clumping agent (Neofat – 90 percent stearic acid and 10 percent palmitic acid) to assist with rapid dispersal of the fibers during deployment (Air Force 1997). Chaff is made as small and light as possible so that it will remain in the air long enough to confuse enemy radar. The chaff fibers are approximately the thickness of a human hair (i.e., generally 25.4 microns in diameter), and range in length from 0.3 to over 1 inch. The weight of chaff material in the RR-188 cartridge is 95 grams (Air Force 1997).

A single bundle of chaff consists of the filaments in an 8-inch long rectangular tube or cartridge, a plastic piston, a cushioned spacer and a 1-inch by 1-inch plastic end cap that falls to the ground when chaff is dispensed. The spacer is a spongy material (felt) designed to absorb the force of release. Figure 1 illustrates the components of a chaff cartridge. Table 1 lists the components of the silica core and the aluminum coating. Table 2 presents the characteristics of RR-188 chaff.

## Chaff Ejection

Chaff is ejected from aircraft pyrotechnically using a BBU-35/B impulse cartridge. Pyrotechnic ejection uses hot gases generated by an explosive impulse charge. The gases push the small piston down the chaff-filled tube. A small plastic end cap is ejected, followed by the chaff fibers. The plastic tube remains within the aircraft. Debris from the ejection consists of two small, square pieces of plastic 1/8-inch thick (i.e., the piston and the end cap) and the felt spacer. Table 3 lists the characteristics of BBU-35/B impulse cartridges used to pyrotechnically eject chaff.




**Figure 1. RR-188/AL Chaff Cartridge (Source: Air Force 1999)**

**Table 1. Components of RR-188 Chaff**

| *Element* | *Chemical Symbol* | *Percent (by weight)* |
|---|---|---|
| **Silica Core** | | |
| Silicon dioxide | $SiO_2$ | 52-56 |
| Alumina | $Al_2O_3$ | 12-16 |
| Calcium Oxide and Magnesium Oxide | CaO and MgO | 16-25 |
| Boron Oxide | $B_2O_3$ | 8-13 |
| Sodium Oxide and Potassium Oxide | $Na_2O$ and $K_2O$ | 1-4 |
| Iron Oxide | $Fe_2O_3$ | 1 or less |
| **Aluminum Coating** (Typically Alloy 1145) | | |
| Aluminum | Al | 99.45 minimum |
| Silicon and Iron | Si and Fe | 0.55 maximum |
| Copper | Cu | 0.05 maximum |
| Manganese | Mn | 0.05 maximum |
| Magnesium | Mg | 0.05 maximum |
| Zinc | Zn | 0.05 maximum |
| Vanadium | V | 0.05 maximum |
| Titanium | Ti | 0.03 maximum |
| Others | | 0.03 maximum |

Source: Air Force 1997

**Table 2. Characteristics of RR-188 Chaff**

| *Attribute* | *RR-188* |
|---|---|
| Aircraft | A-10, F-15, F-16 |
| Composition | Aluminum coated glass |
| Ejection Mode | Pyrotechnic |
| Configuration | Rectangular tube cartridge |
| Size | 8 x 1 x 1 inches<br>(8 cubic inches) |
| Number of Dipoles | 5.46 million |
| Dipole Size (cross-section) | 1 mil<br>(diameter) |
| Impulse Cartridge | BBU-35/B |
| Other Comments | Cartridge stays in aircraft; less interference with FAA radar (no D and E bands) |

Source: Air Force 1997

**Table 3. BBU-35/B Impulse Charges Used to Eject Chaff**

| Component | BBU-35/B |
|---|---|
| Overall Size<br>Overall Volume<br>Total Explosive Volume | 0.625 inches x 0.530 inches<br>0.163 inches$^3$<br>0.034 inches$^3$ |
| Bridgewire | Trophet A<br>0.0025 inches x 0.15 inches |
| Initiation Charge | 0.008 cubic inches<br>130 mg<br>7,650 psi<br>boron 20%<br>potassium perchlorate 80% * |
| Booster Charge | 0.008 cubic inches<br>105 mg<br>7030 psi<br>boron 18%<br>potassium nitrate 82% |
| Main Charge | 0.017 cubic inches<br>250 mg<br>loose fill<br>RDX ** pellets 38.2%<br>potassium perchlorate 30.5%<br>boron 3.9%<br>potassium nitrate 15.3%<br>super floss 4.6%<br>Viton A 7.6% |

