IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MNS WIND COMPANY, LLC, a Delaware limited liability company, Plaintiff, | ) | CASE NO. 04-1569C |
| | ) | (Judge Wolski) |
| v. | ) | **MNS WIND COMPANY, LLC'S REPLY TO THE GOVERNMENT'S SUPPLEMENTAL RESPONSE BRIEF IN RESPONSE TO COURT'S OCTOBER 31, 2006 ORDER** |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

## INTRODUCTION

The following four points are either absent from or misrepresented in the Government's Supplemental Brief, and as a result, critically fatal to the Government's position that interference with radio frequency transmission is an "environmental" impact that may be considered under NEPA:

*First*, nowhere in its Supplemental Response Brief does the Government discuss *Western Radio Services Company, Inc. v. Espy*, 79 F.3d 8963 (9th Cir. 1996) ("Western Radio") – the only case directly on point that answers the Court's question whether interference with "radio frequency transmission" is an "environmental" harm that may be considered under NEPA. As discussed in detail in MNS' Supplement Response Brief, the Ninth Circuit, in *Western Radio*, concluded that interference with radio frequency transmission was not an "environmental impact" under NEPA. *Western Radio*, 79 F.3d at 903. The result in *Western Radio* is completely consistent with both the plain meaning of the NEPA statute (and its regulations), as well as the overwhelming case law applying NEPA.

*Second*, the Government misquotes section 1508.14 of the Code of Federal Register by omitting the second sentence of the regulation. Section 1508.14 provides, in full, as follows:

> "Human Environment" shall be interpreted comprehensively to include the *natural and physical* environment and the relationship of the people with that environment . . . ***This means that economic or social effects are <u>not</u> intended by themselves to require preparation of an environmental impact statement.***

40 C.F.R. § 1508.14 (emphasis added). This omission exposes the legal and factual flaw in the Government's position as the Government has never identified a primary impact of the wind farm project on the "natural or physical" environment.

*Third*, the language of section 1508.14 that was excluded by the Government is entirely consistent with the case law applying NEPA, including *Metropolitan Edison Co.* and *Image of Greater San Antonio, Texas*. Courts have concluded that NEPA does not address non-environmental issues such as a potential interference with radio frequency transmissions, but rather focuses solely upon potential impacts to the "physical environment." *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) ("NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the *physical environment*.") (emphasis added). Indeed, non-environmental issues may *only* be considered where they derive from a primary impact on the natural or physical environment. *See Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522-23 (5th Cir. 1978) (concluding that non-environmental factors can be considered *only* when an action will have a primary impact on the natural environment, but when the threshold requirement of a primary impact on the physical environment is missing, non-environmental factors are insufficient to trigger an agency's obligation to prepare an EIS under NEPA).

*Fourth*, the Government has *never* provided this Court with any authority supporting its *termination* of the NEPA process based solely upon a non-environmental impact, such as interference with radio frequency transmission.[1] In reality, this termination was for "national security" reasons, which should never have been resolved through the NEPA process, but rather in accordance with the national security termination clause in the contract.

## ARGUMENT

### A. NEPA'S PRIMARY FOCUS IS UPON POTENTIAL IMPACTS TO THE "PHYSICAL ENVIRONMENT."

*Western Radio* – the only case directly on point cited by either side – has made it clear that potential impacts to radio transmission frequencies or radio waves are not part of the physical environment nor was the potential impact "significantly affecting the quality of the human environment" (*see* 42 U.S.C. § 4332(2)(C)) under NEPA. It is undisputed that the Government terminated the NEPA process based solely upon a non-environmental impact. As discussed in detail in MNS' Supplemental Response Brief, the DOE actually terminated the NEPA process and the wind farm project because of the wind farm's perceived interference with the Air Force's *operations* at Nellis Air Force base, with potentially adverse impacts on "national security." Thus, the Government should not have considered this non-environmental impact without first establishing a primary impact upon the natural or physical environment.

---

[1] The Government offers inadmissible and irrelevant "examples" of other federal agencies' NEPA documents as "evidence" to support its conclusion that consideration of radio wave interference under NEPA is "commonplace." The "examples" the Government attaches in its Appendix of other agencies' NEPA documents that mention potential "radio spectrum interference" add nothing of substance to the Court's analysis of the question posed in its October 31, 2006 Order. Without the detailed facts and circumstances, these "examples" cannot be evaluated or analyzed , and are irrelevant both factually and legally.