Source: Air Force 1997

Upon release from an aircraft, chaff forms a cloud approximately 30 meters in diameter in less than one second under normal conditions. Quality standards for chaff cartridges require that they demonstrate ejection of 98 percent of the chaff in undamaged condition, with a reliability of 95 percent at a 95 percent confidence level. They must also be able to withstand a variety of environmental conditions that might be encountered during storage, shipment, and operation.

Table 4 lists performance requirements for chaff.

**Table 4. Performance Requirements for Chaff**

| *Condition* | *Performance Requirement* | |
|---|---|---|
| High Temperature | Up to +165 degrees Fahrenheit (°F) | |
| Low Temperature | Down to –65 °F | |
| Temperature Shock | Shock from –70 °F to +165 °F | |
| Temperature Altitude | Combined temperature altitude conditions up to 70,000 feet | |
| Humidity | Up to 95 percent relative humidity | |
| Sand and Dust | Sand and dust encountered in desert regions subject to high sand dust conditions and blowing sand and dust particles | |
| Accelerations/Axis | G-Level | Time (minute) |
| Transverse-Left (X) | 9.0 | 1 |
| Transverse-Right (-X) | 3.0 | 1 |
| Transverse (Z) | 4.5 | 1 |
| Transverse (-Z) | 13.5 | 1 |
| Lateral-Aft (-Y) | 6.0 | 1 |
| Lateral-Forward (Y) | 6.0 | 1 |
| Shock (Transmit) | Shock encountered during aircraft flight | |
| Vibration | Vibration encountered during aircraft flight | |
| Free Fall Drop | Shock encountered during unpackaged item drop | |
| Vibration (Repetitive) | Vibration encountered during rough handling of packaged item | |
| Three Foot Drop | Shock encountered during rough handling of packaged item | |

Note: Cartridge must be capable of total ejection of chaff from the cartridge liner under these conditions.

Source: Air Force 1997

## Policies and Regulations on Chaff Use

Current Air Force policy on use of chaff and flares was established by the Airspace Subgroup of Headquarter (HQ) Air Force Flight Standards Agency (AFFSA) in 1993 (Memorandum from John R. Williams, 28 June 1993). It requires units to obtain frequency clearance from the Air Force

Frequency Management Center and the FAA prior to using chaff to ensure that training with chaff is conducted on a non-interference basis. This ensures electromagnetic compatibility between the FAA, the Federal Communications Commission (FCC), and Department of Defense (DoD) agencies. The Air Force does not place any restrictions on the use of chaff provided those conditions are met (Air Force 1997).

**AFI 13-201, U.S. Air Force Airspace Management**, September 2001. This guidance establishes practices to decrease disturbance from flight operations that might cause adverse public reaction. It emphasizes the Air Force's responsibility to ensure that the public is protected to the maximum extent practicable from hazards and effects associated with flight operations.

**AFI 11-214 Aircrew and Weapons Director and Terminal Attack Controller Procedures for Air Operations**, July 1994. This instruction delineates procedures for chaff and flare use. It prohibits use unless in an approved area.

## References

Air Force. 1997. *Environmental Effects of Self-Protection Chaff and Flares*. Prepared for Headquarters Air Combat Command, Langley Air Force Base, Virginia.

_____. 1999. *Description of the Proposed Action and Alternatives (DOPAA) for the Expansion of the Use of Self-Protection Chaff and Flares at the Utah Test and Training Range, Hill Air Force Base, Utah*. Prepared for Headquarters Air Force Reserve Command Environmental Division, Robins AFB, Georgia.