As the Government must concede, NEPA requires federal agencies to focus on the "environmental" impact of their proposals and actions. *See* DOE's Supp. Brief at 2 (*citing Department of Transp. v. Public Citizen*, 541 U.S. 752, 756-57). Indeed, as discussed in detail in MNS' Supplemental Brief, the United States Supreme Court, based upon its analysis of the statute's legislative history, has held that NEPA was enacted solely to protect "*the air, land and water* which support life on earth." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (emphasis in original; internal citation and quotation marks omitted). Where the Government loses its way, however, is in its analysis of when a federal agency has the *discretion* to consider non-environmental impacts.

Non-environmental factors, such as potential effects of a project on radio waves or radio frequency transmissions, may *only* be considered where they actually derive from a primary impact on the natural or physical environment. This primary impact on the natural or physical environment is completely absent in this case with respect to the alleged interference with radio wave transmissions, as well as with respect to the national security concerns upon which the Government actually terminated the NEPA process in this case. As the Fifth Circuit held in *Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522-23 (5th Cir. 1978):

> We do not mean to say that socio-economic effects can never be considered under NEPA. When an action will have a primary impact on the natural environment, secondary socio-economic effects may also be considered. But when the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligation to prepare an EIS [under NEPA].

(Citations omitted).

The Sixth Circuit also held in *Breckinridge v. Rumsfeld*, 537 F.2d 864, 866 (6th Cir. 1976), that social and economic impacts – such as interference with radio wave transmissions and such as national security concerns – only have a place within the NEPA scheme when there is a primary impact on the physical environment: "Although factors other than the physical environment have been considered, this has been done only when there existed a primary impact on the physical environment."

In reaching this conclusion, *Breckinridge* relied on the same legislative history as the Supreme Court in *Metropolitan Edison Co*., namely "What is involved is a congressional declaration that we do not intend, as a government or as a people, to initiate actions which endanger the continued existence or the health of mankind: That we will not intentionally initiate actions which will do irreparable damage to the air, land, and water which support life on earth." *Id. Breckinridge* further clarified:

> In seeking to define the crucial term "the human environment," Senator Jackson stated: [¶] ["]Mr. President, there is a new kind of revolutionary movement underway in this country. This movement is concerned with the integrity of man's life support system-the human environment. 115 Cong.Rec. 40417 (1969).["] [¶] To extend the meaning of "the integrity of man's life support system" to apply to the factual situation involved in this case would distort the congressional intent.

*Id.* at 866-67. Here, the possible interference with Air Force radio wave transmissions or with national security simply does not affect the air, land or water (*i.e.*, nature's physical environment that supports life on earth), and is therefore a non-environmental, social or economic impact that by itself would not justify the preparation of an EIS.

The regulations implementing NEPA also support the view that social and economic impacts such as interference with radio wave transmissions only have a place within the NEPA scheme when there is a primary impact on the physical environment. The Council on Environmental Quality ("CEQ") enacted regulations which specifically provide that economic or social effects do not give rise to the NEPA requirements unless there are corresponding impacts on the physical environment:

> "Human Environment" shall be interpreted comprehensively to include the *natural and physical* environment and the relationship of the people with that environment . . . ***This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement.***

40 C.F.R. § 1508.14 (emphasis added).

The Government relies heavily on this regulation (*see* Defendant's Supplemental Brief at p. 3), but cites only the first half of the regulation. It omits the line stating that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement." 40 C.F.R. § 1508.14. This omission is also telling and exposes the legal flaw in the Government's position. The Government has never identified a primary impact of the wind farm project on the "natural or physical" environment. Indeed, in the Government's final public statement concerning the wind farm project, which was published in the Federal Register on January 10, 2003, the Government confirmed that its "*primary* concern was for significant adverse impacts to certain NTTR missions within the ranges surrounding the NTS." *See* 68 F.R. 1448-01, 2003 WL 69209 (Jan. 10, 2003).

What is even more egregious, however, is that the Government *terminated* the NEPA process based upon this non-environmental impact without ever demonstrating that such grounds

derived from a primary impact upon the natural or physical environment. In other words, the Government manipulated the NEPA process in a manner that completely circumvented any environmental consideration, a strategy that runs contrary to the true purpose of NEPA and its governing regulations. The Government should not be permitted to *terminate* or *cancel* the NEPA review process based solely upon a potential impact that has nothing to do with potential harm to the natural or physical environmental, as required by the case law and the NEPA regulations.