_____. 2000. Additional Information and Analysis of Proposed Use of Defensive Chaff in the Airspace Known as the Carrabelle and Compass Lake Work Areas (Military Operations Areas). Prepared for the U.S. Air Force Air Education and Training Command (AETC). Tyndall Air Force Base, Florida.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**

# RECORD OF DECISION FOR TERMINAL DOPPLER WEATHER RADAR TO SERVE JOHN F. KENNEDY INTERNATIONAL AND LAGUARDIA AIRPORTS, NEW YORK CITY, NEW YORK

## Section 1. Decision

Pursuant to the authority granted to the Administrator of the Federal Aviation Administration (FAA) found at 49 United States Code (U.S.C.) Subtitle VII, Part A, and a careful review of the administrative record, including the final environmental impact statement (EIS) released in January 1999, it is the final determination of the FAA that installation and operation of the Terminal Doppler Weather Radar (TDWR) to serve John F. Kennedy International (JFK) and LaGuardia (LGA) Airports at the U.S. Coast Guard (USCG) Air Station Brooklyn site in Kings County, New York, is approved. This action was identified as both the agency's preferred alternative and the environmentally preferable alternative in the final EIS.

The proposed action of installing a single TDWR to serve JFK and LGA Airports is consistent with the responsibilities of the FAA Administrator under 49 U.S.C. §§44501 and 44502 *et seq*. This action is also consistent with direction provided by Congress in the 1995 Department of Transportation and Related Agencies Appropriations Act, P.L.103-331 (Sept. 30, 1994), Conference Report on H.R. 4556, 103rd Congress, 2nd Session, 140 *Congressional Record* 9-603 (Sept. 26, 1994). In reaching this decision, careful consideration has been given to aviation safety and operational needs as well as potential environmental effects.

A discussion of the factors considered by the FAA in reaching this decision follows.

## Section 2. Purpose and Need

The purpose of the proposed action is to detect and track severe weather in the vicinity of JFK and LGA Airports. That information is used to warn pilots of potentially hazardous weather conditions, thereby enhancing aviation safety, and to plan airport runway use configurations, thereby enhancing the efficiency of airport operations. However, the proposed action will not result in changes at either airport in airport capacity, number of

flights, airport approach and departure procedures, or standard flight paths of aircraft arriving or departing those airports.

The FAA, as part of the U.S. Department of Transportation (DOT), routinely develops and deploys advanced weather surveillance systems to serve the nation's airports. The Administrator of the FAA is authorized and directed by Title 49 U.S.C. §44502 to prescribe, among other aviation-related activities, the locations of air safety systems such as TDWR. TDWR is an automated radar system designed to provide accurate and reliable detection and tracking of severe weather conditions that are hazardous to aircraft, thereby enhancing aviation safety. TDWR is a highly sophisticated Doppler weather radar and represents a significant improvement over alternative methods of detecting and tracking severe weather features. It is specifically designed to detect and track microbursts, a type of wind shear that presents a grave risk to aircraft in flight and has been the primary cause for a number of aircraft accidents and hundreds of fatalities. A tragic example of this hazard is Eastern Airlines flight number 66; that plane crashed due to wind shear on approach to JFK Airport in 1975, resulting in 112 deaths. Hazardous weather has been identified as a cause of 18 accidents involving commercial aircraft since 1970, resulting in 575 fatalities. A Doppler weather radar system located at the U.S. Coast Guard Air Station Brooklyn site will enable the FAA to improve the safety of air travel at JFK and LGA Airports through the timely detection, tracking, and reporting of severe weather.