While the Government arguably has the *discretion* to consider non-environmental impacts (assuming they derive from a primary impact to the physical environment), the Government has never cited any authority that supports its *termination or cancellation* of the NEPA process based upon non-environmental impacts, such as potential impacts on radio frequency transmissions. That is because none exists. There is no statute, regulation or guideline that supports the Government's decision to terminate the NEPA process based solely upon non-environmental grounds. This is not surprising since that would undermine NEPA's mandate to examine and, in effect, to protect the natural or physical environment that sustains human life. Air Force operations and United States national security are simply not NEPA issues.

The Government's unauthorized, unsupported, and improper decision to cancel the NEPA process based solely upon a potential "non-environmental" impact is particularly damaging here, given that it is undisputed that the Government agreed to compensate MNS if the Government decided to terminate the wind farm project for national security reasons. As discussed in MNS' Opening Summary Judgment Brief at 17-19, the Government's conduct in terminating the NEPA process based solely on non-environmental grounds prevented the completion of the NEPA condition, and thus under basic contract law that condition has been eliminated, the Easement

was effective, and should have been terminated pursuant to the national security termination provision specifically negotiated by the parties and included in the agreements. Indeed, the Government materially breached these agreements by failing to compensate MNS.[2]

## B. THE "EXAMPLES" OF NEPA DOCUMENTS THE GOVERNMENT INCLUDES IN ITS APPENDIX ARE INADMISSIBLE AND IRRELEVANT, AND DO NOT ASSIST THE COURT'S ANALYSIS IN THIS CASE.

The "examples" the Government attaches in its Appendix of other agencies' NEPA documents that mention potential "radio spectrum interference" add nothing of substance to the Court's analysis of the question posed in its October 31, 2006 Order. First, for the reasons cited in MNS' Objection to Evidence, filed concurrently herewith, the entire Appendix is inadmissible and should be stricken from the record. Second, it is entirely unclear from the "examples" attached whether: (1) the agency had the right to terminate the project for convenience regardless of whether the reason was based upon environmental or non-environmental issues; (2) the agency *terminated or cancelled* the proposed project based solely upon potential impacts to "national security;" (3) despite the alleged interference with radio waves, the agency nevertheless "completed" the NEPA process by issuing a final decision; and (4) the parties agreed that the federal agency would compensate the private developer if the agency terminated the project for

2 Contrary to the Government's argument, MNS did not expect the agency "to reach a particular result" in the NEPA process, i.e., approve the wind farm project. What MNS expected was the Government to base its NEPA decision on potential impacts to the "physical environment," and not upon a "non-environmental" issue such as interference with Air Force operations because the parties had expressly agreed that if the Government had to terminate the project based upon the Air Force's national security concerns, the Government would compensate MNS.

"national security" reasons. Without knowing the answers to these questions, the "examples" provided by the Government are not helpful, cannot be analyzed and are irrelevant.

## CONCLUSION

MNS has shown in its Supplemental Brief and this Reply that "potential interference of the proposed wind turbines with the Air Force's radio frequency transmissions" is *not* an environmental factor that may properly be considered under NEPA. The only case on point, *Western Radio Services Company, Inc. v. Espy*, 79 F.3d 8963 (9th Cir. 1996), ("Western Radio") – conclusively answers the Court's question. In contrast, the Government, in its papers has: (1) failed to address *Western Radio*; (2) misquotes section 1508.14 of the C.F.R.; (3) failed to provide any authority for its decision to *terminate* the NEPA process based solely upon an alleged non-environmental impact; and (4) cited inadmissible and irrelevant "evidence."

This Court should reject the Government's latest attempt to avoid the obvious – the Government *terminated* the NEPA process and the wind project farm project, not for any environmental reasons, but rather based solely upon the wind farm project's potential adverse impacts to the Air Force's operations at Nellis Air Force base, that is to say, for "national security" reasons. Indeed, it is an undisputed fact in this case that the Government terminated the NEPA process and the wind farm project "because of possible national security concerns." MNS' Uncontroverted Fact,¶ 12 (Undisputed by the Government).

In light of the overwhelming case law and the specific agreement signed by the parties in this case, it would be unjust and contrary to law for this Court to permit the Government to

manipulate the NEPA process in order to escape liability from its obligation to compensate MNS when this project was terminated for nation security reasons.

Dated: December 12, 2006

s/ George T. Caplan

George T. Caplan, Counsel of Record
KAYE SCHOLER LLP
1999 Ave. of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1285
*Attorneys for Plaintiff*
*MNS Wind Company, LLC*

CERTIFICATE OF FILING

I hereby certify that on December 12, 2006, a copy of the foregoing MNS' Supplemental Response Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Bryant S. Delgadillo