The U.S. Congress has appropriated funds for 47 TDWR units to serve high-priority airports. Prior to Fiscal Year 1995, the FAA proposed the installation of two TDWR units to serve JFK and LGA Airports in New York City—one TDWR at the Roslyn Air National Guard Station in Nassau County, New York, to serve LGA airport and a second TDWR at the Bellmore U.S. Army Reserve Center in Nassau County, New York, to serve JFK airport. However, after Congress directed the FAA, in the House/Senate Conference Report accompanying the 1995 DOT Appropriations Act, to install a single TDWR to serve both JFK and LGA Airports, the FAA conducted an in-depth site survey of a single TDWR to serve the two airports. That survey found that a single TDWR, located at the U.S. Coast Guard Air Station Brooklyn site, could most effectively track, detect, and report severe weather that may affect aircraft using JFK and LGA Airports.

Of the 47 TDWR units for which funds were authorized by Congress, 39 have been commissioned and are in full operation serving high priority airports in the U.S., two units are being used for technical support and training at the Mike Monroney Aeronautical Center, Oklahoma City, Oklahoma, four are installed and in pre-commissioning check-out and the remaining two units are planned for installation in the near future, one to serve JFK and LGA Airports and the other to serve Chicago Midway Airport. The production line for TDWR units has long been closed and the manufacture

second greatest amount of traffic and consume the second greatest amount of energy. The preferred site is the most easily accessible of the alternative sites for TDWR. Traffic generation and energy consumption would be less than for TDWR at Hart Island or at ocean sites. Implementation of ASR/WSP, Doppler 4000 data feed to an Integrated Terminal Weather System (ITWS), or the no-action alternative would generate little or no traffic and would consume little or no energy. Installation of on-aircraft wind shear systems would not generate traffic, but would result in consumption of relatively large amounts of energy because of the need to equip many aircraft.

Installation of TDWR at the preferred site would not substantially affect biological resources. Protected species are not present at the preferred site and would not be affected. Installation of TDWR at Hart Island or an ocean site has much greater potential to affect biological resources. In particular, dredging to install the underwater utility cable could harm marine fauna. Coastal wetlands and the biologically productive shoreline areas at Hart and City Islands would be disturbed if TDWR is installed at Hart Island. The shoreline area at Rockaway Peninsula would be disturbed if TDWR is located in the ocean. The shore terminus for the utility cable serving an ocean-based TDWR could affect important habitat for the rare piping plover and seabeach amaranth. Due to the relatively short height of the TDWR tower and the lack of structural elements that are hard to see, the potential collision risk to birds would be minimal. Installation of on-aircraft wind shear systems or ASR/WSP, implementation of Doppler 4000 data feed to ITWS, or the no-action alternative would not affect biological resources.

The TDWR signal would comply by a wide margin with national and international safety guidelines for exposure of persons to peak and average levels of radio frequency radiation (RFR). Likewise, the TDWR signal would not affect operation of cardiac pacemakers. Based on engineering studies and operation of TDWR at other locations, TDWR would not cause interference with radio or television broadcasts or operation of model airplanes. The TDWR signal is not powerful enough to detonate electroexplosive devices, or affect fuel-handling operations. On-aircraft systems would be smaller and less powerful than TDWR and would not cause RFR effects on persons or electronic systems or devices. Implementation of ASR/WSP, Doppler 4000 data feed to ITWS, or the no-action alternative would not generate new RFR emissions. RFR effects from implementation of the preferred or any or the alternative actions would be insignificant.

With regard to the potential for effects on the environment, the preferred and alternative actions that could fulfill the required purpose can be ranked as follows:

| | |
|---|---|
| Least Impact | TDWR at the preferred site |
| ↓ | TDWR at the Hart Island site |
| | TDWR at the ocean site |

6. A spill prevention, containment, and countermeasure plan for the on-site storage of diesel fuel for the standby generator will conform with FAA Order 1050.15A.

7. Records of all maintenance and operational use of the TDWR standby generator will be maintained for at least five years in accordance with New York State Department of Environmental Conservation regulations.

8. With the exception of the L-810 red aviation warning light at the top of the radome, continuously operating and automatically timed exterior lights at the TDWR site will be shielded to minimize possible adverse effects on nearby uses and to minimize attraction of birds.

9. To enhance visual quality, the concrete masonry unit at the TDWR site will have a facing consistent with the character of neighboring park facilities.

10. The National Park Service, U.S. Coast Guard, and New York City Police Department will be apprised in advance of the schedule for construction activities to minimize the potential for conflicts with non-FAA activities in the vicinity.

11. If deemed necessary by the FAA, the FAA will provide to the New York City Police Department and the U.S. Coast Guard filters for installation on radio systems operated by those agencies to prevent electromagnetic interference caused by the TDWR radio signal.

12. After the useful life of the TDWR has ended, the FAA will decommission the system and remove it. The FAA will take the necessary steps, to the extent feasible, to implement a plan to reclaim the site to pre-TDWR condition as described in the EIS.

## Section 8. NEPA Coordination and Public and Agency Involvement

The final EIS conforms with legal requirements set forth in President's Council on Environmental Quality *Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act* (40 CFR 1500 *et seq*.) and FAA Order 1050.1D, *Policies and Procedures for Considering Environmental Impacts*. A programmatic EIS, prepared in 1991 by the FAA, examined potential environmental effects of the nationwide TDWR program. The final EIS examines potential environmental effects of installing a single TDWR in the New York City area to serve JFK and LGA Airports. The FAA was the lead agency for preparation of the programmatic EIS and the final EIS.

A 135-day scoping period for the final EIS was conducted in January through June 1996, during which written comments on the scope of the EIS were accepted and four official

# NATIONAL ENVIRONMENTAL POLICY ACT
## HANDBOOK



BLM HANDBOOK H-1790-1

(2) Impacts of the Proposed Action and the Alternatives. Analyze and describe the direct, indirect, and cumulative impacts on the quality of the human environment of the proposed action and each alternative analyzed in detail, including the no-action alternative. Also identify possible conflicts between the proposed action (and each alternative) and the objectives of Federal, regional, State, local, and Indian tribal land use plans, policies, and/or controls for the area concerned. Describe the energy and natural or depletable resource requirements and conservation potential of the proposed action and each alternative. Discuss, where applicable, urban quality, historic and cultural resources, and the design of the built environment including the reuse and conservation potential of the proposed action and each alternative. The magnitude of all impacts should be identified and the risks associated with such impacts assessed. The description of impacts should identify how short-term uses of the environment will affect long-term productivity of resources and identify any irreversible and irretrievable commitments of resources resulting from those uses.

Clarity of expression, logical thought processes, and rational explanations are far more important than length or format in the discussion of impacts. Subjective terms should be avoided. The analysis should lead to a pointed conclusion about the amount and degree of change (impact) caused by the proposed action and alternatives. To the extent possible, the level of certainty associated with such conclusions should be noted. The impact analysis may be either organized by alternative or by resource.

(3) Mitigation Measures. Analyze and describe any mitigation measures which could be implemented to avoid or reduce the projected impacts of the proposed action or alternatives. It is recommended that the discussion distinguish between those measures which the BLM has the authority and resources to enforce or implement and those which the BLM does not have the authority and resources to enforce or implement. Identify the effectiveness of the mitigation measures in reducing adverse impacts or enhancing beneficial impacts, including any residual impacts or unavoidable adverse impacts which remain after mitigation measures have been applied. Also identify any further impacts caused by the mitigation measures themselves. Where applicable, discuss the energy and natural or depletable resource requirements and conservation potential of mitigation measures as well as the reuse and conservation potential of mitigation measures associated with urban quality, historic and cultural resources and the design of the built environment.

i. Consultation and Coordination.

(1) Scoping. Briefly describe the scoping process, including efforts to involve the public in the preparation of the EIS. Summarize the results of scoping meetings and the use of comments received during the scoping process. Also identify agencies and organizations consulted during the scoping process and describe the results of coordination and consultation activities. Describe other surveys or studies required by law or executive order which have been satisfied and integrated with the EIS (40 CFR 1502.25).